# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ANTHONY CABRAL,                       ) | |
|                                       ) | |
|        Petitioner,                    ) | |
|                                       ) | |
| v.                                    )    Civil Action No. 05-11069-PBS |
|                                       ) | |
| DAVID NOLAN,                          ) | |
|                                       ) | |
|        Respondent.                    ) | |
| _____ ) | |

## RESPONDENT'S APPENDIX ACCOMPANYING HIS MOTION TO DISMISS PETITION

Pursuant to this Court's Order dated May 24, 2005, the Respondent, David Nolan, Superintendent of the Massachusetts Correctional Institution at Cedar Junction (the "Respondent"), hereby files this Appendix containing documents relevant to the issue of whether Petitioner Anthony Cabral (the "Petitioner") previously exhausted available state remedies with respect to the matters raised by his habeas corpus petition (the "Petition"). The offering of such documents should not be construed as implying that the Respondent considers the Petitioner to have fully exhausted state remedies.

Specifically, attached hereto as exhibits are true and accurate copies of the following:

EXHIBIT A.      Initial docket in connection with Commonwealth v. Anthony Cabral, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("First Super. Ct. Docket");

EXHIBIT B.      Subsequently produced docket in connection with Commonwealth v. Anthony Cabral, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Second Super. Ct. Docket");

EXHIBIT C.    Docket in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. 2003-P-397 in the Massachusetts Appeals Court ("App. Ct. Docket");

EXHIBIT D.    Docket in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. FAR-14710 in the Massachusetts Supreme Judicial Court ("SJC Docket");

EXHIBIT E.    First indictment in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Indictment No. 1");

EXHIBIT F.    Second indictment in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Indictment No. 2");

EXHIBIT G.    Defendant's Motion to Suppress filed in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Def.'s Mot. Suppress");

EXHIBIT H.    Defendant's Memorandum in Support of Motion to Suppress filed in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Def.'s Mem. Supp. Mot. Suppress");

EXHIBIT I.    Order on Defendant's Motion to Suppress in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court ("Order on Def.'s Mot. Suppress");

EXHIBIT J.        Order on Defendant's Motion to Extend Time for Filing Interlocutory

Appeal in connection with Commonwealth v. Anthony Cabral, Case No.

BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court

("Order on Def.'s Mot. Extend Time");

EXHIBIT K.        Defendant's Motion for Hearing Pursuant to Franks vs. Delaware filed in

connection with Commonwealth v. Anthony Cabral, Case No.

BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court

("Def.'s Mot. Franks Hr'g");

EXHIBIT L.        Defendant's Memorandum in Support of His Motion for Hearing Pursuant

to Franks vs. Delaware filed in connection with Commonwealth v.

Anthony Cabral, Case No. BRCR1999-00228 in the Bristol County,

Massachusetts, Superior Court ("Def.'s Mem. Supp. Mot. Franks Hr'g");

EXHIBIT M.        Order on Defendant's Motion for Hearing Pursuant to Franks vs.

Delaware in connection with Commonwealth v. Anthony Cabral, Case No.

BRCR1999-00228 in the Bristol County, Massachusetts, Superior Court

("Order on Def.'s Mot. Franks Hr'g");

EXHIBIT N.        Brief of Defendant/Appellant filed in connection with Commonwealth v.

Anthony Cabral, Case No. 2003-P-397 in the Massachusetts Appeals

Court ("Def.'s Br. to App. Ct.");

EXHIBIT O.        First Supplemental Brief of Defendant/Appellant filed in connection with

Commonwealth v. Anthony Cabral, Case No. 2003-P-397 in the

Massachusetts Appeals Court ("Def.'s First Supp. Br. to App. Ct.");

3

EXHIBIT P. Second Supplemental Brief of Defendant/Appellant filed in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. 2003-P-397 in the Massachusetts Appeals Court ("Def.'s Second Supp. Br. to App. Ct.");

EXHIBIT Q. Commonwealth's Brief and Record Appendix filed in connection with <u>Commonwealth v. Anthony Cabral</u>, Case No. 2003-P-397 in the Massachusetts Appeals Court;

EXHIBIT R. <u>Commonwealth v. Cabral</u>, 62 Mass. App. Ct. 1111, 818 N.E.2d 640 (2002), the decision of the Massachusetts Appeals Court in connection with Case No. 2003-P-397;

EXHIBIT S. <u>Commonwealth v. Cabral</u>, 444 Mass. 1101, 826 N.E.2d 201 (2004), the table decision of the Massachusetts Supreme Judicial Court in connection with Case No. FAR-14710;

EXHIBIT T. Application for Further Review filed in connection with <u>Commonwealth v. Cabral</u>, Case No. FAR-14710 in the Massachusetts Supreme Judicial Court; and

EXHIBIT U. Memorandum of Law in Support of Petitioner's Application for Further Review filed in connection with <u>Commonwealth v. Cabral</u>, Case No. FAR-14710 in the Massachusetts Supreme Judicial Court.

Respectfully submitted,

THOMAS F. REILLY
Attorney General


 /s/ Randall E. Ravitz
Randall E. Ravitz (BBO # 643381)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200, ext. 2852

Dated:  June 30, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on June 30, 2005, by first-class mail, postage prepaid, upon:

Anthony Cabral
W-70469
MCI – Cedar Junction
P.O. Box 100
South Walpole, MA  02071

pro se


 /s/ Randall E. Ravitz
Randall E. Ravitz

COMMONWEALTH OF MASSACHUSETTS

# APPEALS COURT

BRISTOL, ss.                                    NO. 2003-P-397

---

### COMMONWEALTH OF MASSACHUSETTS,
APPELLEE,

v.

### ANTHONY CABRAL,
DEFENDANT/APPELLANT.

---

ON APPEAL FROM JUDGMENTS BY
THE BRISTOL DIVISION OF
THE SUPERIOR COURT DEPARTMENT

---

### BRIEF AND APPENDIX FOR THE DEFENDANT/APPELLANT

---

ANTHONY CABRAL
By his attorney,
SANDRA P. WYSOCKI CAPPLIS
BBO # 638177
WYSOCKI CAPPLIS LAW OFFICE
P.O. Box 83
Milton, MA 02186
617-698-1399

October 24, 2003

# Table of Contents

Table of Contents ................................ i

Table of Authorities ........................... ii

Preface ......................................... 1

Questions Presented ............................. 2

Prior Proceedings ............................... 2

Statement of Facts .............................. 6

Arguments ...................................... 10

I.    THE MOTION JUDGE ERRONEOUSLY ALLOWED CABRAL
      TO REPRESENT HIMSELF BECAUSE CABRAL DID NOT
      WAIVE HIS RIGHT TO COUNSEL ............... 10

II.   THE TRIAL JUDGE DEPRIVED CABRAL OF A FAIR
      TRIAL BECAUSE HE FAILED TO RULE ON CABRAL'S
      REQUESTS FOR JURY INSTRUCTIONS PRIOR TO
      CLOSING ARGUMENTS ........................ 20

III.  CABRAL'S STATE AND FEDERAL CONSTITUTIONAL
      RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S
      ERRONEOUS DENIAL OF HIS MOTION TO DISMISS
      DUE TO THE LOSS OR DESTRUCTION OF EVIDENCE.23

IV.   CABRAL'S STATE AND FEDERAL CONSTITUTIONAL
      RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S
      ERRONEOUS DENIAL OF HIS SEARCH SUPPRESSION
      MOTION ................................... 24

V.    CABRAL'S STATE AND FEDERAL CONSTITUTIONAL
      RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S
      ERRONEOUS DENIAL OF HIS SALMAN MOTION ..... 25

VI.   CABRAL'S STATE AND FEDERAL CONSTITUTIONAL
      RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S
      ERRONEOUS DENIAL OF HIS FRANKS MOTION ..... 25

VII.  CABRAL'S STATE AND FEDERAL CONSTITUTIONAL
      RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S
      ERRONEOUS DENIAL OF HIS IDENTIFICATION
      MOTION ................................... 26

Conclusion ..................................... 27

Addendum ...................... follows Conclusion

## Table of Authorities

### RULES

Massachusetts Rule of Criminal Procedure 24(b) ........ 20-21

### CASES

Commonwealth v. Adams, 34 Mass. App. Ct. 516 (1993) ... 21-22

Commonwealth v. Appleby, 389 Mass. 359, (1983) ....... *passim*

Commonwealth v. Barnes, 399 Mass. 385 (1987) .......... 12-13

Commonwealth v. Bowden, 379 Mass. 472 (1980) ............. 21

Commonwealth v. Britto, 433 Mass. 596 (2001) .......... 18-19

Commonwealth v. Cavanaugh, 371 Mass. 46, 53 (1976) 11, 17-18

Commonwealth v. Chapman, 8 Mass. App. 260 (1979) ........ 11

Commonwealth v. Chavis, 415 Mass. 703 (1993) .......... 18-19

Commonwealth v. Cordle, 412 Mass. 172 (1992) ............. 22

Commonwealth v. Green, 27 Mass. App. Ct. 762 (1989) ...... 20

Commonwealth v. Jackson, 376 Mass. 790(1978). ..... 12-13, 19

Commonwealth v. Lee, 394 Mass. 209, 216-17 (1985) ........ 13

Commonwealth v. Moran, 17 Mass. App. Ct. 200 (1983) ..11, 18

Commonwealth v. Mott, 2 Mass. App. Ct. 47 (1974) ..... *passim*

Commonwealth v. Powers, 420 Mass. 410 (1995) ........ 10, 13

Commonwealth v. Salman, 387 Mass. 160 (1982) .......... 5, 25

Commonwealth v. Tuitt, 393 Mass. 801 (1985) .......... 11, 18

Faretta v. California, 422 US. 806 (1976) ........ 11-12, 19

Franks v. Delaware, 438 U.S. 154 (1978) .......... 6, 25-26

Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ............. 13

Maynard v. Meachum, 545 F.2d 273, 277 (1st Cir. 1976) . 11-13

United States v. Halbert, 640 F.2d 1000 (9th Cir. 1973) .. 11

### OTHER AUTHORITIES

SMITH, CRIMINAL PRACTICE AND PROCEDURE (2d ed. Supp. 1992) ... 21-22

COMMONWEALTH OF MASSACHUSETTS

# APPEALS COURT

BRISTOL, ss.                                    NO. 2003-P-397

---

### COMMONWEALTH OF MASSACHUSETTS,
APPELLEE,

v.

### ANTHONY CABRAL,
DEFENDANT/APPELLANT.

---

ON APPEAL FROM JUDGMENTS BY
THE BRISTOL DIVISION OF
THE SUPERIOR COURT DEPARTMENT

---

### BRIEF FOR THE DEFENDANT/APPELLANT

---

### PREFACE

I, Sandra P. Wysocki Capplis, have been assigned by the Committee for Public Counsel Services as counsel on appeal for the defendant. Arguments III-VII of the defendant's brief has been included at the defendant's insistence. In accordance with Commonwealth v. Moffett, 383 Mass. 201, 208 (1981), I find it necessary to dissociate myself from Arguments III-VII of the defendant's brief.

Attorney for the defendant,

*Sandra P. Wysocki Capplis*

Sandra P. Wysocki Capplis
BBO # 638177
WYSOCKI CAPPLIS LAW OFFICE
P.O. Box 83
Milton, MA 02186
617-698-1399

1

## QUESTIONS PRESENTED

I.   **WHETHER THE MOTION JUDGE ERRONEOUSLY ALLOWED CABRAL TO REPRESENT HIMSELF BECAUSE CABRAL DID NOT WAIVE HIS RIGHT TO COUNSEL?**

II.  **WHETHER THE TRIAL JUDGE DEPRIVED CABRAL OF A FAIR TRIAL BY FAILING TO RULE ON CABRAL'S REQUESTS FOR JURY INSTRUCTIONS PRIOR TO CLOSING ARGUMENTS?**

III. **WHETHER CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS MOTION TO DISMISS DUE TO THE LOSS OR DESTRUCTION OF EVIDENCE?**

IV.  **WHETHER CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS SEARCH SUPPRESSION MOTION?**

V.   **WHETHER CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS SALMAN MOTION?**

VI.  **WHETHER CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS FRANKS MOTION?**

VII. **WHETHER CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS IDENTIFICATION MOTION?**

## PRIOR PROCEEDINGS

The July 1999 sitting of the Bristol County Grand Jury indicted Anthony Cabral ("Cabral"), the defendant/appellant, for two counts of Armed Robbery While Masked (Indictment Nos. 9973CR0228A-B) (G.L. c. 265, § 17)

2

(RA at 1)[1].

On January 9, 2002, the Superior Court (Tierney, J.), allowed the Commonwealth's request to <u>nolle</u> <u>prosequi</u> the second count charging Armed Robbery While Masked in violation of G.L. c. 265, § 17 (RA at 8; Tr.I at 4). From January 9 to 11, 2002, Cabral stood trial on the remaining indictment before Judge Tierney and a jury in the Bristol Superior Court (RA at 8; Tr.I-III <u>et</u> <u>seq.</u>). On January 11, 2002, the jury found Cabral guilty of the lesser included offense of unarmed robbery in violation of G.L. c. 265, § 17, and, at the request of the Commonwealth, Judge Tierney continued the matter to January 25, 2002 for sentencing (RA at 8; Tr.III at 144-46). On January 25, 2002, Judge Tierney sentenced Cabral to serve a term of commitment at MCI-Cedar Junction of not more than ten years nor less than eight years (RA at 8; Tr.S. at 11).

On December 6, 1999, pursuant to the Superior Court Rules of Evidence Cabral filed a handwritten Motion to Preserve Evidence seeking to preserve all audio tapes,

---

[1] Citations herein appear abbreviated as follows:   Addendum as (Add. at [page]); Record Appendix as (RA at [page]); "Lost Evidence Hearings' as (LEH.[vol.] at [page]); "Search Suppression Hearings" as (SSH.[vol.] at [page]); "<u>Salman</u> Hearing" as (SH at [page]); "Burnes Hearing" as (BH at [page]); January 9 to 11, 2002 Trial as (Tr.[volume] at [page]); and January 25, 2002 Sentencing Hearing as (St.H at [page]).

specifically dispatch transmissions from the Fall River Police Department on June 21, 1999 between the hours of 6:00 a.m. and 8:00 a.m. (RA at 1, 13-14). The Fall River Police Department ultimately failed to provide the recordings after first claiming they head been erased and ultimately claiming the recordings in question never existed due to malfunction of the tape recording equipment (RA at 16-17). Consequently, on June 27, 2000, pursuant to Mass. R. Crim. P. 13, the Massachusetts Declaration of Rights and the United States Constitution, Cabral moved to dismiss all indictments due to the loss or destruction of evidence ("Lost Evidence Motion") (RA at 2, 15-17). A hearing on the Lost Evidence Motion commenced on June 27, 2000 before the Superior Court (Nickerson, J.), and continued and concluded on July 11, 2000 (LEH.I & II et seq.). Following the hearing, the judge denied the Lost Evidence Motion and made findings of fact, rulings of law and order on the record (Add. at A).

On August 21, 2000, pursuant to Mass. R. Crim. P. 13, Article 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution, Cabral moved to suppress evidence obtained as a result of the searches of Cabral's automobile and home of John Kazen and subsequent arrest of Cabral ("Search Suppression

4

Motion") (RA at 2, 18-29). On August 21, 2000, the Commonwealth filed a Memorandum in Opposition to the Defendant's Motion to Suppress (RA at 2). A hearing on the Search Suppression Motion commenced on August 21, 2000 before the Superior Court, Toomey, J., continued on September 28-29, 2000 and concluded on November 8, 2000 (SSH I-IV et seq.). On December 14, 2000, the judge denied the Search Suppression Motion and made findings of facts and rulings of law (Add. at B).

On January 9, 2001, pursuant to Commonwealth v. Salman, 387 Mass. 160 (1982), Cabral filed a motion to dismiss, ("Salman Motion") (RA at 4, 3-49). On February 7, 2001, the Superior Court (McLaughlin, J.), held a hearing on the Salman Motion (SH et seq.) On March 13, 2001, the judge denied the Salman Motion and issued a Memorandum of Decision and Order (Add. at C).

On June 18, 2001, Cabral filed a moved to dismiss counsel and appoint new counsel ("Motion to Dismiss Counsel") (RA at 4, 50-55). On June 21, 2001, the Superior Court (Chin, J.), **without any** hearing, denied the Motion to Dismiss Counsel and **failed to make** findings of facts and rulings of law (Add. at D).

On August 27, 2001, Cabral filed a motion entitled Motion for Appearance of Counsel ("Counsel Motion") (RA at

5

4, 56-61) and moved for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) ("Franks Motion") (RA at 4, 62-73). On August 27, 2001, the Superior Court (Burnes, J.), held hearings on the Franks Motion and the Counsel Motion ("Burnes Hearing") (BH et seq.). On August 30, 2001, the judge denied the Franks Motion and made findings of facts and rulings of law (Add. at E). That same day, by separate decision, the judge allowed the Counsel Motion and made findings of facts and rulings of law (Add. at F).

In December 2001, Cabral moved to suppress evidence of any identification of him and filed two motions to that effect (collectively referred to as "Identification Motion") (RA at 7, 62-94 & 95-122). On December 3, 2001, the Superior Court (Kane, J.), held a hearing on the Identification Motion (IH et seq.). On January 3, 2002, the judge denied the Identification Motion and issued a Memorandum and Order ("Kane Order") (Add. at G).

On February 13, 2002, Cabral filed a notice of appeal from his conviction and this Court entered his appeal on its docket in April 2003 (RA at 12).

## STATEMENT OF FACTS

On Monday, June 21, 1999 at about 6:00 a.m. Rosemarie Hobbs ("Hobbs"), the store manager of the Mutual gas station and convenience store on Broadway in Fall River,

6

sat in her office at the back of the store counting the money from the weekend's sales (Tr.II at 21-23, 25, 28). Suddenly, a hooded or masked individual wearing black gloves and a tan winter jacket and work boots entered the office and squirted Hobbs in the face as she rose from her seat to flee (Tr.II at 29-30). Running from the room and wiping her eyes, Hobbs yelled to her coworker, Gloria Reardon ("Reardon"), "Hit the panic button. We're getting held up. We're getting out of here" (Tr.II at 29, 41). The two women ran from the building to a pickup truck screaming for help, never looking back or seeing the assailant exit (Tr.II at 41, 52-53). When Hobbs reached the truck she recognized Charles Moniz ("Moniz"), driving his car fast past the station down Broadway toward Bradford Avenue (Tr.II at 53).

Cabral was charged with the crime after the police arrested him in the second floor duplex apartment of his friend, John Kazan ("Kazan") of 181 Division Street in Fall River shortly after the incident (Tr.II at79-80, 110-12, 116-18, 210). Moniz, who is Kazan's cousin and who happened to live with his mother in the other apartment in the duplex at 181 Division Street, led police to the apartment after coming upon them searching a car (Tr.II at 79-80, 110-12, 116-18, 210). Moniz had followed Cabral to

7

the building, claiming that he saw a hooded or masked person wearing a beige winter jacket with something that looked like a gun and handbag, running out the Mutual gas station to an automobile on Bradford Avenue, remove the mask or hood and reveal his face, which Moniz recognized as Cabral (Tr.II at 82, 87-90, 92-93). When Moniz first saw police they were looking into the car Moniz claimed Cabral had driven from the gas station (Tr.II at 114-115). Upon reaching the automobile, the officers claimed that the front driver's door was open and a homemade Father's Day card displaying the name "Tony Cabral" was on the floor behind the driver's seat (Tr.II at 207-08, 248).

When the police entered Kazan's apartment, Kazan sat against the far wall and Cabral sat in the breakfast nook (Tr.II at 214). An officer went into one of the bedrooms and returned with a lady's pocketbook, which was later given to Hobbs (Tr.II at 220-21). The officers also seized a winter jacket, work boots, gloves, jeans, T-shirt, spray bottle, cigarette lighter (Tr.II at 223-25). The police arrested Cabral and Kazan and brought them to the police station (Tr.II at 227-28).

Eventually the police obtained a search warrant and returned to the apartment and, during a more thorough search, found a white plastic bag containing nearly Eight

Thousand Dollars ($8,000.00), the amount reported stolen from the gas station and some identification belonging to Hobbs (Tr.II at 228-29).

On April 10, 2001, attorney Daniel Rich ("Rich") was appointed to represent Cabral (RA at 5). On June 18, 2001, Cabral filed the Dismiss Counsel Motion seeking replacement to Rich with another attorney (RA at 5, 50-55). **Without hearing Cabral** the Superior Court (Chin, J.), denied the motion (Add. at D). On August 27, 2001, Cabral filed the Counsel Motion (RA at 5). On August 27, 2001, the Superior Court (Burnes, J.), briefly heard Cabral on this motion and, on August 30, 2001, allowed the Counsel Motion (BH at 25-29; Add. at F1). On September 11, 2001, Cabral returned to court on for hearings on other motions (which were **not** held) and apparently requested stand-by counsel[2] (Add. at

---

[2]Doreen at the Taunton Superior Court Clerk's Office informed counsel that after review of the file no transcript existed for this exchange. The docket sheet, while indicating that on September 11, 2001 Cabral filed Notice of Appeal regarding denial of motions to suppress and for reconsideration and, fails to indicate that Cabral appeared before Judge Nickerson on this date (RA at 10). The docket sheet also indicates that although hearings on all remaining motions were scheduled for September 11, 2001, "[e]vent not held-scheduled for another date" (RA at 10). When counsel questioned Doreen why no transcript existed for this date, she speculated that it was likely that the exchange leading to Judge Nickerson's order occurred off the record because the scheduled event was not held and at this point, Cabral was appearing without counsel.

F2). The Superior Court (Nickerson, J.), observed that Cabral had waived counsel before Judge Burnes, however "[i]n an abundance of caution" ordered stand-by counsel limited to advising Cabral as to matters affecting his defense (Add. at F2). Cabral's trial began on January 9, 2002, without further colloquy but with Cabral representing himself with appointed counsel present on a standby status (RA at 8; Tr.I-III et seq.).

Cabral filed written request for jury instructions pursuant to Mass. R. Crim. P. 24(b) (RA at 123-29), however, the judge did not inform the parties of his proposed action prior to closing arguments (Tr.III at 84, 105-10).

## ARGUMENTS

### I. THE MOTION JUDGE ERRONEOUSLY ALLOWED CABRAL TO REPRESENT HIMSELF BECAUSE CABRAL DID NOT WAIVE HIS RIGHT TO COUNSEL.

The motion judge's failure to conduct a "meaningful inquiry" into Cabral's motivation for filing the Counsel Motion constituted an abuse of discretion, and her subsequent decision to allow Cabral to proceed pro se deprived Cabral of his right to counsel. See Commonwealth

v. Mott, 2 Mass. App. Ct. 47, 52 (1974). The motion judge erred in allowing Cabral to represent himself because Cabral failed to make a knowing, intelligent, and voluntary waiver of counsel. Commonwealth v. Moran, 17 Mass. App. Ct. 200, 207 (1983). The Sixth and Fourteenth Amendments to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights guarantee a criminal defendant the correlative rights to self-representation and to representation by counsel. Faretta v. California, 422 US. 806, 815, 835 (1976); Maynard v. Meachum, 545 F.2d 273, 277 (1st Cir. 1976); Commonwealth v. Chapman, 8 Mass. App. 260, 265 (1979); see also Commonwealth v. Appleby, 389 Mass. 359, (1983); Commonwealth v. Cavanaugh, 371 Mass. 46, 53 (1976). However, "the right to represent oneself and the right to counsel are available only in the 'disjunctive.'" Commonwealth v. Tuitt, 393 Mass. 801, 807 (1985)(quoting United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir. 1973)). Accordingly, if defendant makes an effective waiver of counsel, he may not later urge that his right to the assistance of counsel was improperly denied. Id. at 807.

The right to conduct one's own defense "is not wholly unqualified." Mott, 2 Mass. App. Ct. at 51. Before a defendant may proceed without counsel he must make an

11

unequivocal request to do so in advance of trial, which, perhaps most important, must satisfy the judge "that the right is being exercised knowingly and intelligently, and not for an ulterior purpose." Id. A defendant must knowingly, intelligently, and voluntarily, waive counsel prior to representing himself, Maynard, 545 F.2d at 277, because a defendant proceeding pro se relinquishes many benefits associated with the right to counsel. Faretta, 422 U.S. at 835.

Therefore, the judge is required to "conduct some sort of inquiry [examining t]he motivation of the accused in making the request . . . and the accused should be apprised of the pitfalls in proceeding pro se." Mott, 2 Mass. App. Ct. at 51-52. At a minimum, a defendant must have "an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story." Maynard, 545 F.2d at 279; see Commonwealth v. Jackson, 376 Mass. 790, 795 (1978). "[T]he final question is whether his decision was understandingly and intelligently made: that is, did he make his choice 'with eyes open.'" Maynard, 545 F.2d at 278-79. The Supreme Judicial Court in Commonwealth v. Barnes, 399 Mass. 385 (1987) succinctly summarized the binding principles:

12

> We have not prescribed the questions that a judge must pose. . . nor is there any "particular piece of information that is essential to an effective waiver of counsel." Maynard, 545 F.2d at 279. The validity of a defendant's waiver depends on the particular facts and circumstances of each case. Johnson v. Zerbst, 304 U.S. 458, 464 (1938).
>
> The focus of [appellate] review is the defendant's subjective understanding of his decision and its consequences. See Commonwealth v. Lee, 394 Mass. 209, 216-17 (1985). We must be confident that the defendant was "adequately aware of the seriousness of the charges [and the potential penalties], the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation." Commonwealth v. Jackson, 376 Mass. 790, 795 (1978). In assuring ourselves of these concerns, we consider not only the trial record, but also the defendant's "background, experience and conduct," Maynard, 545 F.2d at 278. This includes "such factors as his involvement in previous criminal trials, his representation by counsel before trial, and the continued presence of advisory counsel at trial in determining whether he understood what he was getting into." Id. at 279.

Commonwealth v. Barnes, 399 Mass. 385, 390-91 (1987).

Recognizing his burden to establish the absence of a valid waiver of counsel, Cabral submits that burden will be met where, as here, the record is "barren of the showing that is necessary or would be necessary to conclude that the waiver was constitutionally effective." Maynard, 545 F.2d at 277. As grounds for his Counsel Motion, Cabral states in his supporting affidavit: "[t]he Court has refused to provide me with adequate counsel. I have no

13

choice but to represent myself" (RA at 57-58). Cabral had previously, in his Dismiss Counsel Motion, indicated that he sought a new attorney due to a breakdown in communication with Rich, their disagreements over strategy and Rich's failure to return Cabral's attempts to contact him (RA at 50-55). Immediately prior to hearing from Cabral at the Counsel Hearing in discussing Cabral's desires regarding pretrial motions, Rich stated:

> Judge, the trouble is every time I talk with him, he's disjointed. He mixes and matches his motions and his argument. **So, I'm not even sure what he wants.** This is forty-five pages, and it mentions McCarthy, Salman. **I have no clue** other than what you've already heard by the Court. I mean I'll stay in it. I'll talk with him. A couple of times **we've had arguments, some severe arguments.** That's why he says I'm his version of ineffective. Sometimes I don't want to file things that I ended up filing on his behalf, but **I did it because I wanted to move the case through the system.** Maybe I shouldn't, but that's what has happened. I will sit down. I will talk with him again.

(BH at 24-25) (emphasis added). The following exchange occurred at the Counsel Hearing:

> COURT:    Mr. Cabral, I have your motion for -- which you call motion for appearance of counsel where you request to represent yourself. I think that's what you're representing -- what you're requesting; is that right?
>
> CABRAL:    Yes, your Honor.
>
> COURT:    I have also your motion that was filed back in June, on June 10th, 2001, so a little over two months ago, where you made a motion to

14

dismiss counsel and asked for the appointment of new counsel; and that was heard by Judge Chin and denied. is there additional information that I need to know other than what you put in your June motion in order to evaluate your motion to appear for yourself?

CABRAL:   I don't quite understand the question, your Honor.

COURT:   Well, in June you gave Judge Chin a number of reasons why you wanted to have Mr. Rich dismissed and why you wanted new counsel appointed. Now, since then has anything else happened between then and now that would support your motion to dismiss Mr. Rich?

CABRAL:   Yes, your Honor.

COURT:   What is that?

CABRAL:   You Honor, I asked Mr. Rich a numerous amount of times to file motions, a discovery motion, a Franks motion. I provided him with these motions. To do it to my expectations as far as not deleting anything or make any additions that he wishes to. He refuses to do it in that manner. He has told me a numerous amount of times that he would not file the motions the way I wanted to. He was -- these procedures has been put off a number of times now waiting for the transcripts of the suppression hearing for defense. Counsel told me two and a half weeks ago that he would be up to see me with these transcripts to provide me with a copy. Still no copies, your Honor. Defendant has no choice in the matter but to represent himself because the Court refuses to give him adequate, counsel, effective assistance of counsel.

COURT:   Well, sir, I need to know in order to decide this motion what it is that you say Mr. Rich has failed to do.

CABRAL:   He's prejudiced.

COURT:   Not just what your standards are, but

15

why do you say he has not met the standard of the
ordinary competent criminal defense lawyer?  You
say he's not communicating with you?

CABRAL:  Lack  of  communication,  breakdown  of
communication, no communication.  He's prejudiced
to the defense.

COURT:   I need --

CABRAL:   He's not working in his best interests.

COURT:   Sir,  I  need  some  facts.   What  other
than what you have put in your affidavit back in
June do you say Mr. Rich has failed to do?  You
filed an affidavit back in June saying what it
was that you said Mr. Rich failed to do.  What
has he failed to do?  Is there any more I need to
know?

CABRAL:   Mr. Rich fails to adequately represent
the defendant.  And if the Court will not provide
him  with  counsel,  the  defendant  wishes  to
represent himself.

COURT:   That's  what  you  have  to  say  on  this
motion, correct?

CABRAL:   The motion for --

COURT:   Now.   That's  what  you're  saying  in
support  of  your  motion  to  represent  yourself?
Anything  else?   Anything  else  that  I  need  to
know?

CABRAL:   No your Honor.

COURT:   Okay.  I'll take that under advisement.
Let's get a new date for any outstanding motions.

(BH at 25-29).  On September 11, 2001, when Cabral appeared

in court acting pro se for the first time, he apparently

asked the court to provide stand-by counsel (Add. at F2; RA

at 10).   During his closing argument at trial Cabral

16

informed the jury:

> I have tried to do the best I can.  I have never
> done this before, but I have my reasons I had to.
> Seems like no one else is going to do it.  I have
> to defend myself.

(Tr.III at 93).  Finally, during sentencing, when the judge

sentenced Cabral, although charged with masked, armed

robbery he **was convicted of the lesser included offense of**

**unarmed robbery**, based on the fact that

> [y]ou went into a place where you were used to
> going three or four times a day, to people that
> befriended you, and you went in and held them up
> **with a mask.  You were found guilty of unarmed**
> **robbery**, but it would be the most serious type of
> unarmed robbery.  **You had a mask, you have a gun,**
> **even though the jury didn't find that[,]**

Cabral made no objection, even though this was an

impermissible basis upon which to sentence Cabral (St.H. at

12) (emphasis added).[3]  As indicated above, Cabral's conduct

and statements, during and after the Counsel Hearing,

during the course of trial and at sentencing establish

Cabral's continued desire to be represented by counsel and

his acknowledgment of his inability to properly defend

himself.  See Cavanaugh, 371 Mass. at 55.

The record is devoid of any indication that Cabral

---

[3]Cabral does not on appeal challenge the correctness of the
basis for the judge's sentence, electing rather to raise
this issue in a motion to revise and revoke before the
Superior Court.

made the required **unequivocal request** to represent himself.

See Mott, 2 Mass. App. Ct. at 51. "[I]nsistence on obtaining a new lawyer is not necessarily either a waiver of the right to counsel, or an indication of a desire to proceed alone." Cavanaugh, 371 Mass. at 55. At bar, the judge must give the defendant an opportunity to articulate reasons for requesting new counsel and must appoint a new attorney where a defendant shows "good cause" for removing current counsel, such as "a conflict of interest, incompetence of counsel or an irreconcilable breakdown in communication" Commonwealth v. Chavis, 415 Mass. 703, 712 (1993); see Commonwealth v. Britto, 433 Mass. 596, 600-01 (2001). The judge abused her discretion in failing to make any attempt at determining whether Cabral was entitled to receive appointment of a new attorney. Tuitt, 393 Mass. at 804; Moran, 388 Mass. 659.

Rather than support a finding that Cabral **unequivocally** requested to represent himself, the record supports not only that Cabral sought to receive an new attorney, but also, in light of Rich's statements to the judge, that good cause for granting such request existed. See Chavis, 415 Mass. at 712; Britto, 433 Mass. at 600-01. Rich's statements that "I'm not even sure what he wants. . . . I have no clue other than what you've already heard. .

18

. . we've had arguments, some severe arguments. . . . I did it because I wanted to move the case through the system" indicate a conflict of interest, incompetence of counsel and an irreconcilable breakdown in communication (BH at 24-25). See Chavis, 415 Mass. at 712; Britto, 433 Mass. at 600-01.

Moreover, "the judge failed to conduct a colloquy to set out on the record [Cabral's] understanding of the charges against him or the penal consequences to him if he should be found guilty; nor did the judge interrogate [Cabral] to ascertain his understanding 'of the pitfalls in proceeding pro se.'" Mott, 2 Mass. App. Ct. at 52. Cabral was not "adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation." Jackson, 376 Mass. at 795. The record is devoid of information supporting the judge's finding that Cabral waived his right to counsel, the record makes abundantly clear Cabral's desire to be represented by counsel based upon his recognized inability to properly conduct his defense himself. The record shows that the defendant was not "literate" and "understanding" in the sense that is necessary to make an effective waiver of counsel. Faretta, 422 US. at 815.

19

The judge's finding that Cabral's waived his right to counsel was unjustified and unsupportable on the record and under the circumstances described above. Rather than establish that Cabral knowingly, intelligently and voluntarily waived counsel, the record and the particular facts and circumstances regarding Cabral's background, experience and conduct here contradict the judge's finding that Cabral waived his right to counsel (BH at 25-28). Accordingly, the judge's failure to conduct a meaningful inquiry into Cabral's motivation for filing his Counsel Motion constituted an abuse of discretion and her subsequent decision to allow Cabral to represent himself deprived Cabral of his right to counsel.

## II. THE TRIAL JUDGE DEPRIVED CABRAL OF A FAIR TRIAL BY FAILING TO RULE ON CABRAL'S REQUESTS FOR JURY INSTRUCTIONS PRIOR TO CLOSING ARGUMENTS.

Massachusetts Rule of Criminal Procedure 24(b) provides, in pertinent part that:

> [a]ny party may file written requests that the judge instruct the jury on the law as set forth in the requests. the judge shall inform counsel of his proposed action upon requests prior to their arguments prior to their arguments to the jury.

Mass. R. Crim. P. 24(b) . Judicial compliance with the requirements of Rule 24(b) is mandatory. Commonwealth v. Green, 27 Mass. App. Ct. 762, 771 (1989). The defense "is

20

entitled to know the Judge's treatment of each proposed request in order that counsel may frame their closing arguments accordingly." Id. at 771 (quoting SMITH, CRIMINAL PRACTICE AND PROCEDURE, §1845 (1983)). In his request for jury instructions, Cabral included "an instruction based upon the principle discussed in Commonwealth v. Bowden, 379 Mass. 472, 485-86 (1980), viz., that the jury be permitted to consider deficiencies in the police investigation of the crime." Commonwealth v. Adams, 34 Mass. App. Ct. 516, 517 (1993).

In Adams, this Court reminded

> counsel to take seriously the advocate's responsibility as an officer of the court to cause such matters-even if it necessitates a respectful reminder to the judge-to be place on the record. The prevention of error is not solely the responsibility of the trial judge.

Adams, 34 Mass. App. Ct. at 518. If a judge fails to confirm instructions is "incumbent upon counsel to make further inquiry." Id. at 518. The failure to give a requested jury instruction is reversible error only "if the requested instruction is (1) substantially correct, (2) was not substantially covered in the charge given to the jury, and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." Id. at

21

519 (quoting SMITH, CRIMINAL PRACTICE AND PROCEDURE, §1846 (2d ed. Supp. 1992)).

However, in violation of Rule 24(b), rather than "inform [the parties] of his proposed action on the requested instructions **prior to** the closing arguments to the jury," Adams, 34 Mass. App. Ct. at 517 (emphasis added), the judge ruled on the requested instructions **immediately following** the summations (Tr.III at 84, 105). From Cabral's opening, examination of the witnesses and his closing argument it is apparent that theory of defense was that he was the victim of a misidentification resulting from a biased Moniz hoping to protect his cousin and police ineptitude in handling the investigation (Tr.III at 85-96). However, the judge's failure instruct the jury in accordance with Cabral's request undercut the defense in that Cabral did not argue this to the jury. Recognizing the defendant's responsibility of urging the jury to draw "inferences favorable to the defendant . . . based on deficiencies in the police investigation," Commonwealth v. Cordle, 412 Mass. 172, 177 (1992), the absence of an instruction on this issue undercut the defense and prejudiced Cabral because he lacked the skill to adequately represent himself.

### III. CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS MOTION TO DISMISS DUE TO THE LOSS OR DESTRUCTION OF EVIDENCE.

On June 27 and July 11, 2002, the Superior Court (Nickerson, J.) held a hearing on Cabral's Lost Evidence Motion (LEH et seq.).  On May 11, 2002, Judge Nickerson denied the motion and issued the Nickerson Order (Add. at A).  The judge found that due to a malfunction of the Fall River Police Department's system for the tape recording of radio dispatch messages between the dispatcher and patrol officers, which tapes are referred to as "Turret tapes", no Turret tapes existed on June 21, 1999, the date of the offenses charged (Add at A).  The judge also found that Cabral failed to produce testimony or information by affidavit demonstrating any prejudicial effect resulting from the failure of taping (Add. at A).  It is Cabral's position that Judge Nickerson improperly refused to allow his Lost Evidence Motion.  Assuming arguendo that the judge erred in denying the Lost Evidence Motion, Cabral contends that the error deprived him of his state and federal constitutional rights.  Consequently, its is Cabral's contention that he is entitled to reversal of his conviction and dismissal of the indictments against him based on the Commonwealth's failure to provide the tapes.

23

### IV. CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS SEARCH SUPPRESSION MOTION.

A hearing on Cabral's Search Suppression Motion commenced on August 21, 2000 before the Superior Court (Toomey, J.), continued on September 28-29, 200 and concluded on November 8, 2000 (SSH I-IV et seq.). On December 14, 2002, Judge Toomey denied the Search Suppression Motion, and made findings of facts and rulings of law (Add. at B). The judge denied the Search Suppression Motion after finding that:

> the police entry and search of the motor vehicle was reasonable in light of the condition of the vehicle and the probable cause/exigent circumstances possessed by the officers, . . . the police entry into Kazen's apartment was supported by probable cause, exigent circumstances and consent, . . . items seized in the apartment were obtained incident to the lawful arrest of [Cabral], in plain view and in connection with a reasonable protective sweep of the apartment.

(Add. at B). It is Cabral's position that Judge Toomey improperly refused to allow the Search Suppression Motion. Assuming arguendo that the judge erred in denying the Search Suppression Motion, Cabral contends that the error deprived him of his state and federal constitutional rights and deprived him of a fair trial. Consequently, it is Cabral's contention that he is entitled to a new trial

without admission of the illegally seized evidence he
sought to suppress in the Search Suppression Motion.

### V. CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS SALMAN MOTION.

On February 7, 2001, the Superior Court (McLaughlin,
J.), held a hearing on Cabral's Salman Motion (SH et seq.)
On March 13, 2001, Judge McLaughlin denied the Salman
Motion and issued the McLaughlin Order (Add. at C).  The
judge found that no false information was provided to the
grand jury (Add. at C).  It is Cabral's position that Judge
McLaughlin improperly refused to allow the Salman Motion.
Assuming arguendo that the judge erred in denying the
Salman Motion, Cabral contends that the error deprived him
of his state and federal constitutional rights.
Consequently, its is Cabral's contention that he is
entitled to reversal of his conviction and dismissal of the
indictments against him based on the erroneous denial of
his Salman Motion.

### VI. CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS FRANKS MOTION.

On August 27, 2001, the Superior Court (Burnes, J.),
held a hearing on Cabral's Franks Motion (BH et seq.).  On
August 30, 2001, Judge Burnes denied the Franks Motion and
made findings of facts and rulings of law (Add. at E).  The

25

judge found that Cabral failed to show "that the misstatements, if any, on the affidavit in support of the application for the search warrant were intentionally or recklessly made but in any case, probable cause existed for issuance of the search warrant even without these statements" (Add. at E).    It is Cabral's position that Judge Burnes improperly refused to allow the <u>Franks</u> Motion. Assuming <u>arguendo</u> that the judge erred in denying the <u>Franks</u> Motion, Cabral contends that the error deprived him of his state and federal constitutional rights. Consequently, its is Cabral's contention that he is entitled to a new trial without admission of the evidence obtained in violation of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

**VI.  CABRAL'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE ABRIDGED BY THE SUPERIOR COURT'S ERRONEOUS DENIAL OF HIS IDENTIFICATION MOTION.**

On December 3, 2001, the Superior Court (Kane, J.), held a hearing on the Identification Motion (IH <u>et</u> <u>seq</u>.). On January 3, 2002, Judge Kane denied the Identification Motion and issued  the Kane Order (Add. at G).    The judge found that the identification was not unnecessarily suggestive (Add. at G).    It is Cabral's position that Judge Kane improperly refused to allow the Identification Motion. Assuming <u>arguendo</u> that the judge erred in denying the

26

Identification Motion, Cabral contends that the error deprived him of his state and federal constitutional rights. Consequently, it is Cabral's contention that he is entitled to a new trial without admission of the identification evidence.

## CONCLUSION

For all of the foregoing reasons, this Court should reverse Cabral's conviction and remand the matter to the Superior Court for a new trial or other disposition.

Respectfully submitted,
Defendant/Appellant
ANTHONY CABRAL,
By his attorney,

Sandra P. Wysocki Capplis
BBO # 638177
WYSOCKI CAPPLIS LAW OFFICE
P.O. Box 83
Milton, MA 02186
617-698-1399

Dated:  October 24, 2003

27



BRISTOL, SS SUPERIOR COURT
**FILED**

JUN 2 7 2000

MARC J. SANTOS, ESQ.
**CLERK/MAGISTRATE**

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

Superior Court
Indictment #9973CR0228

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Commonwealth

v.                                                          Motion To Dismiss

Anthony Cabral
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Now comes the defendant, by his attorney, and moves pursuant to
Mass.R.Crim.P. 13, the Massachusetts Declaration of Rights and the United States
Constitution, that the Court dismiss all pending indictments in this matter due to
the loss or destruction of evidence by the Commonwealth.

As grounds therefore, the defendant has suffered the loss of potentially
exculpatory evidence, as appears from the attached affidavit. Commonwealth v
Sasville 35 Mass. App. Ct. 15, 616 N.E.2d 476

By His Attorney,

Stephen C. Nadeau
190 Rock Street, P.O. Box 3128
Fall River, MA 02722
(508) 679-2330
BBO# 366300

*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330

**Addendum A**

BRISTOL, SS SUPERIOR COURT
FILED

JUL 1 4 2000

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss                                           SUPERIOR COURT

Indictment No. 9973CR0~~22A~~-B    *228*

COMMONWEALTH OF MASSACHUSETTS

vs.

ANTHONY CABRAL

BEFORE:  Honorable Gary A. Nickerson

FINDINGS OF FACTS AND RULING
MOTION TO DISMISS

**APPEARANCES:**

**David L. Crowley, Assistant District Attorney,**
Bristol District, 888 Purchase Street, New Bedford,
Massachusetts 02740, for the Commonwealth.

**Stephen C. Nadeau, Esq.,** 190 Rock Street, Fall
River, Massachusetts 02722, for the Defendant.

New Bedford Superior Courthouse
New Bedford, Massachusetts
Tuesday, May 11, 2000

MARILYN SILVIA
Official Court Reporter

## P R O C E E D I N G S

THE COURT:  This matter came before the Court for hearing on the defendant's motion to dismiss.  The Court commenced the hearing initially on June 27th.  The hearing was suspended later that day until today, July 11th.  The only witness presented was Albert Marques.  The Court received exhibits during the course of the hearing and the Court received the affidavit in support of the motion to dismiss as well as the argument and representations of counsel in this matter.

Based on all of the credible evidence, the Court enters the following Findings of Fact, Rulings of Law, and the Order on the motion:

With regard to findings of fact, the Court determines that in 1999 the Fall River Police Department maintained a system at police headquarters for the taping of radio dispatch messages between the dispatcher and patrol officers.  Such dispatches and the tapes that result are sometimes referred to as "turret tapes."

For a period of time during late June and early July of 1999, the taping system

malfunctioned as the result of a fault in the hard drive component of the system. The tape equipment was not recording on June 21, 1999, the date of the alleged offense. The tape before that date contains no recording material; in other words, the tape is blank. A malfunction of the tape equipment was discovered and subsequently repaired August 10, 1999. The tape equipment was functioning between July 12 and August 10. The reason for the resumption of the tape information on July 12 through August 10 was unknown to electrician Marques.

The Court did not receive testimony or information by affidavit demonstrating any prejudicial effect resulting from the failure of taping. The Court did receive representation from counsel in that regard.

With respect to Rulings of Law, the Court has found instructive Commonwealth versus Sasville, 35 Mass. Appeals Court 15; Commonwealth versus Gomes, 403 Mass. 258; Commonwealth versus Henderson, 411 Mass. 309. There's a particularly interesting footnote in the Gomes decision, Footnote 12 at page 276. Gomes deals with the failure of an expert witness to photograph a gel

plate for a scientific test.  In Footnote 12 the court in Gomes states:  "The defendant assumes that the Commonwealth's failure to photograph the test results is the equivalent of losing or destroying the evidence.  Although this assumption is open to question, we analyze the issue as though it is correct."

A similar query must be made in the present case.  Is the failure of an electronic or mechanical device equivalent to an officer losing or destroying evidence such as we see in Sasville, such as we see in Henderson.  This Court believes that it is not equivalent. Nonetheless, for the sake of our proceedings today, I will proceed with the assumption that it is.  The case law notes that:  While the defendant need not prove that the evidence lost or destroyed would have been exculpatory, the defendant must establish a reasonable possibility based on concrete evidence rather than a fertile imagination that access to the material would have produced evidence favorable to his cause.

The courts consistently request that a trial judge apply a balancing test.  But first the defendant must establish that it was

reasonably possible the destroyed evidence was exculpatory.  This Court has no framework placed before it in evidence that would permit that determination.  While counsel has made some representations concerning the utility of radio transmissions in a prospective hearing on the motion to suppress, even taking those assertions at their face value, they have not been detailed sufficiently for this Court to get over the first hurdle, which is the burden of the defendant to establish that it was reasonably possible that the destroyed evidence was exculpatory.  Even if we were to pass by that hurdle, as we did the first question of a mechanical failure being the equivalent of a human losing or destroying the evidence, even if we passed by both hurdles, the balancing test is not friendly to the defendant when applied in this case.

The question of culpability on the part of the Commonwealth is clear, there is no culpability, short of more detailed facts showing some gross failure on the part of the government to monitor the taping system, which, quite frankly, is not in evidence here.  There is no culpability shown today on the Commonwealth in

6

this matter.  Likewise.  The Court has no frame of reference to determine the prejudice to the defendant for the lack of turret tapes.

For the above reasons, it is ordered that the motion to dismiss be denied, and a copy of the Court's decision dictated into the record is to be made and placed with the case file.

7

## CERTIFICATE

I, Marilyn J. Silvia, Official Court Reporter, do hereby certify that the foregoing record, Pages 1 through 6, is a complete, accurate, and true transcription of my stenographic notes taken in the aforementioned matter to the best of my skills and ability.


_____
MARILYN J. SILVIA
Official Court Reporter

*HEARING ON MOTION TO DISMISS 6-27-00 Continued to 7/11/00*

## LIST OF EXHIBITS

9973-CR-0228
**Case Number**

COMMONWEALTH

vs.

ANTHONY CABRAL

| EXHIBITS | IDENTIFICATION |
|---|---|
| ① LETTER FROM ADA STAPLETON DATED 12-14-99 (FORMERLY MARKED "A-ID") | Ⓐ LETTER FROM ADA STAPLETON DATED 12-14-99 (LATER MARKED "EX. #1") |
| ② SERVICE REPORT | |
| 3A-3B) 2 CASSETTE TAPES | |
| ④ SUPPLEMENTARY REPORT | |

Judge: _NICKERSON, J._    P's Counsel: _D. CROWLEY_

(Asst.) Clerk _J. VINCENT (6/27/00) & TIERNEY (7/11/00)_

Stenographer: _L. SAVUSEN (6/27/00)_
_M. SILVIA (7/11/00)_    D's Counsel: _S. NADEAU_

*(#1.)*

*filed*

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                          SUPERIOR COURT
#9973CR0228

AUG 2 1 2000

*********************
COMMONWEALTH ... J. SANTOS, ESQ.
CLERK/MAGISTRATE

v.                                                   MOTION TO SUPPRESS

ANTHONY CABRAL
*********************

Now comes the defendant in the above entitled matter and moves,
pursuant to Mass.R.Crim.P. 13, the 14th Amendment to the U.S. Constitution,
Article XII of the Massachusetts Declaration of Rights, and all other applicabl
provisions of said Constitution and Declaration of Rights, that the items founc
a search of the defendant's automobile and the premises occupied by the
defendant on June 21, 1999 be excluded from evidence. The defendant furthe
moves to suppress all information, materials, identifications, statements or oth
evidence obtained subsequent to said searches.

As grounds therefore, the defendant states that:

1. The search of the automobile was without a warrant, and was not
within any recognized exception to the warrant requirement.

2. The search of the premises in which the defendant was an occupant
the time of his arrest was without a warrant, and was not within any recognize
exception to the warrant requirement. Additionally, the arrest of the defendan
was without probable cause.

3. Any information, statements, identifications or other evidence obta
subsequent to the search of the automobile and premises, including the later
search by warrant, are the "fruit of the poisonous tree" and must likewise be
excluded.

*Stephen C. Nadeau*
Attorney at Law
190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722

**Addendum B**

12/14/00 Having found that the police entry into the motor vehicle was reasonable in light of the condition of the vehicle and the probable cause/exigent circumstances possessed by the officers. Having found that the police entry into Farden's apartment was supported by probable cause, exigent circumstances and consent and warrant found that items seized in the apartment were obtained incident to the lawful arrest of D, in plain view and in connection with a reasonable protective sweep of the apartment, this motion to suppress the items found in the vehicle and in the apartment is denied. -DF [copy]

( #15 )

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT
#0073CR0288

– 9 2001

* * * * * * * * * * * * * * * * * * * * * * * * *

COMMONWEALTH,
                        Plaintiff

                                        MOTION TO DISMISS

VS.

ANTHONY CABRAL,
                        Defendant
* * * * * * * * * * * * * * * * * * * * * * * * *

     Now comes the defendant and moves that this Honorable Court dismiss all pending indictments in this matter.

     As grounds therefore the defendant states that the Commonwealth, through its agents, has introduced false and/or misleading testimony to the grand jury.  <u>Commonwealth v. Salman</u> 387 Mass. 160, 439 N.E.2d 245.

*After hearing and consideration thereof, this motion is DENIED (See Memorandum of Decision) (McLaughlin, J.) March 13, 2001*

                                        Anthony Cabral
                                        By his Attorney

                                        _____
                                        Stephen C. Nadeau
                                        190 Rock Street, PO Box 3128
                                        Fall River, MA 02722
                                        (508) 679-2330
                                        BBO#366300

Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330

**Addendum C**

*16.*

## COMMONWEALTH OF MASSACHUSETTS

**BRISTOL, SS.**                              **SUPERIOR COURT**
                                             **NO. 9973CR0228**



**COMMONWEALTH**

**V.**

**ANTHONY CABRAL**

### MEMORANDUM OF DECISION AND ORDER ON
### DEFENDANT'S MOTION TO DISMISS

The defendant moves to dismiss the indictment on the basis that false information was provided to the grand jury. In particular, the defendant references the differences between the testimony of the police officer at the grand jury and the testimony of a Mr. Moniz at the hearing on a motion to suppress.

Whether Mr. Moniz first communicated with the police officer at the scene of the robbery or when the police officer was searching the defendant's motor vehicle is immaterial. The circumstances in which the officer found the vehicle fully warranted a search such as was in fact conducted. From that investigation, the officers learned the identity of the defendant, a person about whom at least one officer had prior knowledge. The difference between the officer's testimony before the grand jury as to his conversation with Mr. Moniz and the synopsis of Mr. Moniz's testimony given at the motion to suppress, which was provided to support this motion, are not critical. Mr. Moniz apparently agreed there was a conversation near the vehicle and, by omission from the defendant's synopsis,

2

identified the house into which the defendant had gone.

That a civilian unused to events such as occurred on that date would have a different memory of them than that of a police officer is to be expected. This motion does not present a situation where an agent of the Commonwealth knowingly gave false information to a grand jury in order to obtain an indictment. Commonwealth v. Reddington, 393 Mass. 315, 319-20 (1985); Commonwealth v. Salman, 387 Mass. 160 (1982). In context, the differences in the memories of the two individuals was not substantial or material.

## ORDER

Accordingly, defendant's motion to dismiss is hereby DENIED.

David A. McLaughlin,
Justice of the Superior Court

DATED: March 13, 2001

Commonwealth of Massachusetts

Bristol                                      New Bedford
                                             Superior Court

Commonwealth
        V.                          Dkt.# 99T3CRO228
Anthony Cabral



                                        Motion to dismiss

Denied - Held fa trial    June 10, 2001
    6/21/06
            Motion to dismiss Counsel
        Also Appointment of New Counsel

    Now Comes the Defendant moves that
this Honorable Court dismiss Counsel, and
Appoint New Counsel, As reason therefore he
States

    1.) The Defendant and Counsel had a Break-
Down in Communication.

    2.) The Defendant and Counsel cannot Agree
on a Strategy For defense For pre-trial,
nor A defense For trial.

    3.) The Defendant Feel Counsel is not For
his Best interest. nor is Counsel Performing
In his Best Capability.

                        Addendum D

# *COMMONWEALTH OF MASSACHUSETTS*

**BRISTOL, SS**

BRISTOL SS SUPERIOR COURT
FILED
AUG 27 2001
MARC J. SANTOS, ESQ.
CLERK MAGISTRATE

***NEW BEDFORD SUPERIOR COURT***
***#9973 CR 0228***

**COMMONWEALTH OF MASSACHUSETTS** )
)
**vs.** )
)
**ANTHONY CABRAL** )
**Defendant** )

**DEFENDANT'S MOTION FOR HEARING PURSUANT TO FRANKS VS. DELAWARE**

**NOW COMES THE DEFENDANT,** ***ANTHONY CABRAL,*** and moves that this Honorable Court allow him an evidentiary hearing pursuant to <u>Franks vs. Delaware,</u> 438 U.S. 154 (1978). The defendant files herewith a memorandum in support of said motion.

Anthony Cabral

By his attorney

Daniel M. Rich
250 East Main Street
Norton, MA 02766
508-285-4725
BBO #418450

DATE: 8/27/01

**Addendum E**



1o3    #42                                    8

Commonwealth of Massachusetts

Bristol   SS.                    Superior Court
                                 New Bedford Ma

Commonwealth
        V.                       No. 9973CR0228 A
Anthony Cabral

BRISTOL SS SUPERIOR COURT
FILED
AUG 27 2001
MARC J. SANTOS, ESQ.
CLERK MAGISTRATE

Motion For Appearance of
Counsel

Now Comes defendant and moves
this Honorable Court pursuant to the
6th Amendment to the United States
Constitution and Art. 12 Massachusetts
Declaration of Rights to Appear on
the record as Counsel in the above
*** matter

Respectfully Submitt

Anthony Cabral
/o/Anthony Cabral  pro-se
P.C.C.F. 26 long Pond Road
Plymouth, Mass. 02360

SEE ENDORSEMENT on
REVERSE —

**Addendum F1**

On Sept 11, 2001 Defendant appeared in open court for a hearing on his motions. Defendant asked the court to provide stand by counsel. Justice Burnes, on August 27, 2001, allowed defendant's request to proceed pro se, thus defendant has waived his right to counsel. Commonwealth v. Johnson 424 Mass. 338. In an abundance of caution this court will appoint stand by counsel whose role is limited to advising defendant on matters affecting his defense. The clerk is directed to obtain the name of counsel next scheduled on the bar advocate's list, except counsel who have already withdrawn in this matter, and issue a notice of appointment. The district attorney is directed to return the case to the trial / motion list in the October session.



Addendum F2

**COMMONWEALTH OF MASSACHUSETTS**

**BRISTOL, SS.**

**SUPERIOR COURT**
**NO. 9973020228-13**

BRISTOL, SS SUPERIOR COURT
FILED

3

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

**COMMONWEALTH**

**V.**

**ANTHONY CABRAL**

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO SUPPRESS**
**IN-COURT IDENTIFICATION**

On July 15, 1999, the Commonwealth indicted Anthony Cabral for armed robbery while masked. Defendant, defending this action *pro se*, has now presented a motion to suppress any in-court identification by Charles Moniz. This motion states as its grounds for relief that the information provided was not under oath and that a previous in-court identification was unnecessarily suggestive.

### GOVERNMENT'S EVIDENCE

On June 21, 1999, a masked man entered the Mutual gas station located at 339 Broadway, Fall River; sprayed liquid on the clerk, Rosemary Hobbs; and took $8,000 in cash and the pocketbook of Ms Hobbs. A video camera recorded the robbery.

Outside the Mutual gas station, an individual named Charles Moniz saw a masked man carrying a gun and pocketbook emerge from the Mutual gas station, run into a car, and once inside the car "whip off his mask." Moniz recognized that man as an individual whom he knew and had attended a wedding with. Moniz followed the individual, who was

**Addendum  G**

2

driving a blue Thunderbird.[1]  At some point, Moniz lost sight of the blue Thunderbird. Eventually, Moniz arrived at Almond Street and saw the blue Thunderbird pulled over to the left-hand side and observed a male bent over in the car. After making this observation, Moniz went down Almond Street, went up William Street, and turned up Beach Street. At the top of Beach Street, Moniz saw the male (Cabral) crossing the street going toward Moniz's house, located at 181 Division Street.

Moniz walked two and one-half blocks to the Mutual gas station and found Officer Maleck. Moniz told Maleck about his observations. Maleck then left and found  the blue 1989 Ford Thunderbird (Mass. Reg. No. 613BS) with its driver's door open, the keys in the ignition, and engine running.[2]

Moniz headed back to his home, parked his car, went in, and went upstairs to his apartment.  In the apartment he asked his mother whether anyone had come in.  His mother told him that someone had come in and said, "I'm sorry.  I have the wrong apartment." That individual left. Moniz's mother heard that party go next door and heard the door to her nephew's apartment open. Moniz then left and told the police Cabral was at 181 Division Street.

The police found Cabral in the apartment located at 181 Division Street occupied by John Kazen, who opened the door and stated, "I never robbed nobody." In the bedroom of this apartment, the police found a pocketbook belonging to Rosemary Hobbs. Inside the living room, the police found a black mask, a toy gun, and a spray bottle containing an

---

[1]  Moniz has also described this vehicle as a blue Firebird.

[2]  The Fall River police report discloses this sequence of events.  This sequence conflicts with the sequence presented by Moniz at the suppression hearing.

3

unknown liquid.

The police returned to the station and applied for a warrant to search the apartment. Execution of the warrant resulted in seizure of Hobbs' wallet and personal papers, and a small amount of money under couch cushions in the living room, and a black shopping bag containing $7,983. in the bedroom.

## PRIOR IN-COURT IDENTIFICATION

In his memorandum of law supporting his motion to suppress, Cabral asserts that "the only identification here was the one-to-one in-court shown to the alleged eye witness after he had been in custody some 14 months later at counsel table, in handcuffs and in a prison uniform, some 25 feet from Charles Moniz. . . ."[3]

The record reveals an in-court identification of Cabral by Moniz.[4]  The record also reveals that prior to the identification in court, the following exchange occurred  between the judge and Moniz:

> The Court: Let's go a little bit more slower.
>
> Take it easy.  I'm not sure I understood.  Did you recognize him, whoever that man was, did you recognize him - - wait for me, now.  Did you recognize him because you had seen him before or are you telling us you just recognized him in the courtroom now?
>
> The Witness: I recognized him before.  I have been in his presence, not like friendship or anything, but I have seen him in different places in my neighborhood and stuff.

---

[3] This statement appears in the memorandum but not in the affidavit submitted by defendant.

[4] That hearing concerned defendant's motion to suppress evidence derived directly and indirectly from warrantless searches.

4

## DISCUSSION

If, following a reliable identification of a defendant, there are suggestive circumstances "confirming the correctness [of the] identification, no problem of admissibility will arise, either under the independent source test . . . or the reliability test . . . so long as the initial identification and its later repetitions are found to be based on the witness' observations at the scene of the crime." Commonwealth v. Bonnoyer, 25 Mass. App. Ct. 444, 451 (1988).

Even if this encounter between Moniz and Cabral at a suppression of evidence hearing was suggestive, it may not have been unnecessarily suggestive.[5] Cabral's presence at that hearing in which evidence was offered was necessary. Thus, any confrontation of the defendant by Moniz occurred during the defendant's essential confrontation of a witness against him.

Even if this confrontation was both suggestive and unnecessary, the independent source rule authorizes the admissibility of any later in-court identification by Moniz of Cabral. The independent source rule requires clear and convincing evidence that any in-court identification will be based upon an independent source. Commonwealth v. Johnson, 420 Mass. 458, 463 (1995), quoting Commonwealth v. Botelho, 369 Mass. 860, 868 (1976). In assaying the Commonwealth's satisfaction of that burden, a court considers the following factors:

      (1) the extent of the witness' opportunity to observe the
            defendant at the time of the crime;
      (2) prior errors, if any, in description or;
      (3) in identifying another person or;

---

[5] The transcript of the hearing does not reveal particulars of the confrontation.

5

(4) in failing to identify the defendant;

(5) the receipt of other suggestions; and

(6) the lapse of time between the crime and the identification.

*Id.* at 464.

In the instant case, Moniz told the police that the masked man was inside of John Kazen's apartment. The only individual inside of Kazen's apartment besides Kazen was Anthony Cabral.

Analysis of the independent source factors reveals the following findings:

1. When Moniz saw the masked man take off the mask, that individual was approximately 15 feet behind Moniz. Moniz had turned around and focused on the individual "because he had a mask . . . ." At that time, Moniz recognized the masked man as someone Moniz was familiar with. Moniz again saw the masked man walking toward 181 Division Street. At that time, Moniz was half a city block away.

2. The record does not reveal any errors in any physical description given by Moniz. Nonetheless, Moniz has stated that he did not tell the police that the masked man was Anthony Cabral. A Fall River police officer has testified that Moniz referred to the masked man as Anthony Cabral.

3. The record does not reveal any misidentification of another person by Moniz.

4. The record does not reveal any failure by Moniz to identify the defendant.

5. The record does not reveal the receipt by Moniz of any suggestions before the initial identification. After Cabral's arrest, Moniz, however, was informed by undisclosed individuals that Cabral used to go to the gym that Moniz went to. Despite these suggestions, Moniz stated that he does not remember seeing Cabral at the gym.

6. Less than an hour passed between Moniz's observations and his identification

6

to the police.

Analysis of those independent source factors leads me to conclude that the Commonwealth has clear and convincing evidence that any subsequent in-court identification by Moniz of the defendant will be based upon a reliable independent source.

## ORDER

Based on the foregoing, I **DENY** defendant's motion to suppress any in-court identification.

_____
Robert J. Kane,
Justice of the Superior Court

DATED:  January 3, 2002

## Appendix

Docket Sheet................................................1

Notice of Appeal..........................................12

Motion to Preserve Evidence...............................13

Lost Evidence Motion (Motion to Dismiss)..................15

Search Suppression Motion (Motion to Suppress)............18

Salman Motion (Motion to Dismiss).........................30

Motion to Dismiss Counsel.................................50

Counsel Motion (Motion for Appearance of Counsel).........56

Franks Motion.............................................62

Identification Motion I...................................62

Identification Motion II..................................95

Motion for Jury Instructions.............................123

# Docket Sheet

t

BRISTOL SS.

Superior Court for
Criminal Business

**DOCKET**

**COMMONWEALTH vs.**

NO. 9973CR00228

Commonwealth
of
Massachusetts

2SC-241

D.O.B.   6/8/65

ANTHONY CABRAL

| CHARGES | | | ADDITIONAL CHARGES | |
|---|---|---|---|---|
| ARMED ROBBERY W/MASKED | 265/17 | (i) | | |
| ARMED ROBBERY W/MASKED | 265/17 | (j) | | |
| | | (k) | | |
| | | (l) | | |
| | | (m) | | |
| | | (n) | | |
| | | (o) | | |
| | | (p) | | |

**FOR THE COMMONWEALTH**

Jack Stapleton, A.D.A.

**FOR THE DEFENDANT**

/Jerald/Silvia/,/Esq.
/82/New/Boston/Road/
/Fall/River/,/MA
/(508)/679-7747

see over

w/d 9/7/99

| | | |
|---|---|---|
| July 15, 1999 | 1) | Entered. hlm |
| August 11, 1999 | 2) | Appearance of Jerald Silvia, Attorney faor the deft. hlm |
| | | Pleads Not Guilty. - MWG/hlm |
| August 11, 1999 | 3) | Mittimus Issued. |
| | | Deft. ordered to recognize in the amt. of $500,000 with surety or $50,000 cash without prejudice |
| | | and committed failing to recognize as to offense A. (White, J.) MWG/hlm |
| August 11, 1999 | | Deft. ordered and recognized in the amt. of $100 pers. for appear., etc. as to Offense B. MWG/hlm |
| August 17, 1999 | | Mittimus (#3) returned with service. nm |
| September 7, 1999 | 4) | Notice of assignment of Stephon C. Nadeau as counsel for the defendant. (Toomey, J) MWG/nm |
| September 7, 1999 | 5) | Notice of appearance of Stephon C. Nadeau as counsel for the defendant. nm |
| September 7, 1999 | 6) | Attorney Jerald Silvia's Motion to Withdraw filed and ALLLOWED. (Toomey, J) MWG/nm |
| November 10, 1999 | 7) | Defendant's Motion for Funds filed and ALLLOWED. (Marcel W. Gautreau, Asst. Clerk/Magistrate) nm |
| Dec. 6, 1999 | 8) | Defendant's Motion to Preserve Evidence. hlm |

| | | |
|---|---|---|
| e 27, 2000 | | |
| y 11, 2000 | 9) | Defendant's Motion to Dismiss with Affidavit in Support. hlm |
| .y 14, 2000 | | Defendant's Motion #9 to Dismiss, DENIED. Court made findings of fact and rulings of law on record. Copy of transcript to be delivered to Clerk's Office for placement in file. (Nickerson, J.) MWG/hlm |
| 21, 2000 10, 2000 | 10) | Original typed transcript on Findings of Facts and Ruling on Motion to Dismiss on May 11, 2000, submitted by Marilyn Silvia, Official Court Reporter. hlm |
| | 11) 12) 13) | Deft's Motion to Suppress with Supporting Memorandum and Affidavits. dga Commonwealth's Memorandum in Opposition to Deft's Motion to Suppress. dga Habeas Corpus ordered and issued for the appearance of the deft. at Worcester Superior Court on Wednesday, November 8, 2000 at 2:00 p.m. ma |
| 30, 2000 | (14) | Defendant's Motion for Additional Funds, Allowed. (O'Neill, J.) MWG/ma (c/c) |
| mber 13, 2000 | | For entries after November 13, 2000 refer to Forecourt system. nm |

Commonwealth of Massachusetts
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

03/20/2003
08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| File Date | 07/15/1999 | Status | Disposed (appeal pending) (dappen) |
|---|---|---|---|
| Status Date | 02/13/2002 | Session | 2 - Crim 2 Ctrm 2 -lower (New Bedford) |
| Jury Trial | Unknown | Origin | I - Indictment |
| Lead Case | | | |

| Trial Deadline | | Deadline Status | | Status Date | |
|---|---|---|---|---|---|
| | | Custody Status | Plymouth County Correctional Facility) | Start Date | 11/02/2001 |
| Weapon | Hand gun | Substance | | Prior Record | Unknown |
| Arraignment | 07/15/1999 | PTC Deadline | | Pro Se Defendant | No |

### OFFENSES

| Num | Offense | Code | Status | Status Date |
|---|---|---|---|---|
| 1 | 07/15/1999 | 265:017.2 | Guilty verdict (lesser offense) | 01/11/2002 |
| | Robbery, armed, masked/disguised | | | |
| 2 | 07/15/1999 | 265:017.2 | Nolle prosequi | 01/09/2002 |
| | Robbery, armed, masked/disguised | | | |

### PARTIES

**Plaintiff**
Commonwealth
Gender: Unknown
Active 07/15/1999

**District Atty's Office 561219**
David L. Crowley, Jr.
Bristol County District Atty's Office
888 Purchase Street
New Bedford, MA 02740
Phone: 508-997-0711
Fax: 508-997-0396
Withdrawn 04/19/2002

**District Atty's Office 094720**
Kevin E Connelly
Bristol County District Atty's Office
888 Purchase Street
New Bedford, MA 02740
Phone: 508-997-0711
Fax: 508-997-0396
Active 04/19/2002 Notify

**Defendant**
Anthony Cabral
M.C.I. CEDAR JUNCTION
P.O. Box 100
South Walpole, MA 02071
DOB: 06/08/1965
Gender: Male
Active 07/15/1999

**Private Counsel 366300**
Stephen C Nadeau
30 Third Street, 3rd Floor
Fall River, MA 02720
Phone: 508-679-2330
Fax: 508-324-9896
Withdrawn 03/27/2001

**3**

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

**Private Counsel 418450**
Daniel M Rich
250 East Main Street
Norton, MA 02766
Phone: 508-285-4725
Withdrawn 04/19/2002

**Private Counsel 542724**
James W McCarthy II
Lushan McCarthy Goonan Stopa & Sullivan
496 Harvard Street
PO Box 1604
Brookline, MA 02
Phone: 617-739-0700
Withdrawn 04/19/2002

**Public Counsel 638177**
Sandra Wysocki Capplis
P.O. Box 83
Milton, MA 02186
Phone: 617-698-1399
Fax: 617-698-1399
Active 04/19/2002 Notify

**Other interested party**
File Copy
Gender: Unknown
Active 03/23/2001 Notify

| | | ENTRIES |
|---|---|---|
| **Date** | **Paper** | **Text** |
| 07/15/1999 | | Original case info: ORIGIN=I. |
| 08/11/1999 | | RE Offense 1:Plea of not guilty |
| 08/11/1999 | | RE Offense 2:Plea of not guilty |
| 11/10/2000 | | Stat at cnvrsn to cmputr 11/10/2000. |
| | | (see docket book for previous docket entries). |
| 12/07/2000 | 15.0 | Defendant's Memorandum in Support of Motion to Suppress |
| 12/18/2000 | | Motion (P#11) denied (Toomey,J.) (See endorsement on motion) |
| 12/22/2000 | 16.0 | Motion by Deft: to Extend Time for Filing Interlocutory Appeal filed and ALLOWED as requested. (David A. McLaughlin, Justice) |
| 01/09/2001 | 17.0 | Motion to Dismiss and Affidavit in Support filed. |
| 03/13/2001 | 18.0 | MEMORANDUM OF DECISION AND ORDER on Defendant's Motion to Dismiss is hereby DENIED. (David A. McLaughlin, Justice) |

**4**

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

## BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 03/27/2001 | 19.0 | Motion of Stephen C. Nadeau, Esq., to withdraw - ALLOWED (McLaughlin, J.) |
| 04/06/2001 | 20.0 | Motion by Deft: to Dismiss Appointed Counsel |
| 04/10/2001 | 21.0 | Appointment of Counsel Daniel M Rich |
| 05/16/2001 | 22.0 | Motion by Deft: to Continue Trial Date |
| 06/13/2001 | 23.0 | Motion by Deft: to Reconsider the Denial of his Motion to Dismiss pursuant to Comm. vs. Salman |
| 06/18/2001 | 24.0 | Motion by Deft: to Dismiss Counsel and Appoint New Counsel |
| 06/21/2001 | | Motion (P#24) denied (Richard J. Chin, Justice) |
| 06/21/2001 | 25.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) - June 25, 2001 |
| 06/21/2001 | 26.0 | Motion by Deft: to Reconsider the Denial of his Motion to Dismiss |
| 06/21/2001 | 27.0 | Motion by Deft: to Suppress Franks Hearing |
| 07/05/2001 | 28.0 | Motion by Deft: to Reconsider the Denial of His Motion to Dismiss Counsel and Appointment of New Counsel. (forwarded to Chin, J.) cc: ADA/Deft. counsel |
| 07/05/2001 | 29.0 | Motion by Deft: to Stay Proceedings the Filing of an Application for Appeal. |
| 07/05/2001 | 30.0 | Deft's. Notice of Appeal (interlocutory) |
| 07/17/2001 | 31.0 | Defendant's Request for Witnesses to be present at Franks hearing |
| 07/19/2001 | 32.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 07/23/2001 | 33.0 | Motion by Deft: for Transcript of Motion to Suppress |
| 07/23/2001 | 34.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 07/24/2001 | 35.0 | Motion by Deft: to Suppress Frank's Hearing; Supporting Affidavit; Memorandum of Law. |
| 07/26/2001 | | Motion (P#28) denied (Richard A. Chin, Justice) |
| 07/31/2001 | | Motion (#33) ALLOWED (White, J.) |
| 08/01/2001 | 36.0 | Court Reporter Marilyn Silvia is hereby notified to prepare one copy of the transcript of the evidence of August 21, 2000 |
| 08/02/2001 | 37.0 | Notice of Docket Entry from the SJC - JUDGMENT: denying relief under c. 211, s.3 without a hearing (Ireland, J.) |
| 08/22/2001 | 38.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 08/27/2001 | | Hearing on Frank's Motion by Atty. Rich and Defendant's Motion to Represent Self held, matter taken under advisement (Burnes, J.) |
| 08/27/2001 | 39.0 | Motion by Deft: for discovery |
| 08/27/2001 | 40.0 | Motion by Deft: to dismiss (McCarthy) |
| 08/27/2001 | 41.0 | Motion by Deft: for reconsideration in denying defendant's motion to suppress |
| 08/27/2001 | 42.0 | Motion for appointment of counsel |
| 08/27/2001 | 43.0 | Defendant's motion for a hearing pursuant to Franks v. Delaware |
| 08/29/2001 | 44.0 | Affidavit of attorney Daniel M. Rich |
| 08/30/2001 | | Defendant's motion (#41) for reconsideration - ALLOWED and, on reconsideration of, inter alia, all matters submitted by the parties to date, the motion to suppress is, again, DENIED. (Daniel F. Toomey, Justice) |
| 08/30/2001 | | Motion (P#42) After hearing and review of the file the Court allows |

5

MAS-20020121

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

03/20/2003
08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| | | this motion. (see motion for rest of endorsement) (Nonnie S. Burnes, Justice) |
| 08/30/2001 | | Motion (P#43) denied (see motion for endorsement) (Nonnie S. Burnes, Justice) |
| 09/06/2001 | 45.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 09/11/2001 | 46.0 | NOTICE of APPEAL FILED by Anthony Cabral, regarding the denial of his motion to suppress evidence |
| 09/11/2001 | 47.0 | NOTICE of APPEAL FILED by Anthony Cabral, regarding the denial of his motion for reconsideration of his motion to suppress evidence |
| 09/11/2001 | 48.0 | Deft files Motion for Copy of Case File |
| 09/14/2001 | 49.0 | Motion by Deft: for Funds of Transcripts of Franks Hearing |
| 09/14/2001 | 50.0 | NOTICE of APPEAL FILED by Anthony Cabral Denying the defendant's Motion for dismissing Counsel |
| 09/14/2001 | 51.0 | Motion by Deft: to Stay Proceedings Pending the Filing of an Application for Appeal |
| 09/20/2001 | | Motion (#26) to Reconsider the Denial of his Motion to Dismiss - DENIED (McLaughlin, J.) |
| 10/01/2001 | 52.0 | Habeas corpus for Deft at Bristol House of Correction (Dartmouth) |
| 10/11/2001 | 53.0 | Motion by Deft: to Extend Time for Filing Interlocutory Appeal |
| 10/11/2001 | 54.0 | Motion by Deft: to Compel |
| 10/11/2001 | 55.0 | NOTICE of APPEAL FILED by Anthony Cabral, regarding the Denial of Deft.'s Motion for Reconsideration of Motion to Dismiss |
| 10/26/2001 | 56.0 | Motion by Deft: for Speedy Trial |
| 10/26/2001 | 57.0 | Motion by Deft: for Discovery |
| 11/02/2001 | 58.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 11/05/2001 | 59.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 11/08/2001 | 60.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 11/08/2001 | 61.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 11/08/2001 | | Motion (#39) - After hearing and review, DENIED as to 3A, 3B, 3, 5, 6 and 11. Otherwise ordered as follows: The Commonwealth will on November 20, 2001, provide to Deft. a "discovery package" with a written memo directing Deft. to the materials he apparently is seeking. The Commonwealth will also make available to Deft. on that date all physical evidence in it possession. Also on November 20, 2001, standby counsel will be appointed for Deft. pursuant to Judge Nickerson's Order of September 26, 2001. The Commonwealth agrees to include in the "discovery package" all relevant and discoverable material. (Brady, J.) |
| 11/08/2001 | | Motion (#40) - After hearing and upon review, DENIED (Brady, J.) |
| 11/08/2001 | | Deft.'s Notice of Appeal (#47) - The Court notes that this Notice of Appeal is not timely. (See MRCP 15(b)(1) (Brady, J.) |
| 11/08/2001 | | Motion (#48) - See endorsement on Pleading #39 (Brady, J.) |
| 11/08/2001 | | Motion (#51) DENIED (Brady, J.) |
| 11/08/2001 | | Motion (#53) DENIED (Brady, J.) |
| 11/08/2001 | | Motion (#54) - See endorsement on Pleading #39 (Brady, J.) |
| 11/08/2001 | | Motion (#56) ALLOWED, Case scheduled for December 3, 2001 (Brady, J.) |

**6**

MAS-20020121

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

03/20/2003
08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 11/08/2001 | 62.0 | Motion by Deft: for Copy of Turrette Tape |
| 11/20/2001 | 63.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 11/20/2001 | 64.0 | Motion by Deft: for Reconsideration Denying Motion to Suppress |
| 11/20/2001 | 65.0 | Appearance of Deft's Atty: James W McCarthy II |
| 11/20/2001 | 66.0 | Deft files Notice of Appeal |
| 11/20/2001 | 67.0 | Motion by Deft: to Stay Proceedings Pending the Filing of an Application for Appeal, Denied. (Patrick F. Brady, Justice) |
| 11/23/2001 | | Motion (P#64) denied (Patrick F. Brady, Justice). Copies mailed December 13, 2001 |
| 11/26/2001 | 68.0 | Motion by Deft: to Stay Proceedings pending the filing of an Application for Interlocutory Appeal - DENIED (Brady, J.) |
| 12/03/2001 | 69.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 12/03/2001 | 70.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 12/03/2001 | 71.0 | Deft files Reconsideration of Denial of Defendant's Motion to Dismiss with Affidavit and Memorandum, referred to ruling judge. (Robert A. Kane, Justice) |
| 12/03/2001 | 72.0 | Motion by Deft: for Funds, Allowed not to exceed $1000. (Robert J. Kane, Justice) |
| 12/03/2001 | 73.0 | Deft files Supplemental Motion for Discovery, motion for surveilance video tapes is Allowed. (Robert J. kane, Justice) |
| 12/03/2001 | 74.0 | Motion by Deft: to Dismiss or Alternative Relief Due to Lost or Destroyed Evidence with Affidavit. |
| 12/03/2001 | 75.0 | Motion by Deft: to Suppress the In-Court Identification with Affidavit and Memorandum |
| 12/05/2001 | 76.0 | Commonwealth files Affidavit in Opposition to the Defendant's Motion to Dismiss |
| 12/12/2001 | 77.0 | Deft files Supplemental Motion to Suppress Identification |
| 12/12/2001 | 78.0 | Habeas corpus for Deft at Plymouth County Correctional Facility |
| 12/19/2001 | 79.0 | Habeas corpus for Deft at Plymouth County Correctional Facility |
| 12/21/2001 | | Motion (P#74) allowed in Part, Denied in Part(Robert J. Kane, Justice). Copies mailed January 03, 2002 |
| 12/21/2001 | 80.0 | MEMORANDUM & ORDER: on Defendant's Motion to Dismiss/Suppress; it is Ordered that the Commonwealth not offer evidence at trial of the police officers' observation of Anthony Cabral in the bedroom where Mrs. Hobbs' pocketbook was found (Robert J. Kane, Justice) copies to A.D.A. and deft |
| 12/26/2001 | 81.0 | NOTICE of APPEAL FILED by Anthony Cabral |
| 12/26/2001 | 82.0 | Deft files Renewal Motion to Suppress (Franks) with Affidavit |
| 01/03/2002 | | Motion (P#76) denied (Robert J. Kane, Justice). Copies mailed |
| 01/03/2002 | 83.0 | MEMORANDUM & ORDER: on Defendant's Motion to Suppress In-Court Identification, Denied (Robert J. Kane, Justice) copies mailed on January 3, 2002 |
| 01/03/2002 | 84.0 | MEMORANDUM & ORDER: on Defendant's Motion to Dismiss/Suppress, Denied. (Robert J. Kane, Justice (copies mailed on January 3, 2002 |
| 01/03/2002 | 85.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/07/2002 | 86.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |

**7**

MAS-20020121

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

03/20/2003
08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 01/07/2002 | 87.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/08/2002 | 88.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/09/2002 | 89.0 | List of Potential Witnesses |
| 01/09/2002 | | RE Offense 2:Nolle prosequi |
| 01/11/2002 | 90.0 | Motion by Deft: for Jury Instruction |
| 01/11/2002 | 91.0 | Motion by Deft: for Required Finding of not Guilty |
| 01/11/2002 | 92.0 | List of exhibits |
| 01/11/2002 | | RE Offense 1:Guilty verdict (lesser offense) |
| 01/11/2002 | 93.0 | Verdict of guilty to Unarmed Robbery |
| 01/11/2002 | | Bail set on August 11, 1999 revoked; Deft Ordered Held Without Bail (John A. Tierney, Justice) |
| 01/11/2002 | 94.0 | Mittimus without bail issued to Bristol House of Correction (Dartmouth) |
| 01/11/2002 | | Continued until January 25, 2002 for sentencing (John A. Tierney, Justice) |
| 01/14/2002 | 95.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/25/2002 | | Defendant sentenced to MCI Cedar Junction for the term of not more than ten (10) years nor less than eight (8) years as to offense A; Deft advised of his right to appeal to the Appellate Division of the Superior Court for a review of sentence; Deft advised of his right to appeal the judgment and sentence of the Court within thirty (30) days thereof under MRAP Rule 4b; T.C. - 950 - days (John A. Tierney, Justice) |
| 01/25/2002 | | Victim-witness fee assessed: $60.00 |
| 01/25/2002 | 96.0 | Mittimus for safe keeping issued to Cedar Junction MCI (Walpole) |
| 01/31/2002 | 97.0 | Notice of appeal from sentence to Cedar Junction MCI (Walpole) filed by Anthony Cabral |
| 01/31/2002 | 98.0 | Letter transmited to the Appellate Division. All parties notified February 01, 2002 |
| 02/13/2002 | 99.0 | NOTICE of APPEAL FILED by Anthony Cabral |
| 02/19/2002 | 100.0 | Court Reporter Bates, Susan B. is hereby notified to prepare one copy of the transcript of the motion to dismiss hearing of February 07, 2001. |
| 02/19/2002 | 101.0 | Court Reporter Saulnier, Lori E. is hereby notified to prepare one copy of the transcript of the motion to dismiss hearing of August 27, 2001 and of the sentencing of January 25, 2002 |
| 02/19/2002 | 102.0 | Court Reporter Lentini, Jeanne is hereby notified to prepare one copy of the transcript of the motion hearing of December 03, 2001. |
| 02/19/2002 | 103.0 | Court Reporter Silvia, Marilyn is hereby notified to prepare one copy of the transcript of the trial evidence of January 09, 10, and 11, 2002. |
| 03/04/2002 | 104.0 | Defendant files motion to revise and revoke sentence (no hearing requested at this time) |
| 03/04/2002 | 105.0 | Motion by Deft: to withdraw as pro se party |
| 03/04/2002 | 106.0 | Motion by Deft: for appointment of counsel; Affidavit in support |
| 03/04/2002 | 107.0 | Motion by Deft: for appointment of appellate counsel |

**8**

MAS-20020121

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

03/20/2003
08:00 AM

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 03/08/2002 | 108.0 | Transcript of testimony regarding the Deft.'s Motion to Dismiss of August 27, 2001, received volumes #1, from court reporter, Saulnier, Lori E. |
| 03/08/2002 | 109.0 | Transcript of testimony of sentencing received of January 25, 2002, volumes #1, from court reporter, Saulnier, Lori E. |
| 03/25/2002 | | Motion (P#107) allowed, referred to CPCS (Elizabeth M. Fahey, Justice). Copies mailed March 26, 2002 |
| 03/25/2002 | 110.0 | Request for assignment of counsel on appeal |
| 04/11/2002 | 111.0 | Appointment of Counsel Sandra Wysocki Capplis |
| 04/16/2002 | 112.0 | Motion by Deft: to compel production of copy of docket sheet (docket sheet sent April 18, 2002) |
| 04/16/2002 | 113.0 | Transcript of testimony of February 7, 2001 received volumes # 1 from court reporter, Bates, Susan B. |
| 04/26/2002 | 114.0 | Appearance of Deft's Atty: Sandra Wysocki Capplis |
| 05/02/2002 | | Victim-witness fee paid as assessed |
| 08/29/2002 | 115.0 | Transcript of trial testimony from January 9, 2002 received volumes # 1 from court reporter, Silvia, Marilyn |
| 08/29/2002 | 116.0 | Transcript of trial testimony from January 10, 2002 received volumes # 2 from court reporter, Silvia, Marilyn |
| 08/29/2002 | 117.0 | Transcript of trial testimony from January 11, 2002 received volumes # 3 from court reporter, Silvia, Marilyn |
| 09/13/2002 | | Petition for review of sentence withdrawn May 23, 2002 (See letter in back of file) |
| 11/12/2002 | 118.0 | Transcript of motion for reconsideration hearing testimony from December 3, 2001 received volumes # 1 from court reporter, Lentini, Jeanne |
| 11/15/2002 | 119.0 | Certificate of delivery of transcript by clerk filed. |
| 12/03/2002 | 120.0 | Court Reporter Lori E. Saulnier is hereby notified to prepare one copy of the transcript of the hearing on defendant's motion to dismiss evidence of June 27, 2000. |
| 12/03/2002 | 121.0 | Court Reporter Marilyn Silvia is hereby notified to prepare one copy of the transcript of the defendant's motion to dismiss evidence of July 11, 2000 and one copy of the transcript of the defendant's motion to suppress evidence of August 21, 2000 and September 28 & 29, 2000. |
| 12/03/2002 | 122.0 | Court Reporter Pat O'Brien is hereby notified to prepare one copy of the transcript of the hearing on defendant's motion to suppress evidence of November 08, 2000. |
| 12/31/2002 | 123.0 | Transcript of testimony of Motion to Dismiss, heard on Tuesday, July 11, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 124.0 | Transcript of testimony of Motion to Suppress, heard on August 21, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 125.0 | Transcript of testimony of Motion to Suppress, heard on Thursday, September 28, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 126.0 | Transcript of testimony of Motion to Suppress, heard on Friday, September 29, 2000, received from court reporter, Silvia, Marilyn |

**9**

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

# BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|---|---|---|
| 01/23/2003 | 127.0 | Transcript of motion to dismiss testimony from June 27, 2000 received volumes # 1 from court reporter, Lori R. Saulnier. |
| 01/27/2003 | 128.0 | Transcript of testimony received of Motion to Suppress hearing of November 8, 2000 from court reporter, Patricia A. O'Brien |
| 03/20/2003 | 129.0 | Certificate of delivery of transcript by clerk filed. |
| 03/20/2003 | 130.0 | Statement of the case on Appeal |
| 03/20/2003 | 131.0 | Notice of assembly of record; mailed to Appeals Court per Rule 9(d) |

| | EVENTS |
|---|---|

| Date | Session | Event | Result |
|---|---|---|---|
| 12/08/2000 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event not held--scheduled for another date |
| | | For decision on Motion to Suppress u/a with Toomey, J. | |
| 12/18/2000 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event held as scheduled |
| | | For decision on Motion to Suppress u/a with Toomey, J. | |
| 01/09/2001 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event held as scheduled |
| 02/07/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Evidentiary-dismiss | Event held as scheduled |
| 03/27/2001 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event held as scheduled |
| 05/16/2001 | Crim 1 Ctrm 1 -upper (New | TRIAL: by jury | Event not held--scheduled for another date |
| 05/21/2001 | Crim 1 Ctrm 1 -upper (New | TRIAL: by jury | Event not held--scheduled for another date |
| 06/25/2001 | Crim 1 Ctrm 1 -upper (New | TRIAL: by jury | Event not held--scheduled for another date |
| 07/23/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Evidentiary-dismiss | Event not held--scheduled for another date |
| | | Franks hearing | |
| 08/06/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Evidentiary-dismiss | Event not held--scheduled for another date |
| 08/27/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Motion | Event held--under advisement |
| | | Frank's Hearing with Atty. Rich and Defendant's Motion to Represent Self | |
| 09/11/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Motion | Event not held--scheduled for another date |
| | | Hearing on all remaining motions | |
| 10/16/2001 | Crim 1 Ctrm 1 -upper (New | Status: Administrative Review | Event not held--scheduled for another date |
| | | for consideration by McLaughlin, J. | |
| 11/06/2001 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event not held--scheduled for another date |
| 11/07/2001 | Crim 1 Ctrm 1 -upper (New | Status: Review by Session | Event held as scheduled |
| | | cont. from 10/16/01 for Mclaughlin, J. Hearing held on def's discovery motions.11/7 | |
| 11/20/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Compliance | Event held as scheduled |
| | | compliance on discovery motions heard on 11/7/01 | |
| 12/03/2001 | Crim 1 Ctrm 1 -upper (New | TRIAL: by jury | Event not reached by Court |
| | | Held for trial 12/3/01 | |
| 12/03/2001 | Crim 2 Ctrm 2 -lower (New | Hearing: Misc Matters | Event held as scheduled |
| 12/04/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Misc Matters | Event held as scheduled |
| 12/12/2001 | Crim 2 Ctrm 2 -lower (New | Hearing: Misc Matters | Event not reached by Court |
| 12/14/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Misc Matters | Event not reached by Court |
| 12/18/2001 | Crim 1 Ctrm 1 -upper (New | Hearing: Misc Matters | Event held as scheduled |
| 01/07/2002 | Crim 2 Ctrm 2 -lower (New | TRIAL: by jury | Event not held--req of Commonwealth |
| 01/08/2002 | Crim 2 Ctrm 2 -lower (New | TRIAL: by jury | Event not held--req of Commonwealth |
| 01/09/2002 | Crim 2 Ctrm 2 -lower (New | TRIAL: by jury | Trial begins |
| 01/10/2002 | Crim 2 Ctrm 2 -lower (New | TRIAL: by jury | Event continues over multiple days |
| 01/11/2002 | Crim 2 Ctrm 2 -lower (New | TRIAL: by jury | Trial ends |
| 01/25/2002 | Crim 2 Ctrm 2 -lower (New | Hearing: Sentence Imposition | Event held as scheduled |
| | | Sentenced | |

**10**

**Commonwealth of Massachusetts**
BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

**BRCR1999-00228**
**Commonwealth v Cabral, Anthony**

**11**

# Notice of Appeal

COMMONWEALTH OF MASSACHUSETT .

BRISTOL, SS.

Superior Court
Docket No:
9973CR0228,A.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*
COMMONWEALTH           \*
 -Vs-                  \*
Anthony Cabral         \*
                       \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

M O T I O N



NOTICE OF APPEAL

Notice is hereby given that the defendant in the above case,

being aggrieved by certain opinions, rulings, directions, and

judgements of the court, hereby APPEALS pursuant to Mass, Rules

of Appealate Procedure, Rule 3. ( Second Notice Of Appeal )


Respectfully submitted,


Anthony Cabral   Pro se.

MCI Concord

P.O. Box 9106

West Concord, Ma. 01742


12

# Motion to Preserve Evidence

Commonwealth Of Massachusetts

Bristol, ss                                    Superior Court
                                               Criminal Dept.

FILED

EC 6 1999

~~~ J. SANTOS, ESQ.
CLERK/MAGISTRATE

Commonwealth

      V.S.                           DKT. NO. 99-9919 0228

Anthony Cabral,


## Motion to Preserve Evidence

Now comes the Defendant, Anthony Cabral, through
assigned counsel and moves this Honorable Court in the
above captioned matter, to preserve all audio tapes,
inparticlar, dispatch transmissions from the Fall River
Police of June 21, 1999, between the hours of 6:00 AM
and 8:00 AM. under Superior Court Rules of Evidence.

                          Respectfully Submitted,

                          [signature]
Dated: 12-3-99            Anthony Cabral, for
                          Attorney Stephen Nadeau,
                          190 Rock Street
                          Fall River, MA. 02722
Notary: Marie C Hayden
Ex. Date: February 24, 2000
Print Nam: Anthony Cabral
Date Notarized December 3, 1999

## Certificate of Service

Now comes the Defendant, Anthony Cabral, and State's that he has sent a true copy of the enclosed Motion To Preserve Evidence to the following,

Clerk of Courts, located at 9 Court Street, of Taunton, MA. 02980

Bristol County Attorney General Office, located at 888 Purchase Street, New Bedford, MA.

Attorney Stephen Nadeau, located at 190 Rock Street, Fall River, MA. 02722

through First class U.S. mail postage prepaid on this 23-99 day of December 1999.

Dated: 12-3-99

Anthony Cabral, For
Atty. Stephen Nadeau

Notary: _____

Ex. Date: _____

Print Name: _____

Date Noterized: _____

14

# Lost Evidence Motion
# (Motion to Dismiss)



BRISTOL, SS SUPERIOR COURT
FILED

JUN 2 7 2000

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

Superior Court
Indictment #9973CR0228

*********************

Commonwealth

v.                                          Motion To Dismiss

Anthony Cabral

*********************

Now comes the defendant, by his attorney, and moves pursuant to
Mass.R.Crim.P. 13, the Massachusetts Declaration of Rights and the United States
Constitution, that the Court dismiss all pending indictments in this matter due to
the loss or destruction of evidence by the Commonwealth.

As grounds therefore, the defendant has suffered the loss of potentially
exculpatory evidence, as appears from the attached affidavit. Commonwealth v
Sasville 35 Mass. App. Ct. 15, 616 N.E.2d 476

By His Attorney,

Stephen C. Nadeau
190 Rock Street, P.O. Box 3128
Fall River, MA 02722
(508) 679-2330
BBO# 366300

*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                    Superior Court
                                                Indictment #9973CR0228

*********************
Commonwealth
                                                Affidavit In Support
          v.                                    Of Motion To Dismiss


Anthony Cabral
*********************

I, Stephen C. Nadeau, under oath state as follows:

1.  I am the attorney for the defendant in this matter,

2.  The defendant is charged with offenses related to an alleged armed robbery of a Mutual gas station in Fall River on June 21, 1999.

3.  I have reviewed the police reports and other documents provided to me by the Commonwealth.

4.  Prior to December 14, 1999 a Motion to Preserve Evidence was allowed by the court.  Specifically, preservation of all audio tapes and dispatch transmission was ordered.

5.  On December 14, 1999 the assistant district attorney prosecuting this matter wrote to the Fall River Police Department in order to give notice of the preservation order.  The A.D.A. also requested that he be provided with a copy of the tape recordings.

6.  To date, the police department has not provided any recordings to the district attorney's office.  Upon information and belief, for several months there was no response at all from the police department

7.  On numerous occasions during the course of pre-trial discussions I have requested that the Commonwealth provide the defense with a copy of the tape. The assistant district attorney has made efforts to obtain same from the police



*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

department.

8. When a response was finally received from the police, the assistant district attorney was initially told that the tapes would have been erased after thirty (30) days from the date of recording.

9. After further inquiry, the police department is now claiming that the tapes never existed, due to malfunction of the taping equipment.

10. The defendant intends to argue a Motion to Suppress, based upon the illegality of a police search, and also upon the improper arrest of the defendant.

11. In the context of the Motion to Suppress, the nature and extent of information available to the police at and prior to the time of search and arrest is crucial. The police have made certain assertions as to the information and evidence that they had, which is disputed by the defendant.

12. The defendant contends that the tape recordings would corroborate his version of the events, which would therefore be exculpatory.

Signed under the pains and penalties of perjury, this 23 day of June, 2000

Stephen C. Nadeau



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

17

Search Suppression Motion
(Motion to Suppress)

*(#1.)*

*Filed 8/21/00*

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                    SUPERIOR COURT
                                               #9973CR0228

AUG 2 1 2000

*********************
COMMONWEALTH          ...C J. SANTOS, ESQ.
                      CLERK/MAGISTRATE

    v.                              MOTION TO SUPPRESS

ANTHONY CABRAL
*********************

    Now comes the defendant in the above entitled matter and moves,
pursuant to Mass.R.Crim.P. 13, the 14th Amendment to the U.S. Constitution,
Article XII of the Massachusetts Declaration of Rights, and all other applicable
provisions of said Constitution and Declaration of Rights, that the items found in
a search of the defendant's automobile and the premises occupied by the
defendant on June 21, 1999 be excluded from evidence. The defendant further
moves to suppress all information, materials, identifications, statements or other
evidence obtained subsequent to said searches.

    As grounds therefore, the defendant states that:

    1. The search of the automobile was without a warrant, and was not
within any recognized exception to the warrant requirement.

    2. The search of the premises in which the defendant was an occupant at
the time of his arrest was without a warrant, and was not within any recognized
exception to the warrant requirement. Additionally, the arrest of the defendant
was without probable cause.

    3. Any information, statements, identifications or other evidence obtained
subsequent to the search of the automobile and premises, including the later
search by warrant, are the "fruit of the poisonous tree" and must likewise be
excluded.

*Stephen C. Nadeau*
Attorney at Law
190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

\ 8

---

*[Handwritten left margin, bottom to top:]*

12/14/00 "'HAVING FOUND THAT THE POLICE ENTRY INTO AND SEARCH OF THE MOTOR VEHICLE WAS REASONABLE IN LIGHT OF THE CONDITION OF THE VEHICLE AND THE PROBABLE CAUSE/EXIGENT CIRCUMSTANCES POSSESSED BY THE OFFICERS, HAVING FOUND THAT THE POLICE ENTRY INTO KAZEN'S APARTMENT WAS SUPPORTED BY PROBABLE CAUSE, EXIGENT CIRCUMSTANCES, AND CONSENT AND HAVING FOUND THAT ITEMS SEIZED IN THE APARTMENT WERE OBTAINED INCIDENT TO THE LAWFUL ARREST OF D, IN PLAIN VIEW AND IN CONNECTION WITH A REASONABLE PROTECTIVE SWEEP OF THE APARTMENT, THE MOTION TO SUPPRESS THE ITEMS FOUND IN THE VEHICLE AND IN THE APARTMENT IS DENIED —DF (copy)

By His Attorney

Stephen C. Nadeau
190 Rock Street, PO Box 3128
Fall River, MA  02722
508 679-2330
BBO# 366300



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

19

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                          SUPERIOR COURT
                                                     #0073CR0228

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
COMMONWEALTH,
                    Plaintiff

                                                     DEFENDANT'S
VS.                                                  MEMORANDUM IN
                                                     SUPPORT OF
                                                     MOTION TO SUPPRESS

ANTHONY CABRAL,
                    Defendant
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Now comes the defendant and submits the following memorandum in support
of his Motion to Suppress.

### THE SEARCH OF THE MOTOR VEHICLE

       The defendant contends that the police lacked probable cause or other
legal justification to search the motor vehicle. Officer Malek testified that he
responded to the Mutual Gas station and spoke with Charles Moniz. He
allegedly was given certain information, including that the assailant left the
scene in a blue auto. Since Malek did not have any substantive conversation
with any other witnesses at that time, the information regarding the auto could
only have come from Charles Moniz. As a result, Officer Malek began a
search of the neighborhood looking for the auto. Malek contends he shortly
came upon a blue auto that was pulled to the curb in a diagonal manner, with
the engine running and the driver's door open. He then looked through the
vehicle, and found a homemade father's day card with the name "Tony
Cabral" on it.

       Officer Malek would have the court believe that he was looking for an
auto of which he had some description. He testified that he spoke to Charles
Moniz upon his initial response to the gas station, and that he received
information from him. Moniz, however, testified that he did not speak to any
police officers until he came upon them searching the blue auto on Almond
Street. Therefore, prior to the time he searched the defendant's auto, Malek
could not have had any information that caused him to suspect that the vehicle
actually searched was the one involved in the robbery.



*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

1

An issue to consider is whether the manner in which the car was parked was sufficient to raise suspicion. The officers that testified gave varying accounts as to how far the rear of the vehicle was away from the curb. Charles Moniz, however, described the vehicle as "a little bit sticking out" and "not bad". Also, Moniz could not tell whether the car was running or the operator left the door open. Common sense suggests that, if the car had been left in the manner described by the police, Moniz would have noticed it. The defendant has filed an affidavit stating that the car was legally parked at the time. Additionally, from the totality of the evidence and the circumstances presented, it does not make sense that the car would have been abandoned by the operator in the manner suggested by the police.

Obviously, the court must assess the credibility of the evidence, not only regarding the search of the car, but also as concerns all the issues raised by the Motion to Suppress. Throughout the evidence, there were significant and irreconcilable differences between the testimony of Malek and other officers, and that of the civilian witnesses, as follows:

1. Malek contends that he spoke to Charles Moniz upon his arrival at the gas station. Moniz, to the contrary, states that he did not speak to any officers at the scene of the robbery, and that he first spoke to them as they were searching the car on Almond Street.

2. The officers testify that Moniz gave the name of Anthony Cabral as the assailant. Moniz testified that, although he had seen the defendant before and knew him by sight, he did not know his name.

3. The police say that Moniz told them that the defendant was known to hang around the second floor apartment at 181 Division Street with John Kazen. Moniz, however, testified that he had never seen the defendant there before and did not give that information to the police.

4. Officer Malek testified that he received information from Delores Moniz outside the apartment building, and that she also gave them the name of the defendant. Mrs. Moniz testified that she never spoke to the police that day, and that she did not know the defendant's name.

5. At one point, Malek testified that he might not have received the information directly from Mrs. Moniz, since she did not speak English very well. As was demonstrated by her testimony in court, Mrs. Moniz had no difficulty with English.

6. The officers contend that Officer Botelho had seen the defendant at the wheel of the blue auto approximately twenty minutes earlier, acting in a suspicious manner. Yet, despite the alleged suspicious behavior and the fact that Botelho knew the defendant's license was suspended, he did not investigate.



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

2

21

7. Officer Botelho also claimed that he had heard information that the blue car had been involved in the robbery before he came upon the Malek at the car on Almond Street. Yet, again, Moniz testified that he had not given any information regarding the auto to the police until after they were already searching it.

8. At one point during the hearing, Malek even testified emphatically that he had not appeared before the grand jury in this matter. Only after his testimony on that subject obviously became a major issue, did he suddenly "remember" that he had in fact testified before the grand jury.

The officers' version of the events surrounding the search of the auto should not be deemed credible by the court. The defendant contends that the credible evidence shows that the police had no reason to believe the blue auto parked on Almond Street was connected to the robbery, that there was nothing remarkable about the way the car was parked, and that they lacked any justification whatsoever to conduct a search. Probable cause depends on some nexus between the car and the criminal activity being investigated. Commonwealth vs. Scott 29 Mass. App. Ct. 1004, 563 N.E.2d 1375.

## STANDING

The defendant suggests that it is clear that he has standing to challenge the legality of his arrest and the search of the premises in at 181 Division Street, Fall River. There can be no dispute that Mr. Cabral was legally in the residence of John Kazen, with the permission of Mr. Kazen. Mr. Kazen's apartment was a separate residence in the multi-family building at that location.

Likewise, there was a clear expectation of privacy. This was Mr. Kazen's home, where the defendant had been a welcome guest may times. Kazen testified that Cabral had slept in the home a number of times. Further, Cabral's expectations are illustrated by the testimony of Kazen that he (Cabral) was free to take a shower without asking.

Absent exigency or consent, the police must first obtain a search or arrest warrant before they may enter the home of a third person in search of a suspect. Commonwealth vs. Derosia, 402 Mass. 284, 522 N.E.2d 408 (1988).

## CONSENT

The court must determine whether the entry into, and search of, John Kazen's residence was consensual. Only Kazen or the defendant could give valid consent for a search. The was a separate residence in a multi-apartment building. Clearly, valid consent could not have come from either Mr. Moniz or Mrs. Moniz, as their residence was independent from Kazen's and they had



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

3

no rights regarding his unit. The police would have the court believe that they were invited into the apartment freely and without hesitation. However, Kazen's testimony is that the entry and search were conducted contrary to his express protestations. His testimony is corroborated by the affidavit of the defendant. Obviously, the court must decide an issue of credibility. In light of the serious contradictions of the officers' testimony, the defendant contends that Kazen's version is the more credible.

Of note regarding the issue of consent is a fact that the police and Kazen agree upon. After his arrest, Kazen was asked at the police station to execute a consent form. The police would have the court believe that they wanted to gain his consent to return to continue the search. Kazen testified that the police were attempting to legally justify what had already taken place. If the police are to be believed as to what had taken place, they had sufficient grounds to obtain a warrant, and therefore would not need consent. It simply makes more sense that the officers were concerned with the legality of what had taken place, and were attempting to justify the search retroactively. Again, the court in making its decision must consider the serious questions as to the officers' credibility.

Even if the court finds that Kazen, by his words, allowed the police to enter into the apartment the court must determine whether the consent was freely and voluntarily given. It is basic law that consent must be more than submission or acquiescence to the officers' authority.

All witnesses agreed that the officers had their weapons drawn. The officers, of course, minimize the issue. One officer even testified that Kazen would not have been able to see whether the weapon was drawn. However, Charles Moniz was clearly aware of the fact. Kazen testified to a scenario that was much more aggressive. He stated that the officers were excited and nervous, and that they immediately put a gun to his head.

The two versions could not be more disparate: the police say they acted in a calm and professional manner, and Kazen describes a forceful and intimidating encounter. Kazen also relates threats made that, if he did not cooperate, he would be charged as an accessory.

Common sense and experience, as well as the questions concerning the credibility of the officers, should lead the court to conclude that the events occurred in a manner as described by Kazen. Under all the circumstances, it is more likely that Kazen would not have felt free to deny the officers' request to enter and search his apartment.

## EXIGENCY

*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

4

23

It is anticipated that the Commonwealth will argue that, regardless of the determination on the consent issue, the entry, arrest and search were justified by exigent circumstances. The defendant, obviously, submits that the facts of this case do not support the actions of the officers on that basis.

The Commonwealth has the burden of convincing the court that there were such exigent circumstances as to relieve the requirement of obtaining a warrant. Again, the credibility of the officers is key in assessing whether the Commonwealth has met its burden.

The defendant believes that the facts of this case do not rise anywhere close to those in cases where exigent circumstances have been found. For example, there is great contrast between this case and <u>Commonwealth v. Scott</u>, supra and <u>Commonwealth v. Paniaqua</u>, 413 Mass. 796, 604 N.E.2d 1278. While the crime of armed robbery is certainly serious, there is nothing "unusually brutal" about it. Further, there is no indication that there was any ongoing threat to others at the time the search took place.

The factors to be considered by the court on an issue of exigent circumstances are enumerated in <u>Commonwealth v. Kiser</u> 48 Mass.App.Ct. 647, 724 N.E.2d 348. They are:

(1) The crime is one of violence and the suspect is reported to be armed and dangerous. Although the offense of armed robbery is one of violence and there may have been information that the assailant was armed, there was no evidence that he was particularly dangerous. There had been no report of injuries.

(2) Probable cause to believe that the suspect had committed a felony and that he was in the dwelling. In this case, the defendant suggests that the proof was lacking on both prongs. The defendant submits that the police officers had not been given the name of the alleged robber at the time they entered the apartment. They did not know that he allegedly frequented the apartment in question. Although the officers claim that they saw the defendant looking out the apartment windows, Mr. Moniz did not make the same observations. Obviously, not having seen Mr. Cabral looking out the windows, Moniz could not identify that person as the individual he saw leaving the gas station. Further, the information gathered from the illegal entry and search of the automobile cannot aid the Commonwealth on this issue. The officers had not spoken to Mrs. Moniz, so information that they claim they received from her should not be used toward a finding of probable cause.

(3) The entry had been made peaceable, and preferably in the daytime. Although the entry was in the daytime, the credible testimony of John Kazen describes anything but a peaceable incident. According to Kazen, the officers' weapons were drawn,



*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

they were yelling, nervous and excited, and they immediately put
a gun to his head.

(4) A likelihood that the delay caused by obtaining a warrant would
facilitate a destruction of evidence or property. The police had the
building surrounded and under control. The evidence (a weapon,
clothing, etc.) in question is not the type (such as narcotics) that
would easily be destroyed in the apartment.

(5) A likelihood that the suspect would escape if not promptly
apprehended. There is simply no reasonable possibility, in the
circumstances presented here, that there was any opportunity for a
suspect in the apartment to elude the police.

(6) A showing of a reasonable basis for believing that delay would
subject the officers or others to physical harm. Again, there has
been no showing by the Commonwealth that this requirement has
been met. There were no threats or attempts of violence by the
suspect to the officers or others in the vicinity, and they had the
scene under control. Likewise, there is no basis for a finding that
there was any danger to anyone in the apartment.

On all the credible evidence, the Commonwealth has not met its
burden in proving that the police were justified in their warrantless entry into
the apartment, and the subsequent arrest of the defendant and search of the
premises.

## SCOPE OF THE SEARCH

Even if the entry into the apartment is upheld by the court on the basis
of exigent circumstances, the defendant suggests that their authority to do so
ended upon his arrest in the kitchen area. The purpose of an emergency entry
in the residence is not to search for evidence of the crime. A search incident
to arrest is not permitted beyond the area from which the arrestee might obtain
a weapon or destroy evidence. Kazen testified, credibly, that the officers
immediately began to walk throughout the apartment. He protested numerous
times. As stated earlier, the police did not have consent to search the
apartment. At the point of arrest in the kitchen, both occupants were under
control. There was nothing within their reach that would endanger the
officers.

Furthermore, there was nothing in plain view that appeared to be
contraband or evidence of the crime. In fact, the pocketbook seized was
located two rooms away, in the bedroom. Even Officer Malek is to be
believed as to how he first saw the pocketbook, there was no cause to believe
that it was related to the crime. Kazen testified that, when asked about the
pocketbook, he told them that he had a longtime live-in girlfriend (which fact
he believed they already knew) and that he thought it was hers. There is
simply no justification for the seizure and examination of the pocketbook.



*Stephen C. Nadeau*
**Attorney at Law**

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

6

25

Likewise, the items found by Officer Beausoleil were well beyond the control of the defendant. They were found in the parlor, which was the next room from were the defendant was in custody. Further, it is obvious, even from the officers' testimony, that these items were not observed in plain view as they were talking to Kazen or the defendant. It is clear that the discovery of these items was the result of a search which, under the circumstances, was impermissible.

Finally, the discovery of the items in the apartment cannot be upheld under the theory that it was the product of a protective sweep. The officers had no reasonable basis for believing that there was anyone else in the residence. They had not seen anyone, nor had they heard any noises. There was no evidence of any other suspicious activity. Further, it is clear that the officers believed that they were looking for a single suspect in the robbery, and they believed they had that suspect in custody.

A protective sweep is a quick and limited search of a premises incident to arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. <u>Maryland v. Buie</u> 494 U.S. 325, 110 S.Ct. 1093.

Obviously, under the circumstances described in this case, the officers were not conducting a valid protective sweep when they discovered the items in question.

## **CONCLUSION**

Based upon all the credible evidence, the court should conclude that the entry and search into the motor vehicle, the entry into the apartment and arrest of the defendant, and the search of the residence and discovery of evidence were all illegal in that they did not conform to any recognized exception to the warrant requirements. Furthermore, the warrant was largely based upon the information and evidence obtained from the illegal searches and arrest, and therefore is the "fruit of the poisonous tree". The evidence seized in the search by warrant should also be excluded from evidence.

Anthony Cabral
By his attorney

Stephen C. Nadeau
190 Rock Street, PO Box 3128
Fall River, MA 02720
(508) 679-2330
BBO# 366300



*Stephen C. Nadeau*
**Attorney at Law**

**190 ROCK STREET**
**P.O. BOX 3128**
**FALL RIVER, MA 02722**
**(508) 679-2330**
**Fax. (508) 673-0146**

7

26

# Stephen C. Nadeau

### Attorney at Law

190 Rock Street ⁄ P.O. Box 3128

Fall River, Massachusetts 02722⁄3128

---

(508) 679⁄2330   Fax. (508) 673⁄0146

December 6, 2000

Magistrate
Worcester Superior Court
Room 21
2 Main Street
Worcester, MA 01608

Re:    Commonwealth vs. Anthony Cabral
       **Bristol Superior Court # 0073CR0228**

Dear Sir or Madam:

    Enclosed please find Defendant's Memorandum In Support of Motion to Suppress. This relates to a Bristol Superior Court matter that Judge Toomey has under consideration. **I am requesting that this Memorandum be directed to Judge Toomey upon receipt, since the due date is December 7, 2000.**

    Thank you for your help in this matter.

Sincerely,

Stephen C. Nadeau

SCN/jp
Enc
cc:    Magistrate, Bristol Superior Court
       David Crowley, ADA

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                          SUPERIOR COURT
                                      #9973CR0228


**********************
COMMONWEALTH

       v.                             AFFIDAVIT IN SUPPORT
                                      OF MOTION TO SUPPRESS

ANTHONY CABRAL
**********************

I, Anthony Cabral, under the penalties of perjury, depose and state:

1. I am the defendant in this matter.

2. On June 21, 1999 at approximately 6:30 AM my motor vehicle was parked in the vicinity of 181 Division Street, Fall River, Massachusetts. The vehicle was legally parked, the keys were in my possession, and the engine was not running.

3. At that same time, I was lawfully inside of the residence of a friend, John Kazen, at 181 Division Street, Fall River.

4. While I was in the apartment, I heard someone calling "Tony" and "Tony Cabral, come here". I later learned that it was police officers calling. In response to my name being called, I walked into the kitchen.

5. When I walked into the kitchen, the police ordered me to a counter area and told me to place my hands on the counter. I was then pat frisked and placed in handcuffs.

6. During this time I heard John Kazen telling the police that they had no right to be in his home, that they could not be looking throughout the department, and otherwise protesting their presence.

7. I also heard an officer tell Mr. Kazen that, if he did not consent to the search, he would be charged with armed robbery. Mr. Kazen continued to protest and tell the police that he did not consent to their presence and search of the home.



*Stephen C. Nadeau*
Attorney at Law
190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

28

8.  Throughout this time, I observed police officers walking from room to room in the apartment, and returning to the kitchen several times with various items.

9.  At no time did Mr. Kazen or I consent to the presence of the officers in the apartment, nor did he allow them to look around.

10.  I have reviewed the police report regarding this matter. The areas of the living room and bedroom where officers allegedly found items are not visible from the kitchen.

Signed under the pains and penalties of perjury this 2 day of August, 2000.





*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

29

**<u>Salman</u> Motion  (Motion to Dismiss)**

1/4

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

BRISTOL, SS
SUPERIOR COURT
#0073CR0253

**— 9 2001**

MARC J. SANTOS
CLERK

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
COMMONWEALTH,
                 Plaintiff

VS.                                    MOTION TO DISMISS

ANTHONY CABRAL,
                 Defendant
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Now comes the defendant and moves that this Honorable Court dismiss all pending indictments in this matter.

As grounds therefore the defendant states that the Commonwealth, through its agents, has introduced false and/or misleading testimony to the grand jury.  Commonwealth v. Salman 387 Mass. 160, 439 N.E.2d 245.

*After hearing and consideration
thereof, this motion is DENIED
(See Memorandum of Decision)
(McLaughlin, J) March 13, 2001*

*Helen F. Kelly,
Asst Clerk*

Anthony Cabral
By his Attorney

Stephen C. Nadeau
190 Rock Street, PO Box 3128
Fall River, MA 02722
(508) 679-2330
BBO#366300

*Stephen C. Nadeau*
Attorney at Law
190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

30

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                          SUPERIOR COURT
                                      #0073CR0228


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMMONWEALTH,
                    Plaintiff


       VS.                           AFFIDAVIT IN SUPPORT OF
                                     MOTION TO DISMISS


ANTHONY CABRAL,
                    Defendant
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Stephen C. Nadeau, under oath state as follows:

1. I am the attorney for the defendant in this matter and I have reviewed the
   Grand Jury Minutes provided to me by the Commonwealth.

2. The Commonwealth presented one witness before the Grand Jury in this
   matter, Michael Malek, a Fall River Police Officer.

3. Officer Malek testified that, at approximately 6:00 am on June 21, 1999,
   he was dispatched to the Mutual Gas Station regarding an "unknown
   emergency".

4. Officer Malek testified that he first spoke with a witness, Charles Moniz,
   and was given information regarding a robbery.  Malek further testified
   that Mr. Moniz gave him a description of the assailant and information
   regarding his vehicle and direction of escape. Acting on this information,
   Malek commenced a search for the robber and the vehicle.  A short
   distance from the gas station, he came upon a vehicle which he
   investigated. (pages 4 through 6)

5. Charles Moniz has testified at a hearing on a Motion to Suppress.  He
   testified that he witnessed a suspicious individual leave the gas station,
   and he followed that person.  However, he unequivocally stated that he did
   not speak to Officer Malek at the scene of the Mutual Gas Station.  He
   stated that he did not speak to any officers until he came upon Malek and



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

31

other officers searching a motor vehicle allegedly owned by the defendant. He did not give the police any information regarding the assailant or the vehicle until after they were investigating the vehicle.

6.  Malek testified that, at the scene of the auto, he again spoke to Charles Moniz. According to Malek, Moniz stated that the man was in a house on Division Street. He testified that Moniz gave him additional information, including that the suspect's name was Tony Cabral and that he (Moniz) knew that Cabral had a friend living in that house on Division Street. (page 8)

7.  Moniz testified that, at the time of the police investigation, he knew the defendant by sight. However, he did not know the defendant's name and therefore, obviously, did not give a name to the police. Further, Moniz also lived in the house that was identified, but in a separate apartment. He testified that he had never seen the defendant there before, and did not give that information to the police.

8.  Malek then testified that, as the officers were investigating the house, they encountered Charles Moniz's mother in the yard. According to the testimony, Mrs. Moniz told the police that she had seen a man run up the stairs, and she recognized the man to be Mr. Cabral. (pages 8 to 9)

9.  Mrs. Moniz also testified at the Motion to Suppress. She stated that she was not outside the building and did not speak to police at any time that morning. She also testified that she did not know the defendant by name and had never seen him before.

Signed under the pains and penalties of perjury, this 8th day of January, 2001.


_____
Stephen C. Nadeau



*Stephen C. Nadeau*
**Attorney at Law**

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
Fax. (508) 673-0146

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                    SUPERIOR COURT
                                               GRAND JURY

IN THE MATTER OF: ANTHONY CABRAL

APPEARANCE:        Lewis Armistead, Assistant District Attorney
                   Jeanne Veenstra, Assistant District Attorney
                   Bristol County District Attorney's Office
                   888 Purchase Street
                   New Bedford, Massachusetts  02740
                   Representing the Commonwealth

PLACE:             Fall River Durfee Complex
                   Grand Jury Room
                   259 Rock Street
                   Fall River, Massachusetts  02720

DATE:              Wednesday, July 14, 1999

**PALLATRONI COURT REPORTING**
*Certified Verbatim Reporters*
*Three Terry Drive*
*South Dartmouth, MA  02748-2323*
*(508) 993-0510*
*(800) 498-0510*

33

2

(REPORTER'S NOTE:  If this transcript contains quoted
material, such material is reproduced as read or quoted by
the speaker.)

## I N D E X

Witness                                                          Page

Officer Michael Malek                                             3

## E X H I B I T S

No.              Description                                     Page

          There were no exhibits marked.

3

OFFICER MICHAEL MALEK SWORN

DIRECT EXAMINATION

(By Mr. Armistead)

1

2

3

4

5    Q.    Would you state your name for the record, please?

6    A.    Michael Malek.

7    Q.    And you're a police officer with the Fall River

8          Police Department; is that correct?

9    A.    Yes, sir.

10   Q.    And how long -- what's your rank now, sir?

11   A.    Truant Patrolman.

12   Q.    And how long have you held that rank?

13   A.    I'm in my 17th year.

14   Q.    Okay.  Now, Officer, I'd like to direct your

15         attention to early morning hours of June 21, 1999,

16         between the hours of, say, 6:00 and 6:30.  Were you

17         on duty on that date and at that time?

18   A.    Yes, I was.

19   Q.    Did you receive a radio dispatch to go to a Mutual

20         gas station which is located on Broadway in the City

21         of Fall River?

22   A.    Yes, I did.

23   Q.    Did you receive some information in that dispatch

24         prior to arriving at the location?

*Pallatroni Court Reporting* * (508) 993-0510

35

4

| | | |
|---|---|---|
| 1 | A. | It was given to me as there's an unknown emergency |
| 2 | | coming from the store. |
| 3 | Q. | Okay.  Now, upon your arrival, did you meet with |
| 4 | | anyone, sir? |
| 5 | A. | Yes, I did. |
| 6 | Q. | With whom did you meet? |
| 7 | A. | There were two clerks in the store, Rosemary Hobbs |
| 8 | | and Gloria Reardon.  There was also another male |
| 9 | | outside, later identified as Charles Moniz of 181 |
| 10 | | Division Street, Fall River. |
| 11 | Q. | Now, when you first met the -- when you first |
| 12 | | arrived at the scene, who is the first person that |
| 13 | | you met, sir? |
| 14 | A. | Mr. Moniz came to my -- ran towards my cruiser. |
| 15 | Q. | And did Mr. Moniz tell you anything? |
| 16 | A. | He had just stated that the store had been held up. |
| 17 | Q. | Did he provide you with any other information, sir? |
| 18 | A. | He informed me that a male had exited the store |
| 19 | | wearing a black mask, carrying what appeared to be a |
| 20 | | handgun.  The male ran west on Bradford Avenue, |
| 21 | | which is right along the side of the Mutual gas |
| 22 | | station, into an auto, then left the area traveling |
| 23 | | west on Bradford Avenue. |
| 24 | Q. | Did he provide a description of the male? |

*\* Pallatroni Court Reporting \* (508) 993-0510*

36

5

| | | |
|---|---|---|
| 1 | A. | Yes, he did. |
| 2 | Q. | What information? |
| 3 | A. | He appeared to be a white male, with a black mask on |
| 4 | | his face, wearing a winter jacket.  He also stated |
| 5 | | that the male also had some type of spray bottle in |
| 6 | | his hand also. |
| 7 | Q. | Now you said that there -- you also met with the |
| 8 | | clerks who were in the store; is that right? |
| 9 | A. | Briefly upon my arrival, yes. |
| 10 | Q. | When you first met, did you meet with both clerks or |
| 11 | | one of the clerks first? |
| 12 | A. | I met with Ms. Hobbs first. |
| 13 | Q. | And could you describe Ms. Hobbs as you first |
| 14 | | approached her? |
| 15 | A. | She was outside the store.  She was crying.  She was |
| 16 | | shaking, appeared visibly upset, kind of unsteady on |
| 17 | | her feet where she was almost like crouching at |
| 18 | | times. |
| 19 | Q. | Did she give you a report at that time, sir? |
| 20 | A. | I really didn't speak to her all that much at the |
| 21 | | initial stage, no. |
| 22 | Q. | Okay.  Did you have an opportunity at the initial |
| 23 | | stage to speak to Ms. Reardon? |
| 24 | A. | Not initially, no. |

*\* Pallatroni Court Reporting \* (508) 993-0510*

37

6

| | | |
|---|---|---|
| 1 | Q. | Okay.  Now, based on the information that you |
| 2 | | received from Mr. Moniz, what did you then do, sir? |
| 3 | A. | I then traveled westerly on Bradford Avenue.  I |
| 4 | | turned down onto Almond Street, which runs right off |
| 5 | | Bradford Avenue, searching the area for this vehicle |
| 6 | | and suspect.  As I just passed Division Street, just |
| 7 | | north of Division Street, I observed an auto on the |
| 8 | | left-hand side of the road, which is the west side |
| 9 | | of the roadway.  I noticed that the engine was |
| 10 | | running.  The front driver's side door was open. |
| 11 | | The auto was partially into the street.  It was |
| 12 | | almost like a diagonal park.  There wasn't anybody |
| 13 | | in the vehicle at that time. |
| 14 | Q. | And what did you do upon seeing the vehicle? |
| 15 | A. | Upon further investigation, I requested a listing on |
| 16 | | the registration plate.  And as I exited the |
| 17 | | cruiser, I noticed that the rear numbers on that |
| 18 | | particular plate appeared there was an attempt to |
| 19 | | disguise the numbers and letters.  The last two |
| 20 | | letters on the plate appeared to have been changed |
| 21 | | from the original letters through either scraping |
| 22 | | off the paint or adding on paint to make a letter |
| 23 | | look like a number. |
| 24 | Q. | Okay.  Now what did you do when you saw that, sir? |

7

| | | |
|---|---|---|
| 1 | | Did you conduct any further investigation of the |
| 2 | | vehicle? |
| 3 | A. | I looked inside the front of the vehicle.  On the |
| 4 | | floor, next to the front driver's seat, I noticed |
| 5 | | what appeared to be a -- like a home-made type card, |
| 6 | | like a child would make in school or something to |
| 7 | | that effect.  On this particular card -- it was a |
| 8 | | Father's Day card.  There was a little caricature |
| 9 | | of a male lifting a barbell. |
| 10 | Q. | Did you recognize the male? |
| 11 | A. | Well, it was just a child's drawing. |
| 12 | Q. | Oh, okay. |
| 13 | A. | Next to it was a little arrow that stated Tony |
| 14 | | Cabral and underneath it was signed from what I |
| 15 | | took at the time to be that particular person's son. |
| 16 | Q. | Okay.  And what did you do when you found that card? |
| 17 | A. | Looking at that, Officer Alan Beausoleil, who was |
| 18 | | also sent down to assist me, we had a brief |
| 19 | | conversation.  Both of us are aware of the male, |
| 20 | | Anthony Cabral, who reside -- well, to our |
| 21 | | knowledge, had resided in that area at the time.  I |
| 22 | | had known Mr. Cabral for several years and knew he |
| 23 | | was -- |
| 24 | Q. | In the area? |

*\* Pallatroni Court Reporting \* (508) 993-0510*

8

| | | |
|---|---|---|
| 1 | A. | -- frequent to that area. |
| 2 | Q. | Okay.  So what did you do after recognizing that Mr. |
| 3 | | Cabral might live in the area? |
| 4 | A. | At that point Mr. Moniz was coming down Almond |
| 5 | | Street.  Again, he exited a motor vehicle, and he |
| 6 | | was running towards us and also pointing to a house |
| 7 | | on Division Street.  Mr. Moniz approached us, stated |
| 8 | | that he had followed this male.  He noticed the male |
| 9 | | park the auto, get out of the auto.  At this time |
| 10 | | the male had removed the mask.  He exited the |
| 11 | | vehicle.  Mr. Moniz saw this particular individual, |
| 12 | | recognized this male, and saw him carry in a woman's |
| 13 | | pocketbook and several other items in his hand. |
| 14 | Q. | Now whom did he recognize the man to be? |
| 15 | A. | Tony Cabral. |
| 16 | Q. | Now what did you do upon receiving that information? |
| 17 | A. | The house Mr. Moniz was pointing to, we responded to |
| 18 | | that area.  Apparently Mr. Moniz also knows Mr. |
| 19 | | Cabral and stated Mr. Cabral had a friend living at |
| 20 | | that particular address on the second floor, east |
| 21 | | side.  Moniz stated he observed the male run towards |
| 22 | | the house, and that particular house in question is |
| 23 | | owned by Mr. Moniz's mother, who was also in the |
| 24 | | yard at this time.  She stated that she saw the male |

9

```
 1        run up the stairs carrying a woman's pocketbook and

 2        several other items.

 3   Q.   Did she recognize the person?

 4   A.   She said it was Mr. Cabral.

 5   Q.   Oh, she said, okay.  Now what did you then do after

 6        you had -- armed with that information what did you

 7        then do, sir?

 8   A.   At that point Officer Sean Botelho also arrived at

 9        my location to give us additional information.

10        After receiving that information, myself and Botelho

11        went towards the front of the house behind some

12        parked vehicles observing the front of the house,

13        while Officer Tosior and Officer Beausoleil went up

14        to the back of the house.  At this particular point,

15        from the street, there was a window open, completely

16        open.  The screen was not in.  We saw Mr. Cabral

17        stick his head out the window and look around.  When

18        he saw us, we told him not to move.  He then ducked

19        back into the house.  We stayed outside at that

20        location for maybe 30 seconds to a minute and a half

21        not seeing him.  Then I saw him walk by a different

22        window, still looking out the window.  Apparently at

23        that point Officers Tosior and Beausoleil were

24        allowed into the house by the tenant of that
```

*\* Pallatroni Court Reporting \* (508) 993-0510*

| | | |
|---|---|---|
| 1 | | particular apartment.  Officer Botelho remained out |
| 2 | | front.  I ran up the back stairway to assist |
| 3 | | Officers Tosior and Beausoleil. |
| 4 | Q. | Now you gained entrance into the apartment? |
| 5 | A. | Yes. |
| 6 | Q. | And once inside, did you see -- who did you see? |
| 7 | A. | At that point I saw Mr. Cabral.  He was sitting on a |
| 8 | | -- it's like a dinette chair, next to a little |
| 9 | | counter.  He was sweating profusely.  He was out of |
| 10 | | breath.  His clothes were saturated from sweat. |
| 11 | Q. | Did you speak with Mr. Cabral? |
| 12 | A. | I started to, yes, sir. |
| 13 | Q. | And was he advised of any rights? |
| 14 | A. | Yes.  We advised him of his rights, and also the |
| 15 | | tenant of the house who was also there.  We informed |
| 16 | | them of their rights. |
| 17 | Q. | Did he indicate that he wished to speak to you? |
| 18 | A. | At that point he said he would talk.  He asked him |
| 19 | | why he was sweating.  He said he wasn't sweating. |
| 20 | | He had just washed his hair. |
| 21 | Q. | Now did you direct his attention to anything in the |
| 22 | | apartment, sir? |
| 23 | A. | You're talking about Mr. Cabral? |
| 24 | Q. | Mr. Cabral, yes. |

11

| | | |
|---|---|---|
| 1 | A. | At that particular time I didn't. |
| 2 | Q. | Okay. At some point -- |
| 3 | A. | Just outside of the -- his sweating. |
| 4 | Q. | Okay. At some later point, directing your attention |
| 5 | | to the first paragraph of page 2 of the Supplement, |
| 6 | | did you direct either of the occupants' attention to |
| 7 | | any items in the apartment, sir? |
| 8 | A. | Affirmative. After we spoke to Mr. Kate -- I mean, |
| 9 | | Mr. Cabral, the other tenant of the apartment we |
| 10 | | spoke to in a rear room. To avoid any type of |
| 11 | | conflicting stories, we brought the other gentleman |
| 12 | | into a front room. At that point, while we were |
| 13 | | talking to this other individual, we were in a |
| 14 | | living room. I could see a bedroom right off to my |
| 15 | | right. Right on top of this bed was a black leather |
| 16 | | pocketbook, a lady's pocketbook, and on top of that |
| 17 | | was a black leather glove. |
| 18 | Q. | Did you have an opportunity to look at that |
| 19 | | pocketbook? |
| 20 | A. | Yes, sir. I went into the bedroom. I retrieved |
| 21 | | that pocketbook. I opened it up, and I found |
| 22 | | numerous items in it, including identification |
| 23 | | which belonged to Ms. Hobbs who was the complainer |
| 24 | | from the Mutual gas station. |

43

12

| | | |
|---|---|---|
| 1 | Q. | Had Ms. Hobbs indicated that her pocketbook was |
| 2 | | taken? |
| 3 | A. | Initially I did not receive that information, but |
| 4 | | that was relayed when Officer Botelho arrived at the |
| 5 | | scene.  So at that point I was aware that she was |
| 6 | | missing her pocketbook. |
| 7 | Q. | Now what did you do at that point, sir? |
| 8 | A. | At that point I seized the pocketbook, went back |
| 9 | | into the front room.  And at that time I observed |
| 10 | | Officer Beausoleil.  He had observed some items on a |
| 11 | | chair and on the floor just behind him.  There was a |
| 12 | | winter jacket.  There was a replica of a handgun |
| 13 | | that was on the ground.  There were also pants and |
| 14 | | other clothing.  There was also a spray bottle which |
| 15 | | contained a bright blue liquid in it, which we |
| 16 | | weren't exactly sure what it was.  We also found a |
| 17 | | black mask in with the clothing. |
| 18 | Q. | Now did you seize the pieces of those items? |
| 19 | A. | Yes, sir, I did. |
| 20 | Q. | Okay.  Now did you return to the gas station? |
| 21 | A. | Yes, I did. |
| 22 | Q. | And with whom did you speak? |
| 23 | A. | I spoke with Ms. Hobbs and the other clerk, Gloria |
| 24 | | Reardon. |

*Pallatroni Court Reporting * (508) 993-0510*

13

| | | |
|---|---|---|
| 1 | Q. | Did they tell you what happened? |
| 2 | A. | Yes, they did. |
| 3 | Q. | What did they tell you? |
| 4 | A. | They stated Ms. Hobbs was in a back office counting |
| 5 | | the weekend receipts.  They stated the office door |
| 6 | | was not locked and the front door to the business |
| 7 | | was open.  Hobbs stated she was in the back |
| 8 | | counting, and Reardon was working the front |
| 9 | | register.  Hobbs stated, as she was counting the |
| 10 | | money, she observed a male walk in wearing this |
| 11 | | mask.  He didn't say anything at the time.  She said |
| 12 | | she became frightened because the male just watched |
| 13 | | her.  He attempted to take a pile of money.  And as |
| 14 | | he was reaching for it, she -- she moved the money |
| 15 | | to the side.  Still fearing what might happen, she |
| 16 | | ended up getting up, running, and yelled for Reardon |
| 17 | | to set the alarm that they were being robbed.  As |
| 18 | | she was in the process of doing this, this male |
| 19 | | squirted her in the facial area with this liquid. |
| 20 | | Reardon hit the alarm, and they ran out the front |
| 21 | | door leaving this male behind in the store. |
| 22 | Q. | Now, after you took the statement from the clerks, |
| 23 | | did you show them anything? |
| 24 | A. | Yes, sir.  I had taken the clothing, the jacket, the |

*Pallatroni Court Reporting* * (508) 993-0510

45

14

1   mask, etcetera.  It was in my cruiser.  I asked her

2   if she could identify this.  The clothing, she

3   identified it as the clothing the male was wearing.

4   She also identified the spray bottle and the

5   pocketbook which we had.  She identified as hers.

6   She did state at the time she was missing her wallet

7   that was inside the pocketbook.

8   Q.  Okay.

9   A.  As well as some money that was also missing from the

10  store.

11  Q.  And that was Ms. Reardon?

12  A.  Yes -- well, Reardon and Hobbs.  It was Hobbs'

13  pocketbook.

14  Q.  It was Hobbs' pocketbook, okay.

15  A.  Yes.

16  Q.  Now do you know if the gas station had any kind of a

17  security camera?

18  A.  Yes, sir.

19  Q.  Was it working that morning?

20  A.  Yes, sir.

21  Q.  And did you have an opportunity to view the video of

22  the incident?

23  A.  Yes, sir.  I viewed the video.  I took the tape, and

24  it was turned over to our Major Crimes Division.

15

1    Q.    And when you viewed the video, what did you see?

2    A.    You could see the male entering the rear room.  You

3          could also see Ms. Hobbs and Ms. Reardon running

4          from the building, also the male exiting the store.

5    Q.    Okay.  The water bottle, did you have an opportunity

6          to look inside the water bottle?

7    A.    Yes, I did.

8    Q.    Could you describe the contents of the water bottle?

9    A.    It appeared to be a very bright-blue substance,

10         almost the color of a -- like a windshield wash type

11         thing.  It really didn't have any distinguished

12         smell or anything.  Ms. Hobbs said she wasn't burned

13         by it when it struck her in the eyes.  That was

14         turned over as evidence, and I'm not sure if any

15         type of analysis is going to be made on it.  It's a

16         different division that handles that.

17   Q.    Did you have an opportunity to count the cash that

18         was located in the apartment?

19   A.    Yes.  After it was located in the apartment, I

20         returned the money to the station.  Myself and

21         Sergeant Briand counted the money.

22   Q.    And how much was found in the apartment?

23   A.    The exact total we took out of the apartment was

24         $7983.

16

1   Q.   And how much was reported to be missing, sir?

2   A.   I believe -- I just have to check.  I think she said

3        around $8000.

4   Q.   Again, I'm sorry, Officer.  Where was that cash

5        found?

6   A.   Yes, originally Hobbs said it was about $8000 that

7        was missing.  We had to go back to the apartment

8        after obtaining a search warrant, after realizing

9        that we did not get all of the money from -- that

10       was reported missing.  I entered the bedroom where I

11       found the pocketbook, and next to the window where I

12       had originally seen Mr. Cabral duck his head out the

13       window and look at us, there was a large laundry

14       basket full with dirty clothes.  I had removed some

15       clothing, and I found it in a bag right in the

16       laundry basket where Mr. Cabral had looked out the

17       window.

18                MR. ARMISTEAD: Okay.  Thank you.  I

19            haven't any further questions of the officer.

20            Are there any questions of the jurors?

21                     NO RESPONSE

22                MR. ARMISTEAD: Thank you, Officer.  You're

23            excused.  Would you wait outside?

24            WHEREBY THE PROCEEDINGS CONCLUDED

* Pallatroni Court Reporting * (508) 993-0510

48

17

## C E R T I F I C A T E

I, TERESA LYNNE CHELLMAN, a
Notary Public, do hereby certify that the foregoing
16 pages are a true and accurate transcription of my
audiographic notes taken in the matter of Anthony
Cabral Grand Jury proceedings on the 14th day of
July, 1999, to the best of my skill, knowledge and
ability.

_____
Teresa Lynne Chellman,
Notary Public

My Commission Expires:
February 21, 2003.

49

**Motion to Dismiss Counsel**

24
1 of 2

# Commonwealth of Massachusetts

Bristol                                          New Bedford



Commonwealth                              Superior Court

v.

Anthony C____                              t. # 99T3CR0228

                                            Motion to Dismiss

Denied - Held for trial   June 10, 2001
6/21/01

### Motion to dismiss Counsel
### Also Appointment of New Counsel

Now Comes the Defendant moves that this Honorable Court dismiss Counsel, and Appoint New Counsel, As reason therefore he states.

1.) The Defendant and Counsel had a Break-Down in Communication.

2.) The Defendant and Counsel cannot Agree on A Strategy For defense For pre-trial, nor A defense For trial.

3.) The Defendant Feel Counsel is not For his Best interest, nor is Counsel performing in his Best Capability.

56

2 of 2

Respectfully Submitted:


Signature Anthony Cabral
Anthony Cabral  Pro-Se

Date June 10,2001

Plymouth County House of
Correction, 26 long Pond
Road Plymouth, Ma 02360

51

1 of 2

# Commonwealth of Massachusetts

Bristol      SS.

Commonwealth
v.
Anthony Cabral

New Bedford
Superior Court

Dkt.# 9473CR0228

Motion to dismiss
Counsel

June 10, 2001

## Affidavet

1.) Please Find Enclosed a copy of Counsel letter telling me to call collect any time, see also the Day's and time's Counsel personally denied my phone calls. Also denied my calls the Day Before trial, twice that Day, as well as the Day of trial, Clearly this is not in my Best interest, There is No Communication Between Counsel, Counsel and myself.

2.) The communication were do have is one of disagreements, I've Also sent Counsel a number of letters, Asking to File pre-trial motions, Counsel had Advised me, that he Filed

52

2 of 2

A particular motion to the Court And than Advised me two week Later he will not File the motion that were discuss, Counsel and myself cannot Agree on a Strategy, Counsel Also refuse's to File the nececcary Motions to litigate my Right For Appeal, he said to File the motions myself.

3.) I Feel Counsel is not protecting my Right to have A Fair trial, were Also had A discussion of witnesses For trial, Conceting A particular Eyewitness Mrs.Moniz, Counsel told me, were do not need nor want Mrs. Moniz At trial, This witness testimony is Exculpatory Evidence.

4.) I'm to Belief Counsel will not proform in my Best interest, nor to his Best Capabilety, Do to the Degree of ineffective-ness I'm asking this Honorable Court to dismiss Counsel, As well As Appointment of New Counsel

Signed under the penalties of perjury, this 10.day of June,2001
Anthony Cabral
Anthony Cabral

Signature.

53

Mr. Anthony Cabral
May 5, 2001
Page 2

3. **Exculpatory Evidence:** This is evidence that would show you didn't commit the crime, or that would show that the witnesses that are going to testify against you are mistaken.

4. **Information about the Crime:** Any information that you can provide to help in your defense.

All the above information is needed rather quickly because as I told you the trial date is May 16, 2001. When I was appointed I was told that May 16, 2001, is a firm trial date because the case has lingered on for a long time. The Commonwealth thinks you are practicing delay tactics and they will oppose any more continuances.

From the police reports and discovery I have received the evidence against you is very strong. We, therefore, have to be prepared to refute and rebut the evidence and show that the eyewitnesses were wrong and that there are other people who could have committed the crime. As you probably already know, this is a life felony, and if you are convicted you will serve many years in prison.

If you have any questions or comments please write to me or call collect any time. Time is running out and if this case goes to trial I want to be fully prepared.

Respectfully,

Daniel M. Rich

Enclosure

[CALL ANY TIME]

1.) CALL MADE MAY 15, 2001 AT 2:00 P.M. Mr. Rich DENIED the call two time

2.) CALL MADE MAY 15, 2001 AT 7:00 P.M. Mr. Rich DENIED the call

3.) CALL MADE MAY 16, 2001 AT 3:50 P.M. Mr. Rich DENIED the call

4.) CALL MADE MAY 30, 2001 AT 3:15 P.M. Mr. Rich DENIED the call

OVER → COPY

54

Anthony Cabral
Plymouth Count House of Correction
26 long Pond Road
Plymouth, Ma. 02360

DKT#9973CR0228

District Attorney Office
888 Purchase St.
New Bedford MA. 02741
P.O. Box 973

June 10, 2001

PLEASE provide defendant with a complete copy of the names of the witnesses the Commonwealth intends to call for trial.

In addition Defendant request the Commonwealth provide him with the following Commonwealth witnesses for trial.

1.) Delores Moniz
2.) Charles Moniz
3.) Rosemary Hobbs
4.) Gloria Readon
5.) Michael Malek
6.) Sean Botellho
7.) Alan Beausoleil

55

Counsel Motion
(Motion for Appearance of Counsel)

#42

1 of 3

8/07

Commonwealth of Massachusetts

Bristol   SS.                    Superior Court
                                 New Bedford MA.

BRISTOL SS SUPERIOR COURT
FILED
AUG 27 2001
MARC J. SANTOS, ESQ.
CLERK MAGISTRATE

Commonwealth
   v.
Anthony Cabral                  No. 9973CR0228 A-B

Motion For Appearance of
          Counsel

    Now Comes defendant and moves
this Honorable Court pursuant to the
16th Amendment to the United States
Constitution and Art. 12 Massachusetts
Declaration of Rights to Appear on
the record as Counsel in the Above

                    RESPECTFULLY Submitted:

                    Anthony Cabral
              8/23/01 Anthony Cabral   PRO-SE
                    P.C.C.F. 26 long Pond Road
                    Plymouth, MASS. 02360

                         SEE ENDORSEMENT ON
                         REVERSE ───→

56

[handwritten text in left margin, rotated]

2 of 3

# Commonwealth of Massachusetts

Bristol SS,                          Superior Court
                                      New Bedford MA,

Commonwealth

                                      DKT# 9973CRO228 A-B

Anthony Caboral

## Affidavit in Support of Motion
## For Appearance of Counsel

Signed under the pains and Penalties
of Perjury.

1.) My name is Anthony Caboral.
2.) I am the defendant in
      this case.
3.) I have read the Police
      report, Affidavit for the
      issuance of the Search
      warrant, And the grand Jury
      Minutes.
4.) The Court has refused to
      provide me with Adequate
      Counsel.

59

3 of 3

5.) I have No choice but
   to represent myself.


   Respectfully Submitted:


   Anthony Cabral
   Anthony Cabral pro-se
   P.C.C.F. long Pond Road
   Plymouth, Mass. 02360



date: August, 27
       2001

8/29

1 of 3

# Commonwealth of Massachusetts

Bristol    SS.

Superior Court
New Bedford TTA.

Commonwealth
V.
Anthony Cabral

DKT#9973CR0228 A-B

## Motion For Appearance of Counsel

Now Comes defendant and moves this Honorable Court pursuant to the 6th Amendment to the United Stated Constitution And Art. 12 Massachusetts Declaration of Rights to Appear on the record AS Counsel in the Above Entitled Matter

Respectfully Submitted:

Anthony Cabral
Anthony Cabral   pro-se
P.C.C.F. 26 long Pond Road
Plymouth, MASS. 02360

date: August 26. 2001

50

2 of 3

# Commonwealth of Massachusetts

Bristol SS,                          Superior Court
                                     New Bedford Ma,
Commonwealth

                                     DKT # 9973CR0228 A-B
Anthony Cabral

## Affidavit in Support of Motion
## For Appeatance of Counsel

Signed under the pains and Penalties
of Perjury.

1.) My name is Anthony Cabral.
2.) I am the defendant in
    this case.
3.) I have read the police
    report, Affidavit for the
    issuance of the Search
    warrant, And the grand Jury
    Minutes.
4.) The Court has refused to
    provide me with Adequate
    Counsel.

60

2 of 3

5.) I have No choice but
to represent Myself.

Respectfully Submitted:

Anthony Cabral
Anthony Cabral pro-se
P.C.C.F. long Pond Road
Plymouth, Mass. 02360

date: August, 27.
2001

61

Franks Motion

#H-

# COMMONWEALTH OF MASSACHUSETTS

**BRISTOL, SS**



BRISTOL SS SUPERIOR COURT

**FILED**

AUG 2 7 2001

MARC J. SANTOS, ESQ.
CLERK MAGISTRATE

**NEW BEDFORD SUPERIOR COURT**
**#9973 CR 0228**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS ) | **DEFENDANT'S MOTION FOR A** |
| vs. ) | **HEARING PURSUANT TO** |
| ) | **FRANKS VS. DELAWARE** |
| ANTHONY CABRAL ) | |
| Defendant ) | |

NOW COMES THE DEFENDANT, *ANTHONY CABRAL,* and moves that this
Honorable Court allow him an evidentiary hearing pursuant to Franks vs. Delaware, 438 U.S.
154 (1978). The defendant files herewith a memorandum in support of said motion.

Anthony Cabral

By his attorney

Daniel M. Rich
250 East Main Street
Norton, MA 02766
508-285-4725
BBO #418450

DATE: 8/07/01

62

# *COMMONWEALTH OF MASSACHUSETTS*

*BRISTOL, SS*                    *NEW BEDFORD SUPERIOR COURT*
                                 *# 9973 CR 0228*

| | | |
|---|---|---|
| **COMMONWEALTH OF MASSACHUSETTS** | ) | **DEFENDANT'S MEMORANDUM** |
| | ) | **IN SUPPORT OF HIS MOTION** |
| **vs.** | ) | **FOR A FRANK'S HEARING** |
| | ) | |
| **ANTHONY CABRAL** | ) | |
| **Defendant** | ) | |

## STATEMENT OF THE CASE

(The following "facts" recited herein are taken from the police report of Fall River Police Officer, Michael Malek. The defendant neither admits nor denies the same but for the purpose of this request for a Frank's motion they are adopted and outlined for the Court.)

On June 21, 1999, at approximately 6:22 a.m. Officer Michael Malek was dispatched to the Mutual Gas Station, 339 Broadway, Fall River, Massachusetts to investigate an "unknown emergency." Upon arrival Officer Malek observed a male run through the parking lot towards his cruiser. The male, later identified as Charles Moniz, 181 Division Street, Fall River, Massachusetts, told Officer Malik that a male just "held up" the store and was in a blue automobile which left the area travelling west on Bradford Avenue and possibly turning north along one of the side streets.

Moniz also told Officer Malek that this male had a black mask on his fact and was carrying a handgun. Also, he was wearing a hooded winter jacket and was in possession of some type of spray bottle.

Officer Malek began checking the area and later observed a blue Thunderbird car (Mass. Reg. 6139BS) parked on the west side of Almond Street, with the driver's side door open and the engine running. There was no one in the area. Also, Officer Malek noticed that the license plate appeared to be altered. Officer Malek looked inside the car and found a home made Father's Day card depicting a barbell being lifted by "Tony Cabral." Officer Malek knew an Anthony Cabral and that he lived in the area.

Several other officers arrived, including Officer Sean Botelho. Officer Botelho told Officer Malek that he had seen Anthony Cabral in the same automobile about twenty minutes earlier, about one block from the Mutual Gas Station. Also arriving at the automobile was Charles Moniz, who told police offices he had seen Anthony Cabral running in an apartment located at 181 Division Street. Mr. Moniz then stated that he knew who Anthony Cabral was and that he knew that Anthony Cabral had a friend who lived at 181 Division Street.

The officers then went to 181 Division Street, where they saw Anthony Cabral sticking his head out a second floor window. The officers went to the apartment, where the resident, John Kazen, allowed them entry. Once inside the apartment they saw Anthony Cabral, along with items they believed were either stolen in the armed robbery (black leather pocketbook) or used by the alleged robber (winter coat, toy gun). The police officers seized these items as evidence, and arrested Anthony Cabral.

Officer Malek returned to the police station and filed an application for a search warrant and supporting affidavits (attached hereto as Exhibit "A.") They later returned to the apartment and seized money, wallets, and items taken in the robbery.

2

64

**ISSUE:**    **DID OFFICER MALEK MAKE INTENTIONAL OR RECKLESS MISSTATEMENTS IN HIS APPLICATION FOR A SEARCH WARRANT**

**ARGUMENT**

The defendant is entitled to a preliminary hearing pursuant to <u>Frank's v. Delaware,</u> 438 U.S. 154 (1978) if he can show that Officer Malek made intentional or reckless misstatements in his application for a search warrant and those misstatements were necessary for the probable cause necessary to issue the warrant. However, in Massachusetts, the defendant should be entitled, under Article 14 of the Massachusetts Declaration of Rights, to a preliminary hearing without showing or establishing that the alleged misrepresentation was necessary for the establishment of probable cause. <u>Commonwealth v. Pignato,</u> 31 Mass. App. Ct. 907, 908 (1991), <u>Commonwealth v. Dion,</u> 31 Mass. App. Ct. 168, 170. n.3., <u>Commonwealth v Nine Hundred & Ninety-Two Dollars,</u> 383 Mass. 764, 768 (1981).

In the present case, Officer Malek made several misstatements in his affidavit in support of his search warrant for the premises at 181 Division Street, Fall River, Massachusetts. They are:

1.    Officer Malek stated that a witness, Charles Moniz, followed the alleged armed robber as the robber was leaving the gas station in his car. Officer Malek stated that Moniz saw the robber exited the driver's side door of the automobile when it stopped on Almond Street However, at a motion to suppress hearing at which Mr. Charles Moniz testified, he stated that he followed the automobile but didn'' see the suspect get out of his (the robber's car). (See Exhibit "B,"page 1-49, lines 3-8.) This fact is important because Officer Malek gives the impression in his affidavit that Mr. Moniz never lost sight of the alleged robber since he saw him come out of the gas station and enter his car. But in fact, Mr. Moniz did loose sight of the car.

2.    Officer Malek stated in his affidavit that Mr. Moniz said that the alleged suspect exited the automobile and left the automobile running. However, at the suppression hearing, (See Exhibit "B," page 1-28, lines 1-6), Mr. Moniz testified that he couldn't tell if the engine

3

was running or not. Again, Officer Malek gives a misstatement, which leaves the impression that Mr. Moniz never lost sight of the automobile and that the person who left the gas station in the blue automobile is definitely the person who exited it on Almond Street.

3.    Officer Malek's affidavit goes to say that when the alleged robber exited the automobile he did not have a mask on and that Mr. Moniz observed this male to be Anthony Cabral, dob: 6/8/65, and that Moniz knows Cabral.

In fact, Mr. Moniz did not know Cabral nor did he know his name. While it is true Mr. Moniz had seen Cabral before this occasion, he did not know him, (See Exhibit "B," page 1-24, lines 8-13).

This misstatement is vitally important because it gives the impression that Mr. Moniz was one hundred percent sure of the identity of the alleged robber and that the was quite familiar with him. This was simply not the case. In his statement at the motion to suppress (See Exhibit "B," page 1-39, lines 9-17) Mr. Moniz said he did not know Anthony Cabral's name until the police called it out. It was the police who supplied Mr. Moniz with the name Anthony Cabral, not visa versa.

4.    In the affidavit, Officer Malek stated that Mr. Moniz saw Anthony Cabral leave the parked automobile with a woman's black pocketbook (allegedly the pocketbook stolen at the gas station), and that he saw Anthony Cabral take them from the automobile. (See Exhibit "B," pages 1-49, lines 3-18)

However, when Mr. Moniz testified at the suppression hearing he said the person walking down the street had something like a wrapped up coat and a handbag, but he didn't see if these items came from the car.

Officer Malek's statement was simply not the truth. By giving erroneous information to the clerk magistrate he bolstered his chances of getting the search warrant.

4

The nub of the entire affidavit centers around the testimony received from Charles Moniz. According to the affidavit, Officer Malek's probable cause for the search warrant and investigation of 181 Division Street, Fall River, was from the information received from Charles Moniz. However, if Officer Malek correctly stated Mr. Moniz's statements then there is a possibility that the warrant may not have been issued.

The defendant avers that the discrepancies made in the search warrant were not simply the defendant's versions of the facts. These discrepancies were from the Commonwealth's witnesses and not interpretations of the defendant. When viewed objectively, it must give pause to the probable cause for the issuance of the search warrant.

## SUMMARY

The affidavit in support of the search warrant for 181 Division Street, Fall River, was replete with misstatements and inaccuracies that supplied the probable cause for the issuance of the warrant. Because of the conflicting statements of the Commonwealth's witness the defendant should be allowed to a hearing pursuant to Frank's v. Delaware, supra, to test the validity of the issuance of the search warrant.

Anthony Cabral

By his attorney

Daniel M. Rich
250 East Main Street
Norton, MA 02766
508-285-4725
BBO# 418450

DATE: 8/27/01

5

67

# EXHIBIT "A"

2ND DISTRICT CT.                    COURT DEPARTMENT

CRIMINAL                              DIVISION

MICHAEL MALEK
POSITION OF APPLICANT

PATROLMAN CITY OF FALL RIVER POLICE DEPT.

SEARCH WARRANT DOCKET NUMBER

I, the undersigned **APPLICANT**, being duly sworn, depose and say that:

1. I have the following information based upon the attached affidavit(s), consisting of a total of _____ pages, which is (are) incorporated herein by reference.

2. Based upon this information, there is **PROBABLE CAUSE** to believe that the property described below:

   [X] has been stolen, embezzled, or obtained by false pretenses.
   [ ] is intended for use or has been used as the means of committing a crime.
   [ ] has been concealed to prevent a crime from being discovered.
   [ ] is unlawfully possessed or concealed for an unlawful purpose.
   [X] is evidence of a crime or is evidence of criminal activity.
   [ ] other (specify)_____

3. I am seeking the issuance of a warrant to search for the following property (describe the property to be searched for as particularly as possible):
   APPROX. $8275.00 cash stolen from Mutual Gas STATION 339 BROADWAY

   ON 6/21/99.  ALSO SEEKING BLACK WALLET OWNED BY ROSEMARIE HOBBS

   329 JENCKS ST FR ALSO STOLEN IN ROBBERY.  WALLETT CONTAINED APPROX. $200.00

   AND PERSONAL PAPERS

4. Based upon this information, there is also probable cause to believe that the property may be found (check as many as apply):
   [X] at (identify the exact location or description of the place(s) to be searched):

   APARTMENT LOCATED AT 181 DIVISION ST.  APARTMENT IS  LOCATED ON SECOND

   FLOOR EAST SIDE.  PROPERTY IS OWNED BY DELORES MONIZ AND APARTMENT IS
   RENTED TO JOHN KAZEN.

   which is occupied by and/or in the possession of: JOHN KAZEN. APARTMENT WAS ALSO

   OCCUPIED BY ANTHONY CABRAL JR. D.O.B. 6/08/65

   [ ] on the person or in the possession of (identify any specific person(s) to be searched):

   _____

   [ ] on any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**THEREFORE,** I respectfully request that the court issue a Warrant and order of seizure, authorizing the search of the above described place(s) and person(s), if any, to be searched, and directing that such property or evidence or any part thereof, if found, be seized and brought before the court, together with such other and further relief that the court may deem proper.
   I [ ] have previously submitted the same application.
   I [X] have not previously submitted the same application.

| PRINTED NAME OF APPLICANT | SIGNED UNDER THE PENALTIES OF PERJURY |
|---|---|
| MICHAEL MALEK | X _Michael Malek_ |
|  | Signature of Applicant |

SWORN AND SUBSCRIBED TO BEFORE

X _____          6-21-99
       Signature of Justice, Clerk-Magistrate or Assistant Clerk          DATE

01594/1   69   01594/1

# SEARCH WARRANT

**G.L. c. 276, §§ 1-7**

COURT DEPARTMENT

CRIMINAL _____ DIVISION

SEARCH WARRANT DOCKET NUMBER

64903

**TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:**

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

- [X] has been stolen, embezzled, or obtained by false pretenses.
- [ ] is intended for use or has been used as the means of committing a crime.
- [ ] has been concealed to prevent a crime from being discovered.
- [ ] is unlawfully possessed or concealed for an unlawful purpose.
- [X] is evidence of a crime or is evidence of criminal activity.
- [ ] other (specify) _____

**YOU ARE THEREFORE COMMANDED** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

APPROX. $275.00 cash stolen from Mutual Gas STATION 339 BROADWAY

ON 6/21/99. ALSO SEEKING BLACK WALLET OWNED BY ROSEMARIE HOBBS

329 JENCKS ST FR ALSO STOLEN IN ROBBERY. WALLETT CONTAINED APPROX. $200.00

AND PERSONAL PAPERS

- [X] at:

APARTMENT LOCATED AT 181 DIVISION ST. APARTMENT IS LOCATED ON SECOND

FLOOR EAST SIDE. PROPERTY IS OWNED BY DELORES MONIZ AND APARTMENT IS

RENTED TO JOHN KAZEN.

which is occupied by and/or in the possession of: JOHN KAZEN. APARTMENT WAS ALSO

OCCUPIED BY ANTHONY CABRAL JR. D.O.B. 07/08/65

- [ ] on the person or in the possession of:

You [X] are [ ] are not also authorized to conduct the search at any time during the night.

You [ ] are [X] are not also authorized to enter the premises without announcement.

You [X] are [ ] are not also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**YOU ARE FURTHER COMMANDED** if you find such property or any part thereof, to bring it. and when appropriate, the persons in whose possession it is found before the _____ Fall River _____ Division of the _____ District _____ Court Department.

| DATE ISSUED | SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK |
|---|---|
| June 21, 1999 | x _Sharon Hague Coma_ |
| FIRST OR ADMINISTRATIVE JUSTICE<br>WITNESS: _Antone J Aguiar Jr_ | PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK<br>Sharon Hague Coma |

20

08/21/00 10:43 FAX 6755477



ON 6/21/99 I INVESTIGATED AN ARMED ROBBERY WHILE MASKED COMPLAINT AT MUTUAL GAS STATION 339 BROADWAY. THE INCIDENT OCCURRED APPROX. 6:22 AM. A WITNESS IDENTIFIED AS CHARLES MONIZ 181 DIVISION ST FALL RIVER MA OBSERVED A MALE LEAVE THE GAS STATION WEARING BLACK MASK AND HOLDING GUN IN HAND. MONIZ OBSERVES MALE ENTER BLUE 1989 FORD THUNDER BIRD (MA REG 9439BS). MONIZ OBSERVES AUTO TRAVEL WEST ON BRADFORD AVE AND MONIZ FOLLOWS AUTO OVER SEVERAL STREETS AND OBSERVES AUTO STOP ON ALMOND ST NEAR DIVISION. HE OBSERVES LONE MALE EXIT DRIVERS SIDE. MALE DID NOT HAVE MASK ON AT THIS TIME AND MONIZ OBSERVES THIS MALE AS ANTHONY CABRAL JR. D.O.B. 6/8/65. MONIZ KNOWS CABRAL. MONIZ OBSERVES CABRAL GATHER SEVERAL ITEMS ONE BEING A WOMAN BLACK POCKET BOOK AND LEAVE AUTO STILL RUNNING ON SIDE OF ROAD. MONIZ LOST SIGHT OF CABRAL FOR VERY SHORT PERIOD OF TIME AS WE LOCATE AUTO. OFFICER SEAN BOTELHO ARRIVES STATING HE OBSERVED CABRAL OPERATING THIS AUTO APPROX. FIFTEEN MINUTES EARLIER ON BRADFORD AVE AND DIMAN ST. MONIZ THEN RAN TO OUR LOCATION POINTING EAST ON DIVISION ST. MONIZ STATES CABRAL JUST RAN INTO HOUSE AT 181 DIVISION STILL CARRYING POCKET BOOK. MONIZ STATES CABRAL HAS FRIEND AT SECOND FLOOR EAST APARTMENT IDENTIFIED AS JOHN KAZEN D.O.B. 8/16/59. MYSELF AND BOTELHO OBSERVE CABRAL LOOK OUTSIDE OF OPEN WINDOW FACING THE STREET ON THE SECOND FLOOR EAST APARTMENT. HE NOTICES US AND PLACES HIS HEAD BACK INTO APARTMENT. HE APPEARS AGAIN APROX. ONE MINUTE LATER LOOKING OUT ANOTHER FRONT WINDOW. OFFICERS ALAN BEAUSOLEIL AND THADDEUS TOSIOR GO UP REAR STAIRWAY KNOCK ON DOOR AND ARE ALLOWED IN THE APARTMENT BY JOHN KAZEN. I FOLLOWED INTO THE APARTMENT AFTER OFFICERS ARE INSIDE. I OBSERVE CABRAL SWEATING AND BREATHING HEAVY. I INFORM KAZEN AND CABRAL OF THEIR RIGHTS. BOTH STATE THEY UNDERSTOOD. I ALSO HAD KNOWLEDGE THERE WERE WARRANTS OUTSTANDING FOR KAZEN BUT UNSURE AT THAT TIME IF THEY

| PRINTED NAME OF AFFIANT | SIGNED UNDER THE PENALTIES OF PERJURY |
|---|---|
| MICHAEL MALEK | X _Michael J Malek_ |
| | Signature of Affiant |
| SWORN AND SUBSCRIBED TO BEFORE | |
| X _____ | 6-21-99 |
| Signature of Justice, Clerk-Magistrate or Assistant Clerk | DATE |

PAGE _1_ OF _2_ PAGES OF THIS AFFIDAVIT

HAD BEEN SERVED. A PAT FRISK WAS CONDUCTED ON BOTH MALES AND NOTHING WAS FOUND. CABRAL STATED HE WASN T SWEATING BUT HAD JUST WASHED HIS HAIR. I THEN ASKED KAZEN IF WE COULD SPEAK IN ANOTHER ROOM WHILE A WARRANT CHECK WAS CONDUCTE HE AGREED AND WE ENTERED A FRONT ROOM FACING THE STREET. THERE FROM THE LIVING ROOM I OBSERVED A BLACK POCKETBOOK WITH A BLACK GLOVE ON IT LAYING ON THE BED. WE ALSO OBSERVED A HOODED WINTER COAT ON A CHAIR. THERE WAS ALSO A BLACK MASK ON THE CHAIR. OFFICER BEAUSOLEIL THEN OBSERVED A TOY GUN NEAR THE CHAIR ON THE FLOOR. I CHECKED THE POCKETBOOK FINDING IDENTIFACATION IN IT. THE POCKET BOOK BELONGED TO MY COMPLAINAINT WHO WORKS AT MUTUAL GAS. WE GATHERED THE ITEMS ALONG WITH A SPRAY BOTTLE WHICH WAS USED DURING THE ROBBERY. WARRENTS WERE CONFIRMED ON KAZEN AND HE WAS ARRESTED ALONG WITH CABRAL. CABRAL WAS RE TURNED TO THE SCENE WHERE MY COMPLAINAINT ROSMARIE HOBBS AND CO WORKER GLORIA REARDON IDENTIFIED THE CLOTHING,MASK,SPRAYBOTTLE AND GLOVES AS THOSE USED IN THE ROBBERY. A VIDEO TAPE OF THE INCIDENT WAS GIVEN TO ME ALSO. HOBBS STATED SHE WAS MISSING $200.00 CASH FROM HER POCKETBOOK WHICH WAS IN A WALLET. ALSO THE MONEY FROM THE STORE WHICH WAS TAKEN WAS NOT RECOVERED. THE AMOUNT WAS APPROX. $8075.00. BASED ON THESE FACTS I FEEL THE STOLEN MONEY MAY BE HIDDEN IN THE PARTMENT AT THE ABOVE LOCATION.

| PRINTED NAME OF AFFIANT | SIGNED UNDER THE PENALTIES OF PERJURY |
|---|---|
| MICHAEL MALEY | X _Michael Maley_ |
| | Signature of Affiant |
| SWORN AND SUBSCRIBED TO BEFORE | |
| X _____ | 6-11-19 |
| Signature of Justice, Clerk-Magistrate or Assistant Clerk | DATE |

PAGE 2 OF 2 PAGES OF THIS AFFIDAVIT

1 (7/00)

A search warrant must be executed as soon as rea bly possible after its issuance, and in any case ma t be validly executed more than 7 days after its issuance. The executing officer must file his or her return with the court named in the warrant within 7 da after the warrant is issued. G.L. c. 276, §3A.

This search warrant was issued on __JUNE 21, 1999_____, 19_____, and I have executed it as follows:

<p style="text-align:center">DATE</p>

The following is an inventory of the property taken pursuant to this search warrant:

1. CASH  TOTAL SUM $7920.00 IN BILLS

2. BLACK WALLET CONTAINING PERSONAL PAPERS

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

11. _____

12. _____

13. _____

14. _____

15. _____

16. _____

17. _____

18. _____

19. _____

20. _____

(attach additional pages as necessary)

This inventory was made in the presence of: _____

_____

I swear that this inventory is a true and detailed account of all the property taken by me
on this search warrant.

| SIGNATURE OF PERSON MAKING SEARCH | DATE AND TIME OF SEARCH | SWORN AND SUBSCRIBED TO BEFORE |
|---|---|---|
| X _Michael S Malek_ | 6/21/99   11:00 AM | X _signature_  Signature of Justice, Clerk-Magistrate or Assistant Clerk |
| PRINTED NAME OF PERSON MAKING SEARCH | TITLE OF PERSON MAKING SEARCH | DATE SWORN AND SUBSCRIBED TO |
| MICHAEL S. MALEK | PATROLMAN | June 21, 1999 |

☑ 004

23

Identification Motion I

Commonwealth of Massachusetts

Bristol    SS.                    Superior Court
                                  New Bedford, MA.

BRISTOL, SS SUPERIOR COURT
FILED
JUL 3 2001
MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

Commonwealth
        V.                              #99T3CR0229, A-B
Anthony Cabral

## Defendant's Motion to Suppress the In-Court Identification

        Now Comes the defendant and moves this Honorable Court Suppress the in-court identification by Charles Moir

        The defendant further moves this in-court identification be suppress because the information provided to the court is not under prior oath, Such testimony is inadmissible in a court of law.

*(left margin, vertical:)* 12/3/01 Motion to Suppress Identification taken U/A. (Kane, J.) M/ORE (see memo)

*(left margin, vertical:)* 1/3/02 Denied (Kane, J.) M/ORE

62

2 OF 24

SEE, Aguilar V. Texas
378 U.S. 108 (1964),
Gerstein V. Pugh 420
U.S. 103, 120, 125. (1975).

RESPECTFULLY SUBMITTED:

Anthony Cabal
Anthony Cabral PRO-SE
P.C.C.F. 26 long Pond Rd.
Plymouth Mass. 02360

DATE: December, 1.
2001.

63

# COMMONWEALTH OF MASSACHUSETTS

Bristol SS,            Superior Court
                       New Bedford, Ma,

Commonwealth
        V.              DKt.#99T3CR0228, A-B
Anthony Cabral

## DEFENDANT'S AFFIDAVIT MEMORANDUM in Support of his Motion to Suppress the in-Court Identification

I, Anthony Cabral pro-se hereby depose and states the following: under the penalties of perjury

1.) I am the defendant named in the Above referenced indictments

2.) I have read the Transcript from my Suppression hearing

6·4

3.) The only factual basis of knowledge of Charles Moniz to establish probable cause to arrest/identify defendant is not under prior oath as required by <u>Aguilar Supra. Pugh Supra.</u>

4.) Charles Moniz had testified at defendant suppression hearing that: Mr. Moniz stated "he was never at the Mutual gas station" SEE, suppression hearing Transcript Exhibit "A" herein-after as (S.H.Tr.Ex."A") (S.H.Tr.Ex."A" pg. 1-17, lines 20), Mr. Moniz testified that "[he] did not talk to the police at that time because they were not there" (S.H.Tr.Ex."A" pg. 1-51, lines 12-13).

5 of 24

Mr. Moniz stated the first time he spoke to the police was on Almond Street. SEE, (S.H. Tr. Ex. "A" pg. 1-51, lines 17-18). And that, ("he") had went back to the Mutual gas station and ask them, [the victim] if the police were there yet, they "said no". SEE, (S.H. Tr. Ex. "A" pg. 1-50 lines 22-23). Also SEE, (S.H. Tr. Ex. "A" pg. 1-51, lines 5-6), (S.H. Tr. Ex. "A" 1-47, lines 24-25 pg. 1-48, lines 3-5). However this testimony and identification is not under prior oath. All testimony is in contradiction to the leading officer Michael Malek Police report hereinafter Exhibit "B" as (P.R. Ex. B) (P.R. Ex. "B" pg. 1, 7).

Cele

6 of 24

And his sworn testimony to the Grand Jury Min. hereinafter as Exhibit "C" (G.J.M. Ex. "C") SEE (P.R. EX. "B" pg. 1). Also SEE, (G.J.M. Ex. "C" pg. 4, lines 3-24); (G.J.M. Ex. "C" pg. 5, lines 1-6). Clearly Mr. Moniz had not Affied officer Malek with any information At the Mutual Gas Station, nor had Mr. Moniz spoken with Any one At that location. None of this information is reliable under oath. Simple Mr. Moniz was not At the Mutual Gas Station.

5.) Mr. Moniz Further stated that After he Exited his Mother's house "[he] went down to the Corner [and] seen the

7 OF 24

OFFICERS All SEARCHING through the CAR, [1989 Thunderbird]. SEE (S.H.Tr. EX."A" pg. 1-20, lines 15-19). Mr. Moniz testified that "[He] wAlked down to the Corner..." SEE (S.H.Tr. EX."A" pg. 1-21 lines 17-18). Also SEE (S.H.Tr. EX."A" pg. 153, lines 1-57. Mr. Moniz testified that when he saw the CAR pARKED, "[he] spotted him went over in the CAR." SEE (S.H.Tr. EX. "A" pg. 1-15, lines 7-15). And Mr. Moniz did not SEE Any person Exited the CAR. Mr. Moniz testified that "[he] went down the street, drove Around the block... And CAME up BEACH street... He looked down, He WAS "WALKING" towards My house. SEE,

68

8 of 24

(S.H.Tr. Ex. "A" pg. 1-15, lines 18-25). Mr. Moniz testified only that he saw the car when it was parked and only that he was bent over with the door open. SEE (S.H.Tr. Ex. "A" Ex. 1-21, lines 22-23). Mr. Moniz then contradicted his own testimony by saying that "I couldn't see from that angle ... he was bent (over) down in the doorway ... He was getting stuff out ... I don't know whether the door was open or not." SEE (S.H.Tr. Ex. "A" pg. 1-22, lines 19-24). Mr. Moniz testified that it was after he made the above observations "[HE] drove around the block and the next thing he saw was walking up

the STREET. HE WAS
Crossing the corner coming
to my mom's house". SEE,
(S.H.Tr.Ex."A" pg. 1-23, lines
6-7); Also SEE, (S.H.Tr.Ex.
"A" pg. 1-14, lines 7. Mr. Moniz
testified that he lost
the car. "no I didn't
SEE it...." SEE, (S.H.Tr.Ex."A"
pg. 1-43, lines 24-25). Mr.
Moniz testified that
when he seen the male
went over in in the car
[he] could not SEE his
Face. And "[he] did not
recognize him." SEE, (S.H.
Tr.Ex."A" pg. 1-46, lines 19,
pg. 1-48, lines 5-11); Mr.
Moniz testified that "[he]
didn't SEE him leave the
Car. I seen him coming
up the STREET crossing,
that's how I seen him".
SEE, (S.H.Tr.Ex."A" pg. 1-49,

20

lines 6-8). Mr. Moniz testified that, "The only time I knew what his name was was when the officer said Anthony --[in the apartment] what are you doing here? SEE, (S.H.Tr. EX. "A" pg. 1-39, lines 15-19). Mr. Moniz testified to that "no, I don't think I said that, [his name]". SEE, (S.H.Tr. EX. "A" pg. 1-23, lines 19). Moniz testified that "[his] name did not come come to [him] at any point). SEE, (S.H.Tr. EX. "A" pg. 1-24, lines 10-13). Also SEE, (S.H.Tr. EX. "A" pg. 1-39 lines 11). Mr. Moniz testified that when he seen the male leery over in in the car [he] could not see his face." And "[he] did not recognize

him." SEE, (S-H.Tr.EX. pg. 1-46, lines 8-18; pg. 1-47, lines 19; pg. 1-48, lines 5-11). Mr. Moniz testified that the first time ("I)...his name is when the officers said "Tony what are you doing here... After that I knew that there was somebody there. And that's the first time. I known of his name. Heard that's the first time it was mentioned..." SEE, (S-H.Tr.EX."A" pg. 1-65, lines 5-13, 21). Mr. Moniz never properly identified the defendant as the arm robbery at the Mutual gas station because "[he never] seen Anything." SEE, (S-H.Tr.EX."A" pg. 1-66 lines 7-10, 12-14, 25, pg. 1-67, lines 1-7).

12 of 24

Mr. Moniz testified that he never saw defendant again before he went to work. "no, never did" and "I never did look into the apartment ... I left". SEE. (S.H.Tr.Ex. "A" pg. 1-20, lines 14-21).

However this testimony and identification is not under prior Oath. All testimony is in contradiction to the leading officer, Mr. Michael Malek police report and his Sworn testimony to the Grand Jury. Clearly Mr. Moniz did not Stated that he [Moniz] Just saw [defendant] Cabral Run into a house at 181 Division Street, nor did Moniz Know who the defendant was, (by name) nor did Moniz SAY he

73

Followed this Auto on
to Bradford Ave, nor did
Moniz SEE the Auto
Stop, nor did Moniz SEE
defendant without a mask
on, nor remove a mask,
nor did Moniz SEE defen-
dant ~~—~~ Exit Auto, nor
did he Recognized
defendant as a male known
to [him by his name]
tony Caoral. And Moniz
did not SEE the male
Run into a house, And
Moniz did not SEE
defendant gather up
items From the Auto,
Moniz did not SEE the
male bent over in the
Auto, Moniz did not SEE
the male. (S.H. Tr. Ex. "A" pg.
1-46, lines, 19, pg. 1-48, lines
5-11). SEE, Officer Michael
Malek Police report
(P. R. Ex. "B" pg. 2.7.

44 OF 24

(G.J.M. EX. "C" pg. 8, lines 4-15). More importantly, since it is not under prior oath on the police report that any person at the Mutual gas station had told Mr. Moniz or any officers that it had been robbed by a male with a gun, wearing a mask and since Mr. Moniz is not a witness of a victim to a robbery Moniz Alleged statements to officer Majek is only "A general averrment unrevealing of any source in actual observation is insufficient. See, Comm V. Kaufman 381 Mass. 301, 304-305 (1980); Comm V. Stevens 362 Mass. 24 (1972); Gerstein V. Pugh 95 S.Ct. 854 (1975).

75

Mr. Moniz never proper-
ly identified the defend-
ant as the perpatrator
of the arm robbery
at the mutual gas station.
" [he never] seen anyting."
... (S.H.Tr. Ex. "A" pg. 1-66,
lines 7-10, 12-14, 25, pg. 1-67,
lines 1-7).


6.) Mr. Moniz testified
that "I looked, I was
in shocked then the
girl came running out.
He stole my purse, he's
got my address and every-
thing. All my life is in
that purse, she was
worried about him having
her purse (address). So
I turned the car around
and stated following him
down Bradford Avenue."
See, (S.H.Tr. Ex. "A" pg. 1-12,

16 of 24

lines 23-25, pg. 1-13, lines
1-37. This testimony
clearly show that Mr.
Moniz had not spoken
with any one at the
mutual gas station
about a robbery with
a gun. Further, it is
not stated under prior
oath on the police
report that Mr. Moniz
had spoken with any
person at the mutual
gas station regarding
an alleged robbery at
that location. Mr. Moniz
testified that "they
was stopped one car
down from the corner
of Bradford Avenue and
Broadway. SEE, (S.H.T. Ex.
"A" 1-37). Moniz said
that at that time
something caught his

Attention: "HE Come running from the buties between the convience store..." SEE (S.H.Tr. EX. "A" pg. 1-8, lines 20-25, pg. 1-37, lines 8-11, 24-25); pg. 1-38, lines 1-5% It is not stated under prior oath on the police report that Moniz made such personal observat-ions. Insufficient under KAUFMAN SUPRA: STEVENS SUPRA: Aguilar SUPRA: nor is its under prior oath that Mr. Moniz made personal observations of this person had a mask that (HE) saw running..." "Some type of hood that was like a hood over his head." SEE (S.H.Tr. EX. "A" pg. 1-9 lines 2). Or that "(HE)

19 of 24

SAW [this PERSON] [with what]" "Looked like a gun to ME and a PURSE". SEE, (S.H.Tr. Ex. "A" pg. 1-9, lines 10-11, 13) pg. 1-38, lines 9, 13). It is not stated under prior oath on the police report that Mr. Moniz made PERSONAL OBSERVATIONS at the Mutual Gas Station that. "He pulled his MASK OFF like this ... He was open-ing his [CAR] door and He was pulling his MASK OFF. SEE, (S.H.Tr. Ex. "A" pg. 1-39, lines 2-6). Of that ... "I looked And I seen him". SEE, (S.H.Tr. Ex. "A" pg. 1-10, lines 8-11). Of that At that point" ... "I recognized him". SEE, (S.H.Tr. Ex. "A" pg. 1-39, ▓▓▓ lines 9 ) pg. 1-10, lines 13-15).

EVIDENCE that is not under prior oath and without a factual basis of knowledge cannot be considered in the establishment of probable cause for arrest or for the identification purposes. SEE, Gerstein V. Pugh supra; Aguilar V. Texas supra; Comm V. Kauffman supra; Comm V. Stevens supra; Comm V. McCarthy 385 Mass. 160 (1982). The only time that Mr. Moniz said that he saw the defendant's face and recognized him was at the Mutual gas station: "Yes, I recognized him ... right there" SEE, (S.H.Tr. Ex. "A" pg. 1-11, lines 10-16), and "Yes, I seen him get in the car." SEE,

20 of 24

(S.H.Tr.Ex."A" pg. 140), And
"YES, I SEEN HIM PULL
AWAY. (S.H.Tr.Ex."A" pg. 140,
lines 14-16). None of this
Evidence is under prior
Oath on the police
report, (P.R.Ex"B"). As is
required by the due
process and the 4th,
5th, 6th, And 14th.
Amendments.
        Therefore, Mr. Moniz
testimony that he observ-
ed the male enter the
Car, unmasked and that
he recognized him is
without any foundation,
        Mr. Moniz has clearly
testified that he did not
see the defendant in that
Car at any other time,
"I told you, I didn't
see him leave the Car,
I seen him coming up
the Street Crossing,

8

21 of 24

that's how I seen him!!
SEE (S.H.Tr. Ex."A" pg. 1-49,
lines 6-8).

Mr. Moniz's in-court
identification as testified to
at the defendant's suppress-
ion hearing is insufficient
and tainted as a matter
of law. It is not on the
police report under prior
oath that Mr. Moniz
made personal observat-
ions of a male exiting
the mutual gas station
wearing a mask and
carrying a gun or that
Mr. Moniz observe this
male unmask at the
mutual station as he
entered a 1989 thunder-
bird or that Mr. Moniz
then recognize that
male known to him

From being Around, And at a Wedding.

This tainted in-Court probable cause and identification evidence is the only evidence that places the defendant at the Mutual gas station. The only other time that Mr. Moniz said that he saw the defendant is when he allegedly saw the defendant walking up the street crossing the corner, coming to his mother's house.

Mr. Moniz testified that he did not recognize the male that was in that motor vehicle, did not see the male that exit that motor vehicle.

83

23 of 24

Therefore, there is no link of the defendant to the Motor Vehicle.

At the time the police illegally arrested the defendant at the of Mr. John Kazen, Mr. Moniz did not see the defendant inside that apartment, before or after his arrest, nor did Mr. Moniz identified the defendant as the person that robbed the Mutual gas station at the time of his arrest. The only time that the defendant was identified by Mr. Moniz as the same person that he observed at the Mutual gas station was the tainted in-court identification.

2.) The defendant has been determined to be indigent, incarcerad, and is a pro-se litigant and should be excluded from providing exhibits.

For the foregoing reasons, this motion should be granted.

Signed this 1. day of December, 2001. Under the penalties of perjury

Anthony Cabral
Anthony Cabral
Pro-se
Signature of defendant

# CERtiFicATe oF SErvice

I, Anthony Cabral pro-se
do hereby certify that
I have served the
Assistant District
Attorney a copy of
defendant's motions.
1) Motion for Funds,

2) Motion to Dismiss,
Affidavit, Memorandum
lost or Destroyed
Evidence. by handing
it to David L Crowley
Jr. in-court at 888
Purchase Street, Mass.
02741

Signed under the Penalties
of Perjury this 25 Day
of November, 2001

Anthony Cabral
Anthony Cabral pro-se
Signature



BRISTOL, SS.                                                    SUPERIOR COURT
                                                               IND. NO. 9973CR0228

COMMONWEALTH
                              )
V.                            )              COMMONWEALTH'S AFFIDAVIT IN
                              )              OPPOSITION TO THE DEFENDANT'S
ANTHONY CABRAL                )              MOTION TO DISMISS
                              )

        Now comes the Commonwealth and respectfully submits this affidavit in support of its

position that this court deny the defendant's request for a hearing on a motion to dismiss due to

lost or destroyed evidence. The Commonwealth attaches a copy of the incident report.


1. The defendant's motion to dismiss, dated 11/25/01 requests relief due to the fact that certain

evidence "cannot be located" (paragraph 6 of the defendant's affidavit in support of his motion).


2. The defendant describes 8 items which are the subject of this motion to dismiss in paragraph 4

of his affidavit.


3. Item 1 (keys), I infer relates to car keys that were in the ignition of the car allegedly driven by

the defendant Anthony Cabral. The Commonwealth is unaware of the location of this item.

Officer Mike Malek of the Fall River Police Department believes the keys to the vehicle would

have been returned to the owner. As of the writing of this affidavit, the Officer is looking into

the existence of any documentary evidence which would indicate the whereabouts of "keys".


4. "Father's Day card" remains in the possession of Officer Michael Malek and is available for

inspection by the defendant.


5. Pocketbook, wallet, and identifications were all returned to the victim Rosemarie Hobbs in

her capacity as owner of said property and as manager of the business.


<center>87</center>

6. From the defendant's motion to dismiss, I infer that "money bags" refers to a plastic grocery-type bag. To the best of my knowledge this evidence is in the possession of the Fall River Police Department.

7. Turret tapes or dispatch transmissions do not exist. According to testimony given at a previous hearing on a motion to dismiss, a malfunction occurred, whereby all radio transmission which are normally recorded, were not for the relevant period of time of this crime. Judge Nickerson heard this motion and denied it.

8. Police notes and logs have not been ordered produced by the court, nor have they been requested by counsel for the defendant. Absent such an order, a motion to dismiss is not appropriate. The Commonwealth further suggests that even if "police notes" and "logs" have been previously destroyed (NOTE- the Commonwealth has no knowledge about the existence of the these generically labeled items), without a prior court order to produce or to preserve the described items, the defendant's motion cannot succeed.

9. The Commonwealth would have objected to defendant's motion to produce police notes, if such a motion were filed.

10. For the aforementioned reasons, the Commonwealth contends that the defendant cannot make an initial showing that the Commonwealth's actions have deprived him of evidence that would be favorable to his case. See Commonwealth v. Olszewski, 416 Mass. 707, 714 (1993).

Respectfully submitted,

Commonwealth of Massachusetts

David L. Crowley
Assistant District Attorney
Bristol District

Dated: 12/5/01

99-9919        UD A

OFFENSE(S)

ARMED ROBBERY WHILE MASKED
ASSAULT AND BATTERY DANGEROUS WEAPON;
TO WIT;WATER/WATERBOTTLE

ADDRESS

339 BROADWAY        Fall River,

BUSINESS TELEPHONE    HOME TELEPHONE

LOCATION OF OCCURRENCE

MUTUAL GAS STATION
339 BROADWAY

TIME AND DATE OF OCCURRENCE

BETWEEN 6:22 AM  6/21/ 19 99 AND _____ 6/21/ 19 99

| Time | Date | Time | Date |

PTH 7-12-99
+ AOC
6-21-99
ADA Cooper

COMPLETE IF MOTOR VEHICLE VIOLATION  Judge Leonard

Nadeau appt  Bail 50,000 Ca

OPERATOR _____ SEX _____ OWNER _____ SEX _____

STREET _____ D.O.B. _____ STREET _____

CITY—TOWN _____ STATE _____ CITY - TOWN _____ STATE _____

LIC. NO. _____ DATE EXPIRES _____ MAKE & TYPE _____ REG. NO. _____

TO WHOM ISSUED - CHECK ONE

CITATION NO. ISSUED _____ OWNER ☐ OPERATOR ☐    DATE REG. EXPIRES _____

DETAILS OF OFFENSE: (STATE FULLY THE PERSON OR PROPERTY ATTACKED, MEANS, INSTRUMENTS AND OTHER CIRCUMSTANCES)

ON THE ABOVE DATE AND TIME WHILE ASSIGNED TO SECTOR CAR 10, I OFFICER MICHAEL
MALEK WAS DISPATCHED TO THE ABOVE LOCATION TO INVESTIGATE AN "UNKNOWN EMERGENCY".
OFFICER THADDEUS TOSIOR ASSIGNED TO SECTOR CAR 9 WAS SENT TO ASSIST ME.

UPON MY ARRIVAL I OBSERVED A MALE LATER IDENTIFIED AS CHARLES MONIZ 181 DIVISION ST
FR RAN THROUGH THE PARKING LOT TOWARDS MY CRUISER.  I ALSO OBSERVED A FEMALE OUTSIDE
THE STORE CRYING AND SHAKING.  SHE WAS LATER IDENTIFIED AS ROSMARIE HOBBS WHO WORKS
FOR MUTUAL GAS.  MONIZ STATED A MALE JUST "HELD UP" THE STORE AND HE WAS IN A BLUE
AUTO WHICH LEFT THE AREA TRAVELING WEST ON BRADFORD AVE AND POSSIBLY TURNED NORTH ALONG
ONE OF THE SIDE STREETS.  MONIZ ALSO STATED THEY MALE HAD A BLACK MASK ON HIS FACE AND
WAS CARRYING A HANDGUN.  MONIZ STATED NOBODY WAS HURT IN THE INCIDENT.  I ASKED HIM
TO REMAIN AT THE SCENE AND I NOTIFIED THE SURROUNDING SECTOR CARS ABOUT THE ARMED ROB-
BERY.  MONIZ ALSO STATED THE MALE WAS WEARING A HOODED WINTER JACKET AND WAS ALSO IN
POSSESSION OF SOME TYPE OF SPRAY BOTTLE WHICH HE USEDTO SPRAY THE CLERK.

WHILE CHECKING THE AREA I OBSERVED A BLUE 1989 FORD THUNDER BIRD (MA REG#6139BS)
PARKED ON THE WEST SIDE OF ALMOND ST JUST NORTH OF DIVISION ST.  THE DRIVERS SIDE
FRONT DOOR WAS OPEN AND THE KEYS WERE IN THE IGNITION WITH THE ENGINE STILL RUNNING.
THERE WASN'T ANYONE IN THE AREA.  I FURTHER NOTICED THE PAINT ON THE REGISTRATION
TWO LAST LETTERS WERE SCRAPED AND REPRINTED ATTEMPTING TO DISQUISE THE LETTERS.
AS I STARTED TO LOOK INSIDE THIS AUTO I OBSERVED A HOME MADE FATHERS DAY CARD DEPICTING
A BARBELL BEING LIFTED BY TONY CABRAL.AT THIS TIME OFFICER ALAN BEAUSOLEIL CAME TO MY
LOCATION AND WE HAD A CONVERSATION ABOUT A ANTHONY CABRAL WHO IS KNOWN TO US AND HAD
LIVED IN THE AREA PREVIOUSLY.  AS WE SPOKE OFFICER SEAN BOTELHO ARRIVED AT MY LOCATION
STATING THAT HE SAW THAT AUTO APPROX. 20 MINUTES EARLIER ON BRADFORD AVE NEAR DIMAN
ST WHICH IS ONLY A BLOCK AWAY FROM MUTUAL GAS.  HE STATED HE SAW TONY CABRAL IN THE AUTO

Report written this date under the pains and penalties of perjury

INVESTIGATING OFFICER:  MICHAEL MALEK _____    DATE  6/21/99

SUPERIOR OFFICER APPROVING: _____  6/21/99

IS-PR-8

AND WHEN BOTELHO DROVE BY CABRAL TURNED HIS HEAD IN WHAT SEEMED TO TRY TO THIS WAS AN ATTEMPT TO HIDE HIS FACE, BUT BOTELHO KNEW IT WAS CABRAL WHO WAS ALONE IN THE AUTO.

AT THIS TIME WE OBSERVED MONIZ RUNNING DOWN ALMOND STREET POINTING UP TOWARDS DIVISION ST. MONIZ STATED HE JUST SAW CABRAL RUN INTO A HOUSE AT 181 DIVISION ST AND THAT HE KNEW WHO CABRAL WAS NOW AND THAT MONIZ HAD KNOWLEDGE CABRAL HAD A FRIEND WHO LIVED ON THE SECOND FLOOR EAST APARTMENT. MONIZ IDENTIFIED THE FRIEND AS JOHN KAZEN. I ALSO AM FAMILAR WITH KAZEN AND KNEW HE HAD SOME OUTSTANDING WARRANTS BUT WAS UNSURE IF THEY HAD BEEN SERVED. MONIZ WENT ON TO SAY HE FOLLOWED THE THUNDER BIRD WEST ON BRADFORD AVE THEN NORTH ONTO ALMOND ST WHERE HE OBSERVED THIS AUTO DRIVE INTO A LOT AT 300 ALMOND ST. THE AUTO THEN BACKED OUT AND WENT WEST ONTO DIVISION ST. HE THEN WENT SOUTH ONTO HOWARD ST. HE THEN BACKUP AND WENT EAST UP DIVISION ST AND THEN NORTH ON ALMOND WHERE HE SAW THE AUTO STOP. THE MALE DID NOT HAVE THE MASK ON NOW AND MONIZ RECOGNIZED HIM AS A MALE KNOWN TO HIM AS TONY CABRAL. HE THEN SAW CABRAL GATHER UP SEVERAL ITEMS FROM THE AUTO AND RUN INTO THE HOUSE AT 181 DIVISION ST. THE HOUSE IS BY MONIZ'S MOTHER DELORES MONIZ. DELORES ALSO SAW CABRAL RUN INTO THE HOUSE NOTICING HE WAS CARRYING A BLACK LADIES POCKETBOOK. MYSELF AND BOTELHO TOOK A POSITION IN FRONT OF THE HOUSE WHILE TOSIOR AND BEAUSOLEIL WENT UP THE REAR STAIR CASE. BOTELHO AND I OBSERVED CABRAL STICK HIS HEAD OUT AN OPEN WINDOW FACING DIVISION ST. WHEN HE SAW US HE QUICKLY WENT BACK INTO THE APARTMENT. APPROX. ONE MINUTE LATER I OBSERVED CABRAL LOOK OUT ANOTHER FRONT WINDOW LOOKING IN OUR DIRECTION. OFFICERS BEAUSOLEIL AND TOSIOR KNOCKED ON THE DOOR AND KAZEN ALLOWED THEM INTO THE APARTMENT. ONCE I HEARD THEY WERE INSIDE I LEFT MY POSITION AND RAN INTO THE REAR OF THE BUILDING WHILE BOTELHO REMAINED OUT FRONT MAKING SURE NOBODY ELSE LEFT THE BUILDING.

ONCE INSIDE I OBSERVED CABRAL WHO WAS SWEATING AND BREATHING HEAVY. KAZEN WAS SITTING IN A CHAIR VERY CALM. WE CONDUCTED A QUICK PAT FRISK FOR OUR SAFTY AND DID NOT FIND ANY WEAPONS ON EITHER MALE. WE REQUESTED A WARRANT CHECKS ON THE MALES AND I INFORMED BOTH MALES OF THEIR RIGHTS. THEY BOTH STATED THEY UNDER STOOD THEM. I QUESTIONED CABRAL ON HIS WHERABOUTS AND HE STATED HE JUST CAME TO VISIT HIS FRIENDS. HE DENIED BEING AT MUTUAL GAS AND STATED HE WASN'T SWEATING. HE STATED HE JUST WASHED HIS HAIR. I OBSERVED SWEAT ON HIS CHEST, BACK, NECK, AND LEGS. AT THIS TIME I ASKED KAZEN IF I COULD SPEAK WITH HIM AWAY FROM CABRAL. HE AGREED TO GO IN THE FRONT ROOM. I INFORMED HIM I WAS INVESTIGATING AN ARMED ROBBERY AND HE BECAME UPSET STATING HE WAS

| NTITY | PROPERTY STOLEN | VALUE | QUANTITY | PROPERTY STOLEN | VALUE |
|---|---|---|---|---|---|
| | CASH | $7,983.00 | | POCKETBOOK PAPERS | $50.00 |
| | | | | | |
| | | | | | |

| ES OF PERSON ARRESTED OR WANTED | ADDRESS | D.O.B. | OFFENSE |
|---|---|---|---|
| TONY CABRAL JR. | 321 UNION ST FR | 6/08/65 | ARMED ROBBERY MASKED |
| | | | A&B DW |

LIST ALL WITNESSES

| NAME | ADDRESS |
|---|---|
| LEK, T. TOSIOR, A. BEAUSOLEIL, S. BOTELHO | FRPD |
| R. BRIAND, DET. A. WILSON            90 | FRPD |

OFFENSE REPORT
PAGE TWO

A JUNKIE BUT WASN'T A THIEF. AS OFFICER BEAUSOLEIL ATTEMPTED TO CALM KAZEN DOWN I WAS ABLE TO SEE IN A BEDROOM AND I NOTICED A BLACK LEATHER POCKET BOOK ON THE BED. I ASKED KAZEN IF ANY WOMAN LIVED WITH HIM AND HE STATED HE LIVED ALONE. WE HAD RECEIVED FURTHER INFORMATION THAT THE CLERKS POCKETBOOK AND WALLETT WERE ALSO STOLEN. I ENTERED THE ROOM AND OBSERVED A BLACK GLOVE ON THE BAG. I OPENED THE BAG NOTICING IDENTIFACTION PAPERS BELONGING TO ROSEMARIE HOBBS. AS I RE-ENTERED THE ROOM OFF.BEAUS-OLIL WALKED TO A CHAIR IN THE LIVING ROOM OBSERVING A HOODED WINTER COAT ON THE CHAIR.THERE WAS ALSO A PAIR OF JEANS,WORK BOOTS AND A BLACK MASK AND A SHIRT. ON THE FLOOR BETWEEN THE COUCH AND CHAIR WAS A TOY GUN. WE GATHERED THESE ITEMS AND WE WERE INFORMED ALSO THAT KAZEN STILL HAD OUTSTANDING WARRANTS FOR HIS ARREST. BOTH OF THE MONIZ'S STATED KAZEN WAS OUTSIDE THE HOUSE WHEN CABRAL ARRIVED AND NOBODY SAW HIM AT THE GAS STATION. ALSO FOUND NEAR THE CHAIR WAS A SPRAY BOTTLE WITH SOME UNKNOWN TYPE OF LIQUID IN IT. AT THIS POINT NOBODY ELSE WAS FOUND IN THE HOUSE AND I PLACED CABRAL UNDER ARREST.

WE THEN RETURNED TO THE GAS STATION AND I SPOKE WITH HOBBS. SHE STATED SHE WAS IN THE BACK ROOM COUNTING MONEY AND FAILED TO LOCKED ANYDOORS TO THE OFFICE OR STORE. ANOTHER CLERK GLORIA REARDON WAS WORKING THE FRONT OF THE STORE. HOBBS STATED SHE OBSERVED THIS MALE ENTER THE OFFICE WEARING A BLACK MASK HOLDING SOME TYPE OF SPRAY BOTTLE. THE MALE WALKED TO THE DESK AND ATTEMPTED TO PICK UP A PILE OF MONEY. SHE MOVED THE MONEY AND BECAME FRIGHTENED THAT THIS MALE WAS GOING TO HURT HER. SHE RAN OUT OF THE OFFICE YELLING TO REARDON TO SOUND THE ALARM THAT THEY WERE BEING ROBBED. HOBBS STATED THAT SECONDS BEFORE SHE RAN FROM THE OFFICE THIS MALE SQUIRTED HER IN THE EYES WITH THIS LIQUID. THE GIRLS RAN TO SAFETY AND THIS IS WHEN MONIZ NOTICED WHAT HAD TRANSPIRED.

I THEN HAD HOBBS AND REARDON COME TO MY CRUISER. THEY IDENTIFIED AS ITEMS I COLLECTED FROM THE APARTMENT AS THOSE USED IN THE ROBBERRY. THEY BOTH STATED THE MALE NEVER SPOKE A WORD BUT MADE SOME TYPE OF SOUNDS. AND NEVER REMOVED HIS MASK. THEY ALSO PRODUCED A VIDEO TYPE WHICH WAS RECORDING THE EVENT FROM THE STORE SECURITY CAMARAS. WHEN HOBBS LOOKED IN THE DIRECTION OF OFFICER TOSIORS CRUISER SHE NOTICED CABRAL STATING THIS MAN HAS BEEN A REGULAR CUSTOMER COMING IN THE STORE FOUR TO FIVE TIMES A WEEK EVEN ONCE ASKING FOR A JOB THERE.. SHE DID STATE THE MAN IN THE STORE HAD A SIMILAR BUILD AS CABRAL. HOBBS WENT ON TO SAY APROX.$8,000.00 IN CASH WAS STILL MISSING. SHE STATED HER WALLET WAS STILL MISSING AND SHE HAD $200.00 CASH AND PERSONAL PAPERS.

AT THE BOOKING ROOM KAZEN REFUSED TO LET US RE-ENTER HIS HOUSE. I INFORMED I WOULD OBTAIN A SEARCH WARRANT AND HE TOLD ME HE WAS DONE TALKING WITH ME AND TO DO WHAT I HAD TO DO. CABRAL STILL DENIED BEING PART OF THE INCIDENT. DURING THE BOOKING PROCESS HE CALLED HIS SISTER TELLING HER ABOUT THE AUTO BEING TOWED. WE WERE UNABLE TO OBTAIN A LISTING TO THE OWNER OF THE VEHICLE BUT DID GET AND ADRESS AN OTHER INFORMATIOM.

MYSELF AND SGT. RONALD BRIAND WHO WAS IN CHARGE OF THE SCENE RETURNED TO THE STATION AND COMPLETED THE APPLICATION FOR A SEARCH WARRANT FOR THE APARTMENT AND AUTO WHICH WAS TOWED TO THE STATION GARAGE. A WARRANT WAS GRANTED BY CLERK MAGISTRATE SHARRON CORREIA. MYSELF,SGT. BRIAND AND OFFICER DENNIS PACHECO WHO HAD REMAINED AT THE SCENE OF THE APARTMENT EXECUTED THE SEARCH. OFFICER PACHECO RECOVERED HOBBS WALLET AND PERSONAL PAPAERS AS WELL AS A SMALL AMOUNT OF MONEY UNDER SOME

91

OVER

OFFENSE REPORT
PAGE THREE

COUCH CUSHIONS. HER IDENTIFACTIONS WERE WITH THESE ITEMS. I SEARCHED THE
BEDROOM WHERE I OBSERVED CABRAL IN. DIRECTLY UNDER THE WINDOW THAT I SAW
CABRAL HANGING OUT OF I OBSERVED TWO LAUNDRY BASKETS FILLED WITH CLOTHES.
I REMOVED THE CLOTHES OBSERVING A PLASTIC SHOPPING BAG. I OPENED THE BAG
FINDING A LARGE AMOUNT OF MONEY IN VARIOUS DENOMINATIONS OF MONEY. ALL
THE MONEY WAS IN BILLS. WE DID NOT FIND ANY OTHER ITEMS CONNECTED WITH THE
CRIME IN THE APARTMENT.

WE THEN CLEARED THE APARTMENT SECURING THE DOORS. WE INFORMED A
WORKER AT THE GAS STATION ABOUT THE RECOVERY WHO CALLED HOBBS. I SPOKE
WITH HOBBS ON THE PHONE AND SHE STATED SHE AND A SUPERVISOR WOULD BE IN THE
STATION SHORTLY. MYSELF AND SGT, BRIAND COUNTED THE CASH . THE AMOUNT
COLLECTED WAS $7983.00. HOBBS AND AL LISHMAN WHO IS AN AREA SUPERVISOR FOR
MUTUAL RESPONDED TO THE STATION AND THE MONEY WAS RETURNED TO THEM AS
WELL AS HOBBS BELONGINGS. A RECEIT WAS SIGNED FOR THE MONEY AND THE MONEY
WAS PHOTGRAPHED BY DET ANDREW WILSON. WILSON ALSO PHOTOGRAPHED THE
VEHICLE IN OUR GARAGE.  THE VIDEO TAPE WILL BE FOWARDED TO THE MAJOR CRIMES
DIVISION AND THEN INTO EVIDENCE..

BOTH CABRAL AND KAZEN WERE PLACED IN CELLS AFTER BEING ALLOWED AN
OPPORTUNITY TO EXERCISE THEIR RIGHTS.


REPORT SUBMITTED UNDER PAINS AND PENALTIES OF PERJURY,


MICHAEL J. MALEK          6/21/99

92

## Supplementary Report

Offense __RECOVERED EVIDENCE__                                    Case No. __99-9919__

Complainant __ROSEMARIE HOBBS__                    Address __319 BROADWAY__

=====================================================================

**Additional details of offense, process of investigation. Additional description of property recovered, suspects, persons arrested, etc.**

DURING MY INVESTIGATION OF AN ARMED ROBBERY A REPLICA OF A GUN WAS FOUND IN AN APARTMENT AT 181 DIVISIN ST.  THE GUN WHICH RESEMBLED A SMALL CAL. AUTOMATIC HANDGUN WAS A "TWO HORSE" PISTOL TYPE CIGARETTE LIGHTER WHICH WAS SILVER IN COLOR WITH A BLACK HANDLE

---

**Div. case originated**

Case Closed ☐      Unfounded ☐      Cleared by arrest ☐      Other ☐

Approved _A. L. Ct. St. J. Bookello_    Signed _Michael J. Maley_    Date __6/21/99__

IS-PR-05                                    93

## SUPPLEMENTARY REPORT      OFFENSE: Armed Robbery While Masked   CASE: 99-9919

**VICTIM: Rosemarie Hobbs / Gloria Reardon      LOCATION: 339 Broadway, Fall River**

On 6/21/99 at approximately 12:30pm I Detective Andrew Wilson was notified to photographed some evidence.

I met with Officer Malek who directed me to a large sum of money. On the desk of the Sergeants office I photographed the money as directed.

In addition I photographed a Blue Ford Thunderbird that was at the police garage bay. This auto whose is VIN 1FAPP6043KH133636 was bearing MA Reg. 9439BS. However, the plate was altered to look like 9439P8. The "B" and "S" were altered to look like a "P" and "8". Photographs of this were taken.

All photographs taken will be developed, a contact sheet printed and kept on file at the Identification Bureau.

This report submitted under pains and penalties of perjury

APPROVED _____   SIGNED _____   DATE   06/23/99
                                        Det. Andrew Wilson

94

Identification Motion II

69

1 of 25

Commonwealth of Massachusetts

Bristol SS.                    Superior Court
                              New Bedford, Ma.

BRISTOL, SS SUPERIOR COURT
FILED
DEC 1 2 2001
MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

Commonwealth
                    V.
Anthony Cabral

Docket #99TJCR0228 A-B

## Defendant's Supplemental Motion to Suppress Identification

The Defendant in the above-
Entitled matter moves, pursuant
to Mass. R. Crim. P. 13, the
14th Amendment to the Con-
stitution of the United States
And Article 12 of the Mass-
achusetts Declaration of rights,
that the identification which
was made, on 8-21-2000 by
the Alleged witness be
suppressed in that it
was the product of a
constitutionally impermissable
one-to-one confrontation.

95

2 of 25

The defendant further moves that this Honorable Court suppress any mention of the out-of-Court identification made by the alleged witness as well as any proposed in-Court identification, as it will not be based upon a source independent of the improperly suggestive out-of-Court procedure. See Comm V. Johnson 650 N.E. 2d 1257 (1995).

Respectfully Submitted:

Anthony Cabral
Anthony Cabral Pro-Se
P.C.C.F. 26 long Pond Rd.
Plymouth, MASS. 02360

date: December, 10
2001.

96

3 of 25

# Commonwealth of Massachusetts

Bristol SS.                Superior Court
                          New Bedford, Ma.

Commonwealth
    V.                    Dkt.# 9973CR0228, A-B.
Anthony Caboral

## Supplemental Affidavit

I, Anthony Caboral Pro-SE
State that the following Facts
Are true to the best of My
information And Knowledge.

1.) I was Arrested on
June 21, 1999 And charged
with Two counts of Mask
Armed Robbery, wit A gun.

2.) To My Knowledge,
there has not been An in-
person identification of the
defendant Before the Arrest
nor After.

3.) The culprit in this matter was not arrested at the scene of the incident which occurred on June 21, 1999.

4.) Identification will be a critical issue at the trial of the above Entitled case.

5.) Charles Moniz testified at a motion to suppress. This testimony is favorable to the defendant. According to his testimony and the sworn statements by the leading officer, Michael Malek on the police report and the officer's testimony to the Grand Jury is false, perjured, fabricated, inaccurate, misleading and patently unreliable on its face. None of Charles

98

5 of 25

Moniz testimony is under prior oath. Mr. Moniz is not a witness nor a victim to a mask robbery.

6.) At 6:50 A.M., some 30 minute after the alleged crime the police made a warrantless entry/arrest at 181 Division Street Fall River Mass.

7.) At that same time, I was lawfully inside of the residence of a friend, John Kazen at said location

8.) While I was in the apartment, I heard someone calling "Tony" and "Tony Cabral, come here." I later learned that it was police officers calling. In response to my name called, I walked into the

99

6 OF 25

Kitchen.

9.) WHEN I WALKED into the Kitchen, the police ordered me to a counter area and told me to place my hands on the counter. I was then pat frisked and placed in handcuffs.

10.) During this time I heard John Kazen [my friend] telling the police that they had no right to be in his home, that they could not be looking throughout the department, and otherwise protesting their presence.

11.) Throughout this time, I observed police officers walking from room to room in the apartment, and returning

200

7 of 25

to the Kitchen several
times with various items.

(2.) At no time did a
male [Charles Moniz] never
identify ME, I never seen
Charles Moniz. ~~████████~~ until
some fourteeth Month
later at a suppress
hearing.

Signed unde the pains
and penalties of perjury
this 10 day of December
2001

Anthony Cabral
Anthony CABRAL

101

8 OF 25

Commonwealth of Massachusetts

Bristol ss.                    Superior Court
                               New Bedford, Ma.

Commonwealth
      V.                  Dkt.# 99T3CR0228.A-B
Anthony Crotal

## Supplemental Memorandum
## of Law

It is now a widely recognized
tenet of our criminal justice
system that "[A] Major Factor
contributing to the high
incidence of Miscarriage of
justice From mistaken identifi-
cation has been the degree
of suggestion inherent in
the manner in which the
prosecution presents the sus-
pect to witnesses for pre-
trial identification. Comm V.
Kazonis 255 N.E. 2d 333, 336
(1970), United States V. Wade

102

87 S.Ct. 1926, 1933 (1967).

An identification that results from the presentation of a single suspect to a witness has been considered particularly suggestive and fraught with the potential for tragic error, leading the Supreme Judicial Court to note repeatedly that "A one-to-one confrontation, whether in person or by photograph is disfavored." Comm v. Jackson 386 N.E. 2d 15, 23 (1979). Accord, Comm v. Johnson 650 N.E.2d 1257 (1995) ("Although one-on-one confrontations are not per se excludable they are disfavored because of their inherently suggestive nature".)

103

10 of 25

A one-to-one confrontation of a person in custody has been widely condemned by both the Supreme Judicial Court and the United States Supreme Court. Stovall v. Denno 87 S.ct. 1967 (1967); Comm V. Barnett 364 N.E.2d 878 (1976); Comm V. Dickerson 364 N.E.2d 1052 (1977); There were no exigent circumstances here, such as a dying victim, which would demand a one-on-one procedure. Stovall v. Denno Supra. Nor was this an accidental confrontation. Comm v. Leaster 287 N.E.2d 122 (1972).

A confrontation may be so unnecessarily suggestive and conducive to irreparable mistaken identification so as to deny the defendant his due process rights

104

Under the fourteenth
Amendment. United States
V. wade 87 S.Ct. 1926 (1967);
Stovall V. Denno, Supra.

Here the defendant will
show by a preponderance
of the evidence, that the
procedure was inherently
suggestive. And the police
procedure was unduly
suggestive. And Commonwealth's.

On June 21,1999 Officer
Michael Malek wrote the
police report and the only
officer that testified
before the Grand jury,
the said report was base
on false, perjured, fabricated,
inaccurate, misleading and
all of officer Malek
information under oath, is
patently unreliable in

12 OF 25

DETERMINATION OF PROBABLE
CAUSES / IDENTIFICATION TO
ARREST DEFENDANT FOR TWO
COUNTS OF MASK ARMED ROBBERY,
THE CONTENT IS INSUFFICIENT
TO ESTABLISH PROBABLE CAUSE
FRANKS V. DELAWARE 98 S.Ct
2674 (1978); COMM V. McCarthy
385 MASS. 160 (1982); BECK
V. Ohio 379 UNITED STATES
379 U.S. 89 (1964); ALSO SEE,
Grand jury min Fatally defective
COMM V. Saltan 387 MASS.
160 (1982); COMM V. O'DELL
392 MASS. 445 (1984).
OFFICER MICHAEL MALEK
WAS ALLEGEDLY DISPATCH TO
GO TO A MUTUAL GAS STATION
FOR AN UNKNOWN EMERGENCY
[OFFICER MALEK ▓▓▓▓▓▓
HAD NO PRIOR KNOWLEDGE
OF ANYTHING AT THIS TIME]
OFFICER MALEK STATED
THAT HE FIRST MET WITH
Charles MONIZ AT THE

106

13 of 25

Mutual gas station, officer
Malek stated Mr. Moniz
Aided him with informations
see officers report (P.R. EX.
"B" Pg. 1-2) Also see, Grand
Jury min (G.J.M. EX "C" Pg. 3,
lines 14-24, Pg. 4, lines 1-2,
Pg. 4 lines 14-25, Pg. 5, lines
1-6). However Charles Moniz
Testified " he was never
at the Mutual gas station
see (S.H.Tr. EX. "A" Pg. 117, lines
20); (S.H.Tr. EX. "A" Pg. 1-51, lines
12-13); Mr. Moniz stated
" he First spoke to the
police on Almond Street
(S.H.Tr. EX. "A" Pg. 1-51, lines
17-18). The probable cause /
identification of defendant
presented was insufficient
As A matter of law. Comm
McCarthy supra. Beck supra;
Charles Moniz was not
A witness nor A victim to

14 OF 25

A MASK ARMED ROBBERY WITH A GUN NOR WAS HE A CREDIBLE SOURCE OF INFORMATION, MONIZ HAD NO BASIS FOR HIS ALLEGED INFORMATION MONIZ HAD NOT MADE PERSONAL OBSERVATIONS WHICH IS REQUIRED BY LAW COMM V. KAUFMAN SUPRA; COMM V. STEVENS SUPRA; AGUILAR V. TEXAS SUPRA; (S.H.TR. EX. "A" PG. 1-8 LINES 23-25, PG. 1-37, LINES 8-11, 24-25); (S.H.TR. EX. "A" PG. 1-9, LINES 16-17); (S.H.TR. EX. "A" PG. 1-9, LINES 7) PG. 1-9, LINES 10-11, 13 PG. 1-38, LINES 9, 13); SIMPLE IT IS NOT STATED UNDER PRIOR OATH ON THE POLICE REPORT THAT MR. MONIZ MADE PERSONAL OBSERVATIONS AT THE MUTUAL GAS STATION THAT IS REQUIRED BY LAW KAUFMAN, STEVENS AGUILAR SUPRA; MR. MONIZ

108

15 of 25

testimony is inconsistent with the leading officers police report. Simple it is not under prior oath.
The Alleged Mask Attied Robbery was in the store in a back room. the only person present was the Robber and Rosmary Hobbs (P.R. EX. "B" pg. 3). Also see, (G.J.M. EX. "C" pg. 13. lines 4-21). Simple the Alleged Robber was in the store And Charles Moniz was in A Auto on Bradford Avenue one Auto down from the corner. (S.H.Tr. EX. "A" 1-3). Moniz stated he turned his Auto around And Started to following the Alleged Auto down Bradford Avenue. SEE, (S.H.Tr. EX "A" pg. 1-12, lines 23-25, pg. 1-13, lines 1-3) this testimony clearly Show that Mr. Moniz had

109

16 of 25

not spoken with any one
at the mutual gas station
about a robbery with a gun
simple it is not stated
under prior oath on the
police report that Mr. Moniz
had spoken with any person
at the mutual gas station
nor is it under oath that
Mr. Moniz made personal
observations regarding an
alleged robbery at that
location see (P.R.EX."B") Mr.
Moniz stated "he never
seen anything"... (S.H.Tr. EX. "A"
Pg. 1-66, lines 7-10, 12-14, 25,
pg. 1-67, lines 1-7) Mr. Moniz
testimony was he lost the
auto he was allegedly
following. see, (S.H. Tr. EX. "A"
Pg. 1-17, lines 13-16); (S.H.Tr.
EX. "A" pg. 1-43, lines 24-25)
The only time Mr. Moniz
identified the defendant was
at the mutual gas station

110

This information is not under prior oath. SEE, (S.H.T. EX "A" pg. 1-39, lines 2-6 this states "[the] defendant pulled his mask off like this"..."he was opening his [car] door and he was pulling his mask off"; Also SEE, (S.H.T. EX "A" pg. 1-10, lines 8-11 pg. 1-39, lines 9, pg. 1-10 lines 13-15. pg. 1-11, lines 10-16, pg. 1-40 and that he recognized the male. All information stated at a motion to suppress is not under prior oath and is inadmissable in a court of law. <u>Aguilar V. Texas 378 U.S. 108 (1964)</u>. The Judge may consider only the sworn document presented to the magistrate in determination, probable cause / identification. <u>Comm V. Figueira</u>

15 OF 25

3 MASS APP. Ct. 250 (1974):
And the last time Mr. Moriz
stated he seen defendant
was "[HE SEEN him coming
up the street crossing
that's how [HE] seen him.
SEE (S.H.Tr. EX. "A" pg. 149, lines
6-8) As previously stated
Mr. Moriz testefmony was he
lost sight of the Alleged
Auto he followed. SEE (S.H.Tr.
EX. "A" pg. 1-17, lines 13-16)
Moriz stated "no, I didn't
SEE it ... SEE (S.H.Tr. EX. "A"
pg. 1-43, lines 24-25). Moriz
stated the male was bent
over in in the auto "[HE]
did not recognize him" "[HE]
could not see his face".
SEE (S.H.Tr. EX. "A" pg. 1-46, lines
8-18, pg. 1-47, lines 19, pg. 1-48
lines 5-11)". "[HE] didn't
SEE him leave the Auto
I seen him coming up the
Street Crossing that's

118

19 of 25

how, I seen him". SEE,
(S.H.Tr. EX. "A" pg. 1-4a, lines
6-8): Evidence that is not
under prior oath and
without a factual basis
of knowledge cannot be
considered in the estab-
lishment of probable
cause for arrest or for
the identification purposes
SEE, GERSTEIN V. Pugh
95 S.Ct. 854 (1975); Aguilar
V. TEXAS Supra; Comm V.
STEVENS Supra; Comm V.
McCarthy Supra; Franks
V. Delaware Supra.

      Officer Malek stated
in his police report that
Charles Moniz identified
defendant by recognizing
him as Tony Cabral. SEE,
Officer Malek (P.R. EX. "B" pg. 2),
(G.J.Tr. EX. "C" pg. 8, lines 14-15)
However Mr. Moniz stated

113

20 of 25

" NO. I don't think I said that [his name] Tony Cabral. SEE, (S.H.Tr. Ex. "A" pg. 1-23 lines 18) Moniz testified that " [his name did not come come to me at any point] SEE, (S.H.Tr. Ex. "A" pg. 1-24 lines 10-13, pg. 1-39, lines 11). Moniz testified that "The only time I knew what his name was was when the officer said Anthony — in the apartment what are you doing here. SEE, (S.H. Tr. Ex. "A" pg. 1-39, lines 15-19). ... Mr. Moniz testified After that I knew that there was somebody there and that's the first time I know of his name heard that's the first time it was mentioned. SEE (S.H.Tr. Ex. "A" pg. 1-65, lines 5-13, 21).

Mr. Moniz testified he never saw Mr. Cabral again before he went to work "no, never did" and "I never did look into the apartment I left. See, (S.H. Tr. Ex. "A" pg. 1-70, lines 14-21). Mr. Moniz never properly identified the defendant as the perpatrator not before the arrest nor after the arrest (he never) seen anything. See, (S.H. Tr. Ex. "A" pg. 1-66, lines 7-10, 12-14, 25, pg. 1-67, lines 1-7). Mr. Moniz testified he never spoke to the police again about this case. "no, I didn't" and "that he never been down to the station. See, (S.H. Tr. Ex. "A" pg. 1-67, lines 24, pg. 1-68, lines 1). And that he never went down to

22 OF 25

give any other statements
to detectives of anything.
" I never did that. SEE
(S-H. Tr. Ex. "A" pg. 1-6a, lines
1-2). The only identificat-
ion here was the one-to-
one in-court shown to
the alleged eyewitness
after he had been in
custody some fourteen
months later at counsel
table, in handcuffs and
in a prison uniform, some
25 feet from Charles
Moniz this confrontation
is so suggestive as to
constitute a violation of
due process. This one-to-
one confrontation of the
defendant in custody has
been widely condemned
by both the Supreme
Judicial Court and the
United States Supreme
Court. Stovall v. Denno Supra.
Comm v. Barnett Supra.

116

22-A of 25

In general, a witness bases any identification he makes on his perception through the use of his senses. Usually the witness identifies an offender by the sense of sight - but this is not necessarily so, and he may use other senses, but when hearing is alleged to be one of senses. A statement made by the victim, and the record shows the victim ~~xxxxxx~~ made no such statements, nor is the statements under prior oath. Such statements are inadmissable. (United States v. Telfaire 469 F.2d 552. SEE Mr. Moniz's alleged hearing senses and his basis of knowledge. (S.H.Tr. EX. "A" pg. 1-12, lines 23-25, pg. 1-13, lines 1-37.

22-B of 25

In the case at bar the Judge should exercise his power and refuse this criminal case to go to the jury, where identification rests upon the testimony of one witness without corroboration. The one witness testimony is insufficient, as well as the lapse of time some 14 month between the occurrence of the crime and the first confrontation gives rise to a very substantial likelihood of irreparable misidentification.

Comm V. Barnett Supra:
The practice of show-
ing Suspects singly to
persons for the purpose
of identification. And not as
part of a line-up. has
been widely condemned
as well as unconstitutional.
Officer Michael Malek
Suspicion must be based
on specific articulable facts
and reasonable inferences
drawn from those facts
before the pursuit begins
Terry V. Ohio 392 U.S. 1, 19,
21, (1968). Comm V. Silva 366
Mass. 402, 408 (1974). In the
case at bar officer Malek
fabricated, and misled
the magistrate. The evidence
is clear, direct and convinc-
ing, the only remedy when
the police conduct an arrest
without probable cause of

119

reasonable suspicion is to dismiss / suppress. Comm. v. Thibeau 384 Mass. 762 (1981); Comm. v. Lyons 409 Mass. 16 (1990). Police Misconduct. United States v. Tanfi 648 F.2d 598 (1981); Stovall v. Delaware Supra. It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police. United States v. Wade 87 S.Ct. 1926 1936 (1967). The eyewitness 'tainted' identification testimony must be entirely excluded, it is not under prior oath... this ~~███~~ testimony must not be admitted to convict the defendant at all... In other words, no one now

25 of 25

or hereafter can believe his identification of defendant as the robber. Mr. Charles Moniz testimony is not sufficiently reliable.

As the identification procedure was inherently suggestive, that evidence is per se excluded.

Respectfully Submitted:

Anthony Cabral
Anthony Cabral pro-se
P.C.C.F. 26 long Pond Rd.
Plymouth, Mass. 02360

date: December. 10 2001

121

# CERTIFICATE OF SERVICE

I, Anthony Cabral pro-se do hereby certify that I have served the Assistant District Attorney a copy of defendant's Motion.

1.) Motion to Suppress identification, Supplemental Affidavit, Supplemental Memorandum of law by handing it to David L Crowley Jr. in-court at 888 Purchase Street, Mass, 02741

Signed under the Penalties of perjury this 10. Day of December, 2001

Anthony Cabral
Anthony Cabral
PRO-SE

122

Motion for Jury Instructions

1/11/02

82

1 of 6

Commonwealth of Massachusetts

Bristol    SS    Superior Court
New Bedford, MA

BRISTOL, SS SUPERIOR COURT
FILED
JAN 11 2002
MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

Commonwealth
V.
Anthony Cabral

#0973CR0228.A-B

## Motion For Jury Instruction

Now comes the defendant And moves that this Honorable court give the following Jury instruction.

1.) Intensive instruction on the Element of the Charged Offenses.

2.) Intensive instruction on Reasonable Doubt.

3.) Intensive instruction on Circumstantial Evidence.

123

2 of 6

4.) Intensive instruction on credibility and reliability of witness-es

5.) Intensive instruction on Identification as outlined in United State V. Telfaire 469 F.2d 552 (D.C. 1972)

6.) Intensive instruction on mere presence where Evidence of a crime is found is not Evidence of guilt beyond a reasonable Doubt.

7.) Intensive instruction on not Defendant's Right not to testify.

8.) Intensive instruction on Presumption of innocence.

124

3 of 6 :

9.) Intensive instruction police report, that police officers are required by law to put on their police report the probable cause evidence which justifies the arrest of the assailant and the eyewitness's description and circumstances of the incident which would have identified the assailant as the perpetrator of the crime, but not limited to said instructions and the jury cannot take into consideration evidence establishing probable cause and identification of an accused this is not on the police officer's report under prior oath in a warrantless arrest

125

4 of 6

WHere there is no other independant source of information. Comm V. Botelho 369 MASS. 860, 868-870 (1976); United States V. Wade, 388 U.S. 218, 237-241 (1967);

10.) Intensive instruction on the Government's loss or destroyed of potential excculpatory Evidence. For Failure to Conduct Scientific / Forensic and for the premature returned of the Following Evidence:

11.) A wallet, pocketbook, identification documents / personal papers Allegedly belonging to Rosemary Hobbs, taken from 181 Division St. Comm V. Bowden 79 MASS 472 (1980); United States V. Wade Supra. Comm V. Olszewski 401 MASS 749 (1988);

124

5 of C

12.) Cash, A black plastic shopping bag containing $7,983.00 dollars in cash.

13.) Keys from a 1989 Ford Thunderbird.

14.) Police notes and logs taken during the investigation specifically notes taken by a officer at the mutual gas station before the arrest of the defendant.

15.) Turret tapes of police radio transmissions of the alleged unknown emergency. And until the defendant's arrest. Comm V. Willie 400 Mass. 422 (1987); Comm V. Charles 397 Mass. 1. (1986) United States V. Bryan 439 F.2d 642 (D.C.Cir 1971);

127

6 OF 7

OFFICER MALEK provided
no basis of personal
observation on his police
report by Charles Moniz.
OFFICER MALEK had not
spoking to Rosemary Hobbs
nor Gloria Reardon the
victims, About the Alledge
MASK Arm Robbery, nor
has Charles Moniz spoke
to Rosemary Hobbs or
Gloria Reardon About the
said crime.
    THE Police report contains
no AFFIRMATIVE Allegations,
that OFFICER MALEK spoke
with personal knowledge
of a MASK Arm Robbery
stated therein before
Arresting the defendant,
OFFICER MALEK police
report dose not indicate
Any truthfully source
of information for belive

128

not did it set forth
Any other sufficient
basis upon which A
Finding of probable cause
Could be made

This is A case of
the court And not A
Jury.

The defendant moves
the court to dismiss the
idictments in this case.

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

BRISTOL, ss.

NO. 2003-P-397

COMMONWEALTH OF MASSACHUSETTS,
APPELLEE,

v.

ANTHONY CABRAL,
DEFENDANT/APPELLANT.

ON APPEAL FROM JUDGMENTS BY
THE BRISTOL DIVISION OF
THE SUPERIOR COURT DEPARTMENT

BRIEF AND APPENDIX FOR THE DEFENDANT/APPELLANT

12-2-03

# Commonwealth of Massachusetts

## Appeals Court

Bristol,ss

2003 Stting

No.:2003-P-397

---

Commonwealth of Massachusetts

Appellee

V.

Anthony Cabral

Appellant

---

On Appeal from Judgements of

the New Bedford Superior Court

---

Moffett's

Brief and Record

Appendix for the defendant

Anthony Cabral
P.O. Box 100
So. Walpole, Massachusetts-02071

---

## Table of Contents

TABLE of AUTHORITIES ********************************** I-X

ISSUES PRESENTED *************************************** 1

INTRODUCTION ************************************************ 3

STATEMENT of CASE
Prior proceedings ************************************** 5

STATEMENT of FACTS *********************************** 6

SUMMARY of the ARGUMENT ****************************** 31

ARGUMENT ********************************************** 34

## ARGUMENT

I.    THE MOTION JUDGE ERROR WHEN ABUSE HIS
DISCRETION BY NOT SUPPRESSING EVIDENCE, IN A
WARRANTLESS ENTRY, SEARCH/SEIZURE IN A 1989
FORD THUNDERBIRD WITHOUT EXIGENT CIRCUMSTANCES
PROBABLE CAUSE, AND THE WARRANTLESS ENTRY, ARREST
SEARCH/SEIZURE AT 181 DIVISION STREET, AS WELL
AS THE SUBSEQUENT SEARCH AND SEIZURE WITH WARRANT,
VIOLATED DEFENDANT'S 4TH, 5TH, 6TH, 14TH AMEN-
DMENTS TO THE UNITED STATES CONSTITUTION AND
ARTICLE 1, 12, 14, OF THE MASSACHUSETTS DECLARA-
TION OF RIGHTS WHICH PROVIDES EVEN GREATER DUE
PROCESS PROTECTIONS.   ***************************** 34

II.    TRIAL COUNSEL RENDEREDF INEFFECTIVE
ASSISTANCE BY FAILING TO FILE AN INTERLOCUTORY
APPEAL TO THE SUPREME COURT FROM THE DENIAL
OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
VIOLATED DEFENDANT'S 6th , AND 14th AMENDMENTS
TO THE UNITED STATES COSTITUTION AS WELL MASSACHUSETTS
MASSACHUSETTS DECLARATION OF RIGHTS ARTICLE12.
PROVIDES GREATER SAFEGUARDS.   ******************** 59

i

III.    The Motion Judge error when he abused his
discretion by not dismissing the Defective Indict-
ments or in the alternative not entitling defendant
to an evidentiary hearing to resolve the matter in
violation of the 5th,6th,14th amenments to the Unit-
ed Staes Constitution and Article 1,12 of the Massa-
chusetts Declaration of Rights which provide even
greater due process protection. *********************** 61


IV.    THE COMMONWEALTH'S LOSS AND DESTRUCTION
OF THE TURRET TAPE, 911 TAPE, POCKETBOOK,
WALLET, CASH AND PAPERS, PLASTIC BAG, KEYS OF
A 1989 BLUE THUNDERBIRD EFFECTIVELY PREVENTED
CABRAL FORM CROSS/DIRECT EXAMINING THE WITNESS
IN VIOLATION OF HIS DUECEROCESS RIGHT TO A FAIR
TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION,
AND ARTICLE 12 OF THE MASSACHUSETTS DECLARATION
OF RIGHTS, WHICH PROVIDES EVEN GREATER DUE
PROCESS PROTECTIONS. ****************************** 67


V.    THE CUMULATIVE EFFECT OF THE ERRORS
WARRANTS A REVERSAL. *************************** 74


Conclusion ************************************************** 75

Records Appendix ********************************************* 76

ii

<u>**Table of Authorities**</u>

Cases:

<u>Aguelar V. Texas,</u>
<u>378 U.S. 108 (1964)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 50

<u>Arizona V. Hicks,</u>
<u>480 U.S. 321 (1987)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 55

<u>Arizona V. Youngblood,</u>
<u>488 U.S. 51  (1998)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 67

<u>Bumper V. North Carolina,</u>
<u>391 U.S. 543 (1968)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 52

<u>California V. Ciraolo,</u>
<u>476 U.S. 207 (1986)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 40

<u>Carroll V. United States,</u>
<u>267 U.S. 132 (1925)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 34

<u>Chapman V. United States,</u>
<u>365 U.S. 610 (1961)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 56

<u>Chimal V. California,</u>
<u>395 U.S. 752 (1969)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 54,57

<u>Colorado V. Bertine,</u>
<u>479 U.S. 369 (1987)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 38

<u>Combs v. United States,</u>
<u>408 U.S. 224 (1972)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 41

<u>Commonwealth V. Aguiar,</u>
<u>370 Mass. 490 (1976)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 48

<u>Commonwealth V. Almeida,</u>
**373** <u>Mass. 266  (1977)</u>
*   *   *   *   *   *   *   *   *   *   *   *

<u>Commonwealth V. Antobenetto,</u>
<u>366 Mass. 51  (1974)</u>
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 34,40

Commonwealth V. Appleby,
358 Mass. 407 (1970)
*   *   *   *   *   *   *   *   *   *   *   *   * 53

Commonwealth V. Avery,
365 Mass. 59 (1974)
*   *   *   *   *   *   *   *   *   *   *   *   * 35

Commonwealth V. Bacon,
381 Mass. 642 (1980)
*   *   *   *   *   *   *   *   *   *   *   *   * 52

Commonwealth V. Barnes,
2 Mass. App. Ct. 357 (1974)
*   *   *   *   *   *   *   *   *   *   *   *   * 34

Commonwealth V. Bassett,
21 Mass. App. Ct. 713 (1993)
*   *   *   *   *   *   *   *   *   *   *   *   * 74

Commonwealth V. Bowden,
379 Mass. 478 (1980)
*   *   *   *   *   *   *   *   *   *   *   *   * 58

Commonwealth V. Castro,
438 Mass. 160 (2002)
*   *   *   *   *   *   *   *   *   *   *   *   * 68

Commonwealth V. Cohen,
359 Mass. 140 (1971)
*   *   *   *   *   *   *   *   *   *   *   *   * 57

Commonwealth V. Corbett,
26 Mass. APP. Ct. 766 (1989)
*   *   *   *   *   *   *   *   *   *   *   *   * 38

Commonwealth V. Cory,
62 Wash. 2nd 371 (1963
*   *   *   *   *   *   *   *   *   *   *   *   * 66

Commonwealth V. Derosa,
402 Mass. 284 (1988)
*   *   *   *   *   *   *   *   *   *   *   *   * 43,46,52,56

Commonwealth V. Disanto,
8 Mass. app. Ct. 694 (1979)
*   *   *   *   *   *   *   *   *   *   *   *   * 43

Commonwealth V. Dupont,
2 Mass. App. Ct. 566 (1914)
*   *   *   *   *   *   *   *   *   *   *   *   * 35

Commoneweath V. Ellison,
379 Mass. 1 (1978)
*   *   *   *   *   *   *   *   *   *   *   *   * 68

Commonwealth V. Fiote,
364 Mass. 819 (1940)
* * * * * * * * * * * * * * 69

Commonwealth V. Forde,
367 Mass. 805 (1975)
* * * * * * * * * * * * * * 43

Commonwealth V. Frazier,
410 Mass. 235 (1991
** * * * * * * * * * * * * * 39

Commonwealth  V Galvin,
323 Mass. 205 (1948)
* * * * * * * * * * * * * * 65

Commonwealth V. Gregory,
401 Mass. 437 (1988
* * * * * * * * * * * * * * 68,72

Commonwealth V. Harmond,
376 Mass. 557 (1978)
* * * * * * * * * * * * * * 50

Commonwealth V. Harris,
378 Mass. 758 (1982)
* * * * * * * * * * * * * * 48

Commonwealth V. Hason,
387 Mass. 169 (1982)
* * * * * * * * * * * * * * 39

Commonwealth V. Jones,
9 Mass. App. Ct. 83 (1980)
* * * * * * * * * * * * * 38

Commonwealth V. Kater,
431 Mass. 404 (2000)
* * * * * * * * * * * * * 72

Commonwealth V.Kines,
37 Mass. App. Ct. 540 (1994)
* * * * * * * * * * * * 4

Commonwealth V. King,
389 Mass. 233 (1983)
* * * * * * * * * * * * * 39

Commonwealth V. Lam Hue To,
391 Mass 301 (1984)
* * * * * * * * * * * * * 67

Commonwealth V. Manning,
373 Mass 438 (1977)
* * * * * * * * * * * * * * 66

Commonwealth V.   Martin ,
358 Mass. 282 (1970)
* * * * * * * * * * * * * 53

Commonwealth V. Mayfield,
398 Mass. 615 (1986)
*   *   *   *   *   *   *   *   *   *   *   *   * 62,66

Commonwealth V. Med,
46 Mass. App. Ct. 591 (1999)
*   *   *   *   *   *   *   *   *   *   *   * * 43

Commonwealth V. McCarthy,
385 Mass. 160 (1982)
*   *   *   *   *   *   *   *   *   *   *   *   * * 61,65,66

Commonwealth V. Moffet,

383 Mass. 201 (1983)
 *   *   *   *   *   *   *   *   *   *   *   * 4

Commonwealth V. Molina,
439 Mass. 206 (2003)
*   *   *   *   *   *   *   *   *   *   *   *   * 51,59

Commonwealth V.Montanez,
410 Mass. 290 (1991)
*   *   *   *   *   *   *   *   *   *   *   * 40

Commonwealth V. Moon,
8 Mass. App. Ct. 375 (1979)
*   *   *   *   *   *   *   *   *   *   * 35,37,38

Commonwealth V. Neal,
393 Mass. 1(1984)
*   *   *   *   *   *   *   *   *   *   *   * 68

Commonwealth V.Nora,
402 Mass. 262 (1988)
*   *   *   *   *   *   *   *   *   * * 39

Commonwealth V. O'Dell,
392 Mass. 445 (1984)
*   *   *   *   *   *   *   *   *   * * * 65,66

Commonwealth V. Ocasio,
434 Mass. 1 (2001)
*   *   *   *   *   *   *   *   *   *   *   * 74

Commonwealth V. Olszewski,
416 Mass. 707 (1993)
*   *   *   *   *   *   *   *   *   *   * 68,71

Commonwealth V. Ortiz,
376 Mass. 349 (1978)
*   *   *   *   *   *   *   *   *   *   * 42

Commonwealth V. Otsuki,
411 Mass. 218 (1987)
*   *   *   *   *   *   *   *   *   *   * 67,72

Commonwealth V. Panetti,
406 Mass. 230 (1989)
  *      *      *      *      *      *      *      *      *      40

Commonwealth V. Paniagua,
413 Mass. 796 (1992)
  *      *      *      *      *      *      *      *      *      44,46

Commonwealth V. Phoehix,
409 Mass. 408 (1997)
  *      *      *      *      *      *      *      *      *      67

Commonwealth V. Pierre,
377Mass. 650 (1976)
  *      *      *      *      *      *      *      *      *  61

Commonwealth V. Pina,
406 Mass. 540 (1990)
  *      *      *      *      *      *      *      *    *  41,42

Commonwealth V. Podgurski,
385 U.S. 391 (1982)
  *      *      *      *      *      *      *      *    *  39

Commonwealth V. Reddington,
395 Mass. 315 (1985)
  *      *      *      *      *      *      *      *    *  *  65

Commonwealth V. Robinson,
373 Mass. 591 (1971)
  *      *      *      *      *      *      *      *      *    *  61,64

Commonwealth V, Saferian ,
366 Mass. 89 (1974)
  *      *      *      *      *      *      *      *      *    *  60

Commonwealth V. Salman,
387Mass. 160 (1982)
  *      *      *      *      *      *      *      *      *    *  61,62,65

Commonwealth V. Sanna,
424 Mass. 92 (1997)
  *      *      *      *      *      *      *      *      *    *  34

Commonwealth V. Sasville
35 Mass. App. Ct. 19 (1993)
  *      *      *      *      *      *      *      *      *    *  69,70,72.73

Commonwealth V. Scott,
29 Mass App. Ct. 1004 (1990)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 35,37

Commonwealth V. Silva,
366 Mass. 402 (1974)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 36

Commonwealth V. Spagnolo,
17 Mass. App. Ct. 516 (1983)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 36

Commonwealth V. Stafford,
18 Mass. App. Ct. 965 (1984)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 58

Commonwealth V. Thibeau,
384 Mass. 762 (1981)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 52

Commonwealth V. Tiexeita,
29 Mass. App. Ct. 202 (1990)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 69

Commonwealth V. Tucceri,
412 Mass. 401 (1992)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   *: 67

Commonwealth V. Upton,
394 Mass. 363 (1985)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 38

Commonwealth V. Varney,
391 Mass. 34 (1983)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 39

Commonwealth V. Voisine,
414 Mass. 772 (1983)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 43,46,48, 56

Commonwealth V. Walker,
370 Mass. 548 (1976)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 48

Commonwealth V. White,
47 Mass. App. Ct. 430 (1990)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 72,74

Commonwealth V. Willie,
400 Mass. 427 (1987)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 67,71

Commonwealth V. Zeitler,
7 Mass. App. Ct. 543 (1979)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 50

Coolidge V. New Hampshire,
403 U.S. 443 (1971)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 56


Dyke V. Taylor Implemental Mfg. Co.,
391 U.S. 216 (1968)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 35


Florida V. Rover,
460 U.S. 491 (1985)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 52


Harris V. United States,
390 U.S. 234 (1968)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 57


Horton V. Californa,
496 U.S. 128 (1990)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 54,57


Jackson V. Wainwright,
390 F.2d. 288 (1968)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 71


Johnson V. United States,
33 U.S. 10 (1948)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 56


Jones V. United States,
326 U.S. 257 (1960)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 39,41,42


Ker V. California,
374 U.S. 23 (1963)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 57


Lewis V. United States,
385 U.S. 206 (1966)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 57


Levin V. Clark,
408 F.2d. 1209 (1967)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 71


Mapp V. Ohio,
367 U.S. 643 (1961)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 59


Maryland V. Buie,
494 u.s. 325 (1990)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 58


McDonald V. United States,
335 U.S. 45 (1948)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 42


McMann V. Richardson,
397 U.S. 759 (1970)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 59

Michigan V. Long,
463 U.S. 1032 (1983)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 58

Payton V. New York,
445 U.S. 573 (1980)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 43,51,52

People V. Kunn,
33 N.Y.2d. 203
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 52

Rawlings V. Kentuky,
448 U.S. 98 (1980)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 40,42

Schneckloth V. Bustamonte,
412 U.S. 218 (1973)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 52

Sharrar V. Felsina,
128 F.3d. 810 (1997)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 51

Spinelle V. United States,
393 U.S. 410 (1969)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 50

Strictland V. Washington,
466 U.S. 682 (1984)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 59,60

Stuart V. State,
907 F.2d. 783 (1995)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 70

Sullivan V. Disttrict Court of Hampshire,
384 Mass. 736 (1981)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 40

Taylor V. United states,
268 U.S. 1 (1932)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 56

Terry V. Ohio,
392 U.S. 1 (1968)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 58

United States V. Agurs,
427 U.S. 97 (1976)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 70,72

United States V. Al-Azzawy,
784 F.2d. 890 (1985)
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* 44

United States V. Anderson,
813 F.2d. 1450 (1987)
*   *   *   *   *   *   *   *   *   *   *   *   * 54


United states V. Bryant,
439 F.2d. 646 (1971)
*   *   *   *   *   *   *   *   *   *   *   *   * 70


United States V. Herrold,
772 F. Supp. 1483 (1991)
*   *   *   *   *   *   *   *   *   *   *   *   * 51


United sattes V. Iribe,
11 F.3d. 1553 (1960)
*   *   *   *   *   *   *   *   *   *   *   *   * 42


United States V. Levy,
577 F.2d. 200 (1978)
*   *   *   *   *   *   *   *   *   *   *   *   * 66


United States V. Maez,
872 F.2d. 1444 (1974)
*   *   *   *   *   *   *   *   *   *   *   *   * 53


United States V. Malock,
415 U.S. 164 (1974)
*   *   *   *   *   *   *   *   *   *   *   *41,53


United States V. McCox,
839 F.Supp.2d. 1442 (1983)
*   *   *   *   *   *   *   *   *   *   *   *   * 51


United states V. Naugle,
997 F.2d. 819 (1993)
*   *   *   *   *   *   *   *   *   *   *   *   * 55


United States V. Reed,
572 F.2d. 412 (1978)
*   *   *   *   *   *   *   *   *   *   *   *   * 51


United States V. Saari,
88 F.2d. 835 (1999)
*   *   *   *   *   *   *   *   *   *   *   *   * 51


United States V. Salvucci,
448 U.S. 83 (1980)
*   *   *   *   *   *   *   *   *   *   *   *   * 39


United States V. Sepolveda,
15 F.3d. 1161 (1993)
*   *   *   *   *   *   *   *   *   *   *   *   * 74


Wardius V. Oregon,
412 U.S. 470 (1975)
*   *   *   *   *   *   *   *   *   *   *   *   * 70

Weeks V. United states,
232 U.S. 383 (1914)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 59


Wongsom V. United States,
371 U.S. 471 (1963)
*   *   *   *   *   *   *   *   *   *   *   *   *   *   * 38,42,59

CONSTITUTIONAL AMENDMENTS, STATUTES, RULES:

**************************************************** 34-75
Massachusetts Declaration of Rights, Art. 1,12,14

United States Constitution, Amendments, 1st,4th, 5th,6th and 14th

State and Federal Laws,

Declaration of Rights,
*********************************** 34,40,42,48,61,67

United States Constitution,
************************** 34,38,39,41,42,43,48,52,54,59,61,67

State and Federal Law,
*********************************************** 38,47,57,58

Bristol,ss                                                      2003 Stting


No. 2003-P-397

_____

Commonwealth of Massachusetts
**APPELLEE**

V.

Anthony Cabral
**APPELLANT**

_____

**On Appeal from Judgement of the Superior Court**

_____

Brief and Record Appendix from the Defendant

_____

## Issues Presented

**1.)**     Whether or not Justice Daniel F. Toomey abused his discretion
by not supporting with substantial evidence accordence with law
(factual finding) not suppressing evidence seized in a warantless entry,
arrest, search, seizur of items/person, taking of a 1989 ford thunder
bird ( Mass Reg 6139BS) as well as 181 Division Street in a Dwelling
House, Violate the defendants due process right to a fair trial.

**2.)**     Whether or not Attorney Stephen C. Nadeau was ineffective
by not following through with the extention of time motion. Motion
filed for interloctory appeal on a motion to suppress evidence which
prejudice the defense ?

3.)    Whether or not the original grand jury presentment constituted false, inaccurate and/or misleading statements, made the indictment fatally defective violated the defendant's due process right to fair trial, evidence testimony prejudice the defense ?

4.)    Whether or not the commonwealth's loss and distruction of the potentially exculpatory turret tape, 911 tape, pocketbook, wallet, cash and papers, plastic bag containing cash, keys to the blue auto violate the defendant's due process right to a fair trial, where the commonwealth was highly culable for the lossed evidence was highly material, and the loss and distruction evidence greatly prejudiced the defense ?

5.)    Whether or not the cumulative effect of the errors warrant reversal.

**INTRODUCTION**

This brief is filed pursuant to **Commonwealth v. Moffet**, 383 Mass.201 (1983). Appealant request that the arguments herein reviewed under the collective error standard, which requires the court to evaluate all the claimed errors collectively to determine whether, in the agregate, the errors constitute reversible errors. See e.g. **Commonwealth v. Kines**, 37 Mass. App. Ct. 540, 543-544 (1994) (errors which do not warrant reversal individually may warrant reversal when viewed collectively.) However, appealant also requests that the arguments raised in the brief filed by council be reviewed collectively with the issues raised herein to determine whether <u>all</u> the errors, combined, warrant reversal of the conviction under challenge.

## Statement of Case, Prior Proceeding [1]

On June 21, 1999, the district court issued a complaint charging the defendant with two counts of Armed Robbery W/Masked, M. G.L.c. 265 section 17, one count Assault and battery W/Dangerous Weapon, To wit: water bottle, M.G.L.c. 265 section 15(A) [9973CR-288. A-B]

On July 15, 1999, by New Bedford Superior  Court holden at New Bedford, defendant was indicted on two counts of Armed Robbery W/Masked, M.G.L.c. 265 section 17 being masked and armed with a dangerous weapon, to wit.: a hand gun, did assault Rosemary Hobbs with intent to rob her, and did rob and steal from the person of said Rosemary Hobbs or from her immediate control, Money, the property of Mutual Gas Station,[9973CR288.A] being masked and armed with a dangerous weapon, to wit.: a hand gun, did assault Gloria Reardon with intent to rob her, and did rob and steal  from the person of said Gloria Reardon or from her immediate control, money, the property of the Mutual Gas Station. [No. 9973CR288.B]  (R.A. 1 )

On January 9, 2002, David Crowley, Assistant District Attorney dismissed indictment NO.:9973CR228.B. After a three day trial before Justice, John A.Tierney a jury found the defendant Guilty of unarmed robbery, No.:9973CR228.A.(R.A. 2-3 ).

Anthony Cabral (defendant) filed a timely appeal on February 13, 2002, (R.A. 3  ).

The case was docketed in the appeals court on April 26,2003 appearence of Atty. Sandre Wysock/Capplis. (R.A. 4)

---

[1]    Record appendix shall be cited herein as (R.A.   ), citations to the motion to suppress evidence transcript shall be cited by trancript volume and page, E,g, (1/100 ), Copies of cited pages are attached here with Exhibit "A"

4

STATEMENT OF THE FACTS

THE MOTION TO SUUPPRESS

HEARING

THE MOTION JUDGE"S

FINDINGS OF FACT APPEAR

IN APPENDIX (R.A. 5 )

The Commonwealth's case:

<u>1</u> During a hearing on defendant's Motion to suppress evidence, held on September 28, 2000, officer Michael Malek testified, during direct examination that: On June 21,1999 at approximately 6:20am he was working as a patrolman and recieved some information about a robbery that took place at 399 Broardway in Fall River, Massachusetts (2/49). He"was dispatched to the Mutual Gas Station at the corner of Broardway and Bradford Avenue." And the dispatch came in as an un- known emergency. ( 2/50). when he arrived at the Mutual Gas Station, he"learned [that] there was a robbery." there. id. When asked who told him that there was a robbery, Malek testified that it was an indivdual named"Charles Moniz WHO CAME TOWARDS [his] cruiser." id. When asked what Moniz told him, Malek responded that he was told that "a male had just robbed the gas station", And he" was wearing a mask, had a gun and left in a blue Thunderbird heading west down Bradford Avenue and turned down one of the side streets." (2/50-51), Mr. Moniz also stated "that he saw the man come out of the store into this vehicle and drive off." (<u>Id</u>;2/51)"

After receiving the information about the gun, Malek testified that, prior to Malek's entry he had knowledge "that the clerks pocketbook was taken in the robbery", and the source of this information was a dispatch by one of the officers (2/51-52). Malek was asked did you get a physical desription of the person from MR. Moniz at the Mutual gas station. Officer Malek testified that,"he was told it was a white male, wearing a stocking mask, wearing a winter hooded jacket, jeans and work boots, and the physical descriptionwas you know, five - five ten-ish, somewhere around that, medium build". At this point Malek went westerly down Bradford Avenue. [He] eventualy turned down to Almond street proceeded northly on Almond street.There Id.

officer Malek testified that, "[his] attention was attracted to the motor vehicle parked just north of Division Street." (2/53). Malek HAD "observed it was on the left-hand side of the roadway. id. And "The front drivers side tire was against the curve and the back end was partially sticking into the roadway." id. and " The driver's door was open, the engine was running but there was nobody inside the vehicle in the aera." there id.Malek further testified that, " obviously [he] was looking for a blue thunderbird something close to the make and model,[he] saw the car and approached it." (2/54); (3/4-7).

Officer Malektestified on cross examination, what first drew his attention to it (blue thunderbird) [was] " because it was parked illegally." (3/4-7). Malek was asked on direct examination if he entered inside the car, Malek testified that, "yes, Sir." (2/55).Malek testified that, "The door was open and [he] started looking inside to see if [he] could find any registration or some type of paperwork stating who may the owner have been." (3/10-11). Malek further testified that, he "looked in the immediate front seat area, in between the front seats floor attempted the glove box , visors." there id. Malek further testified that "Next to the front seat standing up facing [him] it was like a homemade card, on it it said Happy Father's Day, it depicted a male lifting a barbell and underneath it said Tony Cabral." (2/560;(3/11). Malek testified that, "[he] kept it his possession. the father's day card."(2/57);(3/11-12). Officer Malek further testified that, "...Officer Shawn Botelho had also come to [his] location, and as [they ] were standing out there [they ] observed Mr. Moniz again walking, running toward thier location, walking quickly. He approached [them] and they had a conversation." (2/57);(3/12). Malek testified that, Mr. Moniz gave him a name of the suspect  "He said [it was] Tony Cabral." (2/59);(3/12-13). Malek testified that, "Mr. Moniz stated he was aware who this male was now and that this particular male had a friend that lived at his mother's house,he rented an apartment on the secound floor east." (2/59);(3/14). Officer Malek was asked; If Mr. Moniz told [him] that he was in his cousin John Kazen's house and you said he further told you that he knew him because he was a friend of Mr. Moniz's cousin, is that crrect? Malek testified that, "[Moniz] informed [him] he was a Friend of a guy named John  who lived at his mother's house."

7

And that he knew Cabral to hang around with the guy that lived on the secound floor of 181 Division Street and the individual was a guy named JoHN Kazen. there id.Malek was asked, You don't know Kazen and he were cousins? Malek testified that, "No Sir." (3/4). Malek was asked, Do you know that now? Malek testified that, "Not until you told me." Id. Officer Malek was asked, Now is it your testimony that as the officer's approached Division Street that you saw Charles Moniz's mother in the yard? Malek testified that "As we were approahing up the house our location was just a few feet north of Division Street, and actually from our location we could actually see the house." (3/14). Malek further testified that "- - - As I sarted walking up Division Street we observed his mother in the yard." Id. Malek further was asked, You spoke to his mother? Malek testified,"[Mr. Moniz did] she speaks like brocken english, So it's - - -." ( 3/15). Malek was further asked  Mr. Moniz was speaking to his mother? Malek testified that, "YES" he was      Id. Malek was asked, In your presence? Malek that, "YES", In my presence.Id. Malek was asked, outside of 181 Division Street? Malek testified that, It was at that location "yes Sir" Id. Malek was asked . And she was speaking in brocken english? Malek testified that, " She is not very fluent in english, he was speaking to her in portuguese and was relaying information to us." (3/15). Malek was asked, And is it your testimony that you heard Mrs. Moniz also identify Mr. Cabral? Malek testified that, Through Mr. Moniz." Id. Malek was asked , He told you that his mother had seen Tony Cabral? She said his name."YES" (3/15-16);(2/60). Malek further was asked, But it's fair to say it was testimony at the grang jury back in July of 1999 that she did in fact recognize the person as being Mr. Cabral? Malek testified that, "YES, Sir."      (3/21).

Malek was asked, And it's your testimony that you were told, I understand that there was a language issue, but you were told that she was outside and she saw the individual running into the house? Malek testified that, "YES,Sir." there Id. Officer Malek was asked, Now having your initial information from Mr. Moniz what did you do? Malek testified that, Officer Tosior and officer Beausolel remained in the rear yard Malek and officer Botelho went to the front of the house, At that time they seen the male looking out the window, officer Botelho told the defendant(Cabral) " Not to move and to see his hands but he went back into the apartment." (2/62);(3/25). Officer Malek testified he seen the defendant in the window and"again ordered him not to move and to show his hands." (2/63).Malek testified that, [he] heard a loud knocking on the door and maybe about 45 secounds to a minute after we recieved a dispatch they were inside the apartment Id. Malek further testified that, He ran upstairs and seen the defendant leaning over a breakfast type table they (Officer's) started to pat him down and the defendant was handcuffed for there safty. (2/64); (3/25). At that point Malek sat the defendant down on a chair right next to the breakfast table in the kitchen area. id. Malek testified that, At that point " mr. Kazen became a little upset at us... So we kind of asked if we could talk to him in a different room away from Cabral. We attempted to calm him down, speak to him in a rational manner, and determine exactly what was going on. (2/65);(3/25-26). Malek testified that, Mr. Kazen was standing out front [of 181 Division Street] and Mr. Cabral came by to visit." (2/66). While standing in the living room officer Malek observed a bedroom and on the bed was a black leather pocketbook, lady's pocketbook with a glove on top of it. (2/66-67). Malek testified on direct that, The pocket-

book had meaning to him "[They were] informed by theclerk from the
Mutual Gs Station  her pocketbook had been stolen in the robbery."
(2/67).Malek also testified on cross examination that, At that point
of entering the bedroom the name of Rosemary Hobbs meant nothing to
him.(3/27). Officer Malek was asked  Do you remember Mr. Moniz also
told you something about a pocketbook? Malek  testified that, " I
don't recall I believe he did , yes." Officer Malek further testiied
that, "at that point I walked into the bedroom to take a closer look
at the pocketbook. I retrieved the pocketbook, I opened it up,found
some identifacation to a Rosemary Hobbs."(2/68). Malek was asked Did
that have any significance to you when you looked at it (pocketbook)
Malek testified that, "At that particular moment .no" (2/68-69).
Malek further testified that,"At that point I was returning the [liv-
ing] room, [and Malek] observed officer Beausoleil walk over to a
couch, he had picked up a winter jacket, He then bent down and he
picked up a small blak gun, there was also a pair of boots, some jeans
and a little type of spray , almost like a water bottle type thing.
Also a mask."(2/69).Malek testified that, "[He] collected them [items]
as evidence."(2/69-70). Malek was asked, If he asked Mr. Kazen to
sign a consent form for the search of the apartment that had taken
place? Malek testified that, "yes,Sir. Well, to re-enter the apart-
ment." (3/28). Malek was asked if Mr. Kazen refused to sign a consent
form, Malek testified "yes, Sir" "once ,twice,I don't know how many
times he asked him.there Id. Officer Malek was asked on redirect ex-
amination, Malek testified that he didn't have knowledge of the missing
$8,ooo.00 until he left the apartment. (3/29). Officer Malek  test-
ified that, He "went to [the] secound District Court and applied for
a search warrant from clerk magistrate to re-enter Mr. Kazen's apart-
ment." there Id.

On September 28, 2000, During the same hearing Officer Alan
Beausoleil testified during direct examination asked by the prosecu-
tor , What did you do once you arrive at the blue auto on Almond Street.
" Officer Beausoliel testified that, OFFICER Malek was looking in the
interior of the vehicle trying to find owner information...."Beau-
soliel was asked  DURING CROSS EXAMINATION, officer,after you arrived
officer Malek started looking about inside the car? Beausoleil test-
ified that, "At some point, Yes." (2/26-27). When asked about the blue
auto and how it was parked Officer Beausoleil testified that, "That it
wouldn't have been considered illegal. I believe that's a oneway.That's
a oneway so it would have been Okay." (2/28). And " it might have been
sticking from the curve a little bit in the back end. there id. Off-
icer Beausoleil was asked if he had received any information about a
particular car involved in the robbery at the search of the blue auto
on Almond Street. Beausoleil testified that , " At that point I don't
think I did yet." (2/29). Beausoleil was asked if this card,was first
indacation you had about Tony Cabral involved in this incident. Beau-
soleil testified that , "Yes,Sir." Nobody had brought up the name prior
to looking in the card,"No,Sir." (2/30). Officer Beausoleil was asked ,
when he made his way up the stairs, was his gun drawn? Beausoleil
testified that , "I believe it might have been to my side. I might have
drawn it to my side being that it was a gun call I was on, that's
normally my proceedure." (2/35);(2/37). Officer Beausoleil testified
that , They "were allowed to enter the apartment by Mr. Kazen. (2/12-
13). Officer Beausoleil was asked,you entered into the kitchen, you

11

secured Mr. Cabral (defendant) , Beausoleil testified that, He
"handcuffed him,Yes,Sir." (2/39);(2/14). In the kitchen area upon
entering the defendant stayed in the kitchen area at the counter of
the table area. (2/15). Beausol testified that, When in the house
Malek asked Kazen if they could speak to him away from Mr. Cabral
into the other room. And Mr. Kazen agreed and they went in the far
living room aera. about 8 feet away from the kitchen. (2/16);(2/40.
Beausoleil further testified that, at thatpoint officer Malek ,
(speak to Kazen) and because of our position in the living room,
if you look beyound Mr. Kazen you were looking right into the bed-
room. id. Beausoleil was asked, did you see officer Malek do some-
thing with regard to the bedroom? Beausoleil testified that  Officer
Malek went into thatbedroom, looked in the pocketbook, found a black
glove, retrieved that for identifacation, found that it belonged to
the witness in the robbery." (2/16-17). Beausoleil believes officer
Malek took the pocketbook at that point. there id. Officer Beausoleil
testified that, After the pocketbook was retrieved, and determined
who it belonged to, at that time "[he] just began, just looking
about the room and [he] noticed the hooded winter jacket,blue jeans,
work boots, and in between a couch and a chair there was a gun,what
appeared to be a gun/mask from where [he] was looking on the floor."
(2/17-18). At this time Officer Beausoleil retrieved these items
from the living room. id. Beausoleil was asked if the protective
sweep was doneAfter he had talked to Kazen and Officer Malek invest-
igated the pocketbook and you found these items of clothing. Beau-
soleil testified that, "Yes,Sir, during that time." (2/41). When
asked if Beausoleil looked in the bathroom or other bedroom? Beau-
soleil testified that, "[he] didn't but there were other officer's
in the other room. there id.

The court asked Officer Beausoleil if he seen officer Malek physically inside the vehicle? Beausoleil testified that, "Yes, he was. (2/48)."It might have been before he seen the card that officer Malek was physically inside the vehicle. there id."

O n August 21,1999 Officer Shawn Betelho during the same hearing testified during direct examination asked by the prosecutor, So at that point somebody is looking inside the car correct? Botelho testified that, "yeah, just coming out of the car."(1/98). On cross examination. (1/11-12). Botelho was asked, Do you remember what if anything was pulled out of the car? Botelho testified that, "I remember the , like homemade birthday card from a child. (1/99). Officer Botelho testified that, ..." A witness , Mr. Moniz came running towards us and told us that --- something to the effect, The guy who just robbed the store, and Tony Cabral just ran into my mother's house. (1/100). Botelho was asked You just said Tony Cabral, do you recall the witness actually using the word, Tony Cabral? Botelho testified that, "He (Mr. Moniz) definitely said his name." (1/100-101);(115/116). Officer Botelho further testified that, "There were transmissions being constantly broardcast from the officers on the scene about what his discription was, wearing a mask. Something about aspray bottle, I think something alse with ahood maybeI definitely armed with a gun." (1/101). Also " I think broardcast some of the victim's personel property like a pocketbook or something , and it was also a large amount of money missing." (1/102). Botelho received this information by radio broardcast. After that officer's Botelho and officer Malek positioned themselfs in the front of the house. And officer's Alan Beausoleil and officer Tosior ran towards the rear

13

at this time officer Botelho testified that, "[he] see there's an open window on the secound floor. On the east side of the[house]. He seen Tony Cabral stick his whole body and look left and right. At that time [he] pulled [his] service weapon, drew down on him, told him, Tony show me your hands, let me see your hands, Tony.(1/ 104). Botelho testified he was cocerned for his brothers safty is why he drew his weapon. there id.

On August 21, 200 during the same hearing Charles Moniz test-
ified during direct examination. Mr Moniz was asked, what you did and
what you saw at the Mutual Gas Station.        Mr. Moniz testified
that, "... when I was there I watched a person come running out with
a mask on and like a gun and holding a handbag running to this car
on the side of Bradford Avenue". (1/8). And this male had "some type
of hood that was like a hood over his head". And "some type of, you
know, looked like a gun to me,and a purse". (1/9). Mr. Moniz also
testified that he seen this male, "whipped off his mask like that".
(1/10). " He pulled it over like this. I watched him. I looked and
I seen him". id. Mr. Moniz was asked, if he can describe what [he]
did and where the car went. Mr. Moniz testified that, "...So I went
down , I didn't know if he had a gun or not"."So I didn't want to
take no chance and get shot....". (1/13-14). Mr. Moniz was asked if
he went over the Mutual Gas Station the secound time, looking for
the police. Mr. Moniz testified that, "[he] was never at the Mutual
Gas Station". (1/17). And that Mr. Moniz " at that point went back
down to [his] house...." (1/18). Mr. Moniz testified on cross exa-
mination that, "[he] did not talk to the police at this time because
they were not there." (1/51).Further Mr. Moniz testified that, "...
The first time [he] spoke to the police was on Almond Street...."
there id. Mr. Moniz was asked if he knew this person's name? Mr.
Moniz testified that, "No , I don't think I said that." (1/23);(1/39).
Charles Moniz was asked, Did you tell them (officers) you knew his
name or anything like that? Mr. Moniz testified that, "No I didn't
know this person's name." there (1/24);(1/39). Mr.Moniz was asked,
Did his name come to you at any point did you realize what his name
was?

Mr. Moniz testified that, " No , I did not." (1/24). Mr. Moniz was
asked, And certainly you didn't give the police  the name of the
man? Mr. Moniz testified that, No, I didn't, because I didn't know,
ever know his name. Like I told you I'm bad at names. I can't rem-
ember a name after three weeks. (1/55). Mr. Moniz testified that,
"... After that I knewthat there was somebody there, and that's the
first time, like you said, I knew of his name, heard, that's the
first time it was mentioned...." (1/65).

   Mr. Moniz was asked if he could tell the court how the car was
parked down on Almond Street Mr. Moniz testified that, " It was
parked not bad , but it was a little bit sticking out....  (1/22).
Charles Moniz testified that, "...All of a sudden when I went down
to the corner I seen the Police officer's all searching through the
car because the door was open. (1/20). MR. Moniz was asked if he
knew this man was a friend of his cousin's? Mr.Moniz testified that,
"No I never knew he was a friend of my cousin's John Kazen. (1/56).
Mr. Moniz was asked if he told the police what he saw up at the con-
venience store? Mr. Moniz testified that, "I told them that I was up
there at the convenience store but I think I told them afterward,
the whole report, they asked me after about everything, you know what
I mean? (1/24);(1/67). Mr. Moniz was asked if the police had their
guns in their holsters or if they had them out. Mr. Moniz testified
that, "They took them out when they were ---- they set their selves,
before they even knoocked on the door they got their guns out." (1/16).;
(1/32); (1/64). Mr. Moniz testified that, " All of a sudden I heard
the taller officer say, I think it was the tall guy, he says, Tony,

what are you doing here? And that's all I heard. After that I knew
that there was somebody there, and that's the first time ,like you
said. I knew of his name, heard, that's the first time it was
mentioned...." (1/65-66);(1/32). Mr. Moniz was asked if he seen the
defendant before he left to go to work again at any time. Mr. Moniz
testified , "No. never did,"and " I never did look into the apartment.
I was on the stairway, how could I look in? I was two steps down, and
I left. )1/70). Mr. Moniz went to work.

On September 28, 2000 during the same hearing Rosemary
Hobbs testified during cross examination asked by Attorney Nadeau:
Tell the court what happen that day at the Mutual gas station. Hobbs
testified that , " I was in the back counting my money like I normaly
do for the shift, and some man come in fully masked with some clothes
on, and just like put his hands on the money, and I'm , look ,
what's going on? to myself, what's happening here?...I was just
running out of there, when I approached to get up the man had a
bottle in his hands and squirted me and got me in the face. I seen
right away. I ran out for my other employee and yelled, Hit the panic
button were getting held up. I got her out of there. We both ran out
panicking, crying, everying thing.... " (2/77). Hobbs was  asked if
she seen the man with a weapon? Hobbs testified that All I seen on
him was a little bottle, it was a squirt bottle; that's all I seen
on him." (2/78). Hobbs was asked if she and Reardon ran out of the
building before this man did (2/78). Hobbs testified that, this man
had a mask on a heavey jacket to, and she " couldn't identify him
unless he had the materials on there Id. Hobbs testified that, She
didn't see the male leave the area. )2/79). Hobbs was asked,

17

were there any civilians assiting [You] that day or trying to help
you? (Charles Moniz). Hobbs testified that! " There was one man that
.. I mean, Alls we seen aws him come around, and he was coming down
Broadway, and I mean he took a fast left, and that's all I seen. "
(2/81). Mrs. Hobbs was asked, You didn't talk to him? Hobbs testified
that, " Not at that time, he just took off. there Id.


On September 28 2000 during the same hearing Gloria A. Reardon
testified during direct examination by Attorney Nadeau; Could you
tell us what you rember happening at the Mutual gas station. Reardon
testified that, " I didn't see him until everything happened. after
my cousin ( Rosemary Hobbs ) came running out of the store,which was
my manger, came running out of the store through the back office,
turned and said to me , we're getting held up. "(2/85).And " After
she told me that I pressed the panic button, we ran out of the store,
that's when I saw the gentleman coming running out of the station.
    Reardon couldn't describe the person but she testified that,
 This male " was wearing a winter jacket, it was a bulky winter
.jacket (2/85). Reardon was asked if she could tell the court how
this individual left the area. Reardon testified that, all I saw
was somebody getting into a car and then that's when I was scream-
ing for help;" The man in the Bulky jacket, that's all I saw was
[Him] getting into a car and drive off. "(2/86-87). Mrs. Reardon
did not know the make or model nor the registration number to the
vehicle. (2/87-88). Reardon testified that it was [About] 20
minutes before any officer showed up. (2/89). Reardon was asked if

anybody come to assit her? Reardon testified that, [A] gentleman'
(Charles Moniz) actualy followed the customer, or followed the
gentleman in the car."(2/90). Reardon testified that, "[She} was
pointing to the car that the gentleman took off in, and the gent-
leman (Charles Moniz)  followed him in his vehicle, the vehicle did
a u-turn in the middle of Bradford Avenue and followed him" there Id.
[Gloria Reardon provided no no information to Charles Moniz, nor
officer Michael Malek at the Mutual gas station there Id]

      On August 21, 2000 during the same hearing Delores Moniz testified
during direct examination asked by Attorney nadeau  Tell the court
what happen that day at 181 Division Street. Mrs. Moniz testified
that, she heared noise in the entry somebody dropped something, some-
body she had seen  a couple of times before.Someone opened her door to
her apartment (1/77-79)  Mrs. Moniz was asked, Did you know this
persons name that opened your door. Mrs. Moniz testified she did not
know his name. "No". (1/78). Mrs. Moniz was asked if anybody anybody
spoke to her that day. Mrs. Moniz testified that, "No" she did not speak
to no one but her son (Charles Moniz). (1/80). Mrs. Moniz was asked.
If she ever opened the door to see police officer? Mrs. Moniz testified
that, "No" ,but I seen ••• coming in the yard through the front window
. ("The Policeman" (1/81-82). Mrs. Moniz was asked if ever opened
her door to the hallway ,or did you ever speak to the police officers?
Mrs. Moniz testified that "No I didn't". Id. Mrs. Moniz was asked if
at any time since that day have you spoken to the police officers?
Mrs. Moniz testified that, "She spoke to the police down stairs today!"
(1/82). Mrs. moniz did not speak about this case and had not spoke
to the police officer. Mrs. Moniz testified that, "No" I didn't

went to work.[Delores Moniz had not provided any officer's with
any information that day. There Id.]

On November 8, 2000, during the same hearing John Kazen testified
during direct examination asked by Attorney Stephen C. Nadeau:
Would you describe that building, Mr. Kazen testified that, "It's
a six-tenement house right on the corner of Almond and Division.
(1/4). Kazen was asked, Who lived with you there at the time, If
any one? Kazen testified that, "JUst my girlfriend, Carol Faseel,
she lives with me the past five years, and her clothing and her be-
lonings are there.(1/5). Kazen's cousin Charles Moniz and mother
live in separate apartment at 181 Division Street .(1/60. Kazen was
asked, On June 21st. , can you tell the court at approximately 6
or 6:30 a.m. where youwere? Kazen testified that, "Standing in [hIS]
driveway." on Division Street. Further testified that , "[he] was
standing outside, [and] Tony Cabral [came] by, and [kazen] invited
[Cabral] in [his] house. (1/7). Kazen testified that, he waited for
Cabral and Cabral came in with him in his apartment and Cabral had
been there before.(1/8). On cross examination asked by the prosec -
uter, DidMr. Cabral Frequently come to your house at 6:15 in the
morning? Kazen testified that, "Sometimes, Yeah." (1/21). Kazen was
asked, And you invited him into your house,correct? Kazen testified
"yes." I told him to come on into the house. Kazen testified that,
The conversation was about drugs,and Cabral had a bag of heroin to
give him." (1/24-26). Kazen testified that he didn't see Cabral car-
rying any items that day. (1/27-29). Kazen testified that, "[he] was
in the kithen getting high on drugs. (2/9);(1/30). Kazen was asked
if he had any conversation with Mr. Cabral about him taking a shower?
Did he ask for permission to take a shower. Kazen testified that,
"No, he does'nt have to ask for permission to take a shower though."
(1/30). Kazen further testified that, Mr. Cabral can take a shower

21

whenever he wanted to "yes"' "He's come over my house, He's a good friend of mine. there id. Kazen was asked if Cabral had ever stayed overnight? Kazen testified that"Yes", he had. (1/45). Kazen testied that,"[he] heard some screaming outside the house, and [he] heard the people running up the stairs." (1/9). Kazen learned who those people were he said it was the police banging on his door. And Kazen heard one of them say kick the door down.(1/9-10). Kazen testified that, He did have a conversation whatsoever with the police before they entered in his apartment nor did they ask to enter the apart-ment. (1/10). And that's when the cops came in." They called for him . I told him, Tony, come on out.(1/31 . Kazen testified that, The officers had there weapons drawn upon entering, and he could see them right away." Yes as soon as they came in through the door.... They pulled their guns to his head  and threw him in the chair ." (1/10-11);(1/30-31).KAZEN asked, where was——— Mr. Cabral at this time. Kazen testified that, Cabral was in the bedroom. (1/11). And the officer's at this time "started yelling, Tony,Tony come out here. We are going to blow your head away stuff like that." (1/11);(1/32). Kazen testified at this time Mr. Cabral "came out." there Id. And at this time the officer's "grabbed him and threw him against the counter. They frisked him down. They sat him down in the chair at the counter there in the kitchen." (1/12).Cabral was hand-cuffed. (1/36). Id. Kazen testified that, One of them (officer's) went in the other ---- started going in the other room. (1/12).Kazen was asked, If he first heard the knocks. You went and opeded the door right away, crrect? Kazen testified that, "No, it was too fast, I didn't even have achance to open the door.(1/36). They just Walk-ed in the door, and that's when they had their guns drawn.(1/36). Kazen was asked, And when the officer's moved you in the other room,

Did they keep the handcuffs on you? Kazen testified that, "Yes" (1/36-37). Kazen was asked, If anyone, any officer's asked you whether they could look around your house. Kazen testified that, "No, when they went in the other room, I told them what are you doing, I kept asking him what are you doing because I had something in the other room I didn't want him to see." (1/12-13). The officer's never asked .for permission to go in the otherroom.There Id. Kazen further testified that, "[The officer's] went in the room, sarted moving everthing around, tipping the cushions all over on my furniture, and looking all over the house and in the closets. And then one officer seen the pocketbook I thought was my girl's, he went over thereand grabed that. (1/14). Kazen was asked, Was there any conversation between you and the officer's whether anyone alse lived in the apartment. Kazen testified that, "Yes, they asked me before... He seen the pocketbook. He says, Who's pocketbook is that? I say, It must be my girl's pocketbook cause she lived with me, and that's the first morning she wasn't there. And he just went in the room and grabbed it." (1/14-15);(1/39-40). Kazen testified that, The officer's knew a woman lived with him. There Id. Kazen was asked, What was the paper they asked you to sign? Kazen testified that, "That's when they told me again thatI was going to get charged with A---- if I didn't sign the paper, They were going to charge me." (1/16-17). Kazen further testified that,[Officer's] came to my cell at least three times, Maybe four." (1/17). To sign a consent form for "what had taken place" "They just wanted me to sign that paper saying that I gave them permission to do what they did the first." There Id.

The court asked Kazen if any officer ever ask if that stuff found in his house was his, Kazen testified that: "No." They did not. (1/46-47). John Kazen refused to sign the consent fotm and was never charged with accessory in this case. (1/42).

<u>Statement of the Facts</u>
<u>Attorney Stephen C. Nadeau,Ineffective</u>
<u>Assisistant of Council</u>

The Case Summary
Criminal Docket
Appear in the Appendix
(R.A. 6)

2)    ON December 22,2000, Attorney Stephen C.Nadeau filed a Motion to extend time for Interloctory Appeal, paper #16.0 Mr Nadeau never followed through with the extention of time Motion for a Interloctory Appeal on denial of Motion to Suppress evidence. See Motion to extend time.(R.A. 7)

24

### Statement of the Facts

### The Motion to Dismiss Hearing (Salman)

### The Motion Judge's

### Findings of Fact Appear

### in the Appendix (R.A.8-9)

---

3)      During a hearing on the defendant's Motion to dismiss Comm-
onwealth V. Salman, 387 Mass. 160, 439 NE 2nd. 245. Held on Febru-
ary 7, 2001. Michae Malek was the only witness that testified be-
fore the grand jury.

2    Officer Malek testified to the grand jury that he received
some information by the dispatchor about "An unknown emergency com-
ing from the[Mutual Gas Station.]" (g.j. 4/1-2)"There was [A]...male

outside [the Mutual Gs Station] later identified as Charles Moniz
of 181 Division Street"(g.j. 4/9-10), The first person  Malek met
with, was Mr. Moniz came,... running towards [his] cruser." " He
informed [Malek]that a male had exited the store wearing a black
mask, carrying what appeared to be a handgun. The male ran west on
Bradford Avenue... into an auto, then left the area traveling west

2   Citation to the Grand Jury Minutes Transcripts shall be
cited pages and lines E.g. (g.j. 1/17), copies of the cited pages
are attached here' with Exhibit "B"

on Bradford Avenue. "Malek testified that," He was provided with
a discription of the male by Mr. Moniz at the Mutual Gas.

Station ." He appeared to be a white man, with a black mask on his
face, wearing a winter jacket. He also stated that the male had some
type of spray bottle in his hand also." (g.j.4/24);(g.j. 5/1-6).Off-
icer Malek testified that,"[He] really didn't speak to the victim
[Ms. Hobbs nor Ms. Reardon at the Mutual Gas Station.] initial stage
no." (g.j. 5/20-24). On August 21, 2000 during a motion to suppress
evidence hearing, Charles Moniz testified during direct examination
that: [he] was never at the Mutual Gas Station." (1/17).And that Mr.
Moniz left the Mutual Gas Station to go "back to [his] house...."
(1/18). Mr. Moniz testified that "... The first time [he] spoke to
the police was on Almond Street...." There Id.

Officer further testified to the grand jury that based on the
information that Malek recieved from Charles Moniz, Malek traveled
westerly on Bradford Avenue. [Malek] turned down onto Almond Street...
searching the area for the vehicle and suspect." (g.j. 1-6). Officer
Malek testified to the g.j. that, Mr. Moniz recognized this male as
being  "Tony Cabral." (g.j. 8/11-15). Officer also stated to the g.j.
that, after receiving this information they responded to the hous
Mr. Moniz was pointing to. Mr. Moniz also knows Mr. Cabral had a
friend living at that particular address on the secound floor, east
side.(g.j. 8/16-21). Charles Moniz testified at the suppression hear-
ing that , "[He] didn't know this person's name." (1/24);(1/39).

26

Mr. Moniz did not realize this males name at any time (1/24),Mr. Moniz certainly didn't give the police the name of the male. Mr. Moniz testified that, he was bad remembering names after three weeks and that Mr. Moniz never knew this males name. (1/55).and the first time MR. Moniz knew of his name was when he heard the police mention it in the apartment. (1/65). Mr. Moniz also testified that, he never knew this male had a friend living at that particular address on the secound floor, eastside. (1/56).

Officer Malek further told the grand jury that, the particular house in question is owned by Mr. Moniz's mother, who was also in the yard at this time. She Stated that she saw the male run up the stairs carrying a woman's pocketbook and several other items. (g.j. 8/22-24):(g.j.9/12). And that she recognized this person,"She said it was Mr. Cabral" by his name.

However, Delores Moniz the mother of Charles Moniz testified during a suppression hearing that, She did not know this male's name. (1/78),and that nobody spoke to her that day.(1/80),She never opened the door to her apartment that day. But she seen the police coming in the yard through the front window on the secound floor. (1/81-82). She never opened the door to the hallway.Id. And the first time she spoke to the police was down stairs at the suppression hearing fourteen months later. (1/82). And Mrs. Moniz never spoke about this case to the police officer there Id. Delores Moniz had not provided any officer's with any information that day. There Id.

Staement of the Facts

The Motion  to Dismiss Due

to Loss or distroyed Evidence

The Motion Judge's
Findings of Fact Appear
in the Appendix (R.A. 10-23)

---

4)     On June 27, 2000, During a hearing on defendant's Motion to

Dismiss Loss or Distroyed Evidence.

Albert Marques is the only witness the that testified in this

matter

3     During the hearing held on June 27,2000 Marques was asked:

Are the 911 tapes reused? Marques testified that, "After about a year

they are. A year and a half, yes. They cannot be erased until about

a year and half. (5/17-25;(6/1). Marques was asked:Where physically

are those two tapes that you say were blank, Marques testified that:

"One of them has been saved because of another case. The other one

we just recorded over again because it was blank. (13/24-25);(14/1-3).

Marques was asked.Okay so, that would have been an exception --- that

one that you recorded over would have been an exception to the eigh-

teen month rule that you talked about? You said that they couldn't

be recorded again? Marques testified that, "Well, there was nothing

on it." (14/4-9). Marques was further asked, So, because it was blank

you recorded over it, Before eightenMonths had passed? Marques test-

ified that, "Yes Sir." (14/10-14).

---

3     Citation to the Motion to Dismiss hearing transcripts shall
be cited by pages and lines E.g. (1/25).Copies of the cited pages
are attached here with Exhibit "C"

Mr Marques did not know whether or not the tape that's still in existance would have been taping on June 21st., or was it for some other period within that time. Marques testified that: " It was within that period, yeah. It's either the June tape or the July tape. I'm not sure which. (14/15-24).

On July 11, 2000 Albet Marques testified during the same hearing, Marques was asked: Do you recall your testimony from our last hearing? Did you indicate that with regard to either or both of those tapes, that brcause they were blank, you recorded over them or used them again? Marques testified that "Yes I did." (13/20-24);(14/1-2). Marques forgot that he turned turned both of the tapes over to Detective in this case . Marques was asked am I remembering your last testimony correctly? Marques testified that: "[He] recorded over it." (!/3-17). Further Marques determined that he"turned both of them [tapes] over to the M.C.D. people. They were working on that other case that they were looking for in court." (14/18-24).(R.A. 10-14)

ON December 3, 2001, A hearing on the defendant's Motion to Dismiss loss or destroyed evidence. Justice Robert J. Kane in hs Memorandum of Decision and Order on defendant's Motion to Dimiss/ Suppress. Found the police were negligent in not fingerprinting those

particular items discribed below Justice Kane further stated:More-
over, the police should have waited a sufficient amount of time
to enable the defendant, if he wanted, to examine these items for
the purpose of determining independently if there was any finger-
print evidence.

The goverment's return of evidence to Rosemary Hobbs deprived
 the defendant of potentially exculpatory evidence; namely, finger-
prints of a third party.This culpable loss of potentially exculpa-
tory evidence entitles defendant to relief.

Based upon the goverment's culpability falling within the realm
of negligence and the lost evidence assuming the form of a potential
but not necessarily an actual loss ,of excupatory evidence, I fashion
the following remedy:The goverment's witness may testifiy to discov-
ering the belongings of Ms. Hobbs, But may nottestufy to observing
Anthony Cabral in the bedroom where Hobb's pocketbook was recovered.
This relief preserves defendant's opportunity to ague that Kazen poss-
essed the recovered evidence without unduly depriving the goverment
of it's evidence.(R.A. 15-23).

These items had been returned to there owners.:
A) Pocketbook
B) Wallet
C) Cash and Papers
D) Plastic Bag
E) Keys

---

### Defendant's Case

Charles Moniz testified that he was never at the Mutual Gas
Station.(1/17). Mr Moniz further testified that he did not talk
to the police at the Mutual Gas Station because they were not there.
(1/51). Further Mr. Moniz testified that the first time he spoke
to the police was on Almond Street. There Id.

30

Officer Malek had no factual knowledge at this time, and Malek search the area for the suspect and his auto. (2/53).

Mr. Moniz first seen Officer Malek searching a 1989 blue thunderbird on Almond Street. (1/51). Officer Malek found a father's day card with the name Tony Cabral on this card, This card warrant the defendant's arrest. (2/56);(3/11).

Charles Moniz testified that, he didn't know this persons name. (1/24);(1/39). Mr Moniz further testified that, this name never came to him . (2/53). Mr. Moniz never realized what his name was at at anytime. (1/24).Mr. Moniz certainly never told the police the name of the man. (1/55). Mr. Moniz testified that, the first time he heard the name Tony Cabral was in the house when one of the officer's first mentioned it. (1/65).

Officer Malek testified, with this information he made a warrantless ENTRY arrest and search and seazure in a dwelling house at 181 Division Strret.

Charles Moniz's mother testified that, she did not know the defendant's name.(1/78). Mrs. Moniz further testified that, nobody spoke to her that day.      Mrs. Moniz said she did not speak to no one that day but her son Charles Moniz. (1/80-82). The first time Mrs. Moniz spoke to police was in the courthouse that day. (1/82). See Motion to Suppress Evidence transcript for support..

---

## Summary of the Argument

1)  ·   The admission into evidence of the illegal entry, search and seizure of items taking  of the 1989 blue thunderbird, and the illegal arrest of the defendant in a warrantless entry, search/seizure

of items at 181 Division Street as well as subsequent search/ seizure by way of warrant, violated defendant's constitutional rights, and where the commonwealth introduced of said evidence at trial, constitutional violation warrants reversal. (P.P. 34-59)

2.)    Stepen C. Nadeau fault by not following through with the extention of time motion, Motion filed for interloctory Appeal on a motion to surpress greatly prejudice the defense. (P.P.59-60)

3.)    The admission of the defective indictments before the grand Jury knowingly with reckless disregard for the truth and for purpose of obtaining a conviction by impaired the integrity of the Grand Jury on a material fact greatly prejudiced the defense. (P.P.61-67)

4.)    The Commonwealth was wholly at fault for losing the potentially exculpatory evidence. Turret tape, describing the events as it accured, 911 Tapes, pocketbook, Wallet, Cash and Paper; Plastic bag containing cash, keys to a Blue auto. Where this potentially exculpatory evidence was highly material, and where the loss and destruction of evidence unfairly prejudiced the defendant as it deprived him of fair oppurtunity to direct/cross examine the witnesses to the alleged events as they accured in a warrantless entry in a 1989 Blue Thunderbird, search of said auto and it's seizure of items, Entry in 181 Division Street, the search in said dwelling house and seizure of items found therein as well as the warrantless arrest in said dwelling house, and the loss evidence return to thier owners without determing independently if there was any finger print evidence violated defendant's due process right to a fair trial. (P.P. 67-74)

5)    The cuulative errors complained of above, standing alone, warrant reversal. However, if the court should find    that neither of the errors complained of in the preceding arguments, standing alone, warrants reversal , there can be no question that the cumulative effect of the complained of above warrant reversal, where the prejudice resulting from the combination of  those errors clearly cannot be said to be harmless. (P.P. 74-75).

## ARGUMENT

> **I.    THE MOTION JUDGE ERROR WHEN ABUSE HIS
> DISCRETION BY NOT SUPPRESSING EVIDENCE, IN A
> WARRANTLESS ENTRY, SEARCH/SEIZURE IN A 1989
> FORD THUNDERBIRD WITHOUT EXIGENT CIRCUMSTANCES
> PROBABLE CAUSE, AND THE WARRANTLESS ENTRY, ARREST
> SEARCH/SEIZURE AT 181 DIVISION STREET, AS WELL
> AS THE SUBSEQUENT SEARCH AND SEIZURE WITH WARRANT,
> VIOLATED DEFENDANT'S 4TH, 5TH, 6TH, 14TH AMEN-
> DMENTS TO THE UNITED STATES CONSTITUTION AND
> ARTICLE 1, 12, 14, OF THE MASSACHUSETTS DECLARA-
> TION OF RIGHTS WHICH PROVIDES EVEN GREATER DUE
> PROCESS PROTECTIONS.**

This court must address the denial of a motion to suppress evidence, and not accept the motion Judge's subsidiary findings of fact (R.A. 5 ) <u>Commonwealth v. Sanna,</u> 424 Mass. 92, 97 (1997). Justice Daniel F. Toomey found probable cause/exigent circumstances to search the motor vehicle was reasonable in the condition of the vehicle, and found that the police entry into kazen's apartment was supported by probable cause, exigent circumstances, and consent, and having found that items seized in the apartment were obtained incident to the lawful arrest, plain view and in connection with a reasonable protective sweep of the apartment..

A.  <u>**The Officers Lacked Probable Cause, Exigent  Circumstances Within They Knowledge To Enter Into 1989 Blue Ford Thunderbird And Search/ Seizure Of Evidence Therein.**</u>

The Supreme court has held warrantless searches of automobiles are permissible where the search is based on probable cause and exigent circumstances exist <u>Carroll v. United States</u> 267 U.S. 132 (1925). See also <u>Commonwealth v. Barnes</u> 2 Mass. App. ct. 357, 360 (1974) "]n the circumstances of the case there was a Nexus between...[The Defendant's]

34

conduct and the vehicle sufficient to give rise to pobable cause
to search the vehicle "Quoting from **Commonwealth v. Avery** 365
**Mass. 59., 64 (1974)**. "The critical question is whether...[The Off
-icer] had... reasonable or probable cause to beleave..[He Would]
Find... evidence pertaining to a crime before [He began his] war-
rantless search." **Commonwaelth v. Dupont** 2 mass. App. ct. 566,
**569 (1974)**, Quoting from **Dyke v. Taylor Implement MFg. Co,** 391
**U.S. 216, 221 (1968)**. The Suppreme Court has held that probable cause
depends on some Nexus between  the car and the criminal activity
being investigated **Commonwealth v. Scott** 29 Mass. App. ct 1004 (1990).
See also **Commonwealth v. Moon 8 Mass. Mass. App.** ct. 375, 381 (1979).

_1_    On June 21, 1999 Officer Michael Malek received a radio dispatch
to go to the Mutual Gas Station which is located on Broadway in tthe
city of Fall River. Officer Malek was to investigate an unknown
emergency, (2/50). Malek testified when he arrived at the Mutual Gas
station, Malek learned there was a robbery by an indiviual named Charles
Moniz who came towards Malek's cruiser at the Mutual Gas station,he
told Malek that "a male had just robbed the gas station" he was wearing
a mask, had a <u>gun</u> and left in a Blue Thunderbird heading west down
Bradford Avenue and turned down one of the side streets. "(2/50-51),
and Mr Moniz also stated  "that he saw the man come out of the store
into this vehicle and drive off" .(Id, 2/51). Malek further testified
that, during the course of the investigation it was revealed to him
that the clerk's pocketbook form the store had been taken, (2/52).
Malek testified that, Moniz provided him with a discription of the
male, he appeareded to be a white man, with a black mask on his face
,wearing a winter jacket, jeans and work boots, and the physical

description was Five, Five-Tenish, somewhere around that, Medium build. There Id. Officer Malek claimed this information stated above was provided to him at the Mutual gas station as Malek's factual basis ok knowledge. However Charles Moniz testified that he never was at the Mutual gas station.(1/17), (1/18) ,polic was never at that location (1/51). The first time Mr. Moniz spoke to the police was on Almond street , search of Blue auto Id. The defendant had demonstrated that officer Malek did not have a foundation to search for a blue auto ,nor a suspect, no factual basis of knowledge. Officer Malek must have specific and articulable infernces drawn from those facts before the pursuant begins **Terr v. Ohio** 392 **U.S. 1, 19, 21 (1968)** **Commonwealth v. Spagnolo** 17 **Mass. App. ct. 516, 518 (1983)** ,**Commonwealth v. Silva** **366 Mass. 402, 408, (1974),** and not based upon a costitutionally impermissible hunch or guess **Commonwealth v. Almeida** 375 **Mass. at 272.**

Before officer Malek entered and searched the Blue Auto, Malek had no factual basis of knowledge about a 1989 Blue Thunderbird from any credible source. **Commonwealth v. Antobenetto** 366 **Mass. 51, (1974).** Officer Malek at this time claims to have knowledge, and upon invest-igating a crime, Malek testified he searched for the blue Auto and the suspect, his attention was drawn to a Blue Thunderbird because it was parked illegally. ..While invetigating a robbery, Malek made a entry insid the Blue auto (2/55). Malek said the door was open, and he started to look inside to see if he could find any registration, or some type of paper work stating who may own the auto. (3/10-11). Malek further testified that, he was looking in the inmediate front saet area, between the front seat floor, and attempted the glove box,

36

visors, there Id. Malek found a homemade card, on the card ,it said happy Fathers Day and underneath the card said, "Tony Cabral" (2/56), (3/11-12). Officer Alan Beausoleil corroborated officer Malek's search of the blue auto. Beausoleil testified that, Officer Malek was looking in the interior of the vehicle trying to find owner information. (2/26). Malek was looking inside the car. (2/27). Officer Beausoleil further testified that, the auto condition might have been sticking out from the curb a little bit, but it wouldn't have been considered illegal. (2/26-28). )fficer Beausoleil also testified that ,he had not received any information about a particular car involed in a robbery at the search of the blue auto on Almond Sreet. Officer Shaun Betelho corroborated officer Beausoleil and Malek's search of the blue auto. Betelho testified that, officer Malek was just just coming out of the car. (1/98) Also testified that ,Malek removed a homemade Birthday card from the blue auto (1/99). Officer Malek had no reason to beleave the blue auto parked on Almond Sreet was conection to a crime, and that they lacked any justification whatsoever to conduct a search, probable cause depends on some Nexus between the car and the crininal activity being invetigated **Commonwealth v. Scott 29 Mass. app. ct. 1004 (1990)**. **Commonwealth v. Moon** 8 Mass. App. ct. **375,381 (1979)**. If the court finds probable cause, Exigency to search the auto because officer Malek testimony, that the car was parked illegal the court must look at police discretion is exercised according to standard criteria and on the basis of something other that suspicion of evidence of criminal activity. Here there was no showing that the police choose to impound Cabral's car in order to investigate suspected criminal activity. **Colorado v. Bertine** 479 U.S.

369 (1987). Clearly officer Malek's testimony was the sole purpose of investigating crimnal activity. Malek entered into the auto searching for information of ownership. In violating defendant's rights, Malek was not following a routine, he was usíng discretion in exploring a lead, The lead allegedly was provided by Charles Moniz at th Mutual gas station, this invetsigation was to search for evidence by examining the Fathers day Card contents in violation of state  and Fedral law. Officer Malek conducted a search of a Blue 1989 Thunderbird without probable cause or reasonable suspicion. In **Commonwealth v Upton** 394 Mass. 363. 370 (1985), **probable cause principals essentially require** that a set of facts more probably than not indicates criminal activity of evidence there of. This entry violated the defendant's rights under the Fourth Ammendment to the United States Constitution and the evidence seizure in the dwelling house should be excluded

As :**Fruit Of The Poisonous Tree.** **WongSon v. United States** 371 U.S. 471, 488 (1963) See also **Commonwealth v. Moon** 8 Mass. App. ct. 375, 379, 382 (1979). With regard to the motion Judge's findings, there is no question that his subsidiary findiings were clear error of law. The critical problem here relates to the absence in the Judge's findings in particular events which allegedly occured and for which there is contradictory testimony **Commonwealth v. Jones** 9 mass. App. ct.83, 90-91 (1980). See**Commonwealth v. Corbett** 26 Mass. App. ct. 766, 768, 770, 772 (1989).

## B.    STANDING

## Defendant's reasonable expectation of privacy in Dwelling house

This court had held, where possession is essential element of the charge. A defendant has standing to contest the search and seizure of evidence under the State Constitution even though the defendant did not have actual possession of it at the time of the search. **Commonwealth v. Frazier**, 410, Mass. 235 (1991). the defendant ask this court to adopt the rule of **Jones v. United States** 326 U.S. 257 (1960), which affords individuals accused of possessory crimes "Automatic Standing" to challenge the legality of a search. The defendant asserts that this court has left open the possibility that it will retain the automatic standing rule of **Jones** which the United Supreme court over rule in **United States v. Salvucci,** 448 U.S. 83 (1980). See **Commonwealth v. Varney**, 391 Mass. 34, 38n, 13 (1983), **Commonwealth v. Ring,** 389, Mass. 233, 240 n. 13 (1983); **Commonwealth v. Hason**, 387 Mass. 169, 172, (1982); **Commonwealth v. Podgurski**, 385, 391 (1982). The court further stated, in **Commonwealth v. Nora** 402 mass. 262, 26 (1988) that automatic standing flows from the expectation of privacy in the place searched at the time the item is seized, from the defendant's interest in the placed searched. Automatic standing does not derive from the item seized. Rather, it protects the defendant's expectation of privacy in the place searched See **Jones**, **Supra**. The determination whether the goverments conduct cosistituted a search turns on whether "the activity intr-duced on the defendant's reasonable expectation of privacy.

<u>Commonwealth v. Pina</u>, 406 Mass. 540, 545 (1990); <u>Rawlings v. Kentuky</u>,

448 U.S. 98, 104-105 (1980): See <u>Sullivan v. District Court Of</u>

<u>Hampshire</u>, 384 Mass. 736, 742 (1981). "The defendant's expectation

of privacy is (1) Whether the defendant has manifested a subjective

expectation of privacy in the object of the search ,and (2) Whether

society is willing to recognize that expectation as reasonable".

<u>Commonwealth v. Montanez</u>, 410 Mass. 290, 301 (1991), citing

<u>Callifornia v. Ciraolo</u>, 476 U.S. 207, 211 (1986). If the defendant

Satifies his burden, then the goverment has the burden

to show that it's search was reasonable and,

therfor, lawful, <u>Commonwealth v. Pina</u>, Supra at 544, ct. <u>Commonwealth</u>

<u>v. Antobendetto</u> 366 Mass. 51 ,57 (1994). Finally this court recognize

that, a e e "in examining the expectation under article 14, we do not

neccessarily reach the same result as under Fourth Amendment analysis"

<u>Commonwealth v. Montanez</u>, Supra at 301, citing <u>Commonwealth v. Panetti</u>,

406 Mass. 230, 234 (1989). In the case at bar John Kazen testified at

a motion to suppress evidence hearing on November 8, 2000. Kazen

testified that, he lived at 181 Division Street with his girlfriend

( Carol Faseel) the past five years, and her clothing and her belonings

are there. (1/5). Kazen stated on June 21st 1999 at approximately

6:00 am or 6:30 am ,he was standing in his driveway on Division

Street, at which time Tony Cabral came by, and Kazen invited Cabral

in his house. (1/7), and that Cabral frequently come to his house

at 6:15 in the morning. (1/21), and that Cabral and Kazen went in

his apartment to do drugs. (1/24-30), (2/9). Kazen further testified

that Cabral doesn't ned to ask Kazen to take a shower in his apartment

,Cabral could take shower whenever he wanted to shower, and that

Cabral comes over his house all the time. Cabral is a good friend

of Kazen. Id. Kazen also testified that, Cabral had stayed overnight

(1/45).and that Cabral was in the bedroom doing drugs. (1/11).

40

(1/45). Kazen clearly testified that, Cabral had a mutual use of the property, joint access or control, for most purposes, **United States v. matlock**, Supra. Officer Malek testified at the motion to suppress evidence hearing that, they were informed by the clerk from the Mutual gas station that, the clerk's pocketbook had been stolen, (2/67). Malek further testified that, while in the apartment of John Kazen, Malek could see in the bedroom, and on the bed there was a women pocket, Malek entered the bedroom to retrive the pocketbook, at which time Malek searched the bag and found some identification beloning to Rosemary Hobbs (2/68), and that the name of the victim Rosemary Hobbs meant nothing to him at the time of the illegal search of the pocketbook (3/27), (2/68-69). Officer Malek testified that, Charles Moniz informed Malek that this male was in possession of a pocketbook (2/15), (3/16). Which defendant was the target of the search and seizure in the dwelling house, given the defendant a possessory interest in the item taken. The defendant was legitimately on the property at the time of the search **Jones**, **Supra at 263-264, 265. Combs v. United States**, 408 U.S. 224, 227, **n.4.** In **Jones** Supra in order to qualify as a "person aggrieved by a unlawful search and seizure, one against whom the search was directed. The defendant claim the protection of the Fourth Amendment with respect to a governmental invasion of the premises, even though his **"Interest"** in those premises might not have been recognized property iterest at common law. **Jones** Supra. See also **Holloway v. Wolff**, **482 F.2D 110 (ca8-1973).** (Defendant has standing to object to search of    bedroom in third person because lawfully in a house at time of search even though no showing that defendant had ever been given permission to use or had ever been in bedroom.) The United State

41

Supreme Court has ruled that when a officer illegaly invades the privacy of an individual to obtained evidence, must be suppress based on the prior illegal police conduct **Jones v. United States**, 326 U.S. 257 (1960, wongsun, **United States v. Iribe**, 11 F.3d 1553 (1993). Mr. Justice Jackson's remark in 1948 that " Even a guess may expect the shelter of the rooftree he is under against crimneal intrusion, **McDonald v. United states**, 335 U.S. 45-46 (1948). The defendant asserts that under Article 14 of the declaration of Rights of the Massachusetts constition may afford greater protection to a person in certain circumstances than those required by Federal decisions interpreting the 4th Amendment, **Com v. Ortiz**, 376 Mass. 349, 358 (1978). The Governments conduct constituted a search, the activity intruded on defendant's reasonable expectation of privacy. **Commonwealth v. Pina**, Supra; **Rawlings v. Kentucky**, Supra.

This court must address the ilegal search/seizure evidence, given the defendant automatic standing with a reasonable expectation of privacy at John Kazen's apartment Locateed at 181 Division Street.

42

C.    The Officers Lacked Probable
Cause, Exigent Circumstances Within
Thier Knowledge To Enter Into 181
Division Street.

The Supreme Court concluded that Staturtory Authority not
withstanding "The fourth Amendment has drawn firm line at the
entrance to the house. Absent exigent circumstances, that threshold
may not reasonably be crossed without a warrant. Payton v. NewYork
445 U.S. 573, 590 (1980). See also Commonwealth v. Medi, 46 Mass.
App. ct. 591, 594  (1999). Quoting From  Commonwealth v. Forde, 367
Mass. at 805 (" The right of police officers to enter into a home
for whatever purpose, represents a serious governmental intrusion
into one privacy. It was just this sort of intrusion that the Fourth
Amendment was designed to circumsrcibe"). The Supreme Court has held
that ,police cannot make a warrantless entry into the home of
a third person to arrest a susupect or to search for or seizure
evidence, absent exigent circumstances or consent Commonwealth v.
Voisine, 414 Mass. 772, 783 (1983); Commonwealth v. Derosia, 402 Mass.
284, (1988). Here ,the notion. In Commonwealth v. Disanto, 8 Mass
App. ct. 694, 700 (1979). cert. denied, 449 U.S. 855 (1980).
Enunciated several factors to consider in determing exigency and the
reasonableness of the intrusion, " (1) The crime in quetion was one
of violence ,and the suspect had been reported to be armed and
dangerous; (2) Probable cause to believe the suspect  has commited
a felony and strong reason to believe the suspect is in the particular
dwelling; (3) The entry has been made peacefully (Preferably in
the daytime); (4) a likelihood that the delay attendant upon securing
a warr..

43

A warrant would facilitate the destruction of evidence or property;
(5) A likelihood that the suspect would escape if not promptly
apprehended; and, (6) Some showing of a reasoable basis for
beleaving that delay would subject the officers or others to physical
harm".

The defendant claims that the facts of this case do not rise
anywhere close to those in case where Exigent circumstances have
been found. **Commonwealth v. Paniaqua**, 413 Mass. 796 **United States
v. Al. Azzawy**, 784 F.2d 890 (9th cir !985). The Commonwealth has
the burden of convincing the court that there were such exigent
circumstances as to relieve the requirment of obtaining a warrant.
The credibilty of the officers is Key in assessing whether the
Commonwealth has met it's burden. Officer Malek testified that,
Botelho had also come to this location, and as they were staning
out side on Almond street they observed Charles Moniz walking/running
toward thier location, Mr Moniz approached them and they had a
conversation. (2/57), (3/12). Malek testified that Moniz had given
him a name of thesuspect. Moniz said it was Tony Cabral (2/59);
(3/12-13), and Mr. Moniz was aware who this male was now, and that
this particular male had a friend that lived at his mother's
house, he rented a apartment on the second floor east. (2/59);
(3/14). This friends name is John Kazen. There Id. Officer Shaun
Botelho testified that, officer Malek and himself positioned
themselves in the front of the house, and officer Alan Beausoleil
and officer Tosiot ran towards the rear at this time. Officer
Botelho that he seen Tony Cabral stick his whole body out the window
and look left and right. At that time Botelho pulled his service
weapon and told Tony, show me your hands, let me see your hands,

44

Tony (1/104). Botelho testified that, he was concerned for his brother's safety that's. why he drew his weapon There Id. However Charles Moniz testified that, he did not know this male's name (1/23-24): (1/39). Mr. Moniz stated that this males name did not come to him at any point, Mr. Moniz never realized what his name was. There Id. Mr. Moniz said because he never knew his name  he can't rember a name. After three weeks (1/55); and the first time he knew of  this males name, is when Mr. Moniz heard the officer's mention it in the apartment. (1/65) Anthony what are you doing here (1/65-66); (1/32). Mr. Moniz never ID this male. Mr. Moniz never looked into the apartment. Mr. Moniz left for work. (1/70) ,nor did Mr. Moniz observe any body in the windows (1/57), and Mr. Moniz was walking with the police and Mr. Moniz "Didn't see nothing at all hanging in the windows or nothing". There Id.Officer Malek testified at this time he approached Division Stret, Malek saw Charles Moniz's mother in the yard at 181 Division Street. Malek spoke to his mother,"She speaks like broken english". So Charles Moniz spoke to his mother Delores Moniz, and through Charles Moniz , Delores Moniz identified Mr. Cabral by name. (1/21); (2/60); (3/14-16), and Malek had information that a male ran into the yard with a--Carrying a pocketbook and several items. (3/16). However Delores Moniz in total contradiction testified that, she did not speak to the police officers that day. (1/82), and Mrs. Moniz did not open her door to her apartment to see or say anything to any one that day.(1/79-80)but she seen the police comining in her yard through her front window (1/81-82). Mrs. Moniz also testified that she did not know this males name (1/77-78); and the first time she spoke to the police officers about this case was that day down stairs in the court house Fourteen months later (1/82).

45

Nothing in the record showing officer Malek speaking to Delores Moniz in the yard at 181 Division Street.

**Exigency:**   The motion judge found that exigent circumstances just-ified the officer's warrantless entry into the apartment(R.A. 5) In the sevsral factors in determining exigency stated above.

1.)  Officer Malek testified that his factual basis of knowlegde came of Charles Moniz upon his arrival at the Mutual Gas Station.

Charles Moniz to contrary testified that, he did not provide any information to any police officer's at the Mutual Gas Station, and that Mr. Moniz first spoke to police on Almond Street when they were searching a blue auto, there is no information in the record, nor on a report that Charles Moniz provided information about a gun, the Commonwealth had not met it's burden. Officer Malek nor any other of-ficer's in the record showing Charles Moniz provided any information at any time about a male being armed with a gun, nor was there any evidence that the male was particularly dangerous. The officers must have exigent circumstances before making a warrantless entry. **Commonwealth V. Paniaqua**, 413 Mass. 796 (1992). See also. **Commonweath- -V. Voisine**, 414Mass. 772,783(1983),**Commonwealth V. Derosia**, 402 Mass- -284(1988), "Police may not make a warrantless entry into the home of a third person to arrest a suspect or search for or seize evidence ab-sent exigent circumstances or consent."

2)  Officer Malek had no information about a suspect had comm-itted a felony, and that he was in the dwelling, the defendant claims that the proof was lacking on both prongs, T he defendant submits that the police officer's had not been given the name of the alleged robber at the time they entered the apartment nor was they given the apartment where the alleged suspect was.

Charles Moniz is not a credible source of information, Mr. Moniz did not see what apartment this male was in, Moniz did not know this male, nor had Moniz ever see this male at the location, Moniz did not know this male had a friend that lived on the east side apartment.

Mr. Moniz testified that, he seen a gun , "looked like a gun." (1/8). And then testified that, "[he] didn't know if [the suspect] had a gun or not. So Mr. Moniz didn't want to take no chance and get shot. (1/13-14).

(1-56). The officer's made a warrantless entry not on probable cause or exigent circumstances, but acted on a hunch or guess, in violation of both Federal and State Law. Further the information gathered from the illegal entry and search of the automobile cannot aid the commonweath on this issue.

3.) Although the entry was in dayTime, the credible testimony of John Kazen describes anything but a peaceable incident. According to Kazen the offocers weapons were drawn they were yelling, nervous and excited and  they immediately put a gun to his head.  Officer Allen Beausleil, and Shawn Betelho, as well as Michael Malek, all corrobrated Mr. Kazen view of the event as it accured.

4.)  The police had the building surrounded and under control. The evidence in question was unknown to the officers, they had no facual basis of knowlegde what the evidence was upon entry.

5.)  There is simply no reasonable possibility in the cercumstances presented here, that there was any opportunity for a suspect in the apartment to elude police.

6.)  Again, there has been no showing by the commonwealth that this requirement has been met. There were no threats or attempts of violence by the suspect to the officers or others in the vicinity and they had the scene under control. Likewise, there is no basis for a finding that there was any danger to anyone in the apartment.

On all the credible evidence, the commonwealth has not met it's burden in proving that thepolice were justified in that warrantless

entry into the apartment and the subsequent consent, arrest of the defendant and search on the premises.

**D.    The officers lacked consent to enter/arrest and search John Kazen's apartment.**

The forth amendment to the United States Constitution and Article 14 of the declaration of rights of theMassachusetts constitution prohibit warrantless entry/arrest in the home or warrantless searches and seizurs. Absent exigent circumstances of consent. When police seek to justify a warrantless arrest or entry on the basis of consent, the commonwealth must show "consent unfettered by coercion, express or implied, and also something more than a mere acquiescence to a claim of lawful authority." **Commonwealth V. Voisine**, Supra; quoting **Commonwealth V. Walker**, 370 Mass. 548,555, cert. denied 429 U.S. - -943 (1976). The volintariness of an individuals consent to a warrantless entry is an issue of fact, and must be examined in the cercumstances of the case. See **Commonwealth V. Voisine**, Supra; **Commonwealth V. Harris**, 387Mass. 758,766 (1982;**Commonwealth V. Aguiar**, **370 Mass. 490,496 (1976)**. The motion judge found that John Kazen volintary consent to the entry in the dwelling house. (R.A.5  ).

The judge had not made finding that Kazen freely and volintary consent to the entry/search in the dwelling house.

**Consent :**

. The record clearly provides no basis for John Kazen's consent was freely and volintary given, "The question whether consent was volintary is  question of fact to be determined in the circumstances of each case, with the burden of proof on the goverment. **Commonwealth-** **-V. Aguiar**. John Kazen clearly testified at amotion to suppress that, he heard some screaming outside the house, and he heard people runnig up the stairs. (1/9), Kazen learned who those people were he said

48

it was the police banging on his door. And Kazen heard one of them
say kick the door down. (1/9-10). Kazen testified that he didnot
havea conversation whatsoever with the police, before they entered
in his apartment nor did they ask to enter the apartment (1/10);(1/36).
And the police just came in the apartment, and they called for Cabral
by name to come out. (1/31). Kazen further testified that the officer
had thier weapons drawn upon entering, and that the police put their
guns to his head and threw him in the chair. (1/10-11);(1/30-31).Kazen
stated that Cabral was in the bedroom when the police were yelling
Tony,Tony come out here, we are going to blow your head away stuf like
that. (1/11);(1/32). Kazen testified that Cabral came out. id. And at
this time the officer's grabbed him and threw him against the counter
they frisked him down, and sat him in the chair in the kitchen. (1/12).
Hand cuffed. (1/36). Kazen stated that, one of the officer's went in
the other... started going in the other room (1/12). At this time the
officer's asked Kazen if they could look around the house. Kazen test-
ified that, No, I told them what are you doing, looking in the other
room, Kazen kept asking them what are you doing, because Kazen had
something in the other room he didn't want them to see. (1/12-13).
The officer's never asked for permission to go in the other room Id.
And the officer's started moving everthing around, tipping the cushings
all over on his furniture, and looking all over the house and in the
closets, and at which time  one officer see in Kazen's bedroom a
poicketbook that Kazen thought was his girlfriends, the officer went
in the bedroom and grabbed the pocketbook. (1/14-15);(1.39-40).

    Mr. Moniz testified that,"he didn't recall remembering" if he
told any officer about the color of the handbag or what type of hand-

bag or what type of handbag it was. Mr. Moniz don't think he said anything about the color of the handbag. (1/26-27). And Mr. Moniz also testified that he didn't tell the police what color the handbag was. (1/55). Kazen testified that, the officer's knew a woman lived with him. Id. Kazen was asked to sign a consent form for what had taken place. (1/16-17). Kazen was asked to sign a paper given consent to search, and if Kazen didn't he was going to get charged with accessary to robbery. There Id.

Here again the court in making its decision must consider the serious questions as to the officer's credibility. The two versions could not be more disparate, the police say they acted in a calm and professional manner, and Kazen describes a forceful and intimidating, with gun drawn encounter. Kazen also relates threats made that, if he did not cooperate he would be charged with accessory to robbery. The voluntariness of Kazen cosent is nowhere close to case where consent was given without trickery or threats on the part of the police. See **Commonwealth V. Zeitler**, 7 Mass.App.Ct.543,547 (1979). Nor a case without coercion, actual or implicit, overt subtle. See **Commonwealth V. HARMOND**, 376 Mass. 557,(1978).

The question concerning credibility on the officer's should lead the court to conclude that the events occured in a manner asdescribed by Kazen, under all the circumstances, it is more likely that Kazen would not have felt free and did not feel free to deny the officer's request of coercive to enter and search his apartment. Once inside officer's Beausoleil and Tosior arrested Cabral. And placed him in a chair by the door they entered. The record is clear officer Malek had No facual basis of knowlegde that added up to probable cause satisfing the two prong test. See, **Aguelar V. Texas**, 378, U.S. 108 (1964); **Spinelli V. United Staes**, 393 U.S. 410 (1969).

**Entry/Arrest:** In **Payton V. New York**, 445U.S.573,576 (1976), the
United States Suprem Court drew a bright-line at the threshold of
entry by holding that the forth amendment "prohibits the police from
making a warrantless and non-consensual entry into a suspects home
in order to make a routine felony arrest" Even when the police have
probable cause to make the arrest, Id. More recently **Payton** has been
interpreted to require suppression when police, with guns drawn, pos-
ition themselves outside the doors to an apartment and order the sus-
pect to step outside to place him under arrest without a warrant,
**United States V. Saari**, 88 F.Supp. 2nd. 835,839-851, (1999); **United-
-States V. Maez**, 872 F2nd. 1444,1450-1457, (10 Cir. 1989). (Bank-
Robber's licence number lead to CI giving location which swat team
surrounded, suspect being ordered out for arrest also invaladated
his wifes consent to search); **United States V. Herrold**, 772 F.Supp.-
1483,1489-1493, (1991).(Suspect who opened door chased into apart-
ment by police.);**United States V. Reed**, 572 F.2nd. 412,422-423 (2nd.
Cir.1978). (Suspect illegally arrested just inside the thershold of
apartment when she opened door), **Sharrar V. Felsing**, 128 F.3d. 810,
**814-820 (3d. Cir. 1997)**. (When a swat team surrounds a residence
with machine guns pointed at the window and the persons inside the
house are ordered to leave the house backwards with their-hands
raised, an arrest has undoubtable occured). **Payton V. New York**, The
rule includes a mandate that evidence be suppressd anytime police
order a person out of a dwelling house or apartment and any subse-
quent consent to search may also be invalidated. **United States V.-
McCoy**, 839 F.Supp. 1442 (1993).
See Also **Commonwealth v. Molina**, 439 Mass. 206 (2003) defendant
arrest, unlawful (Police observations of [items in] apartment
made subsequent to his arrest [without exigent or consent[).

In the case at bar Officer Malek testified that, officer Botelho told Cabral not to move and see his hands when Cabral looked out the window. (3/25);(2/62-63). Officer Botelho testified that, he seen Tony Cabral in the window and pulled his servous weapon and told Tony Cabral, Shoe me your hands. (1/104). Officer Malek testified that, he could hear officer's Tosior and Beausoleil yelling for the tenants to put there hands where they could be seen.

Defendant was arrested once officer's Botelho ordered Cabral, in the window not to move, and/or Cabral was ordered out of the bedroom by officer with gun drawn for arrest without consent. Consent to enter/search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatiable with official coercion actual or implicet, overt or suble. See **People V. Kunn**, 33 N.Y. 2nd 203, 208; **Schneckloth V. Bustamonte**, 412 U.S. 218,225-228. As the supreme court stated in **Bumper V. North Carolina**, 391 U.S. 543,550. "Where there is coercion there cannot be consent."

The forth amendment "prohibits the police from making a warrantless and non-concensual entry into a suspects home in order to make a routine felony arrest." **Payton V. New York Supra**. **Commonwealth V. Voisine Supra;Commonwealth V. DeRosia Supra.**

In **Commonwealth V. Bacon**, 381 Mass. 642,645-646 (1980), And **Commonwealth V. Thibeau**, 384 Mass. at 763-764, See also **Florida V. Rover**, 460 U.S.491,497 (1985). The officer's suspicion must be reasonable before the pursuit begins. Were the rule otherwise, the police could turn a hunch into a reasonable suspicion by indusing the conduct justifing the suspicion.The only factual basis of knowlegde officer Malek recieved was at the search of the 1989 blue ford thun-

52

derbird. Malek only testified that, Charles Moniz provided him with the name of the suspect and that this suspect had a friend named John Kazen, and Kazen lived at 181 Division Street secound floor east side, and which Charles Moniz testified in complete contradiction, Malek is without a foundation to justify his conduct.

There is no independent information justifing the pursuit at that moment. Officer Malek with the above information pursuit to 181 Division Street to arrest Anthony Cabral.

In **United Staes V. Matlock**, 415 U.S. 164,171 N.7 (1974). "The authority which justified the third party consent does not rest upon the law of property...but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." John Kazen clearly testified at a motion to suppress that, Cabral would visit Kazen frequently. (1/21), Kazen told Cabral that morning to come into the house, so they can due drugs.(1/24-26). Further Mr. Kazen testified that, Cabral doesn't have to ask permission to take a shower in his dwelling (1/30), and that Cabral comes over his house all the time, Cabral is a good friend of Kazen's. There Id. And that Cabral had stayed overnight (1/45). LIKEWISE Cabral had valid authority to consent to the police entry/search of the apartment.

John Kazen nor Anthony Cabral was asked at anytime for permission to enter/search the premises. Such a conclusion accords with the factual back drop stated above and the legal landscape. See **Commonwealth V. Appleby**, 358 Mass. 407,411 (1970),**Commonwealth V.Martin**, 358 Mass. 282,288 (1970). There is no information in the record testimony that support the Jugde's findings of fact, clear error of law.

## E.     THE OFFICERS WENT BEYOND THE SCOPE OF THE SEARCH

The Supreme Court held, when making a lawful arrest, police may conduct a warrantless search of the area within the arreste's imediate control, this is "the area from within which he might gain possession a weapon or destructable evidence". Chimel v. California, 395 U.s 752, 763 (1969). Such a search inceident to arrest must be conducted at " about the same time of the arrest, United States v. Anderson, 813 F,2d 1450, 1456 (1987). To justify a warrantless seizure based on plain view three conditions must be satisfied. First, The seizing officer must not have violated the fourth Ammenment "at arriving at the place from which the evidence can be plainly viewed". Horton v. California, 496 U.S. 128 (1990). Second, The item must not only be in plain sight, " But it's incriminating character must also be imediately apparent Id. Finaly  ,"not only must the officer be lawfully located in a place from which the object can be plainly seen. but he, or she must also have a lawful right of access to the object itself". Id.at 137. The court noted ,a two level inquiry first it put itself in the officers postion and dertimine whether the searched bag was within the arrestee's imediate control when he was arressted. Which he was not. Next, it considered whether events accurring after the arrest but before thesearch made the search unreasonable. Officer Malek acted unreasonably when he entered a seprate room away from the kitchen area, and seized the pocketbook, and searched after the defendant's arrest in the kitchen area, made the search unreasoable, Malek didn't know what kind of handbag it was. Charles Moniz testified that, he didn't tell the police anything about the color of the handbag, or what type of

handbag it was, and that Moniz didn't think he said anything
about the color of the handbag (1/26-27). Clearly  officer Malek
nor any officer in the record showed proable cause to seize the
pocketbook. It's noted in, **United States v. Naugle**, 997 F.2d 819,
820 (1993) Probable cause to seize evidenec merely requires that
facts available to officers warrant a man reasonablecaution in
belief that certain item may be contraband  or stolen property or
useful as evidence of a crime...." and the incrimination nature
of the evidence be immediately apparent to the seizing officer,
and must rise to the level of probable cause Id at 822-823 see
also **Arizona v. Hicks**, 480 u.s 321, 226 (1987). " The officers
discovery of the object must so galvanize their knowledge that
they can be said, at that very moment or soon thereafter , to
have probable cause to beleave the object to be contraband or
evidence". Officer Malek testified that, Rosemary Hobbs the
victims name meant nothing to him at the time Malek entered the a
apartment, (3/27). Malek testified that, while in the apartment
, Malek went into the front room area, after the arrest of the
defendant in the kitchen area, at which time Malek could see into
the bedroom a dark leather pocketbook, Malek walked into the
bedroom (not to sweep the bedroom but) to retreive the pocketbook
at which time officer Malek seized the bag and open the pocketboo
k-up, Found some identification belonging to a Rosemary Hobbs
(2/65-68). Malek further testified that, that the name Rosemary
Hobbs had no significence  to him when he looked into the pocket-
book  (2/68-69). Malek also testified that , at the point he was
returning into the living room, and Malek observed officer
Beausoleil walk over to the couch, he had picked up a winter
jacket. he then bent down a picked up a small black gun, ther was
also a pair of boots, some jeans, and a little type of spray

bottle, also on the floor, a mask, at which time Malek
collected them as evidence. (2/69-70). Clearly showing a "Full-
blown" search from " top-to-bottom" looking for incriminating
evidence of a crime, with no factual basis of knowledge in the
the officers possession at the time of the search/seizure. Second
, not only must the officer be lawfully located in a place from
which a object can be plainly seen, but he or she must also have
a lawful right of access to the object it self. Officers did
not exigent circumstances nor probable cause to be in the apart-
ment, nor consent to walk into the rooms and search / seize
items therein. The arrest happen in the kitchen area two rooms
from the bedroom. If the court finds exigent circumstances that
exigency stop at the arrest of the defendant, Malek testified
that the only reason why he entered the bedroom was to retrieve
the pocketbook. There is nothing in the record showing that
officer Malek was in fear of his life (2/65-68), No amount
of probable cause can justify a warrantless search or seizure
absent exigent circumstances or consent **Commonwealth v. Voisine**,
**404 Mass. 772, 783 (1993)**. **Commonweralth v. Derosia**, 402 Mass.
**284 (1988)**. Incontrovertible testimony of the  sensses that
an incriminating is on the premises belonging to a criminal
suspect may establish the fullest possible measure of probable
cause. But even where the object is contraband, the Supreme
Court has repeatedly stated and enforced the basic rule that
the police may not enter and make a warrantless seizure **Taylor**
**v. United States,** 268 U.S. 1 (1932); **Johnson v. United States,**
33 U.S. 10 (1948); **Chapman v. United States**, 365 U.S. 610
(1961); **Coolidge v. NewHampshire,** 403 U.S. 443 (1971). Officer
Malek  did not inadvertently come across the incriminating

object. Malek opened the bag, and the victims name at this time
meant nothing to Màlek, clearly searching for evidence of a
crime. Not like cases , where the officers come across incriminating
object inadvertently. See Harris v. United States, 390 U.S. 234
(1968); Ker v. California, 374 U.S. 23 , 43 (1963); CF. Lewis V.
United States, 385 U.S. 206 (1966). The pocketbook may only
be opened pursuant to either, A search warrant , or one of the
well-delineated exceptions to warrant requirement Horton v.
California, 496 U.S. 127 , 140 (1990). In the case at bar, even
if the entry into the open apartment is upheld by the court on
the basis of exigent circumstances, the defendant suggests that
thier authority to do so ended upon his arrest in the kitchen
area. The purpose of an exigency entry in the residence is not
to search for evidence of the crime. A search incident to arrest
in a not permitted beyond the area from which the arrestee
might obtain a weapon or destroy evidence. Defendant's
interest in privacy has been invaded, this violation occurred
before the object came into plain view. Even if the court found
privacy was not invaded, do to exigency. The court must look
at the officers lawful right of access is to incriminating
nature of the evidence been immediately apparent, which it was
not, violating defendant's federal And State rights and laws.
United States v. Massey, 997 F.2d 823 (1993). The search here
falls within the prohibited area as defined in Chinel v. California
395 U.S. 752 , 763 (1969). See also Commonwealth v. Cohen,
359 Mass. 140, 146 (1971). The Fall River police officers went
far beyond the defendant's person and the area from within
which he might have obtained either a weapon or something that
could of been used as evidence against him. Kazen testified that,

when asked about the pocketbook he told the officer's that he had a long time live in girlfriend, and that he thought it was hers, and protested a number of times about the officer rummaging through his apartment. There is simply no justification for search and seizure of the pocketbook.

Protective Sweep:

The Supreme Court held, a "Protective Sweep" is a quick and limited search of a premise incident to arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Maryland v. Buie. 494 U.S. 325 (1990); Commonwealth v. Bowden, 379 Mass. at 478(1980); Commonwealth v. Stafford, 18Mass. app.ct.at 965 (1984). Officer Michael Malek testified that, while in the apartment in the living room area, Malek could see in a bedroom, a pocketbook on the bed, at which point, Malek "walked in the bedroom to take a closer look at the pocketbook". Not inadvertently, but to to retrieve it. At which time, Malek opened it up, finding some identification belonging to a Rosemary Hobbs (2/68). The opening of the pocketbook is the first disputable search / seizure of evidence in the record showing the violation of the defendant fedral and States rights and laws. The Commonwealth had not meet the fourth amendment limited protective sweep in conjunction with an in home arrest. When the searching officer did not possess a reasonable belief based on specifed and articulable facts that the bedroom area to be swept harbors a individual posing a danger to those on the arrest scene Michigan v. Long , 463 U.S. 1032 , 1049-1050 (1983); Terry v. Ohio, 392 U.S. 1 , 21 (1968 ). Obviously under the circumstances

described in this case, the officers were not conducting a valid protective sweep when they discovered the item in question. Based upon all the credible evidence the court should conclude that the entry an search of the motor vehicle, the entry into the apartment and the arrest of the defendant , and the search of the residence and discovery of evidence were all illegal and that they did not conform to any recognized exception to the warrant requirements. Further more ,the subsequent search / seizure of the apartment was by way of a warrant based upon information and evidence obtained from the illegal searches / seizures and arrest, and there-for is the "Fruit Of The Poisonous Tree." **Wong Sun v. United States**, 371 U.S. 471, 491 (1963): **Weeks v. United States**, 232 U.S. 383 , 398 (1914); **Mapp v. Ohio**, 367 U.S. 643 , 657 (1961). See Also Commonwealth v. Molina, Supra, found no justification for being in the apartment

**II.    TRIAL COUNSEL RENDEREDF INEFFECTIVE ASSISTANCE BY FAILING TO FILE AN INTERLOCUTORY APPEAL TO THE SUPREME COURT FROM THE DENIAL OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE VIOLATED DEFENDANT'S 6th , AND 14th AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS MASSACHUSETTS DECLARATION OF RIGHTS ARTICLE12. PROVIDES GREATER SAFEGUARDS.**

The sixth amendment guarantees of a right to counsel has long been recognized to guarantee the effective assistance of counsel " **McMann v. Richardson**," 397 U.S. 759 771 n.14 (1970). In order to prevail on a claim of ineffectiveness of trial counsel, a claimant must show first, that, "counsels represent-ation fell below an objective standard of reasonableness... under prevailing professional norms". **Stricland v. Washington**, 466 U.S. 682, 687-688 (1984). And second, that, there is a

reasonable probability that, but for counsels unprofessional errors, the results of the proceedings would have been different . Id at 695. See also **Commonwealth v. Saferian**, **366 Mass. 89, 92 (1974) for state standard.**

On December 18, 2000 the court ruled on the motion to suppress evidence denying same. (R.A. 5 ) Defense counsel filed a motion to extend time within which to file an interlocutory appeal (R.A. 7 ) ,but counsel never prosecuted that appeal. The Superior Court's ruling on the motion to suppress evidence was thus not tested on appeal, although the ruling was clearly erroneous and contrary to well established decisional law. One need only take a cursory look at the court's ruling, the transcript of the hearing on the motion to suppress evidence and applicable law on the issue to conclude that an interlocutory appeal would have prevailed in the case at bar and deprived the Commonwealth of there only support it had to justify the search / seizure and arrest in this case. The defendant relies upon the argument raised, supra, at argument, (1) for support for this argument that he would have prevailed on appeal but for tráil counsels  failure to take interlocutory appeal in this case. Error on counsel's part caused the prejudice required to satisfy defendant's burden to demonstrate that he was prejudiced. by counsel's failure to act. **See e.g. Strickland,** **supra, and Saferian, Supra.**

III.    The Motion Judge error when he abused his
discretion by not dismissing the Defective Indict-
ments or in the alternative not entitling defendant
to an evidentiary hearing to resolve the matter in
violation of the 5th,6th,14th amenments to the Unit-
ed Staes Constitution and Article 1,12 of the Massa-
chusetts Declaration of Rights which provide even
greater due process protection.


Justice David A. McLaughlin abused his discretion by not dis-

missing the defective indictments or in the alternative not entitl-

ing defendant to an evidentiary hearing to resolve the matter, vio-

lated defendant's due process rights under the 5th, 6th and 14th

amendements to the United States Constitution, and article 1 and 12

of the Massachusetts Declaration of rights.

**Commonwealth V. Salman**, 387 Mass. 160 (1982), clearly stated

the law when a Commonwealth witness knowingly gives false testimony

to the grand jury on a material fact. The Supreme Judicial Court

wrote at pages 166-67, that, "[i]t is the general rule that a court

should not inquire into the adequacy or competency of the evidence

upon which an indictment is based. **Commonwealth V. Robinson**, 373 -

**Mass. 591,592 (1977)**, and cases cited. See **Commonwealth V. McCarthy**,

385 Mass. 160,161-162 (1982). However, when it appears that the in-

tegrity of the grand jury process has been impaired, the defendant

may attact the validity of the indictment by way of motion to dis-

miss. See **Commonwealth V. St. Pierre**, 377 Mass. 650,654-657 (1979).

There can be no doubt that the knowing use by the commonwealth or

one of its agents of false teatimony to procure an indictment is a

ground for dismissing the indictment, See **St.Pierre,Supra** at 655

(footnote omitted). If ie became known to the prosecution that false

testimony was knowingly used to obtain an indictment, it is the duty

61

of the prosecutor so to advise the court and request a dismissal of the indictment."

On February 7, 2001 Attorney Stephen C. Nadeau filed a Motion/affidavit to dismiss under **Commonwealth V. Salmam**, 387 Mass. 160 (1982). <u>4</u>

Here in the present case, the defendant claims that the integrity of the grand jury proceedings was impaired. The defendant must show that 1) The misleading, false or deceptive evidence was given to the grand jury knowingly or with areckless disregard of the truth, 2) That the evidence in question was so presented for the purpose of obtaining an indictment, and 3) That the evidence in question "probably influenced" or "probably made a difference" in the grand jury's decision to return an indictment,**Commonwealth V. Mayfield**, 398 Mass. 615,621-622 (1986).

<u>1&2</u> Officer Malek the only witness that testified before theGrand Jury held on July 14, 1999 testified that there was,"An unknown emergency coming from the [Mutual Gas Station.]"(g.j. 4/1-2)." There was [A]... Male outside [the Mutual Gas Station] later identified as Charles Moniz of 181 Division Street...." (g.j. 4/9-10). The first person Malek met with, was Mr. Moniz came,... running towards [his] cruser." "Mr. Moniz informed [Malek] that a male had exited the store wearing a black mask, carrying what appeared to be a <u>handgun</u>. [ This] male ran west on Bradford Avenue... into an auto then left the area traveling west on Bradford Avenue." Malek testified that,"He was provided with a discription of the male by Mr. Moniz at the Mutual Gas

---

<u>4</u>
    Stephen C. Nadeau's Motion/Affidavit appear in the Appendix
(R.A. 24-26)

Station ." He appeared to be a white man, with a black mask on his face, wearing a winter jacket. He also stated that the male had some type of spray bottle in his hand also." (g.j.4/24);(g.j. 5/1-6).Officer Malek testified that,"[He] really didn't speak to the victim [Ms. Hobbs nor Ms. Reardon at the Mutual Gas Station.] initial stage no." (g.j. 5/20-24). On August 21, 2000 during a motion to suppress evidence hearing, Charles Moniz testified during direct examination that: [he] was never at the Mutual Gas Station." (1/17).And that Mr. Moniz left the Mutual Gas Station to go "back to [his] house...." (1/18). Mr. Moniz testified that "... The first time [he] spoke to the police was on Almond Street...." There Id.

Officer further testified to the grand jury that based on the information that Malek recieved from Charles Moniz, Malek traveled westerly on Bradford Avenue. [Malek] turned down onto Almond Street... searching the area for the vehicle and suspect." (g.j. 1-6). Officer Malek testified to the g.j. that, Mr. Moniz recognized this male as being  "Tony Cabral." (g.j. 8/11-15). Officer also stated to the g.j. that, after receiving this information they responded to the house Mr. Moniz was pointing to. Mr. Moniz also knows Mr. Cabral had a friend living at that particular address on the secound floor, east _side.(g.j. 8/16-21). Charles Moniz testified at the suppression hearing that , "[He] didn't know this person's name." (1/24);(1/39). Mr. Moniz did not realize this males name at any time (1/24),Mr. Moniz certainly didn't give the police the name of the male. Mr. Moniz testified that, he was bad remembering names after three weeks and that Mr. Moniz never knew this males name. (1/55).and the first time MR. Moniz knew of his name was when he heard the police mention it in the apartment. (1/65). Mr. Moniz also testified that, he never

knew this male had a friend living at that particular address on the secound floor, eastside. (1/56).

Officer Malek further told the grand jury that, the particular house in question is owned by Mr. Moniz's mother, who was also in the yard at this time. She Stated that she saw the male run up the stairs carrying a woman's pocketbook and several other items. (g.j. 8/22-24):(g.j.9/12). And that she recognized this person,"She said it was Mr. Cabral" by his name.

However, Delores Moniz the mother of Charles Moniz testified during a suppression hearing that, She did not know this male's name. (1/78),and that nobody spoke to her that day.(1/80),She never opened the door to her apartment that day. But she seen the police coming in the yard through the front window on the second floor. (1/81-82). She never opened the door to the hallway.Id. And the first time she spoke to the police was down stairs at the suppression hearing fourteen months later. (1/82). And Mrs. Moniz never spoke about this case to the police officer there Id. Delores Moniz had not provided any officer's with any information that day. There Id. All the commonwealth's witnesses testimony on these issues tends to corroborate officer Malek distorted account of the events as they accured. In fluenced the Grand Jury in it's decision to indict Athony CabralThe defendant has demonstrated that Officer Malek know-ingly gave false or deceptive misleading and distorted Charles Moniz as well as Delores Moniz statements allegelly to be armed with mat-erial facts which officer Malek had no foundation that establised knowlegde. A court will not generally inquire into the competencyor sufficiency of the evidence presented to a grand jury, **Commonwealh-V. Robertson, 373 Mass. 591,592 (1977);**Commonwealth V. Galvin, 323

Mass. 205,211-212 (1948). However, despite this general rule, A court may properly review the evidence presented to the grand jury, to determine whether the grand jury heard sufficient evidence to find probable cause for arrest, or whether the integrety of the grand jury proceedings were impaired. **Commonwealth V. Reddington**, 395 Mass. 315,319 (1985);**Commonwealth V. McGahee**, 393 Mass. 743,746-747 (1985).

Dimissal of an indictment is warranted by a grand jury's failure to hear evidence which, at the very least, is sufficient to establish the identity of the accused and probable cause to arrest him or her, **Commonwealth V. McCarthy**, 385 Mass. 160,163 (1982).(Indictment dismissed, grand jury heard no evidence of criminal involvement by te defendant) Alternatively, A court should dismiss an indictment where it determines that the unfair, misleading or distorted presentation of evidence to the grand jurors, **Commonwealth V. O'Dell**, 392 Mass. 445,446-447 (1984).(Indictment dismiissed unfair and misleading presention of defendant's statement, excluding exculpatory portin, seriously tainted the integrity of the grand jury proceeding). See also **Commonwealth V. Salman**, 387 Mass. 160, 167 (1982).(If it becomes known to the prosecution that knowingly false testimony was used to procure indictments, the prosecutor has to advise the court and dismiss the indictments). The defendant has shown the officer Malek,the only and primary witness that testified before the grand jury, knowingly and intentionally falsified, rectlessly fabrickcated, distorted, misled and decieved the grand jury. Dismissal of indictments under these circumstances is necessary to ensure that the "Grand Jury's historic function as an investigative and accusatory body" is not interferred with, **O'Dell**,Supra at 450, and to protect the grand jury's" traditional function as an effective protection against unfounded

criminal presecution. **McCarthy**, Supra at 163.

In the present case Justice David A. McLaughlin abused his dis-
cretion by not dismissing the indictments or by not entitling the
defendant to an evidentiary hearing to resolve the matter, the defen-
dant has met his burden under **O'Dell** and **Mayfield**.

This is not a case of merely negligent or overzealous prosecution,
This is a case where the police and prosecutor knowingly falsified
and allowed the evidence to secure indictments against Anthony Cabral
and/or to a conviction. Officer Malek presented evidence in this man-
ner to the grand jury intentionally, for the purpose of strenghting
what appeared to be a weak case against Cabral.

Finally the false and minleading manner in which the material
evidence against Cabral was presented "probably influenced" and pro-
bably made a difference in the grand jurors decesion to return armed
robbery indictments against Cabral. Indeed, it is highly likely that,
had the evidence been presented in a fair and honest manner, the
grand jury might not have returned armed robbery indictments.

For the reasons stated above this court should dismiss the in-
dictments. Accordingly in **Commonwealth V. Manning**, 373 Mass. 438,444,
(1977). The court concluded that a new trial was an insufficient rem-
ady where "[t]he indictment itself is so inextricably interwoven
with the misconduct which preceeded it [and] that the only approp-
riate remedy [was] to dismiss the indictment." The court found dis-
missal of the defendant's indictment necessary because "The officer's
misconduct was so pervasive as to proclude any confident assumption
that proceedings at a new trial would be free of the taint." Id.
Other courts also have reached such results. See, E.g. **United States
V. Levy**, 577 F.2nd. 200,210 (32d Cir.1978); **State V. Cory**, 62 Wash.
2nd. 371, 376-377 (1963). cited in **COMMONWEALTH V. Lam Hue To.**,

dentiary hearing to resolve the matter.

> IV.    THE COMMONWEALTH'S LOSS AND DESTRUCTION
> OF THE TURRET TAPE, 911 TAPE, POCKETBOOK,
> WALLET, CASH AND PAPERS, PLASTIC BAG, KEYS OF
> A 1989 BLUE THUNDERBIRD EFFECTIVELY PREVENTED
> CABRAL FORM CROSS/DIRECT EXAMINING THE WITNESS
> IN VIOLATION OF HIS DUECPROCESS RIGHT TO A FAIR
> TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES CONSTITUTION,
> AND ARTICLE 12 OF THE MASSACHUSETTS DECLARATION
> OF RIGHTS, WHICH PROVIDES EVEN GREATER DUE
> PROCESS PROTECTIONS.

The Commonwealth's loss and destruction of the turret tape, 911 Tape, Pocketbook, Wallet, Cash and Papers, plastic bag, Keys of a 1989 Blue ThunderbirdViolated defendant's due process rights under the Fifth and Fourteenth Amendments of the United States Constitution ,and Article 12 of the massachusetts Declaration Of Rights to the disclosure by the Government of evidence in it's possession that could materially aid the defense. See **Arizona v. Youngblood**, 488U.S. 51 (1998): **Commonwealth v. Tucceri**, 412 Mass. 401, 404 (1992). The rule under the due process provisions of the Massachusetts Declaration Of Rights is stricter than the Federal rule. See **Commonwealth v. Phoenix**. 409 mass. 408, 412 n.1 (1991). "Whenever potentially Exculpatory Evidence is lost or destroyed, the Judge must weigh (1) The Commonwealth's culpability as to the lost evidence; (2) The materiality of the lost evidence; (3) The potential prejudice_to the Defendant as a result of the unavailability of the evidence." **Commonwealth v. Otsuki**, 411 Mass. 218, 231 (1991). Each of the prongs of what is sometimes referred to as the "Willie test" See **Commonwealth v Willie**, 400 Mass. 427, 432 (1987), will be examined in turn.

A.    **EVEIDENCE WAS POTENTIAlLY EXCULPATORY:**

A defendant who seeks relief form the loss or destruction of potentially

Exculpatory evidence has the initial burden, **Commonwealth v.Olszewski**, 416 Mass. 707, 714 (1993) cert denied, 513 U.s. 835, 115 s.ct 113,130 L.E.D.2d Go (1994) to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the [Evidence] would have produced evidence favorable to his cause.Id. See also **Commonwealth v. Neal**, 393 Mass. 1, 12, (1984). Exculpatory evidence does not mean evidence that proves the defendant is innocent. Rather, Exculpatory evidence includes evidence which provides some significant aid to the defendant's story, calls into question a material ,although not indispensable element of the prosecutions version of the events, or the challenges the credibility of a key prosecution witness". **Commonwealth v. Castro**, 438 Mass. 160, 168 (2002). See also  **Commonwealth v. Gregory**, 401 Mass. 437, 442 (1988). Quoting **Commonwealth v.Ellison**, 379 Mass. 1, 22 (1978). Here if the Turret tapes and said items describe above had been turned over to the defense, there is a reasonable possibility that it would have produced evidence to refute the most damaging evidence present by the Commonwealth: Officers Orel's testimony about the events as they acoured to make a warrantless entry in a 1989 Blue ThunderBird , and the entry at 181 division Street as well as the arrest of the defendant as the suspect in the armed robbery. As well as evidence seized in a third party dwelling house described above.

Here, because the Commonwealth did not preserve the tapes, there is no way to know for certain what the tapes or the finger print would have revealed.

"Where evidence is lost or destroyed, it maybe difficult to determine the precise nature of evidence." **Commonwealth v. Sasville**,

**35 Mass. App. ct. 19, 20 (1993).** In this case it is indeed difficult to determine the precise nature of the lost or destroyed Turret tape, 911 tape, or the events as they accured. There can be no genuine dispute that there is a real possibility that the tapes would have included valuable exculpatory material, as well as the real possibility the evidence seized in a third person home had valuable exculpatory material. There is no culpable evidence to aid the Commonwealth clearly. Albert Marques testified during a hearing held on June 27, 2000 3 that, "One of them tapes [Turret Tapes] has been saved because another case, [And] the other one we just recorded over again because it was blank. (13/24-25); (14/1-3). Also see (14/4-9)."**well there was nothing on it"** So Marques recorded over the tape. Id. (14/10-14). Marques further testified that, The recording over the blank tape would have been **"within that period, yeah."** It's either the june tape or the july tape. I'm not sure which. (14/15-24). And then on july 11, 2000.'  Marques forgot he turned both of the tapes over to detective in this case.(13/20-24); (14/1-24). We are not to assume which tape Marques taped over, but if Marques was negligence for the destruction. Marques testified that, After about a year and a half the tapes would be reused and"**They (Turret Tapes) canot be erased until about a year and a half** (5/17-20). Marques was asked, So, it would have been a exception to record over the tapes before the eighteen month rule that you talked about? You said the tapes couldn't be recorded over again until the eighteen month period ended. Marques earlier statement is to be the more accurate one, the one this court must determine to be the truth. **Commonwealth v.fiore**, 364 Mass. 819, 823 (19940; **Commonwealth v. Tiexeira** 29 mass. App. sect 202 (1990). "Where a witness confronted

with a prior inconsistent statement adopts the earlier statement as the truth". Albert Marques was at negligent in the destruction of the Turret tapes by recording over this tape.

However , had the Commonwealth provided the tapes to the defense, as it should have done, there is real possibility that the tape would have contained evidence to discredit and impeach officer`orel version of the alleged events see, eg. **Stuart v. State**, 907 P.2d 783,816 **(Idaho (1995), (destroyed jail telephone log would have had" Exculpatory value" in the prisoner's prosecution for murder by torture.).** In these circumstances, had the Commonwealth not loss and destroyed the tapes .of the recording of the alleged event. There is a very real probability that it would have contained information helpful to the defenses attempts to limit the substantial damage done by officer's Orel testimony. As such, it certainly would have aided Cabral's case, and there-for cabral has carried his initial burden to show a real possibility that the evidence would have contained exculpatory material. See **Commonwealth v. Sasville**, 35 Mass. app. ct. at 25.

The circumstances of this case clearly mandate the imposition of of judicial sanctions even without showing of bad faith destruction. The adversary system is intended to render the trial prosessa .search for truth rather than the type of contest where the element of surprise assumes overwhelming importance. See E.G. **United States v. bryant**, 439 f.2d 642 (D.C. cir. 1971); **Wardius v. Oregon**, 412 U.S. 470 (1975). Therefore the disclosure requirement of Brady and Agurs is designed to the inbalance of investigative resources generally weighed so heavily in favor of the state. In order to insure that the defense will also have access to the material evidence nesessary for thorough trial

preparation see, E.G. **Jackson v. Wainwright,**390 f.2d (5th cir. 1968); it's goal is to secure a fair trial for the defendant consonant with with the requirement of due process "not to punish the government for it's misconduct." The concern is not that law enforcers are breaking the law but that innocent people may not be convicted **Levin v. Clark, 408 F.2d 1209, 1211 (D.C. Cir 1967).**

The police entry into 181 division street and arrest defendant therein seizure of a lady's pocketbook, papers identification, wallet, cash, plastic bag, key to a 1989 blue Thunderbird. The judge's remedy in this case is insufficient, in the alternative the judge should had suppressed the said item and all testimony of it. Or dismiss the indictment for the grossly negligent of the commonwealth. Justice Robert J. Kane remedy only the pocketbook found in a bedroom, but nothing to remedy the wallet, cash or papers found in the living room. This evidence should have been suppressed and all testimony of it. Justice Kane found this evidence to be material. Potentially exculpatory ,and that the government's falling within the realm of negligence. (R.A.19-20) The defendant is put in a position where he is unable to establish the exculpatory nature of the lost or destroyed evidence, the defendant is longer able to inspect or examine for finger prints to show someone other committed the alleged crime; **Commonwealth v. Olszewski,** 416 Mass. 707, 714 (1993); **Commonwealth v. Willie,** 400Mass. 427. (1987).

> **B.  THE COMMONWEALTH WAS HIGHLY CULPABLE FOR THE LOSS AND DESTRUCTION OF THE ALLEGED TURRET TAPE, 911 TAPE, POCKETBOOK ,PAPERS IDENTIFICATION, WALLET, CASH, PLASTIC BAG,KEY TO AUTO.**

71

The first prong of the "**Willie**" test requires the court to consider the " Commonwealth's culpability as to the lost evidence". **Commonwealth v.Otsuki**, 411 Mass. 218, 231 (1991). In this case, there can be no question that the Commonwealth was at the very least, grossly negligent, and there for certainly highly culpable for the loss and destruction of the items seized at 181 Division street and the Turret tapes as well as the 911 tape, see **Commonwealth v. Kater**, 432 Mass. **404, 417, 418 (2000) ,(State is "Culpable" For Loss or Destruction Of Evidence If The Evidence Has Been Losat Or Destroyed Through It's Negligence Or Inadvertence).** See the above testimony of Albert Marques as well as the Judges findings of Fact (R.A.10-23) Finding negligence.

### C.    MATERIALITY:

The second prong of the "**Willie Test**" is the materiality prong. Undisclosed exculpatory evidence is material if evaluated in the context of the entire record, it creates a reasonable doubt that did not otherwise exist. "**Commonwealth v. Gregory**, 401 Mass. at 442, quoting **United States v. Agurs**, 427 U.S. 97, 112, 96 sect. 2392, 49L. ED.2d. 342 (1976)". When the evidence no longer exists and the defendant has made a specific request for it, the defendant need only show a reasonable possibility that the evidence was exculpatory. "**Commonwealth v. White**, 47 Mass. App. ct. 430 ,433 (1999); citing **Sasville**, 35 Mass. **App. ct. at 26, n. 11.** Motion to preserve evidence appear in the appendix (R.A. 33)

### D.    The Loss And Destruction Of The Evidence Prejudiced The Defendant's Cause:

The third and Final prong of the "**Willie Test**" requires the court to consider "the potential prejudice to the defendant as result of the unavailability of the evidence. "**Commonwealth v.Otsuki**", 411 Mass.

218,231 (1991). Credibility of a key prosecution witnesses and the items was found in a "Third" persons dwelling house. if finger prints would have been favorable to the defense, and without the turret tape the defendant is put in a position where he is unable to restablish the exculpatory nature of evidence. Here, because the evidence seized in a warrantless entry, and the turret tapes as being the version of the events as they accured between the Officers, and the knowledge allegedly to have at the moment of entry / arrest. the defense could not challenge this because it is so powerful, and so incriminating, the resulting prejudice from the commonwealth's loss and / or destroyed evidence. "where the defendant is essentially precluded from presenting a defense, the prejudice is great" See **Commonwealth v. sasville**, 35 Mass. **App. ct. at26.** If the defendant establishes that the Commonwealth has lost and / or destroyed potentially exculpatory evidence, the judge next must consider the appropriateness and extent of a remedial action ensure the defendants right to a fair trial."

Due to justice Kanes findings the court should had ordered a Bowden instruction as a remedy, and / or the defendant was intitled to said instruction as a remedy, which Kane or the trial judge did not provide see for support "Jury Instruction Argument" by Wysocki Capplis BBO.#_____, Attorney att law, "Brief". Filed. Appropriate instructions were **Not** given to the jury to limit the prejudice to Cabral's defense due to the Commonwealth failure to preserve the finger print evidence and the Turret tapes destruction.

In this case it can not be fairly disputed that the loss of the Turret tapes and the finger print evidence greatly prejudiced cabral's defense. Thus ,where for the reasons set forth above, the evidence

73

was clearly exculpatory, the commonwealth was highly culpable and the evidence was highly material, cabral's convictions must be reversed and remanded for a new, and fair,trial, where evidence is not admitted see **Commonwealth v, ocasio**, 434 Mass. 1 ,5-7 (2001) (the lost evidence doctrine "provides that when potentially exculpatory real evidence is discarded lost or destroyed in a criminal case the defendant may seek to have the charges dismissed, or to prevent the prosecution from relying on the evidence) See **Commonwealth v. White**, 47 mass. App. ct . at 435 (" In these circumstances, if the case were retried, the government should be precluded from admitting the evidence). And the testimony.

## V,
### THE CUMULATIVE EFFECT OF THE ERRORS
### WARRANTS A REVERSAL.

For the reason set forth in argument I (Supra pp.34-59)and in Argument II (Supra pp.59-60) Argument III (Supra pp.61-67) Argument IV (Supra pp.67-74) Incorporated herein by reference, if the court should find that neither of the errors complained of, in the four preceding arguments, standing alone, warrant reversal. There can be no question that four errors complained of in the proceeding arguments, taken together, cann't be said to be harmless. See, eg. **United States v. Sepulveda**, 15 F.3d 1161, 1196 (1st cir 1993). ("Individual errors, insufficient in themselves to necessitate a new trial, May in the Aggregate have a more debilitating effect"). As such, the cumulative effect of the four errors complained above warrant a reversal, where the prejudice resulting from the combination of those four errors clearly cannot be said to be harmless. See, e.g., **Commonwealth v. Bassett**, 21 Mass. App. ct 713, 717 (1993). See also for support

Wysocki capplis P.O. box 83 Milton, Massachusetts 02186 BBO#_____

Brief and combine the cumulative effect of her errors with argument #V.

## CONCLUSION

For all the for going reasons, the defendant, Anthony cabral
, respectfully requests that this court reverse his adjudications,
and grant him a new trial.

RESPECTFULLY SUBMITTED

ANTHONY CABRAL

MCI CEDAR JUNCTION

P.O. BOX 100

SOUTH WALPOLE, MA 02071

75

# Record Appendix

1) Indictment ************************************** 1

2) Indictment ************************************** 2

3) Criminal Docket ****************************** 3

4) Motion to Suppress
   Evidence,Findings
   of Fact            **************************** 5

5) Criminal Docket ****************************** 6

6) Motion to Extend
   Time for Filing
   Interloccutory Appeal ********************** 7

7) Motion to Dismiss
   Indictments,
   Finding of Fact  ***************************** 8

8) Motion to Dismiss
   Lost or Destroyed
   Evidence, Findings
   of Fact          ***************************** 10

9) Motion to Dismiss
   /Suppress Lost or
   Destroyed Evidence,
   Finding of Fact  ***************************** 15

10) Motion to Dismiss **************************** 24

11) Motion to Preserve
    Evidence          **************************** 27

12) Motion to Suppress
    Evidence Transcript
    Attached herewith exhibit "A"   ***************** "A"

13) Grand Jury Minutes
    Transcript Attached
    Herewith exhibit "B"   :********************** "B"

14) Motion to Dismiss
    Lost or Destroyed
    Evidence, Transcript
    Attached herewith exhibit "C" ***************** "C"

# Commonwealth of Massachusetts

BRISTOL, SS.

*At the SUPERIOR COURT holden at New Bedford within and for the County of Bristol, for the transaction of criminal business on the first Monday of July, 1999,*

THE JURORS for the said Commonwealth on their oath present, That

Anthony Cabral,

on or about June 21, 1999, at Fall River, in the County of

Bristol aforesaid,

being masked or disguised and having his features

artificially distorted, and armed with a dangerous weapon,

to wit: a handgun, did assault Gloria Reardon with intent to

rob her, and thereby did rob and steal from the person of

said Gloria Reardon or from her immediate control, money,

the property of Mutual Gas Station.

(G.L. Chap. 265, Sec. 17)

A true bill.

*Foreperson of the Grand Jury.*

*Assistant District Attorney.*

# Commonwealth of Massachusetts

BRISTOL, SS.

*At the SUPERIOR COURT holden at New Bedford within and for the County of Bristol, for the transaction of criminal business on the first Monday of July, 1999,*

THE JURORS for the said Commonwealth on their oath present, That

Anthony Cabral,

on or about June 21, 1999, at Fall River, in the County of Bristol aforesaid,

being masked or disguised and having his features artificially distorted, and armed with a dangerous weapon, to wit: a handgun, did assault Rose Marie Hobbs with intent to rob her, and thereby did rob and steal from the person of said Rose Marie Hobbs or from her immediate control, money, the property of Mutual Gas Station.

(G.L. Chap. 265, Sec. 17)

A true bill.

_____
*Foreperson of the Grand Jury.*

_____
*Assistant District Attorney.*

BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

## BRCR1999-00228
### Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 01/07/2002 | 87.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/08/2002 | 88.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/09/2002 | 89.0 | List of Potential Witnesses |
| 01/09/2002 | | RE Offense 2:Nolle prosequi |
| 01/11/2002 | 90.0 | Motion by Deft: for Jury Instruction |
| 01/11/2002 | 91.0 | Motion by Deft: for Required Finding of not Guilty |
| 01/11/2002 | 92.0 | List of exhibits |
| 01/11/2002 | | RE Offense 1:Guilty verdict (lesser offense) |
| 01/11/2002 | 93.0 | Verdict of guilty to Unarmed Robbery |
| 01/11/2002 | | Bail set on August 11, 1999 revoked; Deft Ordered Held Without Bail (John A. Tierney, Justice) |
| 01/11/2002 | 94.0 | Mittimus without bail issued to Bristol House of Correction (Dartmouth) |
| 01/11/2002 | | Continued until January 25, 2002 for sentencing (John A. Tierney, Justice) |
| 01/14/2002 | 95.0 | Habeas corpus for Deft at Plymouth County Correctional Facility) |
| 01/25/2002 | | Defendant sentenced to MCI Cedar Junction for the term of not more than ten (10) years nor less than eight (8) years as to offense A; Deft advised of his right to appeal to the Appellate Division of the Superior Court for a review of sentence; Deft advised of his right to appeal the judgment and sentence of the Court within thirty (30) days thereof under MRAP Rule 4b; T.C. - 950 - days (John A. Tierney, Justice) |
| 01/25/2002 | | Victim-witness fee assessed: $60.00 |
| 01/25/2002 | 96.0 | Mittimus for safe keeping issued to Cedar Junction MCI (Walpole) |
| 01/31/2002 | 97.0 | Notice of appeal from sentence to Cedar Junction MCI (Walpole) filed by Anthony Cabral |
| 01/31/2002 | 98.0 | Letter transmited to the Appellate Division. All parties notified February 01, 2002 |
| 02/13/2002 | 99.0 | NOTICE of APPEAL FILED by Anthony Cabral |
| 02/19/2002 | 100.0 | Court Reporter Bates, Susan B. is hereby notified to prepare one copy of the transcript of the motion to dismiss hearing of February 07, 2001. |
| 02/19/2002 | 101.0 | Court Reporter Saulnier, Lori E. is hereby notified to prepare one copy of the transcript of the motion to dismiss hearing of August 27, 2001 and of the sentencing of January 25, 2002 |
| 02/19/2002 | 102.0 | Court Reporter Lentini, Jeanne is hereby notified to prepare one copy of the transcript of the motion hearing of December 03, 2001. |
| 02/19/2002 | 103.0 | Court Reporter Silvia, Marilyn is hereby notified to prepare one copy of the transcript of the trial evidence of January 09, 10, and 11, 2002. |
| 03/04/2002 | 104.0 | Defendant files motion to revise and revoke sentence (no hearing requested at this time) |
| 03/04/2002 | 105.0 | Motion by Deft: to withdraw as pro se party |
| 03/04/2002 | 106.0 | Motion by Deft: for appointment of counsel; Affidavit in support |
| 03/04/2002 | 107.0 | Motion by Deft: for appointment of appellate counsel |

BRISTOL SUPERIOR COURT
Case Summary
Criminal Docket

## BRCR1999-00228
## Commonwealth v Cabral, Anthony

| Date | Paper | Text |
|------|-------|------|
| 03/08/2002 | 108.0 | Transcript of testimony regarding the Deft.'s Motion to Dismiss of August 27, 2001, received volumes #1, from court reporter, Saulnier, Lori E. |
| 03/08/2002 | 109.0 | Transcript of testimony of sentencing received of January 25, 2002, volumes #1, from court reporter, Saulnier, Lori E. |
| 03/25/2002 | | Motion (P#107) allowed, referred to CPCS (Elizabeth M. Fahey, Justice). Copies mailed March 26, 2002 |
| 03/25/2002 | 110.0 | Request for assignment of counsel on appeal |
| 04/11/2002 | 111.0 | Appointment of Counsel Sandra Wysocki Capplis |
| 04/16/2002 | 112.0 | Motion by Deft: to compel production of copy of docket sheet (docket sheet sent April 18, 2002) |
| 04/16/2002 | 113.0 | Transcript of testimony of February 7, 2001 received volumes # 1 from court reporter, Bates, Susan B. |
| 04/26/2002 | 114.0 | Appearance of Deft's Atty: Sandra Wysocki Capplis |
| 05/02/2002 | | Victim-witness fee paid as assessed |
| 08/29/2002 | 115.0 | Transcript of trial testimony from January 9, 2002 received volumes # 1 from court reporter, Silvia, Marilyn |
| 08/29/2002 | 116.0 | Transcript of trial testimony from January 10, 2002 received volumes # 2 from court reporter, Silvia, Marilyn |
| 08/29/2002 | 117.0 | Transcript of trial testimony from January 11, 2002 received volumes # 3 from court reporter, Silvia, Marilyn |
| 09/13/2002 | | Petition for review of sentence withdrawn May 23, 2002 (See letter in back of file) |
| 11/12/2002 | 118.0 | Transcript of motion for reconsideration hearing testimony from December 3, 2001 received volumes # 1 from court reporter, Lentini, Jeanne |
| 11/15/2002 | 119.0 | Certificate of delivery of transcript by clerk filed. |
| 12/03/2002 | 120.0 | Court Reporter Lori E. Saulnier is hereby notified to prepare one copy of the transcript of the hearing on defendant's motion to dismiss evidence of June 27, 2000. |
| 12/03/2002 | 121.0 | Court Reporter Marilyn Silvia is hereby notified to prepare one copy of the transcript of the defendant's motion to dismiss evidence of July 11, 2000 and one copy of the transcript of the defendant's motion to suppress evidence of August 21, 2000 and September 28 & 29, 2000. |
| 12/03/2002 | 122.0 | Court Reporter Pat O'Brien is hereby notified to prepare one copy of the transcript of the hearing on defendant's motion to suppress evidence of November 08, 2000. |
| 12/31/2002 | 123.0 | Transcript of testimony of Motion to Dismiss, heard on Tuesday, July 11, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 124.0 | Transcript of testimony of Motion to Suppress, heard on August 21, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 125.0 | Transcript of testimony of Motion to Suppress, heard on Thursday, September 28, 2000, received from court reporter, Silvia, Marilyn |
| 12/31/2002 | 126.0 | Transcript of testimony of Motion to Suppress, heard on Friday, September 29, 2000, received from court reporter, Silvia, Marilyn |

*filed 8/21/00*

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                 SUPERIOR COURT
                                             #9973CR0228

AUG 21 2000

COMMONWEALTH        . . . J. SANTCS, ESQ.
                    CLERK/MAGISTRATE

        v.                          MOTION TO SUPPRESS

ANTHONY CABRAL
* * * * * * * * * * * * * * * * * * * * * * *

Now comes the defendant in the above entitled matter and moves, pursuant to Mass.R.Crim.P. 13, the 14th Amendment to the U.S. Constitution, Article XII of the Massachusetts Declaration of Rights, and all other applicable provisions of said Constitution and Declaration of Rights, that the items found in a search of the defendant's automobile and the premises occupied by the defendant on June 21, 1999 be excluded from evidence. The defendant further moves to suppress all information, materials, identifications, statements or other evidence obtained subsequent to said searches.

As grounds therefore, the defendant states that:

1. The search of the automobile was without a warrant, and was not within any recognized exception to the warrant requirement.

2. The search of the premises in which the defendant was an occupant at the time of his arrest was without a warrant, and was not within any recognized exception to the warrant requirement. Additionally, the arrest of the defendant was without probable cause.

3. Any information, statements, identifications or other evidence obtained subsequent to the search of the automobile and premises, including the later search by warrant, are the "fruit of the poisonous tree" and must likewise be excluded.

*Stephen C. Nadeau*
Attorney at Law

190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722



## BRCR1999-00228
## Commonwealth v Cabral, Anthony

**Private Counsel 418450**
Daniel M Rich
250 East Main Street
Norton, MA 02766
Phone: 508-285-4725
Withdrawn 04/19/2002

**Private Counsel 542724**
James W McCarthy II
Lushan McCarthy Goonan Stopa & Sullivan
496 Harvard Street
PO Box 1004
Brookline, MA 02
Phone: 617-739-0700
Withdrawn 04/19/2002

**Public Counsel 638177**
Sandra Wysocki Capplis
P.O. Box 83
Milton, MA 02186
Phone: 617-698-1399
Fax: 617-698-1399
Active 04/19/2002 Notify

**Other interested party**
File Copy
Gender: Unknown
Active 03/23/2001 Notify

| Date | Paper | Text |
|------|-------|------|
| 07/15/1999 | | Original case info: ORIGIN=I. |
| 08/11/1999 | | RE Offense 1:Plea of not guilty |
| 08/11/1999 | | RE Offense 2:Plea of not guilty |
| 11/10/2000 | | Stat at cnvrsn to cmputr 11/10/2000. |
| | | (see docket book for previous docket entries). |
| 12/07/2000 | 15.0 | Defendant's Memorandum in Support of Motion to Suppress |
| 12/18/2000 | | Motion (P#11) denied (Toomey,J.) (See endorsement on motion) |
| 12/22/2000 | 16.0 | Motion by Deft: to Extend Time for Filing Interlocutory Appeal filed |
| | | and ALLOWED as requested. (David A. McLaughlin, Justice) |
| 01/09/2001 | 17.0 | Motion to Dismiss and Affidavit in Support filed. |
| 03/13/2001 | 18.0 | MEMORANDUM OF DECISION AND ORDER on Defendant's Motion to Dismiss is |
| | | hereby DENIED. (David A. McLaughlin, Justice) |

# COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                    Superior Court
                                               Indictment #9973CR0228

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Commonwealth


                                               Motion To Extend Time
                    v                          for Filing Interlocutory Appeal


Anthony Cabral
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        Now comes the defendant, by his attorney and moves, pursuant to
Mass.R.Crim.P. 15(b)(1), that this Honorable Court allow additional time in order
to file an interlocutory appeal pursuant to Mass.R.Crim.P. 15(a)(2). The
defendant wishes to appeal the denial of his Motion to Suppress.

        As grounds therefore, the defendant received the decision of Judge
Toomey denying said motion on December 21; pursuant to the Rule, the appeal
must be filed within ten (10) days or such additional time as the court may allow;
and counsel for the defendant will be on vacation from December 23, 2000 until
January 1, 2001and will be unable to prepare and file the necessary documents
within the ten day period. The defendant requests that the time for filing be
extended to and including January 19, 2001.


                                    By His Attorney,


                                    Stephen C. Nadeau
                                    190 Rock Street, P.O. Box 3128
                                    Fall River, MA  02722
                                    (508) 679-2330
                                    BBO# 366300

# COMMONWEALTH OF MASSACHUSETTS

**BRISTOL, SS.**
                                          **SUPERIOR COURT**
                                          **NO. 9973CR0228**


## COMMONWEALTH

## V.

## ANTHONY CABRAL


## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS


The defendant moves to dismiss the indictment on the basis that false information was provided to the grand jury. In particular, the defendant references the differences between the testimony of the police officer at the grand jury and the testimony of a Mr. Moniz at the hearing on a motion to suppress.

Whether Mr. Moniz first communicated with the police officer at the scene of the robbery or when the police officer was searching the defendant's motor vehicle is immaterial. The circumstances in which the officer found the vehicle fully warranted a search such as was in fact conducted. From that investigation, the officers learned the identity of the defendant, a person about whom at least one officer had prior knowledge. The difference between the officer's testimony before the grand jury as to his conversation with Mr. Moniz and the synopsis of Mr. Moniz's testimony given at the motion to suppress, which was provided to support this motion, are not critical. Mr. Moniz apparently agreed there was a conversation near the vehicle and, by omission from the defendant's synopsis,

A True Copy By Photostatic Process
Attest:

ASst. Clerk of Courts

2

identified the house into which the defendant had gone.

That a civilian unused to events such as occurred on that date would have a different memory of them than that of a police officer is to be expected. This motion does not present a situation where an agent of the Commonwealth knowingly gave false information to a grand jury in order to obtain an indictment. Commonwealth v. Reddington, 393 Mass. 315, 319-20 (1985); Commonwealth v. Salman, 387 Mass. 160 (1982). In context, the differences in the memories of the two individuals was not substantial or material.

### ORDER

Accordingly, defendant's motion to dismiss is hereby **DENIED**.

David A. McLaughlin
Justice of the Superior Court

DATED: March 13, 2001

1    police officers in terms of what they --

2    it's anticipated they will present at the motion

3    to suppress.

4              THE COURT:  Thank you.

5              Anything further, Mr. Crowley?

6              MR. CROWLEY:  No, your Honor.

7              THE COURT:  This matter came before the

8    Court for hearing on the defendant's motion to

9    dismiss.  The Court commenced the hearing

10   initially on June 27th, the hearing was suspended

11   later that day, until today, July 11th.  The only

12   witness presented was Alan Marques.  The Court

13   received exhibits in the course of the hearing,

14   and the Court received the affidavit in support

15   of the motion to dismiss, as well as the

16   arguments and representations of counsel in this

17   matter.

18              Based on all of the credible evidence,

19   the Court enters the following findings of fact,

20   rulings of law, and the order on the motion:

21              With regard to findings of fact, the

22   Court determines that in 1999, the Fall River

23   Police Department maintained a system at police

24   headquarters for the taping of radio dispatch



38

1    messages between the dispatcher and patrol

2    officers.  Such dispatches and the tapes that

3    result are sometimes referred to as "turret

4    tapes."

5        For a period of time of late June and

6    early July of 1999, the taping system

7    malfunctioned as the result of a fault in a hard

8    drive component of the system.  The tape

9    equipment was not recording on June 21, 1999, the

10   date of the alleged offense.  The tape before

11   that date contains no recording material; in

12   other words, the tape is blank.

13       The malfunction of the equipment was

14   discovered during the second week of July that

15   year.  Strike that.  The malfunction of the tape

16   equipment was discovered and subsequently

17   repaired August 10, 1999.  The tape equipment was

18   functioning between July 12 and August 10.  The

19   reason for the resumption of the tape information

20   on July 12 through August 10 was unknown through

21   electrician Marques.

22       The Court did not receive testimony,

23   nor information by affidavit, demonstrating any

24   prejudicial effect resulting from the failure of

1    taping.   The Court did receive representation

2    from counsel in that regard.

3              With respect to rulings of law, the

4    Court has found instructive Commonwealth versus

5    Sasville, 35 Mass. Appeals Court 15; Commonwealth

6    versus Gomes, 403 Mass. 258; Commonwealth versus

7    Henderson, 411 Mass. 309.

8              There's a particularly interesting

9    footnote in the Gomes decision, Footnote 12 at

10   page 276.  Gomes deals with the failure of an

11   expert witness to photograph a gel plate from a

12   scientific test.  In Footnote 12, the court in

13   Gomes states:  "The defendant assumes that the

14   Commonwealth's failure to photograph the test

15   results is the equivalent of losing or destroying

16   the evidence.  Although this assumption is open

17   to question, we analyze the issue as though it is

18   correct."

19             A similar query must be made in the

20   present case.  Is the failure of an electronic or

21   mechanical device equivalent to an officer losing

22   or destroying evidence such as we see in

23   Sasville, such as we see in Henderson?  This

24   Court believes that it is not equivalent.



40

1    Nonetheless, for the sake of our proceedings

2    today, I will proceed with the assumption that it

3    is.

4          The case law notes that, "While the

5    defendant need not prove that the evidence, lost

6    or destroyed, would have been exculpatory, the

7    defendant must establish a reasonable possibility,

8    based on concrete evidence, rather than a fertile

9    imagination, that access to the material would

10    have produced evidence favorable to his cause."

11          The courts consistently request that a

12    trial judge apply a balancing test. But first,

13    the defendant must establish that it was

14    reasonably possible that the destroyed evidence

15    was exculpatory. This Court has no framework

16    placed before it in evidence that would permit

17    that determination.

18          While counsel has made some

19    representations concerning the utility of radio

20    transmissions in a prospective hearing on the

21    motion to suppress, even taking those assertions

22    at their face value, they have not been detailed

23    sufficiently for this Court to get over the first

24    hurdle, which is the burden of the defendant to

41

1    establish that it was reasonably possible that

2    the destroyed evidence was exculpatory.

3            Even if we were to pass by that hurdle,

4    as we did the first question of a mechanical

5    failure being equivalent of a human losing or

6    destroying the evidence, even if we passed by

7    both hurdles, the balancing test is not friendly

8    to the defendant when applied in this case.

9            The question of culpability on the part

10   of the Commonwealth is clear.  There is no

11   culpability, short of more detailed facts showing

12   some gross failure on the part of the government

13   to monitor the taping system, which, quite

14   frankly, is not in evidence here, there is no

15   culpability shown today on the Commonwealth in

16   this matter.  Likewise, the Court has no frame of

17   reference to determine the prejudice to the

18   defendant for lack of turret tapes.

19           For the above reasons, it is ordered

20   that the motion to dismiss be denied, and a copy

21   of the Court's decision dictated into the record

22   is to be made and placed with the case file in

23   these indictments.

24           Further date, gentlemen?

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                   SUPERIOR COURT
                                              NO. 9973CR0228


### COMMONWEALTH

### V.

### ANTHONY CABRAL


### MEMORANDUM OF DECISION AND ORDER ON
### DEFENDANT'S MOTION TO DISMISS/SUPPRESS


On July 15, 1999, the Commonwealth indicted Anthony Cabral for the crime of

armed robbery while masked.  Cabral, defending this action *pro se*, has now moved for

dismissal or suppression, asserting that the government's loss of evidence harming fair trial

rights requires dismissal of the charge or exclusion of the evidence.  For reasons stated

in this memorandum, I relieve the loss of evidence by means proportional to the

government's culpability and responsive to the prejudice caused by the loss of potential

exculpatory evidence.

### SUMMARY OF GOVERNMENT'S CASE

On June 21, 1999, a masked man entered the Mutual gas station located at 339

Broadway, Fall River, sprayed liquid on the clerk, Rosemary Hobbs, and took $8,000 in



2

cash and the pocketbook of Ms. Hobbs. A video camera recorded the robbery.

Outside the Mutual gas station, an individual named Charles Moniz saw a masked man carrying a gun and pocketbook emerge from the Mutual gas station, run into a car, and once inside the car "whip off his mask." Moniz recognized that man as an individual whom Moniz knew and had attended a wedding with. Charles Moniz followed the individual, who was driving a blue Thunderbird.[1] At some point, Moniz lost sight of the blue Thunderbird. Eventually, Moniz arrived at Beach Street and observed the male enter 181 Division Street, where Moniz and his mother lived.

Moniz informed the Fall River Police Department about his observations of the masked man. Officer Malek then observed a blue 1989 Ford Thunderbird (MA reg. #613BS) parked on Almond Street just north of Division Street. The driver's door was open, the keys were in the ignition, and the engine was running. While looking inside the car, Officer Malek saw a father's day card containing a picture of Anthony Cabral. Another patrolman approached Officer Malek and told him that 20 minutes earlier the patrolman had seen Cabral driving the blue car a block away from the Mutual gas station.

The police found Cabral in an apartment located at 181 Division Street occupied by John Kazen, who opened the door and stated, "I never robbed nobody." In the bedroom of this apartment, the police found a pocketbook belonging to Rosemary Hobbs.[2] Inside the living room, the police found a black mask, a toy gun, and a spray bottle containing an unknown liquid.

---

[1] Moniz has also described this vehicle as a blue Firebird.

[2] Before entering 181 Division Street, the police observed Cabral at a window in a bedroom where Hobbs' pocketbook was found.

**16**

3

Upon returning to the station, Sergeant Ronald Briand and Officer Malek applied for a warrant to search the apartment.  Execution of the search warrant for the apartment resulted in seizure of Hobbs' wallet and personal papers, a small amount of money found under couch cushions in the living room, and a black shopping bag containing $7,983 found in the bedroom.  Later that day, the police returned the wallet, personal papers, cash, and pocketbook to Ms. Hobbs, and $7,983 to a representative of the Mutual gas station.  Before returning these items, the police photographed the money.

## DEFENDANT'S SHOWING

The defendant has established that the government does not have possession of a wallet, pocketbook, cash, and identification documents taken from Rosemary Hobbs.

## DISCUSSION OF CLAIM

If evidence is lost or destroyed, "[i]t is no longer possible to determine whether the defendant would have obtained any evidence of an exculpatory nature had [it] been made available to him for inspection or examination.  To require the defendant at this stage to prove that the [evidence was] in fact exculpatory would convert the disclosure duty established by Brady [v. Maryland, 373 U.S. 83 (1963)] and its progeny into 'an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.'" Commonwealth v. Olszewski, 401 Mass. 749, 754 (1988), quoting United States v. Bryan, 439 F2d 642, 648 (D.C. Cir. 1971).  If a lost item "could have had fingerprints . . . the [lost item] was potentially exculpatory." Id. at 75.  If "potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action." Id. quoting Commonwealth



4

v. <u>Charles</u>, 397 Mass. 1, 14 (1986). "The court must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant. . . . [The] test does not require the commonwealth to prove good faith or earnest efforts to preserve the evidence." <u>Olszewski</u>, *supra* at 755, quoting <u>Commonwealth</u> v. <u>Willie</u>, 400 Mass. 427, 432 (1987).

I begin my examination of defendant's claim by analyzing the strength of the government's evidence against Anthony Cabral. No witness can directly identify Anthony Cabral as the individual inside of the Mutual gas station who robbed Rosemary Hobbs and took approximately $8,000; this individual was masked. Moniz, however, saw a masked man emerge from the Mutual gas station, enter a blue Thunderbird, whip off his mask, and leave. Moniz followed this man, and oddly enough, saw him enter the home of Moniz and his mother located at 181 Division Street. Again peculiar, is the subsequent presence of this man, later identified as Anthony Cabral, in the apartment of John Kazen, a cousin of Moniz. According to his own statement, Kazen is a "junkie."

Inside Kazen's apartment, the police found cash belonging to the Mutual gas station; the pocketbook, wallet, and cash, belonging to Rosemary Hobbs; a toy gun; a spray bottle containing unknown liquid; and a black mask. None of these items were found on Anthony Cabral. Cabral completely denied involvement in the armed robbery at the Mutual gas station. The blue Thunderbird was found nearby 181 Division Street. Inside of that blue Thunderbird, which had two scraped and repainted letters on the license plate, was a father's day card showing a picture of Anthony Cabral. The front door of that car was open. The keys were in the ignition, and the engine was running.

The Commonwealth's case significantly depends upon the credibility of Charles



5

Moniz.[3]    Moniz described seeing Cabral previously in different places "in my neighborhood," at undefined times at Moniz's gym, and at a wedding. Moniz's identification is supported by Officer Sean Botelho, who observed Anthony Cabral driving the blue Thunderbird near the Mutual gas station at a time shortly before the robbery. Also supporting the government's case is the discovery of the picture of Cabral in the blue Thunderbird.

Nonetheless, this case will depend upon the credibility of Charles Moniz. Moniz will tell the jury that he saw a masked man; that he followed him to Moniz's home, located at 181 Division Street. The police will testify that inside of 181 Division Street they found Anthony Cabral together with John Kazen, the cousin of Charles Moniz.[4] When the police came to Kazen's apartment, Kazen told them that he hadn't committed any robbery, while admitting that he was a "junkie." Inside of Kazen's apartment, the police recovered the missing money taken from Ms. Hobbs in the Mutual gas station; Ms. Hobbs' pocketbook, wallet, identification; the toy gun; the black mask; and the spray bottle containing unknown liquid.

The police found nothing on Anthony Cabral. Cabral denied any involvement in the armed robbery.    Anthony Cabral may suggest that John Kazen committed the armed robbery of the Mutual gas station. This claim has arguable support in the evidence.

The state of the evidence makes the question of whether or not there were

---

[3] Moniz has testified to not knowing the masked man's name. Officer Botelho testified that Moniz told the police Tony Cabral had run into Moniz's house.

[4] Both Charles Moniz and Moniz's mother told the police that Kazen was outside 181 Division Street when Cabral arrived at that address.



6

fingerprints on the pocketbook, wallet, cash, or papers, a material point in the case. Without investigating whether or not latent fingerprints were on these particular items, police returned the belongings to Ms. Hobbs.

As to the question of police culpability, I find no support in the record to find that the police acted deliberately to deprive the defendant of exculpatory evidence by returning the personal belongings to Ms. Hobbs. It would appear that this was a good faith effort to return to Ms. Hobbs items which had been taken from her and which she needed. Nonetheless, the police were negligent in not fingerprinting those particular items. Moreover, the police should have waited a sufficient amount of time to enable the defendant, if he wanted, to examine these items for the purpose of determining independently if there was any fingerprint evidence.

The government's return of evidence to Rosemary Hobbs deprived defendant of potentially exculpatory evidence; namely, fingerprints of a third party. This culpable loss of potentially exculpatory evidence entitles defendant to relief.

Based upon the government's culpability falling within the realm of negligence and the lost evidence assuming the form of a potential but not necessarily an actual loss of exculpatory evidence, I fashion the following remedy: The government's witnesses may testify to discovering the belongings of Ms. Hobbs, but may not testify to observing Anthony Cabral in the bedroom where Hobbs' pocketbook was recovered. This relief preserves defendant's opportunity to argue that Kazen possessed the recovered evidence without unduly depriving the government of its evidence.



7

## ORDER

Based on the foregoing, it is **ORDERED** that the Commonwealth not offer evidence at trial of the police officers' observation of Anthony Cabral in the bedroom where Mrs. Hobbs' pocketbook was found.

<div style="text-align: right">

_____
Robert J. Kane,
Justice of the Superior Court

</div>

DATED:  December 21, 2001



## COMMONWEALTH OF MASSACHUSETTS

**BRISTOL, SS.**

SUPERIOR COURT
NO. 9973020228-13

### COMMONWEALTH

### V.

### ANTHONY CABRAL

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS/SUPPRESS

As previously discussed in a memorandum of decision and order providing relief to defendant for the Commonwealth's loss of potential fingerprint evidence on various items belonging to a Rosemary Hobbs (a clerk at the Mutual gas station), Anthony Cabral has moved for either dismissal or suppression because of the Commonwealth's loss of potentially exculpatory evidence. Besides his complaint about the Commonwealth's loss of the Hobbs evidence, Cabral has also asserted that the Commonwealth either lost or relinquished control of: (1) keys to the 1989 blue Thunderbird; (2) a father's day card allegedly containing Cabral's picture found in the blue Thunderbird; (3) a bag containing the cash taken from the Mutual gas station; (4) turret tapes; and (5) police notes, logs.

Based upon my consideration of the defendant's motion, affidavit and memorandum in support and the Commonwealth's affidavit in opposition, I find that the defendant has failed to prove that the Commonwealth lost the father's day card or the bag containing the cash taken from the Mutual gas station. As to police notes and logs, defendant has not



proven that the court ordered the production of police notes[1] or that the government does not possess the logs concerning this investigation.    As to the turret tapes, the Commonwealth's affidavit convinces me that these tapes were never produced due to equipment failure.

Defendant, however, has proven that the police returned the keys to the owner, but Cabral has not proven the government returned these keys to the owner of the blue Thunderbird before the defendant had an adequate opportunity to request the keys be kept for his inspection and analysis.  Accordingly, this issue warrants a further hearing on the timing of the return of the keys by the police to the owner.[2]

## ORDER

The court denies defendant's motion for suppression or dismissal.  Nonetheless, the defendant shall be entitled to a hearing on when the police returned the keys to the owner of the blue Thunderbird.

Robert J. Kane,
Justice of the Superior Court

DATED: January 3, 2002

---

[1] See Commonwealth v. Borans, 379 Mass. 117, 151-154 (1979) (police notes do not necessarily constitute mandatory discovery materials).

[2] If the defendant proves that the police prematurely returned the keys to the owner, that loss of potentially exculpatory fingerprint evidence may entitle the defendant to a instruction by the court on the government's loss of evidence.  See Commonwealth v. Bowden, 79 Mass. 472, 485-486 (1980); Commonwealth v. Smith, 412 Mass. 823, 838 (1992) (Defendant not entitled to jury instruction on failure of police to conduct certain tests).

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                        SUPERIOR COURT
                                                   #0073CR0228


**************************
COMMONWEALTH,
                    Plaintiff


            VS.                                    MOTION TO DISMISS


ANTHONY CABRAL,
                    Defendant
**************************

    Now comes the defendant and moves that this Honorable Court
dismiss all pending indictments in this matter.

    As grounds therefore the defendant states that the Commonwealth,
through its agents, has introduced false and/or misleading testimony to the
grand jury.  Commonwealth v. Salman 387 Mass. 160, 439 N.E.2d 245.


                                        By his Attorney

                                        Stephen C. Nadeau
                                        190 Rock Street, PO Box 3128
                                        Fall River, MA 02722
                                        (508) 679-2330
                                        BBO#366300



Stephen C. Nac
Attorney at Law
190 ROCK STREET
PO BOX 3128
M. RIVER, MA 027
(508) 679-2330
(508) 673-0146

Stephen C. Nadeau
Attorney at Law
190 ROCK STREET
P.O. BOX 3128
FALL RIVER, MA 02722



COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                              SUPERIOR COURT
                                         #0073CR0228


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
COMMONWEALTH,
                    Plaintiff


            VS.                          AFFIDAVIT IN SUPPORT OF
                                         MOTION TO DISMISS


ANTHONY CABRAL,
                    Defendant
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Stephen C. Nadeau, under oath state as follows:

1.  I am the attorney for the defendant in this matter and I have reviewed the
    Grand Jury Minutes provided to me by the Commonwealth.

2.  The Commonwealth presented one witness before the Grand Jury in this
    matter, Michael Malek, a Fall River Police Officer.

3.  Officer Malek testified that, at approximately 6:00 am on June 21, 1999,
    he was dispatched to the Mutual Gas Station regarding an "unknown
    emergency".

4.  Officer Malek testified that he first spoke with a witness, Charles Moniz,
    and was given information regarding a robbery. Malek further testified
    that Mr. Moniz gave him a description of the assailant and information
    regarding his vehicle and direction of escape. Acting on this information,
    Malek commenced a search for the robber and the vehicle. A short
    distance from the gas station, he came upon a vehicle which he
    investigated. (pages 4 through 6)

5.  Charles Moniz has testified at a hearing on a Motion to Suppress. He
    testified that he witnessed a suspicious individual leave the gas station,
    and he followed that person. However, he unequivocally stated that he did
    not speak to Officer Malek at the scene of the Mutual Gas Station. He
    stated that he did not speak to any officers until he came upon Malek and



Stephen C. Nadeau
Attorney at Law

190 ROCK STREET
PO BOX 3128
FALL RIVER, MA 02722
(508) 679-2330
(508) 673-0146



other officers searching a motor vehicle allegedly owned by the defendant. He did not give the police any information regarding the assailant or the vehicle until after they were investigating the vehicle.

6.  Malek testified that, at the scene of the auto, he again spoke to Charles Moniz. According to Malek, Moniz stated that the man was in a house on Division Street. He testified that Moniz gave him additional information including that the suspect's name was Tony Cabral and that he (Moniz) knew that Cabral had a friend living in that house on Division Street. (page 8)

7.  Moniz testified that, at the time of the police investigation, he knew the defendant by sight. However, he did not know the defendant's name and therefore, obviously, did not give a name to the police. Further, Moniz also lived in the house that was identified, but in a separate apartment. He testified that he had never seen the defendant there before, and did not give that information to the police.

8.  Malek then testified that, as the officers were investigating the house, they encountered Charles Moniz's mother in the yard. According to the testimony, Mrs. Moniz told the police that she had seen a man run up the stairs, and she recognized the man to be Mr. Cabral. (pages 8 to 9)

9.  Mrs. Moniz also testified at the Motion to Suppress. She stated that she was not outside the building and did not speak to police at any time that morning. She also testified that she did not know the defendant by name and had never seen him before.

Signed under the pains and penalties of perjury, this 8th day of January, 2001.

Stephen C. Nadeau

*Stephen C. Nadeau*
~Attorney at Law
190 ROCK STREET
P.O. BOX 3128
- J. RIVER, MA 02722
(08) 679-2330
(508) 673-0146



Commonwealth Of Massachusetts

Bristol, ss
Superior Court
Criminal Dept.

Commonwealth

vs.
DKT. NO. 99-9919

Anthony Cabral,

### Motion to Preserve Evidence

Now comes the Defendant, Anthony Cabral, through Assigned counsel And moves this Honorable Court In the Above captioned matter, to preserve All audio tapes, inparticlar, dispatch transmissions from the Fall River Police of June 21, 1999, between the hours of 6:00 AM And 8:00 AM. Under Superior Court Rules of Evidence.

Respectfully Submitted,

Anthony Cabral, For

Dated: 12-3-99

Attorney Stephen Nadeau,
190 Rock Street
Fall River, MA. 02722

Notary: Marie C Hayden
Ex. Date: February 24, 2000
Print Name Anthony Cabral
Date Notarized December 3, 1999

27

1-13-04

# Commonwealth of Massachusetts

## Appeals Court

Bristol,ss                                          2003 Stting

No.:2003-P-397

---

Commonwealth of Massachusetts
Appellee

V.

Anthony Cabral
Appellant

---

On Appeal from Judgements of

the New Bedford Superior Court

---

Supplemental Moffett's

Brief and Record

**Appendix for the defendant**

**Anthony Cabral**
**P.O. Box 100**
**So. Walpole, Massachusetts-02071**

## TABLE OF CONTENTS

Table of Authorities ......................................I-IV

Issues Presented .........................................1

Statement of Case,
Prior Proceedings ........................................2

Statement of Fcats .......................................2

Argument .................................................2

## ARGUMENT

1.    The motion Judge errored when he abused
      his discretion by not suppressing the
      out-of-court identification, as well as,
      the tainted in-court identification
      violating defendant's 5th,6th, and 14th
      Amendments to the United States Constitution
      and Article 1, 12, 14 of the Massachusetts
      Declaration of Rights which provide even
      greater Due Process Protection ................2


2.    The trial Judge abused his discretion by
      not providing defendant with a fair trial
      on a request for jury instruction prior
      to closing arguments, as well as, the
      TelFaire requested instruction ................20


Conclusion ...............................................23

Record of Appendix .......................................24

-i-

TABLE OF AUTHORIES

Cases:

Biggers v. Tonnessee,
390 U.S. 404 (1968)
.................................................... 8


Califinfornia v. Green,
399 U.S. 149 (1970)
.................................................... 10,16


CF. Douglas v. Alabama,
380 U.S. 415 (1965)
.................................................... 10, 16


Commonwealth v. Barnett,
371 Mass. 89 (1976)
.................................................... 4,11,15


Commonwealth v. bonnoyer,
25 Mass.App.CT. 444 (1988)
.................................................... 10


Commonwealth v. Botelho,
369 Mass 860 (1976)
.................................................... 5,10


Commonwealth v. bowden,
379 Mass. 472 (1980)
.................................................... 22


Commonwealth v. Chase,
372 Mass. 736 (1977)
.................................................... 13


Commonwealth v. Clifford,
374 Mass. 293 (1978)
.................................................... 15


Commonwealth v. Coy,
10 Mass.App.Ct. 367 (1980)
.................................................... 11


Commonwealth v. Daye,
393 Mass. 483 (1984)
.................................................... 11,13


Commonwealth v. Dickerson,
372 Mass. 283 (1977)
.................................................... 4


Commonwealth v. Funderberg,
374 Mass. 577 (1978)
.................................................... 15

Commonwealth v. Geromini,
357 Mass. 61 (1970)
.......................................................... 2

Commonwealth  v. Green,
27 Mass.App.Ct. 762 (1989)
.......................................................... 20

Commonwealth v. Gordon,
6 Mass.App.Ct. 230 (1978)
.......................................................... 10

Commonwealth v. Hallet,
427 Mass. 552 (1998)
.......................................................... 21

Commonwealth v. Hicks,
17 Mass.App.Ct. 574 (1984)
.......................................................... 10

Commonwealth v. Jackson,
377 Mass. 319 (1979)
.......................................................... 3

Commonwealth v. Johnson,
420 Mass. 458 (1995)
.......................................................... 3

Commonwealth v. Jones,
375 Mass. 349 (1978)
.......................................................... 15

Commonwealth v. Kazonis,
356 Mass. 649 (1970)
.......................................................... 2,3,4,9

Commonwealth v. Mackenzie,
413 Mass. 508 (1992)
.......................................................... 10

Commonwealth v. Martin,
417 Mass. 187 (1994)
.......................................................... 11

Commonwealth v. Monteiro,
51 Mass.App.Ct. 552 (2001)
.......................................................... 21

Commonwealth v. Moon,
380 Mass. 751 (1980)
.......................................................... 11

Commonwealth v. Rodriguez,
378 Mass. 296 (1979)
.......................................................... 20,23

Commonwealth v. Seminara,
20 Mass.App.Ct. 789,796 (1985)
.......................................................... 12

Commonwealth v. Simmonds,
386 Mass. 234 (1982)
.......................................................... 4,13

Commonwealth v. Storey,
378 Mass. 312 (1979)
.......................................................... 11

Commonwealth v. Swenson,
368 Mass. 268 (1975)
.......................................................... 12,16

Commonwealth v. Torres,
367 Mass. 737 (1975)
.......................................................... 10

Commonwealth v. Venios,
378 Mass. 24 (1979)
.......................................................... 10

Foster v. Californa,
394 U.S. 441 (1969)
.......................................................... 8

Kirby v. Illinois,
406 U.S. 682 (1972)
.......................................................... 13

Manson v. Brathwaite,
432 U.S. 98 (1977)
.......................................................... 15,19,20

Martin v. Donnely,
391 F.Supp. 1241 (1974)
.......................................................... 10

Neil v. Biggers,
409 U.S. 188 (1972)
.......................................................... 22

People v. Gonzales,
643 N.E.2d. 1295 (1994)
.......................................................... 5

Simmons v. United States,
390 U.S. 377 (1968)
.......................................................... 15

Stovall v. Denno,
388 U.S. 293 (1967)
.......................................................... 3,4,5,15

United States v. Kavanagh,
572 F.2d. 9 (1st cir.1978)
......................................................... 22

United States v. Telfaire,
469 F.2d. 552 (1972)
......................................................... 1,20,21,22

United States v. Wade,
388 U.S. 218 (1967)
......................................................... 3,4,10,15,16


Constitutional Amendments, Statutes, Rules:

......................................................... 2-23

Massachusetts Declaration of Rights, Art. 1st, 12th, 14th

.........................................................

United States Constituution Amendments, 1st, 5th, 6th and 14th

.........................................................


State and federal Laws:

Declaration of Rights,

......................................................... 2,3,4,13,14,20

United  States Constitution,

......................................................... 2,3,4,9,13,14,16

State and Federal law,

......................................................... 9

Rule 24(b),

......................................................... 20

-IV-

Commonwealth of Massachusetts

Appeals Court

Bristol,ss                                              2003 Stting

No. 2003-P-397
———————————

Commonwealth of Massachusetts
**APPELLEE**

V.

Anthony Cabral
**APPELLANT**

On Appeal from Judgement of the Superior Court

Brief and Record Appendix from the Defendant

## Issues Presented

1.   Whether or not Justice Robert J. Kane, abused his
     discretion by not suppressing the out-of-court, and
     the in-court identification viloating defendant's Due
     Process Right to a fair trial.

2.   Whether or not Justice John A. Tierney, abused his
     discretion by not providing defendant with jury
     instructions prior to closing arguments, as well as,
     the Telfaire requested instructions viloated
     defendants rights to a fair trial.

-1-

## Statement of Case
## Prior Proceeings

The statement of case are setout in the previous Moffett Brief.

P.P. 4 Supra.

## Statement of Facts

The commonwealth facts are setout in the previous Moffett Brief.

P.P. 6-31 Supra.

## Argument

1.  The motion Judge errored when he abused his
    discretion by not suppressing the out-of-court
    identification, as well as, the tainted in-court
    identification violating defendant's 5th,6th
    and 14th Amendments to the United States
    Constitution and Article 1,12,14, of the
    Massachusetts Declaration of Rights which
    provide even greater Due Process Protection.

This court must address the denial of a motion to suppress

testimony evidence of the in-court identification, being the pro-

duct of the out-of-court attributing testimony by officer Micheal

Malek; **Commonwealth v. Kazonis**, 356 Mass. 649 (1970); **Commonwealth**

**V. Geromini**, 357 Mass. 61 (1970). (officer testified that he saw

and had first hand knowlegde of the identification of a suspect.)

And not accept the motion   Judge's subidiary Findings of Fact.

Justice Robert J. Kane Finding of Fact appear in appendix.[1] (R.A.1-6).

---

[1]     Record appendix shall be cited herein as (R.A.). Citations to
the trial Transcript shall be cited by volumes and pages. E.g.
(T.TR. 1/300). Citations to the Motion to Suppress evidence hear-
ing are setout in the previous Moffett Brief footnote (1).

## A. The officers Lacked Knowledge
## of the Identity of a Suspect

Justice Robert J. Kane abused his discretion by not supp-ressing the out-of-court as well as the in-court identification vio-lated defendant's rifgts under the 5th,6th,14th amendments to the United States Constitution and Article 1,12,14 of the Massachusetts Declaration of Rights.

The Supreme Judicial Court had held:

It is now a widely recognized tenet of our criminal justice system that "[A] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." **Commonwealth V. Kazonis**, 356 Mass. 649,653 (1970) quoting from **United States V. Wade**, 388 U.S. 218,228. (1967).

The identification that results from the presentation of a single suspect to a witness has been considered particularly suggestive and fraught with the potential for tragic error, leading the Supreme Judi-cial Court to note repeatedly that, "A one-to-one confrontation, whet-her in person or by photograph, is disfavored." **Commonwealth V. Jack-son**, 377 Mass 319,332 (1979). Accord, **Commonwealth V. Johnson**, 420 **Mass. 458. (1995).** (Although one-on-one confrontations are not Per-Se excludable, they are disfavored because of their inherently sugges-tive nature.")

A one-to-one confrontation of a person in custody has been widely condemned by both the Supreme Judicial Court and the United States Supreme Court. **Stovall V. Denno**, 388 U.S. 293 (1967), **Commonwealth V.**

**Barnett**, 371 Mass. 87. (1976); **Commonwealth V. Dickerson**, 372 Mass. 783 (1977).

A confrontation may be so unnecessarily suggestive and conducive to irreparable mistaken identification so as to deny the defendant his due process rights under the Fourteenth Amendment. **United States V. Wade**, 388 U.S. 218 (1967); Stovall V. Denno, 388 U.S. 293, (1967). Here, the defendant was shown to the only witness after he had been placed in custody some fourteen months later, in-court at council table in handcuffs and in a prison uniform, some 25 feet from the only wit-ness, Charles Moniz, this confrontation is not only suggestive it is unnecessarily suggestive.

"[A] major factor contributing to the high incidence of miscarr-iage of justice from mistaken indentification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. " **Commonweath V. Kazonis**, 356 Mass. 649 (1970); **United States V. Wade**, 388 U.S. 218 (1967) this identification violated the defendant's 5th, 6th  14th Amendments to the United States Constitution and Artical 1,12,14 of the Massachu-setts Declaration of rights which provides even greater due process protection.

The Supreme court has held:

That a violation of due process occurs when under the "totality of circumstances", a confrontation procedure  is "unnecessarily sugg-eestive and conducive to irreparable mistaken identification." **Stovall V. Denno**, 388 U.S. 293 (1967); **Commonwealth V. Simmonds**, 386 Mass. 234 (1982).

Here the defendant will show by a preponderence of the evidence

that the procedure was inherently suggestive, and the police proc-
edure was unduly sugestive.

In deciding whether a particular confrontation was unnecessarily
suggestive the judge is to consider the totaity of the circumstances
surrounding it. See **Stovall V., Denno**, 388 U.S. at 302 (1967), **Comm-
onwealth V. Botelho**, 369 Mass at 867. THe only identification in this
case is the in-court identification made by Charles Moniz, to be the
product of the attributing statement, made by thr Fall River Police
Department, Officer Micheal Malek suggestive the identification on a
hunch, the hunch was a father's day card found in a 1989 Blue ford
thunderbird, (2/56);(3/11). Malek believed the name in the card was
in fact that of the perpetrator. The testimony in-court made by Charles
Moniz was inexplicably tainted by officer Malek attributing the name
of the suspect to Charles Moniz without any identification at all at
any time. As well as defendant's illegal arrest. See **People V. Gon-
zales**, 643 N.E.2nd 1295,(Ill.App. 1 Dist.1994).

On September 28, 2000, Officer Micheal Malek testified at a Mo-
tion to suppress evidence hearing that: On June 21, 1999, He was all-
egedly dispatched to go to a Mutual Gas Station for an unknown emer-
gency. Officer Malek stated that, he first met with a witness named
Charles Moniz at the Mutual Gas Station and Charles Moniz allegedly
armed officer Malek with a discription of the suspect. Officer Mich-
eal Malek testified that Charles Moniz stated to him, at the Mutual
Gas Station, that "a male had just robbed the Gas Station," and this
male "was wearing a mask, had a gun and left in a blue thunderbird
heading west down Bradford Ave, and turned down one of the side
streets." (2/50-51) and the description was"...It was a white male,

-5-

wearing a stocking mask, wearing a winter hooded jacket, jeans and
work boots." Id. And as to height and weight "you know, five--Five
ten-ish, somewhere around that, medium build." There Id. However
Charles Moniz testified that "[He] was never at the Mutual Gas Station.
(1/17). Moniz went back down to his house on Division Street. (1/18).
Moniz testified that," [He] did not talk to the police at this time
because they were not there." (1/51). Moniz stated, "...the firsttime
[Moniz] spoke to the police was on Almond Street ...." Id. The re-
cord does not  show a discription of the perpetrator; Moniz did not
provide officers with any information at the Mutual Gas Station at
any time. No record supports of any description.[2] Prior to the in-
court identification Charles Moniz never made no mention of what ap-
pears to be in the one and only opportunity to observe the defendant
at the crime scene. Charles Moniz had not informed any officers at
any time that he witnessed a masked man remove a mask at the Mutual
Gas Station. (1/10);(1/13-14).

Charles Moniz testified on cross examination at the Motion to
Suppress evidence hearing that, he saw the masked man whipp off his
mask, and Moniz turned around in his auto and focused on the indivi-
dual because he had a mask on his face.[3] (1/10);(1/13-14).

---

[2]
    Charles Moniz testimony at trial was, he had not provided off-
icer Micheal Malek with any information at all at the Mutual Gas
Station at any time. (T.Tr. 2/125-134).

[3]
    Charles Moniz testified at trial that,..."[he] seen [the masked
man] very fast. (T.Tr. 2/140-141);(T.Tr. 2/145). Moniz was asked,
and your testimony here today is that before this male got into the
auto, he stopped and pulled off this mask, correct? Moniz testified

The victim's , Rosemary Hobbs and Gloria Reardon testified at the Motion to Suppress evidence hearing,Hobbs testimony was, she "couldn't identify this male unless he had the materials on him." (2/78). And that she"didn't see the male leave the erea". (2/79). Readon's testimony was she "couldn't described the person ," but she testified that, this male "was wearing a winter jacket, it was a bulky winter jacket." (2/85). Reardon was asked, if she could tell the court how this individual left the area, Reardon's testimony was, "All I saw was [him] getting into a car and drive off.[4] (2/86-87).

---

3
that,"...he pulled something over his head, like that. You were bent --you were bent down, and threw it in the car." That's what you did, Yes." (T.Tr. 2/145-146);(T.Tr.2/148-149).Charles Moniz also testif-ied that he "never seen his face again, except for in between Almond and Division Street." he seen this male's face twice, first time is when the male pulled off a mask and got into the auto at the Mutual Gas Station. And the seound time, he walked across the street. Mon-iz never seen this male again; "No I didn't, except for walking up my driveway in my back-yard." and "THat's the last time [Moniz] seen [this male] (T.Tr. 2/152). Moniz never identified the alleged man he seen at the Mutual Gas Station, nor the man he seen walk across the street, "No I didn't, Sir, (2/152-153).

4
    On cross examination at trial Gloria Readon testified that, she made personal observations of the suspect, Reardon did not wit-ness the suspect having a gun. (T.Tr. 2/186);(T.Tr.2/194-195). Rear-don saw this male getting into a automobile and did not at any point witness this male remove he/she mask at any time before leaving the area, and if she did Reardon stated she would have been able to ident-ify this defendant if she witnessed him remove a mask. (Reardon knew the defendant by name), T.Tr. 2/187-189). Reardon witnessed the per-son enter the auto, and leave the area with a mask on the person's face. There. Id.

Micheal Malek had no factual basis of knowlegde about the mask man removing a mask at the Mutual Gas Station.[5] Malek did not know the identification of the perpetrator, No I.D. was made by the one and only witness, Charles Moniz.

The suggestive in-court elements in this identification proce- dure made it all but inevitable that Charles Moniz would identify the defendant whether or not he wasin fact the man. In effect, the po- lice repeatedly said to the witness the name "Tony Cabral" as well as the people in the gym. (1/12). See **Biggers V. Tennessee**, 390 U S. **401,407 (19   )**. This procedure so undermined the reliability of the eyewitness identification as to violate due process. See **Foster V. California**, 394 U.S. at 443 (1969).

In weighing the credibility of Charles Moniz, the court must look at Moniz's other senses of identifing the event as they occurr- ed . Moniz's senses of hearing is in total contradiction to that of the officers. For support See **Footnote(8)**. infra, As well as the vic- tims in this case Rosemary Hobbs, and Gloria Reardon.[6]

And at trial Charles Moniz testified that, Rosemary Hobbs was screaming "she was saying, Help,Help. He's got my purse and all my life is in that bag." when Moniz witnessed the masked person emerge from the Mutual Gas Station. (T.Tr. 2/123).

---

**5**
    Officer Micheal Malek's testimony on cross examination at trial was, Charles Moniz had not provided him with any information about the male removing a mask at any time, "No, he did not tell me that, Sir." (T.Tr.2/237-238).

**6**
    Rosemary Hobbs testified at trial that , she did not state He's got my purse, My lifes in that bag, not until the officers came in.

Once again Charles Moniz is not a credible source, Moniz had fabriccated this statement, he alleged  to have heard, when the mask person emerged from the Mutal Gas Station. The record clearly shows that Moniz heard this information sometime after the suspect left the area, and after the arrest of the defendant, and not at the time of the crime.

The identification of the defendant by eyewitnesses as a suspect in a robbery, conducted in the courtroom during defendant's suppression hearing without defendant knowledge or that of his attorney was a violation of the defendant's rightsunder the  14th Amendment to the United States Contitution.

This identification occured during a request by the defendant's suppression hearing on the robbery charge. Although defendant was then represented by council, neither defendant nor his council was aware that the witnesses were present for the first confrontation in-court or that the witnesses were engaged in the process of identification at the request of the police, (the only purpose for which the defendant was present in the courtroom was to question defendant's rights under Federal and Staes laws,) but not to be put in a high incidence of miscarriage of justice from mistaken identification...in which the prosecution presents the suspect to witnesses for pretrial identification. **Commonwealth v.Kazonis**, **356 Mass. 649 (1970)**; **United States**

---

6

And not as Hobbs emerged from the Mutual Gas Station, Hobbs did not know what was missing until after she went back with an officer that had arrived at the Mutual Gas Station. (T.Tr. 2/70-74).
    Gloria Reardon testified at trial that, Mrs. Hobbs stated, He's got my pocketbook after she took notice that her pocketbook was missing, five, or ten minutes after Hobbs went back into the store, that's when she noticed that her purse was missing, and that's when she made the statement. (T.Tr.2/189-193).

**V. Wade**, 388 U.S. 218 (1967). the identification proceedings cf the witnesses were conducted by the police in secret to cover-up thier unnecsarily suggestive hunch, So as to deny the defendant his due process rights. See **Martin V. Donnelly**, 391 F.Supp. 1241, 1247 (1974). And that admission in evidence of the out-of -court identification by officer's, absence of any idependent evidence of guilt was pre-judicial error. As well as the fabricated in-court identification testimony made by Charles Moniz.

On the basis of these facts the judge should have excluded Charles Moniz's anticipated in-court identification of Cabral as the product of Officer Malek's unfortunate suggestion and as unreliable.

This ruling is a correct application to the facts found of now fam-iliar principles stated in such cases as, **Commonwealth V. Botelho**, **369 Mass. 860 (1976); Commonwealth V. Venios ;378 Mass. 24 (1979);** **Commonwealth V. Gordon, 6 Mass. App. Ct. 230 (1978); Commonwealth V. Hicks, 17 Mass. App. Ct. 574 (1984)** under the judge's finding, the anticipated in-court identification has no source independent of the unnecessary and improper suggestion by the police. **Commonwealth V. Bonnoyer, 25 Mass. App. Ct. 444,448 (1988).** See **Commonwealth V. Mackenzie, 413 Mass. at 508-509 (1992).** (Trooper testimony that were attributable to [defendant] that impicated the defendant in the crime ...were inadmissible.) See also **Douglas V. Alabama**, 380 U.S. 415, **419-421 (1965);Califoria V. Green**, 399 U.S. 149,192-194, **Commonwealth V. Torres**, 367 Mass. at 739-740 n.2 (1975). ..."An out-of-court identification is admissible for probative purposes if the defendant's constitutional right of confrontation is satisfied, which it was not.

-10-

The Supreme Judicial Court had held:

If there are special element of unfairness, indicating a desire on thepart of the police to "Stack the deck" against the defendant, an identification resulting from a confrontation would be inadmissable. **Commonwealth V. Moon**, 380 Mass. 751,756-759 (1980); **Commonwealth V. Storey**, 378 Mass. at 317-318 (1979); **Commonwealth V. Barnett**, 371 Mass. at 93 (1976); **Commonwealth V. Coy,** 10 Mass. App. Ct. 367,372-374 (1984). In **Commonwealth V. Martin**,417 Mass.187,307 (1994). Like the present case Charles Moniz testimony at the Suppression hearing did not establish he extra judicial identification at trial, nor did he sufficientlyadopt it during his testimony. See **Commonwealth V. Daye**, 393 Mass. at 61 (1984). To the contary he testified that he did not provide any officers at the Mutual Gas Station with a description of the defendant at any time nor does the record support the Judge's findings of fact. Officer Malek testified that, while at the search of the auto on Almond Street Charles Moniz provided him with the identification of the perpetrator by his name "Tony CABRAL". (2/59);(3/12-13). And knew this particular male had a friend that lived at his mother's house on the secound floor eastside (2/59);(3/14). This friends name was John Kazen. Id.

However Charles Moniz testimony was in the contradiction to officer Malek's testimony, Charles Moniz stated at the suppression hearing that, he did not know this male's name. (1/23-24));(1/39). And that this male's name did not come to him at any point, Moniz never realized what his name was. ThereId. because Moniz can't remember a persons name after three weeks. (1/55). And the time Moniz knew of this male's name, is when Moniz heard the officer's mention it in  apartment. (1/65-66);(1/32).

And Moniz doesn't know if it was officer Beausoliel or the taller officer that said in the apartment Anthony what are you doing here Id. The tall officer is officer Thaddeus.[7] (1/58)

Charles Moniz also testified that he heard in the apartment, John Kazen say"I never stole anyone" (1/31-32); "I never robbed anybody". [8] (1/65-66) Charles Moniz never ID this male he allegegly seen at the Mutual Gas Station, nor the male he allegegly seen walking across the street. Moniz never looked into the apartment. (1/70) In determing the credibilty, the court must look at officer Michael Malek statement that he seen and talked to Charles Moniz mother in the yard, Delores Moniz. For support see previous Moffett Brief, P.P. 45-46 Supra. Thus, there [was] a dispute not only as to [the] accuracy of the pretrial identification, but also as to whether the identification was in fact made, [and therefore] the evidential value of the prior identification [was] almost completely dissipated. quoting Commonwealth v. Swenson, 368 Mass. 268,273, n.3, (1975).

In Daye, Id.at 61, supra, Where the extrajudicial identification is established not by the identifying witness but by a person who observed the identification. The probative worth is outweighed by "the hazard of error or falsity in the reporting officer." Michael Malek testimony had been shown to be false on it's face. Commonwealth v. Mendrala, 20 Mass.App.Ct. 398, 400-401 (1985); Commonwealth v. Seminara, 20 Mass.App.Ct. 789,796 (1985).

Furthermore, the Supreme Judicial Court stated: that a party

---

[7]    The record is clear Charles Moniz is not a creditable source. Moniz testimony at trial was, he heard the tall officer mention in the apartment, say, Anthony what are you doing here. (like nothing happened at all) (T.Tr. 1/65) Officer Tosior testimony was, he did not say, Anthony what are you doing here in the apartment. (T.Tr. 3/42-44) Officer Alan Beausoleil testimony was, he did not, no, say Anthony what are you doing here. (T.Tr. 3/30).

[8]    Officer Tosior testimony was, he did not hear John Kazen say, I never hurt anybody, I never robbed anybody, and officer Tosior was present upon entrance. (T.Tr. 3/43-44).

"may not circumvent limitations on the probative use of prior
inconsistent statements by seeking to introduce a prior
inconsistent statemnet as a statement of identification uunder
[the rule] ...governing probative use of extrajudicial
identification." Commonwealt v. Daye, 393 Mass. at 61 n.9 (1984).
Thus, a police officer's attributingto a witness of a positive
identification denied by the witness at trial is not admissible
to prove the identification. Id.

There is no corroboration of Charles Moniz in-court
identification and the totality of the circumstances cries
out for a finding that said identification is tainted and
unreliable.

The defendant's higher standard  of miscarriage of justice
which deals with disregards or denies a party's essential rights
(due process).

The defendant's fundamental priniples violated the United
States Constitution 5th, 6th, 14th Amendments and Articles 1,12
and 14 of the Massachusetts Declaration of rights, not conforming
to standards of fundamental fairness.  The defendant's fundamental
rights of due process to be identified prior to the one -on-one
confrontation that was due, prior to the issuing complaint,
indictments and before arrest. See Commonwealth v Simmonds,
386 Mass. 234,239 (1982); Kirby v. Illinois, 406 U.S. 682, 690-
691 (1972); Commonwealth v. Chase, 372 Mass. 736,743 (1977).

Charles Moniz only identification of the defendant was
fourteen months after the arrest, complaint and indictment was
issued and handed down.

-13-

Defendant was in court with counsel in handcuffs at counsel table in a prisoners uniform, some 25 feet from Charles Moniz, (the witness). The fundamental fairness investigative process, whether before or after, the initiation of formal proceedings; which defendant did not have, before or after, his arrest. Officer's had not conducted at any time any indentification of the defendant as the perpatrator.

Fundamental right mandatory compulsory, not a matter of discretion [it's] required to be done or performed. This is a fundamental error of the court not suppressing Charles Moniz in-court identification, there is not a scorce independent indentifying the perpatrator of a crime prior to the in-court identification by Charles Moniz. The "origin" indentification of the perpatrator was the officers testimony/report information attributed identification of that of the defendant. That goes to the foundation of this case or derives this litigant of due process judicial error of such severity that it will be reviewed on appeal even if it is not specifically cited as grounds for appeal.

The court must look at the violation of fundamental rights (due process) and substantive of due process in the very essence of the 5th, 6th, and 14th amendants to the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of rights is the concept that the government may not act arbitrarily or capriciously in making interpretating or enforcing the law.

-14-

The defendant as entitled to both substantive due process and procedural due process.  It is undeniable that a defendant has a due process right to indentification procedures meeting a certain basic standard of fairness.  Stovall v. Dennoi, 388 U.S. 293,301 (1967); Simmons v. United States, 390 U.S. 377,384 (1968); Commonwealth v. Clifford, 374 Mass. 293,303-304 (1978). This right would mean little [i]f it did not carry with it the right to be iinformed of the details of any out-of-court identification, even if it were not used at trial.  this is because the prosecution could then rely on a seemingly unimpeachable in-court identification, with the defendant sitting conspicously at the defense table or in the docket, without even revealing to defense counsel or the jury that perhaps egregiously suggestive procedures which had caused the defendant to be linked to the crime in the first place.

The suggestiveness of such pretrail procedures and their impact on the eyewitnesses perceptions of the defendant, may be the defendant's sole means of attack on what otherwise appears to be unshakable in-court identification. United States v. Wade, 388 U.S. 218,240-241 (1967); Manson v. Brathwaite, 432 U.S. 98, 113 n.14 (1977); Commonwealth v. Jones, 375 Mass. 349,355 (1978); Commonwealth v. Funderberg, 374 Mass. 577,582 (9178); Comonwealth v. Barnett, 371 Mass. 87,94 (1976), cert. denied, 429 U.S. 1049 (1977).

In the present case there is no testimony by any witness and there is no statement by any person in the record from the victims, Charles moniz or Delores Moniz, identifying the

-15-

defendant prior to the suppression hearing some fourteen months later from arrest in-court.

The right under the sixth amendant to the united States Constitution had been violated by not allowing defendant to confront the witnesses against him; Commonwealth v. Swenson, 368 Mass. at 272-273, n.3, (the constitutional right to confront one's accusers may be implicated in this situation.) CF. Douglas v. Alabama, 380 U.S. 415,419-420 (9165); California v. Green, 399 U.S. 149,192-194 (1970).

The judge's erroneous admission of the testimony did in the circumstances here created a substantial likelihood of a miscarriage of justice.  Defendant was entitled to a required finding of not guilty.[9]

**Independant Source:**

The majority cites United states v. Wade, 388 U.S. 218 (1967) and the six factors which should be analyized in determining if an  identification is independant.  A discussion of the applicability of these factors to the facts of this case, contrary to the majority analysis, in fact inescapability leads to a conclusion that the in-court indentification is not

---

[9]
    The defendant's finding's of not guilty appear in the record appendix (R.A.7-9)

-16-

independant of the impermissibility suggestive identification
made by police officers in this case:

1) **The witness opportunity to observe the criminal act:**

On cross examination at the motion to supress evidence
hearing Charles moniz testified that, he saw the maked
man whip off his mask, and he turned his body around in
the auto and focused on thiis individual because he had
a mask on his face. (1/10)  [for support see footnote
(3), supra]

No one corroborated Charles Moniz, observations, and the
victims Rosemary Hobbs and Gloria Readon, whom was outside
the Mutual Gas Station at the time the suspect entered
the auto.  Hobb's testimony was, she couldn't identify this
male unless he had the materials on him. (2/78) and she
didn't see the male leave the area. (2/79)

Readon's testimony was, she couldn't describe the person
but she testified that this male was wearing a winter
jacket, it was a bulky winter jacket. (2/85)  Readon was
asked if she could tell the court how this individual
left the area.  readon's testimony was "all I saw was
[him] getting into a car and drive off" (2/86-87) [For
support see footnote (3), supra]

Officer Malek testified at trail that Charles Moniz did
not tell him that a male had removed a mask at any time.
[for support see footnote (5), supra

-17-

(2)   The discrepancy, if any, between the suspect and
      the witness' description:

The facts of this case creates a scenario more lacking

than a mere discrepancy in the discription of defendant.

Charles Moniz testified that he never identified the

defendant at any time and he did not inform the police

that the offender was someone he knew from the neighborhood;

nor had officer Malek any knowledge that Moniz seen this

offender at a wedding.  Charles moniz did not give a

physical descripton of offender.  Moniz never provided

officer Malek with any information at the matual gas

station. (1/17-18); (1/51), nor does the record show

that Moniz provided officer Malek with any information [for

support see footnote (1); (4); (5); supra]

Charles Moniz never provided any officer with the name

of the offender at any time. (1/23-24); (1/39); (1/55).

Moniz alleged that he heard the officer mention the name

of the defendant. (1/65)  That's the first time Moniz

claims to know of the name.  Id.  However, no one

corroborated Charles Moniz statement.  [For support see

footnote (4), supra]

Charles Moniz, did not, at any time give officer Malek

any information about a male at the Mutual Gas Station,

had removed his/her mask at said location, nor at any

location for that matter.  [For support see footnote

(5), supra]

-18-

(3)    **Any identification made by other witnesses before the in-court Id:**

In this case there was no identification by anyone at

any time before the unnecessary suggestive identification

in-court.

(4)    **The identification, if any, of defendant by name before the in-court Id:**

Charles Moniz had not identified defendant by name prior

to the in-court Id.

(5)    **The failure to identify defendant on prior occasion:**

Charles Moniz admits that he did not recognize this male

by name at the time of the robbery or thereafter.  Moniz

testified that he first heard the name mentioned in the

apartment.

Charles Moniz testified that he did not Id the suspect at

any time. [For support see footnote (3), supra]

(6)    **The length of time between the alleged crime and the in-court identification:**

Fourteen months elapsed from the date of the crime/arrest

to the date of the in-court identification.  None of these

factors supports the conclusion that the in-court

identification is independant and purged of the taint

of the in-court identification.

Defendant need not repeat himself as to the reliability

test of <u>Brathwaite</u>, the defendant had clearly demonstrated

that the identification was unnecessary suggestive, and

the evidence of the identification should be per se excluded under the totality of the circumstances as unreliable, and create a substantial likelihood of irreparable misidentification. Weighing this currupting effect of the suggestive identification itself does not satisfy the Brathwaite test as required of Article 12, supra.

2. **The trial Judge abused his discretion by not providing defendant with a fair trial on request for jury instructions prior to closing arguments, as well as, the Telfaire requested instruction.**

Massachusetts Rule of criminal procedure 24(b) requirements of said rule is mandatory. Commonwealth v. Green, 27 Mass.App.Ct. 762, 771 (1989). The defense "is entitled to know the Judge's treatment of each proposed request in order that counsel may frame their closing arguments accordingly" Id.

The trial Judge abused his discretion by not providing defendant with a fair trial on a request for jury instructions prior to closing arguments. [see (T.Tr. 3/84-105)] As well as the omission of that portion found in Telfaire requested instruction. There Id.

The defendant requests that the court give the standard Telfaire instruction which in Massachusetts is found in Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (1979). First the defendant objects to the omission of that portion of the model charge which provides as follows:

-20-

> "You may also take into account that an
> identification made by picking the defendant
> out of a group of similar individuals is
> generally more reliable than one which results
> from the presentation of the defendant alone to
> the witness."

In this case Officer Malek attributed the identification
of the perpetrator to the only eyewitness in the case, Charles
Moniz. The defendant was entitled to this portion of the
pattern instruction in Telfaire as requested. As well as
the omissions that: "you may take into account both the
strenth of the identification, and the circumstances under
which the identification was made."

"If the identification by the witness may have been
influenced by the circumstance under which the defendant was
presented to him for identification, you should scrutinize
the identification with great care."

"You may take into account any occasions in which the
witness failed to make an identification of defendant or made
an identification that was inconsistent with his identification
at trial. In the case at bar the Judge errored in his omission
instruction of the Telfaire request, in which there were
discrepancies and inconsistencies between and among descriptions
given by other witnesses in their trial and prior testimony.
[For support see argument 1, supra,] Commonwealth v. Monteiro,
51 Mass.App.Ct. 552, 558-559 (2001). A one-on-one identification is
more troublesome particularly in the light of Commonwealth v. Hallet, 427
Mass. at 556-558 (1998), like the present case (there was no preserved
objection, and the court concluded the omission ran a substantial risk of
a miscarriage of justice).

-21-

The First Circuit Court of appeals has also indicated that a requested charge on the possibility of mistaken identification should be given in a case where "[t]he trustworthiness of the eyewitness identification was an important factual issue for the jury to resolve." United States v. Kavanagh, 572 F.2d. 9 (1st Cir. 1978); Commonwealth v. Bowden, 379 Mass. 472 (1980).

The defendant was clearly warranted this model charge of Telfaire, when the evidence demonstrates a danger of misidentification.

In this case at bar the police never obtained a pretrial statement/identification from Charles Moniz describing the male whom he allegely seen at the Mutual Gas Station or the male walking accross the street.

Thus, the jury had no evidence that permitted them to compare the defendant's appearance against what Moniz told the police. Neil v. Biggers, 409 U.S. 188, 199 (1972).

The Supreme Court has deemphasised the role of deterring police misconduct in the analysis of suggestive confrontations to fucus more on nonreleliability as the sustification for the exclusion of an identification that may have been influenced by a suggestive confrontation Id.

Where identification evidence had not been suppressed, defendant was entitled not only to inform jury of procedures uused which might have been somewhat suggestive but also to establish existence of fairer procedures which police chose to ignore. Defendant attempted a number of times during trial

-22-

to bring the pretrial identification procedures employed by the police to the juries attention. Here in the present case the evidence cannot be plausibly characterized as overwhelming because the  chief evidence of the defendant's guilt lay almost exclusively in Charles Moniz, the only witness with no corroborated, independent evidence, and contrary testimony by the officers attributing the identification of the defendant as the perpetrator. We cannot be confident that the conclusion would have been the same had the jury been sufficiently instructed on identification.  Including the possibility of good faith but mistaken identification.  The omission of any instruction on the trial's disputed issue tended "to submerge one of the crucial issues in this case, if not to rob the defendant of his defense entirely." Commonwealth v. Rodriguez, 378 Mass. at 302.

Finally, the judge's failure to provide the omission in the identification instructions warrants a new trial because the error was prejudicial.  [For support see Sandra P. Wysocki Capplis, BBO# 638177, Attorney at Law, and consolidate her arguments to this argument].


## CONCLUSION

Based on the foregoing reasons, this Court must suppress Charles Moniz, in-court identification testimony, as well as, all out of Court attributed identification testimony made by all officers as unreliable, and order a new trial.

Respectfully Submitted,

Dated: December 5, 2003                    Anthony Cabral, Pro-se
                                           MCI-Cedar Junction
                                           P.O. Box 100
                                           So. Walpole, MA  02071

-23-

## <u>RECORD APPENDIX</u>

1.   Motion to suppress identification, findings
     of facts......................................... 1-6

2.   Motion for required finding of not guilty........ 7-9

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                         SUPERIOR COURT
                                                    NO. 9973020228-13

> BRISTOL, SS SUPERIOR COURT
> FILED
>
> MARC J. ........ OS, ESQ.
> CLERK/MAGISTRATE

COMMONWEALTH

V.

ANTHONY CABRAL

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION TO SUPPRESS
## IN-COURT IDENTIFICATION

On July 15, 1999, the Commonwealth indicted Anthony Cabral for armed robbery while masked.  Defendant, defending this action *pro se*, has now presented a motion to suppress any in-court identification by Charles Moniz.  This motion states as its grounds for relief that the information provided was not under oath and that a previous in-court identification was unnecessarily suggestive.

### GOVERNMENT'S EVIDENCE

On June 21, 1999, a masked man entered the Mutual gas station located at 339 Broadway, Fall River; sprayed liquid on the clerk, Rosemary Hobbs; and took $8,000 in cash and the pocketbook of Ms Hobbs.   A video camera recorded the robbery.

Outside the Mutual gas station, an individual named Charles Moniz saw a masked man carrying a gun and pocketbook emerge from the Mutual gas station, run into a car, and once inside the car "whip off his mask."  Moniz recognized that man as an individual whom he knew and had attended a wedding with.  Moniz followed the individual, who was

2

driving a blue Thunderbird.[1]  At some point, Moniz lost sight of the blue Thunderbird.

Eventually, Moniz arrived at Almond Street and saw the blue Thunderbird pulled over to

the left-hand side and observed a male bent over in the car. After making this observation,

Moniz went down Almond Street, went up William Street, and turned up Beach Street. At

the top of Beach Street, Moniz saw the male (Cabral) crossing the street going toward

Moniz's house, located at 181 Division Street.

Moniz walked two and one-half blocks to the Mutual gas station and found Officer

Maleck. Moniz told Maleck about his observations. Maleck then left and found the blue

1989 Ford Thunderbird (Mass. Reg. No. 613BS) with its driver's door open, the keys in the

ignition, and engine running.[2]

Moniz headed back to his home, parked his car, went in, and went upstairs to his

apartment.  In the apartment he asked his mother whether anyone had come in.  His

mother told him that someone had come in and said, "I'm sorry.  I have the wrong

apartment." That individual left.  Moniz's mother heard that party go next door and heard

the door to her nephew's apartment open.  Moniz then left and told the police Cabral was

at 181 Division Street.

The police found Cabral in the apartment located at 181 Division Street occupied

by John Kazen, who opened the door and stated, "I never robbed nobody." In the bedroom

of this apartment, the police found a pocketbook belonging to Rosemary Hobbs. Inside the

living room, the police found a black mask, a toy gun, and a spray bottle containing an

---

[1]  Moniz has also described this vehicle as a blue Firebird.

[2]  The Fall River police report discloses this sequence of events.  This sequence
conflicts with the sequence presented by Moniz at the suppression hearing.

3

unknown liquid.

The police returned to the station and applied for a warrant to search the apartment. Execution of the warrant resulted in seizure of Hobbs' wallet and personal papers, and a small amount of money under couch cushions in the living room, and a black shopping bag containing $7,983. in the bedroom.

## PRIOR IN-COURT IDENTIFICATION

In his memorandum of law supporting his motion to suppress, Cabral asserts that "the only identification here was the one-to-one in-court shown to the alleged eye witness after he had been in custody some 14 months later at counsel table, in handcuffs and in a prison uniform, some 25 feet from Charles Moniz. . . ."[3]

The record reveals an in-court identification of Cabral by Moniz.[4]  The record also reveals that prior to the identification in court, the following exchange occurred  between the judge and Moniz:

> The Court: Let's go a little bit more slower.
>
> Take it easy.  I'm not sure I understood.  Did you recognize him; whoever that man was, did you recognize him - - wait for me, now.  Did you recognize him because you had seen him before or are you telling us you just recognized him in the courtroom now?
>
> The Witness: I recognized him before.  I have been in his presence, not like friendship or anything, but I have seen him in different places in my neighborhood and stuff.

---

[3] This statement appears in the memorandum but not in the affidavit submitted by defendant.

[4] That hearing concerned defendant's motion to suppress evidence derived directly and indirectly from warrantless searches.

4

## DISCUSSION

If, following a reliable identification of a defendant, there are suggestive circumstances "confirming the correctness [of the] identification, no problem of admissibility will arise, either under the independent source test . . . or the reliability test . . . so long as the initial identification and its later repetitions are found to be based on the witness' observations at the scene of the crime." Commonwealth v. Bonnoyer, 25 Mass. App. Ct. 444, 451 (1988).

Even if this encounter between Moniz and Cabral at a suppression of evidence hearing was suggestive, it may not have been unnecessarily suggestive.[5] Cabral's presence at that hearing in which evidence was offered was necessary. Thus, any confrontation of the defendant by Moniz occurred during the defendant's essential confrontation of a witness against him.

Even if this confrontation was both suggestive and unnecessary, the independent source rule authorizes the admissibility of any later in-court identification by Moniz of Cabral. The independent source rule requires clear and convincing evidence that any in-court identification will be based upon an independent source. Commonwealth v. Johnson, 420 Mass. 458, 463 (1995), quoting Commonwealth v. Botelho, 369 Mass. 860, 868 (1976). In assaying the Commonwealth's satisfaction of that burden, a court considers the following factors:

> (1) the extent of the witness' opportunity to observe the
>     defendant at the time of the crime;
> (2) prior errors, if any, in description or;
> (3) in identifying another person or;

---

[5] The transcript of the hearing does not reveal particulars of the confrontation.

5

(4) in failing to identify the defendant;
(5) the receipt of other suggestions; and
(6) the lapse of time between the crime and the identification.

*Id.* at 464.

In the instant case, Moniz told the police that the masked man was inside of John Kazen's apartment. The only individual inside of Kazen's apartment besides Kazen was Anthony Cabral.

Analysis of the independent source factors reveals the following findings:

1. When Moniz saw the masked man take off the mask, that individual was approximately 15 feet behind Moniz. Moniz had turned around and focused on the individual "because he had a mask . . . ." At that time, Moniz recognized the masked man as someone Moniz was familiar with. Moniz again saw the masked man walking toward 181 Division Street. At that time, Moniz was half a city block away.

2. The record does not reveal any errors in any physical description given by Moniz. Nonetheless, Moniz has stated that he did not tell the police that the masked man was Anthony Cabral. A Fall River police officer has testified that Moniz referred to the masked man as Anthony Cabral.

3. The record does not reveal any misidentification of another person by Moniz.

4. The record does not reveal any failure by Moniz to identify the defendant.

5. The record does not reveal the receipt by Moniz of any suggestions before the initial identification. After Cabral's arrest, Moniz, however, was informed by undisclosed individuals that Cabral used to go to the gym that Moniz went to. Despite these suggestions, Moniz stated that he does not remember seeing Cabral at the gym.

6. Less than an hour passed between Moniz's observations and his identification

6

to the police.

Analysis of those independent source factors leads me to conclude that the Commonwealth has clear and convincing evidence that any subsequent in-court identification by Moniz of the defendant will be based upon a reliable independent source.

### ORDER

Based on the foregoing, I **DENY** defendant's motion to suppress any in-court identification.

_____
Robert J. Kane,
Justice of the Superior Court

DATED: January 3, 2002

Commonwealth of Massachusetts

Bristol    ss.    Superior Court
New Bedford, Ma.

Commonwealth
v.    DKt.#9973CR0228,A,B.
Anthony Cabral

## Motion For Required
## Finding of not Guilty

Now come the defendant
And moves that this
Honorable Court, Dismiss
indictments # 9973CR0228, A-B.

The evidence presented
was insufficient as a
matter of law to sustain
a conviction on the charge
offenses. Beck v. Ohio 379
U.S. 89 (1964).
The Commonwealth Failed to
prove it's case.

1.) THE COMMONWEALTH EYE-
WITNESS WAS NOT CREDIBLE
NOT RELIABLE AS A
MATTER OF LAW, NOR WAS
THERE A SUFFICIENT
IDENTIFICATION OF THE
ASSAILANT, NOR WAS THERE
PROBABLE CAUSE TO ARREST
THIS DEFENDANT AS A
MATTER OF LAW. Wong Sun
V. United States 371 U.S. 471 (1963)

2.) THE COMMONWEALTH DID
NOT PROVE THE ELEMENTS
OF THE CHARGED OFFENSE.

3.) THE COMMONWEALTH KNOW-
INGLY INTENTIONALLY PRESENT-
ED FALSE, PERJURED
EVIDENCE, WHICH INFLUENCED
THE JURY, WHICH RETAINS
ILLEGAL, VIOLATING THE 14th.
AMENDMENT DUE PROCESS
AND PREJUDICE DEFENDANT.
Mooney V. Holohan 294 U.S.
103 (1935)

3 of 3

4.) The Commonwealth evidence is entirely circumstantial and supports two inconsistent proposition. the Commonwealth cannot prove its case and did not by a matter of law.

5.) The Commonwealth's illegal use inadmissible evidence not under prior oath which influenced the jury which prejudice defendant Aguilar v. Texas 378 U.S. 108 (1964).

Respectfully submitted:

Anthony Cabral

Anthony Cabral  Pro-se
P.C.C.F. 26 long Pond Rd.
Plymouth, Mass, 02360

Date: December 31, 2001

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

BRISTOL, ss                                    NO: 2003-P-397

COMMONWEALTH OF MASSACHUSETTS
APPELLEE,

v.

ANTHONY CABRAL
DEFENDANT/APPELLANT

ON APPEAL FROM JUDGMENTS
OF THE NEW BEDFORD SUPERIOR COURT

SUPPLEMENTAL MOFFETT'S
BRIEF AND APPENDIX FROM THE DEFENDANT/APPELLANT

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

BRISTOL, ss.                                    2004 SITTING
                        03-P-0397

COMMONWEALTH

V.

ANTHONY CABRAL

ON APPEAL FROM A JUDGMENT OF
THE BRISTOL SUPERIOR COURT

COMMONWEALTH'S BRIEF AND RECORD APPENDIX

Respectfully submitted,
PAUL F. WALSH, JR.
District Attorney

David B. Mark
Assistant District Attorney
Bristol District
P.O. Box 973
888 Purchase Street
New Bedford, MA  02740
(508) 997-0711
BBO # 320510

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................... i

ISSUES PRESENTED ........................................... 1

STATEMENT OF THE CASE ...................................... 2

STATEMENT OF THE FACTS ..................................... 6

SUMMARY OF THE ARGUMENT ................................... 16

ARGUMENT .................................................. 21

I.   THE MOTION JUDGE PROPERLY ALLOWED THE DEFENDANT'S
     MOTION TO REPRESENT HIMSELF AT TRIAL ................ 21

II.  THE DEFENDANT WAS IN NO WAY PREJUDICED BY THE
     TRIAL JUDGE'S FAILURE TO RULE ON HIS REQUESTS FOR
     INSTRUCTIONS PRIOR TO HIS CLOSING ARGUMENT .......... 28

III. THE DEFENDANT'S SEVERAL CLAIMS OF ERROR WITH
     RESPECT TO THE DENIAL OF HIS PRETRIAL MOTIONS ARE
     ALL MERITLESS ....................................... 30

     A.   The Motion Judge Correctly Denied the
          Defendant's Motion to Suppress items seized
          from the Blue Thunderbird on Almond Street
          and Jon Kazen's Division Street Apartment ...... 31

          1.   The Police Had Ample Justification to
               Search the Blue Thunderbird ............... 32

          2.   The Officers' Warrantless Entry Into
               Kazen's Apartment Was Justified By
               Kazen's Consent to the Entry, and By
               Probable Cause and Exigent Circumstances ... 36

          3.   The police lawfully seized fruits and
               instrumentalities of the crime in plain
               view ...................................... 38

     B.   Counsel Was Not Ineffective For Failing To
          Pursue A Meritless Appeal Of The Denial Of
          The Defendant's Motion To Suppress ............. 39

     C.   The Motion Judge, Rejecting The Defendant's
          Claim That The Indictment Had Been Secured
          On The Basis Of False Testimony, Correctly
          Denied The Defendant's Motion To Dismiss The
          Indictment .................................... 40

D.  The Remedy Fashioned By The Motion Judge Who Ruled On the Defendant's Second Lost Evidence Claim Was As Much As He Was Entitled To ..................................... 41

E.  The Motion Judge Correctly Denied The Defendant's Motions To Suppress Moniz's Identification Of Him As The Mutual Station Robber ......................................... 45

F.  The Trial Judge's Instructions To The Jury On Identification Were Unexceptionable ......... 48

CONCLUSION ............................................. 50

ADDENDUM ............................................. A 1

## TABLE OF AUTHORITIES

Cases

Commonwealth v. A Juvenile (No.2),
    411 Mass. 157 (1991) .................................. 34

Commonwealth v. Allen,
    28 Mass. App. Ct. 589 (1990) ........................ 39

Commonwealth v. Andrade,
    422 Mass. 236 (1996) ............................... 49

Commonwealth v. Ayles,
    31 Mass. App. Ct. 514 (1991) ....................... 48

Commonwealth v. Bonnoyer,
    25 Mass. App. Ct. 444 (1988) ....................... 48

Commonwealth v. Bowden,
    379 Mass. 472 (1980) ............................... 39

Commonwealth v. Burbank,
    27 Mass. App. Ct. 97 (1989) ..................... 26,28

Commonwealth v. Burns,
    43 Mass. App. Ct. 263 (1997) ....................... 45

Commonwealth v. Day,
    387 Mass. 915 (1983) ............................... 35

Commonwealth v. Dinkins,
    440 Mass. 715 (2004) ............................... 42

Commonwealth v. Dyous,
    436 Mass. 719 (2002) ............................... 28

Commonwealth v. Frate,
    405 Mass. 52 (1989) ................................ 49

Commonwealth v. Jackson,
    419 Mass. 716 (1995) ............................... 29

Commonwealth v. Johnson,
    420 Mass. 458 (1995) ............................ 27,46

Commonwealth v. Johnson,
    424 Mass. 338 (1997) ............................ 23,27

Commonwealth v. Hawkins,
    17 Mass. App. Ct. 1041 (1984) ........................ 27

Commonwealth v. Levesque,
    436 Mass. 443 (2002) ................................ 41

Commonwealth v. Martin,
    425 Mass. 718 (1997) ........................... 22,23,25

Commonwealth v. McJunkin,
    11 Mass. App. Ct. 609 (1981) ........................ 28

Commonwealth v. Moffett,
    383 Mass. 201 (1981) ................................ 30

Commonwealth v. Molina,
    439 Mass. 206 (2003) ................................ 37

Commonwealth v. O'Brien,
    432 Mass. 578 (2000) ................................ 30

Commonwealth v. Ortega,
    441 Mass. 170 (2004) ................................ 40

Commonwealth v. Pettingel,
    10 Mass. App. Ct. 916 (1980) ..................... 28,29

Commonwealth v. Sanna,
    424 Mass. 92 (1997) ................................ 38

Commonwealth v. Silva,
    440 Mass. 772 (2004) ................................ 35

Commonwealth v. Tart,
    408 Mass. 249 (1990) ................................ 29

Commonwealth v. Than,
    59 Mass. App. Ct. 410 (2003) ........................ 44

Commonwealth v. Viriyahiranpaiboon,
    412 Mass. 224 (1992) ................................ 39

Commonwealth v. Voisine,
    414 Mass. 772 (1993) ................................ 37

Commonwealth v. Walker,
    14 Mass. App. Ct. 544 (1982) ........................ 45

Commonwealth v. Waters,
    420 Mass. 276 (1995) ................................. 45

Commonwealth v. Williams,
    439 Mass. 678 (2003) ................................. 29

United States v. Hemmer,
    729 F.2d 10 (1ˢᵗ Cir. 1984) .......................... 44

United States v. Rodriguez-Morales
    929 F.2d 780 (1ˢᵗ Cir. 1991) ......................... 35

United States v. Telfaire,
    469 F.2d 552 (D.C. Cir. 1972) .................... 48,49

Statutes and Other Authorities

G.L. c. 90, §13 ......................................... 34

Mass. R. Crim. P. 24(b) ............................. 17,28

## ISSUES PRESENTED

I.  Where the defendant sought to dismiss each of his appointed attorneys and moved to be allowed to represent himself, and where the record abundantly established that the defendant knew what his self-representation would entail, did the motion judge properly allow the defendant's motion to represent himself at trial?

II.  Where the defendant was not disadvantaged, did the trial judge commit reversible error by ruling on the requests for instructions only after closing argument?

III(A).  Where probable cause and exigent circumstances justified the police entry into the blue Thunderbird, and probable cause, exigent circumstances, and consent justified the police entry into Kazen's apartment, did the motion judge correctly deny the defendant's motion to suppress?

III(B).  Was counsel ineffective for failing to pursue a meritless appeal of the denial of the defendant's motion to suppress?

III(C).  Where the defendant failed to show that the single grand jury witness had deliberately presented false testimony to the grand jury to secure the indictment, did the motion judge correctly deny the defendant's motion to dismiss the indictment?

III(D).  Where at best the potential probative value to the defendant of the lost evidence was low, was the motion judge correct in granting the defendant only limited relief?

III(E).  Where the record established that a witness's identification of the defendant was untainted by his exposure to the defendant at the hearing on the defendant's motion to suppress, did the motion judge correctly deny the defendant's motion to suppress the identification?

III(F).  Where the trial judge charged extensively on identification, did he err in not including in his charge certain passages from the model instruction in

<u>United States</u> v. <u>Telfaire</u> that largely addressed circumstances not present in this case?

<div align="center"><b>STATEMENT OF THE CASE</b></div>

**A.    <u>Procedural History Pertaining to the pre-Trial Motions and Trial</u>.**

On July 15, 1999, a Bristol County Grand Jury handed up a two count indictment charging the defendant with masked armed robbery (R.A.1).

On June 27, 2000, the defendant filed a motion to dismiss the indictment on the grounds that the Commonwealth lost or destroyed potentially exculpatory evidence (R.A.2,15). On July 11, 2000, the court, Nickerson, J., denied this motion (R.A.2,15; D.Br. Addendum A).

On August 21, 2000, the defendant filed a motion to suppress items seized from the car he drove on the morning of the robbery and the apartment where he went after the robbery (R.A.2,18). After conducting an evidentiary hearing on this motion on August 21, September 28 and 29, and November 10, the court, Toomey, J., on December 18, denied it (R.A.4,18). On January 9, 2001, the defendant filed a second motion to dismiss the indictment, this one on the ground that the Commonwealth had presented false or misleading testimony to the grand jury (R.A.4,30). On March 13,

2001, the court, McLaughlin, J., denied this motion
(R.A.4,30; D.Br. Addendum C).

On August 27, 2001, the defendant filed his
"Motion For Hearing Pursuant To Franks VS. Delaware"
(R.A.5,62). On August 30, 2001, the motion judge,
Nonnie S. Burnes, denied this motion (R.A.6,62).

On December 3, 2001, the defendant filed, pro se,
his "Motion "to Suppress the In-Court Identification"
(R.A.7,62-63). On December 12, 2001, he filed his
"Supplemental Motion to Suppress Identification"
(R.A.7,95-96). On January 3, 2002, the motion judge,
Robert J. Kane, denied the defendant's motion to
suppress in-court identification (R.A.7; D.Br.
Addendum G).

On December 3, 2001, the defendant filed his
"Motion to Dismiss or Alternative Relief Due to Lost
or Destroyed Evidence" (R.A.7). On December 21, 2001
and again on January 3, 2002, the motion judge, Robert
J. Kane, issued memoranda and orders denying in part
and granting in part the defendant's motion (R.A.7).

On January 9, 2002, the defendant's Superior
Court jury trial commenced, John A. Tierney, J.,
presiding (R.A.10). That same day, the Commonwealth
entered a nolle prosequi as to that count of

Indictment No. 9973CR0228 that charged the armed robbery of Gloria Reardon (R.A.8; Tr.1:4). On January 11, 2002, the jury found the defendant guilty of the lesser included offense of unarmed robbery (R.A.8). On January 25, 2002, the court sentenced the defendant to 8 to 10 years at M.C.I. Cedar Junction (R.A.8). On February 13, 2002, the defendant filed his notice of appeal (R.A.8,12).

**B.    Procedural History Pertaining to Defendant's Self-Representation.**

On September 7, 1999, Attorney Stephen C. Nadeau filed an appearance on behalf of the defendant (R.A.1). On April 6, 2001, the defendant filed a motion to dismiss appointed counsel (R.5) No action was necessary on this motion as Attorney Nadeau had, on March 27, 2001, already been permitted to withdraw (R.5).

On April 10, 2001, Attorney Daniel M. Rich was appointed to represent the defendant (R.A.5). On June 18, 2001, the defendant filed his "Motion to Dismiss Counsel Also Appointment of New Counsel" (R.A.5,50-54). On June 21, Judge Chin denied that motion (R.5, 50), and, on July 26, 2001, a motion to reconsider as well (R.A.5).

On August 27, 2001, the defendant filed his "Motion for Appearance of Counsel," which was, in fact, the defendant's motion to represent himself (R.A.5,59-61). That same day, Judge Nonnie Burnes held a hearing on the defendant's motion (R.A.5; Tr. 8/27/01:23-28). On August 30, 2001, Judge Burnes allowed the defendant's motion to represent himself (R.5-6). She endorsed the defendant's motion as follows:

> After hearing and reviewing the file the court allows this motion. The defendant is knowingly and competently waiving his right to counsel. He was very dissatisfied with the representation by appointed counsel. Mr. Cabral wishes to control the defense of his case. He has prior experience with the criminal justice system and, in this case, has filed his own exhaustive and knowledgeable motions.

R.56 (emphasis in original).

On September 11, 2001, the Court, Gary A. Nickerson, J., held a hearing on the defendant's request for standby counsel (Tr. 9/11/2001:1-8). On September 26, 2001, Judge Nickerson added a new endorsement to the defendant's motion to represent himself. He wrote:

> On September 11, 2001, Defendant appeared in open court for a hearing on his motions. Defendant asked the Court to provide stand by [sic] counsel. . . . In an abundance of caution this court will appoint stand by [sic] counsel whose

role is limited to advising defendant on matters affecting his defense.

D.Br. at Addendum F2.

On November 20, 2001, Attorney James W. McCarthy II filed an appearance as the defendant's standby counsel (R.7).

The defendant represented himself at trial, and, on January 11, 2004, the jury convicted him of unarmed robbery (R.A.8). On March 4, 2004, the defendant filed three related motions: a motion to withdraw as pro se party, a motion for appointment of counsel, and a motion for appointment of appellate counsel (R.A.8). On March 25, 2002, the defendant's motion for appointment of appellate counsel was allowed (R.A.9).

## STATEMENT OF THE FACTS

Fall River Police Officer Shawn Botelho testified that at about 6:00 a.m. on June 21, 1999 he drove past the Mutual Gas Station, at the intersection of Bradford Street and Broadway (Tr.3:63). Twenty yards down from the station, in front of a warehouse, Officer Botelho saw a blue Ford Thunderbird parked partly on the sidewalk (Tr.3:63). Officer Botelho saw the defendant, whom he recognized immediately, behind the wheel (Tr.3:63,65,75). When the defendant saw

Botelho, he turned his head and brought his arm up to shield his face (Tr.3:65). Officer Botelho noted this behavior, but did not stop, as he was on his way to assist on an emergency call (Tr.3:66).

Officer Botelho had known the defendant for about ten years (Tr.3:64). He and the defendant were "very friendly with each other" (Tr.3:64).

Rosemarie Hobbs testified that on June 21, 1999, she was working as a manager at the Mutual Gas Station on Broadway in Fall River (Tr.2:21-22). She arrived at work at 5:00 a.m. in order to open at 6:00 a.m. (Tr.2:23). Hobbs worked at the gas station with her cousin Gloria Reardon (Tr.2:24).

Cash that the business had accumulated was held in a safe (Tr.2:26). One of Hobbs's responsibilities before she opened the station was to remove and count the money in the safe (Tr.2:25). On the morning of June 21, 1999, Hobbes removed the money from the safe at approximately 5:45 a.m. (Tr.2:27). In her office, she prepared the money for deposit, counting and banding it (Tr.2:28).

Hobbes, sitting in the office, had counted out more than five thousand dollars when a man wearing a mask entered (Tr.2:29-30). In addition to the mask,

which was black, the man was wearing a tan, hooded
winter jacket and work boots (Tr.2:30). He wore black
gloves which revealed his knuckles(Tr.2:30-31). He was
"built" (Tr 2:31), that is, muscular (Tr.2:32).

When Hobbes first saw the man, she though it was
a joke of some sort (Tr.2:32). When she rose, the man
put his hand in his jacket pocket. Hobbes thought the
man had a gun in his jacket pocket (Tr.2:33).

The man did not speak, "[j]ust 'Uhm, Uhm.' He
didn't use voice, no voice at all" (Tr.2:33; and see
Tr.2:62).

Afraid, Hobbes got up from her desk to run
(Tr.2:35). The man squirted her in the face with a
spray bottle (Tr. 2:35,69). She ran from the office
and yelled to Gloria Reardon at the cash register
(Tr.2:28,41), "Hit the panic button. We're getting
held up. We're getting out of here." (Tr.2:29). Both
women ran out of the door of the station, screaming
"Please, somebody help us. We're getting held up."
(Tr.2:41;Reardon, Tr. 2:176).

Reardon was standing with Hobbs by the pumps when
she saw a masked man in a tan winter jacket come out
of the station (Tr.2:179). The man had Hobbs's purse

in his hands (Tr.2:179). He got into a blue car on Bradford Avenue (Tr.2:179, 180).

When Hobbs returned to the station she discovered that the station's money and her pocketbook were gone (Tr.2:54). Hobbs had put her pocketbook on the floor beside her desk (Tr.2:54).

Hobbs testified that the robber was approximately the same size and build as the defendant (Tr.2:61).

Charles Moniz testified that on the morning of June 21, 1999, he passed the Mutual Gas Station on his way to work (Tr.2:82-83). A little after 6:00 a.m., he reached the intersection of Bradford Avenue and Broadway, by the Mutual station (Tr.2:83-84). Moniz was stopped at the intersection, with one car in front of him, when he saw a masked man come running toward him (Tr.2:87-88). He came within fifteen feet of Moniz (Tr.2:88). The masked man then headed west, toward the side of the Mutual station on Bradford Avenue (Tr.2:88).

The masked man was wearing a beige or khaki jacket, "the same kind of jacket as a welder uses" (Tr.2:89). The man had a black handbag and he had a "smaller caliber" gun in one hand (Tr.2:89).

The man ran to a blue car (Tr.2:97) parked on Bradford Street to the side of the Mutual station (Tr.2:90). He opened the car door, took off his mask, and tossed it into the car (Tr.2:92). When the man turned his head, Moniz saw his face (Tr.2:93-94). Moniz recognized this man (Tr.2:161). Moniz testified that he did not at that time know his name, but he recalled that he had been at social functions which the man also had attended (Tr.2:160-161). "[H]e's been in my presence a couple of times" (Tr.2:161). Moniz identified the man as the defendant, Anthony Cabral (Tr.2:93-94).[1]

The defendant drove off (Tr.2:96). "The girl" came running out of the Mutual station, saying, "He took my purse . . . he's got all my important papers. . . . My life is in that bag" (Tr.2:97). Reardon and Hobbs urged Moniz to pursue the robber (Reardon, Tr. 2:182).

Moniz made a U-turn and set off in pursuit of the defendant (Tr.2:97). Moniz followed the defendant for several blocks losing sight of the blue Thunderbird

---

[1] Gloria Reardon testified that she saw the robber get into the blue car and did not see him remove his mask before he did so (Tr. 2:188-189; 195). However, she testified that her attention was focused on attempting to make out the license plate of the blue car (Tr. 2:189).

only momentarily (Tr.98-103). Moniz twice saw the defendant's face as he drove and twice saw the defendant's face after he got out of the Thunderbird and set out on foot (Tr.2:161-162).

After finding himself behind the defendant as the defendant backed up the Thunderbird on Howard Street at high speed (Tr.2:100-102), Moniz circled the block and came back to Division Street at the Almond Street intersection (Tr.2:102). When Moniz looked to his left at the intersection he saw the defendant's blue car parked (Tr.2:103). There was a man in the car, bent over (Tr.2:103).

Moniz circled the next block up and returned to Division Street on Beach Street (Tr.2:104). From his new position at this intersection, Moniz saw the defendant crossing the street (Tr.2:105). The defendant had a bundle in his hands (Tr.2:106).

Moniz lived on Division Street (Tr.2:79). He saw the defendant go into the yard of Moniz's own house (Tr. 2:106).[2] Moniz lost sight of the defendant (Tr.2:106). Moniz drove through the intersection and pulled up past the first house on the corner

---

[2] What Moniz described as his "house" was actually a small apartment building with several units (Tr.2:111-112; Tr.3:8).

11

(Tr.2:108). From his new vantage point, Moniz saw the defendant on the walkway of his house (Tr.2:110). The defendant opened the door and went inside (Tr.2:110-111).

Charles Moniz's mother, Maria Moniz, lived with him in an apartment at 181 Division Street (Tr.3:50-51). At about 6:30 a.m. on June 21, 1999, Mrs. Moniz was preparing to leave her apartment when she heard "a commotion in the entry, something falling down the stairs" (Tr.3:51). Then a "young man" opened the door to her apartment (Tr.3:52). The man was carrying a big bundle under his arm (Tr.3:55). The bundle "looked like a jacket or something (Tr.3:57). The man said, "'I'm sorry. I have the wrong apartment.'" (Tr.3:55).

Mrs. Moniz did not at that time know the man by name, but she had seen him four or five times before, going into the adjacent apartment of her nephew, Jon Kazen (Tr.3:53). At trial, she identified this man as the defendant (Tr.3:56).

Moniz "rushed" back to the Mutual Gas Station to see if the police had arrived (Tr.2:113). When he saw that the police were not there, he returned to his apartment building and went into the apartment he shared with his mother (Tr.2:113).

Officer Michael Malek testified that he did, in fact, speak to Moniz at the Mutual station, and that after speaking to Moniz he went looking for a dark blue automobile (Tr.2:202-204). He found it on Almond Street, just north of Division Street (Tr.2:204). The car, a Ford Thunderbird (Tr.2:207), was angled out into the street with the left tire against the curb and the back end partially obstructing the roadway (Tr.2:204). The driver's door was open and the engine was running (Tr.2:204). The driver was gone (Tr.2:204).

Malek discovered that the license plate had been altered to disguise the plate number: paint had been used to make a "P" look like a "B" and a "6" look like an "8" (Tr.2:205).

Malek found in the car a homemade father's day card on which was printed the name "Tony Cabral" (Tr.2:207,208-209,248, Exhibit 21).

Officer Botelho joined Officer Malek and others by the blue Thunderbird (Tr.3:67-68). He told the other officers about having seen the defendant in that car by the Mutual Gas Station at 6:00 a.m. that morning (Tr.3:68).

13

Malek was standing by the blue Thunderbird with other officers when he saw Moniz running toward them (Tr.2:209). After speaking with Moniz, the officers went to Moniz's house, 181 Division Street, a "couple of hundred feet" from where the blue Thunderbird stood (Tr.2:211-212).

Officer Malek saw the defendant put his head out a front window of the house at 181 Division Street (Tr.2:212-213). The defendant looked at the officers (Tr.2:212-213). Officer Botelho said, "Let me see your hands, Tony" (Tr.2:213; 3:69). In response, the defendant brought his head back inside and closed the window (Tr. 2:213;3:69). A minute later Officer Malek saw the defendant looking at the officers through another window (Tr.2:213).

The police went to the second floor apartment of Mr. Jon Kazen, knocked on the door, and, after a delay of about a minute, were admitted (Tr.2:117-119).

Officer Malek entered the house with other officers and went to the apartment of Jon Kazen (Tr.2:214). When he entered the apartment he found two officers with the defendant in the Kitchen (Tr.2:214-216). The defendant was breathing heavily and sweating profusely (Tr.2:216; and see Beausoleil, Tr.3:15,

14

Tosior, Tr.3:40). Asked about this, the defendant insisted that he was not sweating and was not out of breath. He said that he just come from a friend's house where he had washed his hair (Tr.2:218).

Officer Malek went into the front room with Jon Kazen (Tr.2:219). While speaking with Kazen, Officer Malek saw, through the open bedroom door, a dark-colored woman's pocketbook on the bed (Tr.2:220). There were gloves on top of the pocketbook (Tr.2:220, 222, Exhibit 22). Officer Malek seized the pocketbook and gloves, and returned to the front room (Tr.2:220,222). Inside the pocketbook he found, among other things, paperwork addressed to Rosemarie Hobbs (Tr.2:221).

Back in the front room, where an officer was talking to Mr. Kazen, Officer Malek saw on a chair a mask and a dark winter coat (Tr.2:222,224; Beausoleil, Tr.3:15). The mask and coat were identified at trial as those the robber had worn (Tr.2:56-57;223-224). The officers then found on the floor near the chair on which the coat lay a little spray bottle and cigarette lighter shaped like a gun (Tr.2:223, 224; Beausoleil, Tr.3:15-16). The police also found on the floor in front of the chair work boots that Hobbs identified at

trial as those worn by the robber (Tr.2:56-57;225).

The police arrested the defendant and returned with the defendant and the seized items to the Mutual gas station (Tr.2:225). When the police brought the defendant to the station, Hobbs and Reardon recognized him immediately. He had been a steady customer of the station for years, sometimes coming in five and six times a day (Hobbs, Tr.2:59-60, 62; Reardon, Tr.2:184-185).

Two hours after they arrested the defendant, the police returned to Kazen's apartment with a search warrant (Tr.2:227-228). In the bedroom, towards the front window, there were two or three laundry baskets (Tr.2:228). In one of the laundry baskets, under some clothing, officer Malek found a white plastic bag containing nearly eight thousand dollars in cash (Tr.2:228-229). Another officer found under some couch cushions in the living room more money and identification belonging to Rosemarie Hobbs (Tr.2:229; Tr.3:48).

## SUMMARY OF THE ARGUMENT

I. The motion judge did not err in allowing the defendant's motion to represent himself at trial. The record establishes that the defendant was aware of the

seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation. (pp. 21-26)

The defendant's otherwise valid waiver of counsel was not undermined merely because of his stated preference for being represented by counsel where he had already sought to dismiss two competent attorneys, and where it was by no means clear that any appointed counsel would have been satisfactory to him. (pp. 26-27)

II. While Mass.R.Crim.P 24(b) calls for the trial judge to rule on requests for instructions before closing arguments, the defendant did not object to the judge's failure to follow the rule, and in any case can show no prejudice from the fact that he learned only after his argument that the judge would not give a Bowden instruction. (pp. 28-30)

III(A). The police had probable cause to enter the blue thunderbird they found on Almond Street, as the open door, running motor, and altered license plate tended to confirm that this was the blue Thunderbird used in the robbery of a nearby gas station. In any case, the police could enter for safety reasons a car abandoned by its driver with the door open and the

17

engine running. Once in the car, the police found in plain view the birthday card with the defendant's name on it. (pp. 32-36)

By the time they approached Kazen's apartment at 181 Division Street, the police had information that an officer had seen the defendant in the blue Thunderbird by the gas station just before it was robbed, they had the card with the defendant's name on it that they had removed from the Thunderbird, and they had information from a witness that he had tracked the robber from the gas station to the second floor apartment of Jon Kazen. They also learned from this witness that the robber was armed. The police actually saw the defendant lean out the window of Kazen's apartment as they approached it. Thus, by the time the officers knocked on Kazen's door they had both probable cause and exigent circumstances to justify entry into that apartment. (pp. 36-37)

In fact, the police entered with the consent of its occupant, Jon Kazen. While talking with Kazen the police saw in plain view proceeds and instrumentalities of the robbery, which they lawfully seized. (pp. 37-39)

18

III(B). The four day hearing on the defendant's motion
to suppress established that the police were justified
on several grounds both in entering the blue
Thunderbird and in entering Kazen's apartment. As
there were no reasonable grounds on which to challenge
the motion judge's denial of the motion to suppress,
counsel was not ineffective in failing to pursue a
meritless appeal of the denial of the motion. (pp. 39-
40)

III(C). The motion judge rightly rejected the
defendant's claim that the Commonwealth had presented
false testimony to the grand jury in order to secure
an indictment. The defendant established at most that
there were some inconsistencies between the
recollections of Officer Malek and a civilian witness,
Charles Moniz. But it does not follow from this that
Malek, the only witness who testified before the grand
jury, deliberately lied, or even that it is Malek's
recollection that is in error. (pp. 39-41)

III(D). The motion judge correctly ruled that there
was no culpability on the part of the Commonwealth and
no prejudice to the defendant from the failure of
malfunctioning equipment to make a tape of police

communications on the morning of the robbery. (pp. 41-42)

A second motion judge found that the police had prematurely returned to the owner certain items taken in the robbery that might have been tested for fingerprints. As a consequence, the judge imposed certain evidentiary restrictions on the Commonwealth but did not grant any other relief. The motion judge was correct that no other relief was warranted. The absence of the defendant's prints on the items taken in the robbery or the presence of Kazen's prints on the items would not have substantially undermined the overwhelming evidence of the defendant's guilt: the defendant wore gloves during the robbery, and, in any case might have handled the items without leaving prints, and Kazen might have handled the items after the defendant had brought them to Kazen's apartment. (pp.42-45)

III(E). The motion judge correctly ruled that Moniz's exposure to the defendant at the hearing on the defendant's motion to suppress would not taint any later identification of the defendant by Moniz. Moniz got a good look at the robber and recognized him as someone he had seen before. At no time did Moniz

misidentify or fail to identify the defendant. The
fact that Moniz encountered the defendant at a motion
hearing would not by itself taint any later
identification, and the defendant points to no
additional factor that would tend to undermine the
motion judge's finding of an independent source for
Moniz's identification. (pp. 45-48)

III(F). The trial judge gave comprehensive and correct
instructions on identification. The defendant did not
specifically ask for the passages from Telfaire that
he now says were erroneously omitted from the charge,
nor did he object to their omission. In any case,
those passages would have been inapplicable to the
evidence of identification as it actually came in.
(pp.48-49).

## ARGUMENT

I.   **THE MOTION JUDGE PROPERLY ALLOWED THE DEFENDANT'S
     MOTION TO REPRESENT HIMSELF AT TRIAL.**

     After seeking to dismiss in turn each of the two
attorneys appointed to represent him at trial (R.A.
5), the defendant moved to represent himself (R.A. 5,
59-61). After a hearing, the motion judge, Nonnie
Burnes, allowed the defendant's motion to represent

21

himself. She endorsed the defendant's motion as follows:

> After hearing and reviewing the file the court <u>allows</u> this motion. The defendant is knowingly and competently waiving his right to counsel. He was very dissatisfied with the representation by appointed counsel. Mr. Cabral wishes to control the defense of his case. He has prior experience with the criminal justice system and, in this case, has filed his own exhaustive and knowledgeable motions.

R.56 (emphasis in original).

Despite his evident determination to represent himself at trial, the defendant now insists that the motion judge erred in allowing his motion "because Cabral failed to make a knowing, intelligent, and voluntary waiver of counsel." D.Br. at 11. This contention is plainly wrong. The record supports the motion judge's finding of a "knowing[] and competent[]" waiver of the right to counsel.

The Supreme Judicial Court has not prescribed particular questions that a judge must ask in order to establish a knowing and intelligent waiver of the right to counsel. <u>Commonwealth</u> v. <u>Martin</u>, 425 Mass. 718, 719-720 (1997). Nor is there any particular piece of information that is essential to the effective waiver of the right to counsel. Ibid. Rather, the reviewing court will look to "the defendant's

22

subjective understanding of his decision and its consequences." Id. At 720. The reviewing court will consider whether the defendant was adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation. Ibid. The burden of establishing that his waiver was not knowing and intelligent rests on the defendant. Commonwealth v. Johnson, 424 Mass. 338, 340-341 (1997).

At the time of trial the defendant's own words establish his awareness of the seriousness of the crime with which he had been charged. See defendant's closing argument, Tr. 3:88. It may reasonably be inferred that the defendant, who had, according to the motion judge, "prior experience with the criminal justice system," and who had participated extensively in the pre-trial preparation of his case even when he was represented by counsel, was aware of the seriousness of the crime charged well before the time he undertook his own representation.

It is also evident from the record that the defendant was aware of the magnitude of his undertaking. See the March 27, 2001, affidavit the defendant filed in support of his motion to dismiss

23

Attorney Steven Nadeau, reproduced in the Commonwealth's Record Appendix at 2-4. This affidavit establishes that months before he sought to proceed pro se the defendant was deeply and passionately involved in the management of several complex pre-trial motions.

At the August 27, 2001, hearing on the defendant's motion to dismiss his second appointed attorney and proceed pro se, the defendant's complaints about his attorney reflect his continuing involvement in every facet of his case, and his definite views on the way his defense should be conducted See Tr. 8/27/2001:276-27.

The Superior Court docket entries subsequent to the allowance of the defendant's motion to proceed pro se demonstrate the energy and comprehensiveness of the defendant's self-representation. See, e.g., paper 48 (defendant's motion for a copy of the case file); paper 56 (defendant's motion for a speedy trial); paper 57 (defendant's motion for discovery); paper 62 (defendant's motion for a copy of the turret tape); paper 72 (defendant's motion for funds); paper 73 (defendant's supplemental motion for discovery); paper 74 (defendant's motion to dismiss on grounds of lost

24

or destroyed evidence); paper 75 (defendant's motion
to suppress defendant's in-court identification) (R.A.
6-7).

It is obvious that the defendant was aware of the
magnitude of his undertaking in representing himself.
Indeed, that undertaking had the magnitude that it did
in part because of the defendant's own efforts to
dismiss the indictments or exclude damning evidence.

The third factor listed in Martin - that the
defendant be aware of the availability of advisory
counsel - is also satisfied here. The defendant was
not only aware of the availability of standby counsel,
he successfully moved to have standby counsel
appointed. Tr. 9/11/2001:2; D. Br. at Addendum F2.

The fourth factor listed in Martin is that
defendant must be adequately aware of the
disadvantages of self-representation. 425 Mass. at
720. The record establishes that he was aware of at
least one disadvantage. See R.A. 85 (in affidavit,
defendant reveals his awareness of the difficulty of
gathering material for the defense while
incarcerated).

In any event, no warning could have dissuaded the
defendant from undertaking his own representation. The

25

defendant repeatedly demonstrated himself to be an unsparing critic of the work of his appointed attorneys. See, e.g. Com.R.A. at 3 ("I bel[ie]ve that the material that coun[sel] cited in my motion to dismiss was improperly prepared"); Tr. 8/27/2001:26 (I provided [counsel] with these motions. [He refuses to] do it to my expectations as far as not deleting anything or make any additions that he wishes to"); Tr. 9/11/2001:6 ("The motions [counsel] did file wasn't up to par with the motions I have on file"). Further, the defendant demonstrated his conviction that he could do better than the attorneys who had been appointed to represent him. See, e.g., Tr. 8/27/2001:27 ("The defendant has no choice in the matter but to represent himself because the Court refuses to give him adequate counsel"). In the circumstances, any warning to the defendant about the dangers of self-representation would have been an empty formality. "No further warning was likely to dissuade him from pursuing the course he was on." Commonwealth v. Burbank, 27 Mass. App. Ct. 97,108 (1989).

Seizing on the defendant's remarks that he would have liked a third attorney to replace the second

attorney that he had found unsatisfactory, if only the
Court would appoint someone he considered competent
(Tr. 8/27/2001:27, 28), the defendant now insists that
his waiver of the right to counsel was not
"unequivocal." See D. Br. at 14-16, 17-18). This claim
finds no support in the case law. See Commonwealth v.
Johnson, 424 Mass. 338, 340-341 (1997)(defendant's
"unequivocal" waiver of right to counsel demonstrated
where defendant sought to dismiss two different
attorneys, filed a motion to waive counsel, and later
filed three pro se motions, each of which referred to
his self-representation); Commonwealth v. Hawkins, 17
Mass. App. Ct. 1041, 1041 (1984)(presumption of waiver
attached where defendant had been advised of his right
to counsel, had fired two different appointed counsel,
and had acquiesced to have standby counsel assist him
during trial).

The mere fact that the defendant would have
preferred representation by some purely hypothetical
attorney who met his standards (assuming such a person
could ever have been found) does not render his
otherwise valid waiver "equivocal." "Having been
offered counsel prepared to defend him competently and
loyally at trial, his refusal of that representation

27

amounts to a voluntary waiver of the right to counsel." Commonwealth v. Burbank, 27 Mass. App. Ct. at 108.

## II. THE DEFENDANT WAS IN NO WAY PREJUDICED BY THE TRIAL JUDGE'S FAILURE TO RULE ON HIS REQUESTS FOR INSTRUCTIONS PRIOR TO HIS CLOSING ARGUMENT.

At the close of the evidence, after the denial of his motion for a required finding of not guilty, the defendant alerted the judge that "I'll have jury instructions, your honor" (Tr. 3:84). At the conclusion of the closing arguments, the trial judge reviewed and ruled on the defendant's proposed requests for instructions (Tr. 3:105-108).

Under Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979), the trial judge should have informed counsel of his proposed action on requests for jury instructions prior to closing arguments. Commonwealth v. Pettingel, 10 Mass. App. Ct. 916, 917 (1980). However, this error, like any other, must be brought to the trial judge's attention if it is to be preserved for appellate review. Commonwealth v. McJunkin, 11 Mass. App. Ct. 609, 618 (1981). Cf. Commonwealth v. Dyous, 436 Mass. 719, 730-731 (2002). As the defendant did not do this, he is entitled only to limited review to determine if the asserted error created a substantial

risk of a miscarriage of justice.[3] Commonwealth v. Tart, 408 Mass. 249, 265 (1990).

Further, even if the claim of error had been properly preserved, it would still be incumbent on the defendant to establish that he had been prejudiced by the trial judge's failure to rule on his requested instructions prior to argument. Commonwealth v. Pettingel, 10 Mass. App. Ct. 916, 917 (1980). The defendant cannot make such a showing. Instead, the defendant merely makes a confused argument that "the judge's failure [to] instruct the jury in accordance with Cabral's request [for a Bowden instruction concerning deficiencies in the police investigation] undercut the defense in that Cabral did not argue this to the jury." D. Br. at 22.

There are several things wrong with this argument. First, "the giving of such an instruction is never required." Commonwealth v. Williams, 439 Mass. 678, 687 (2003). The trial judge was thus well within his discretion in declining to give the requested instruction. Second, the defendant fails to show how he

---

[3] The defendant's pro se status at trial does not excuse his failure properly to preserve claims of error, as pro se litigants are held to the same standards as defendants represented by counsel. Commonwealth v. Jackson, 419 Mass. 716, 719 (1995).

would have been in any better position if the trial judge had denied his request for a Bowden instruction _before_ the defendant's closing argument. The judge's late adverse ruling on this point did not preclude the defendant from making an argument that he was otherwise entitled to make. See Commonwealth v. O'Brien, 432 Mass. 578, 590 (2000)("Bowden simply holds that a judge may not remove the issue [of deficiencies in the investigation] from the jury's consideration").

The defendant's claim here could not meet the standard for prejudicial error, let alone that required to establish a substantial risk of a miscarriage of justice.

## III. THE DEFENDANT'S SEVERAL CLAIMS OF ERROR WITH RESPECT TO THE DENIAL OF HIS PRETRIAL MOTIONS ARE ALL MERITLESS.

In addition to the brief filed on his behalf by appointed counsel, the defendant has filed, pro se, a 75 page brief entitled "Moffett's Brief and Record Appendix for the Defendant" (hereafter "Pro Se Br.") and a 23 page brief entitled "Supplemental Moffett's Brief and Record Appendix for the Defendant" (hereafter "Sup. Pro Se Br.").[4] In these two briefs the

---

[4] In her brief on behalf of the defendant, counsel, citing Commonwealth v. Moffett, 383 Mass. 201, 208 (1981), states but does not otherwise argue the several claims the defendant develops at length in his two pro se briefs. See D. Br. 23-27.

defendant claims -- but fails to demonstrate -- error in the denial of several of his pretrial motions.

**A.    The Motion Judge Correctly Denied the Defendant's Motion to Suppress items seized from the Blue Thunderbird on Almond Street and Jon Kazen's Division Street Apartment.**

After conducting an extended hearing on the defendant's motion to suppress evidence seized from the blue Thunderbird on Almond Street and from Jon Kazen's apartment (see generally volumes 1-4 of the transcript of the hearing on the motion to suppress) the motion judge, Toomey, J., made succinct findings and rulings:

> 12/14/00 Having found that the police entry into and search of the motor vehicle was reasonable in light of the condition of the vehicle and the probable cause/exigent circumstances possessed by the officers[;] having found that the police entry into Kazen's apartment was supported by probable cause, exigent circumstances and consent[;] and having found that items seized in the apartment were obtained incident to the lawful arrest of the defendant, in plain view[,] and in connection with a reasonable protective sweep of the apartment, the motion to suppress the items found in the vehicle and in the apartment is denied.

R.A. 18. In argument I of his Pro Se brief, the defendant challenges the motion judge's findings and rulings with respect to both the item seized from the blue Thunderbird and those items seized from Kazen's apartment. Pro Se Br. at 34-59. But the defendant's

several arguments here are based on his disagreement
with Judge Toomey's well-supported findings of fact or
his misunderstanding of the case law, or both.

**1.    The Police Had Ample Justification to Search the
        Blue Thunderbird.**

Officer Michael Malek testified at the hearing on
the motion to suppress that he had driven to the
Mutual gas station in response to a report of an
emergency when Charles Moniz approached him in his
cruiser and told him that a masked man armed with a
gun had robbed the gas station, that the man had fled
in a blue thunderbird, and that the Thunderbird had
turned down a side street off Bradford Avenue (M.
Suppress Tr. 2:50-51). Malek made a radio report to
cruisers in the area, and then drove west on Bradford
Avenue, checking the side streets for the Thundebird
(M. Suppress Tr. 2:52). On Almond Street Malek came
upon a blue Thunderbird parked on the left side of the
street. The car was at an angle with the left front
wheel against the curb and the back partly sticking
into the roadway. There was no one in or near the
vehicle, yet the engine was running and the driver's
door was open. (M. Suppress Tr. 2:53-54). As he
approached the car, Malek saw that the license plate

had been deliberately altered with red paint (M.
Suppress Tr. 2:55). Malek later learned that the owner
of the vehicle was someone other than the defendant
(M. Suppress Tr. 2:55).

Malek entered the car looking for the
registration or other evidence of ownership (M.
Suppress Tr. 2:55). "Next to the front seat standing
up facing me" Malek saw a homemade father's day card
depicting a male lifting a barbell and underneath the
drawing the name "Tony Cabral" (M. Suppress Tr. 2:56).

The propriety of the subsequent seizure of the
card is beyond question. Malek had been told by an
eyewitness to the flight of the gas station's robber
that the robber fled in a blue Thunderbird and went
down a side street off of Bradford Avenue. Minutes
later Malek found a blue Thunderbird on a side street
off of Bradford Avenue. Buttressing the hypothesis
that this was the vehicle in which the robber had fled
was the evidence of the haste with which it had been
abandoned by its driver: the car was badly parked, the
driver's door was open, and the engine was still
running. Finally, before he entered the car, Malek
learned one other fact that tended to confirm that

this was the car used by the robber: the license plate
had been deliberately altered.

In the circumstances, as the motion judge found,
Malek possessed probable cause to justify his entry
into the vehicle. See Commonwealth v. A Juvenile (No.
2) 411 Mass. 157, 162-163 (1991)(there was probable
cause to justify seizure of juvenile's car where
witness told police juvenile's car was headed toward
the accident site at the relevant time, paint chips at
accident scene appeared to match those missing from
juveniles's car, and there was damage to the
juveniles's car and fibers around the headlight and
roof that were consistent with the accident). Further,
as the motion judge also found, exigent circumstances
justified the warrantless entry into the Thunderbird.
See Id at 163-165 & n.7 (inherent mobility of even
parked and unattended automobile sufficient to permit
invocation of exigency exception to the warrant
requirement).

Even if the police had not been investigating a
robbery, they would have been justified in entering
the automobile. It was a violation of the law for the
driver to have left the Thunderbird unattended with
the engine running. G.L. c. 90, §13. It was thus

incumbent upon the police to at least secure the car
and attempt to locate the owner, which would have
entailed a limited a search of the interior for
evidence of ownership. Such a search, pursuant to the
police's "community caretaker function," does not
offend the Fourth Amendment. United States v.
Rodriguez-Morales, 929 F.2d 780,785 (1st Cir. 1991).

The defendant argues (it may be inferred) that
the judge's finding of probable cause to search the
Thunderbird must be rejected because Officer Malek
testified that he got his information on the blue
Thunderbird at the Mutual station from Charles Moniz,
and Moniz testified that when he returned to the
Mutual station after following the defendant he did
not speak to any police officer (M Suppress Tr. 1:17-
18; 51). See Pro Se Brief at 36. But it is the motion
judge's responsibility to resolve conflicts in the
evidence. Commonwealth v. Day, 387 Mass 915, 919
(1983). His findings of fact will be accepted by a
reviewing court absent a showing of clear error.
Commonwealth v. Silva, 440 Mass. 772, 773 (2004). To
the extent that his findings imply that he credited
Officer Malek's recollection on this point over that

of Moniz, there is nothing to show that he committed

clear error as fact-finder in doing so.

**2.    The Officers' Warrantless Entry Into Kazen's**
**Apartment Was Justified By Kazen's Consent to the**
**Entry, and By Probable Cause and Exigent**
**Circumstances.**

By the time the police knocked on the door to Jon

Kazen's apartment, several independent lines of

information pointed powerfully to the defendant's

involvement in the Mutual station robbery and to his

presence in Kazan's apartment. As to the defendant's

participation in the robbery: Officer Botelho had seen

the defendant stopped next to the Mutual gas station

in a blue Thunderbird just before the robbery M.

Suppress Tr. 1:92-95. The police had the reports of

eyewitnesses that the robber had fled in a blue

Thunderbird (M. Suppress Tr. 2:51, 89). Shortly after

the robbery, a few blocks from the scene, the police

found a blue Thunderbird that had obviously been

recently and hastily abandoned. In this vehicle they

found a child's birthday card made out to the

defendant (M. Suppress Tr. 2:56). Charles Moniz then

told the officers investigating the car that he had

seen the robber go into Moniz's apartment building,

and that he was in the apartment of Jon Kazen (M.

Suppress Tr. 1:23-24). Officer Botelho knew the
defendant, and while the officers where on the way to
Moniz's building Botelho saw the defendant stick his
head out the window of Kazen's apartment (M. Suppress
Tr. 1:104).

Moniz testified that he told the officers before
they went into Kazen's apartment that the defendant
was armed (M. Suppress Tr. 1:26).

Thus, before they knocked on the door of Kazen's ·
apartment, the police had probable cause to believe
that the defendant was the armed and masked robber who
had robbed the Mutual station and fled in the blue
Thunderbird. In addition, the police knew from
information they had received and their own
observations that the defendant had taken refuge in
Kazen's apartment.

In the circumstances, the police would have been
justified in making an entry into Kazen's apartment to
arrest the defendant even over Kazen's objection. See
Commonwealth v. Molina, 439 Mass. 206, 209-210 (2003).
In fact, the police knocked and were lawfully admitted
with the consent of the apartment's resident, Jon
Kazen. See Commonwealth v. Voisine, 414 Mass. 772, 783
(1993)(warrantless entry into the home of a third

37

person to arrest suspect is permissible with third

person's consent). The motion judge's finding that the

entry was by consent (R.A. 18) is abundantly supported

in the record (M. Suppress Tr. 1:71, 84-85; 2:13,45,

63).[5] It was within his discretion as fact-finder not

to credit the implausible conflicting testimony of

Kazen. See Commonwealth v. Sanna, 424 Mass. 92, 97

(1997)(reviewing court will invariably accept motion

judge's resolution of conflicting testimony).

3.    **The police lawfully seized fruits and
      instrumentalities of the crime in plain view.**

    The police were lawfully in Kazin's apartment

pursuant to Kazin's consent when the defendant walked

from another room into the view of the officers (M.

Suppress Tr. 2:13-14). The police seized and

handcuffed the defendant (M. Suppress 2:14 ["At that

point we secured Mr. Cabral, not knowing if he had any

weapons on him"], 2:64). Officer Malek asked Kazen if

he would go into the living room so that Malek might

speak with him out of earshot of the defendant. Kazen

---

[5] The motion judge raised, but did not address in his
findings, the question whether the defendant even had
standing to challenge the police entry into Kazen's
apartment and the subsequent seizure of evidence found
there. See M. Suppress Tr. 2:72-75. Because the
propriety of the police conduct here is so abundantly
clear, it is unnecessary to address this issue.

agreed, and went into the next room with Officers

Malek and Beausoleil (M. Suppress Tr. 2:16). Once in

the living room, the officers saw in plain view items

taken in the robbery and clothing worn by the robber

(M. Suppress Tr. 2:7, 17-18,68-69).

 As the police were in the living room with the

permission of the resident of the apartment, they

could lawfully seize fruits and instrumentalities of

the robbery in plain view. See Commonwealth v.

Viriyahiranpaiboon, 412 Mass. 224, 228 (1992)(items in

plain view during a consent search may be seized, even

if the item viewed is beyond the scope of the consent

given).[6]

**B.**  **Counsel Was Not Ineffective For Failing To Pursue A Meritless Appeal Of The Denial Of The Defendant's Motion To Suppress**.

 The defendant contends that his counsel at the

time was ineffective for failing to pursue an

interlocutory appeal of the denial of his motion to

suppress. Pro Se Br. at 59-60. As the motion judge's

---

[6] The motion judge also found that police seized items "in connection with a reasonable protective sweep of the apartment." R.A. 18. See M. Suppress Tr. 2:20. The police may seize evidence that they come upon in the course of a quick and limited search to protect themselves from person who may be on the premises. Commonwealth v. Allen, 28 Mass. App. Ct. 589, 594 (1990); Commonwealth v. Bowden, 379 Mass. 472, 478 (1980).

denial of the motion to suppress was plainly correct

in light of the evidence adduced at the hearing on the

motion, counsel cannot be faulted for failing to

pursue a meritless appeal. See Commonwealth v. Ortega,

441 Mass. 170, 176 (2004).

C.    **The Motion Judge, Rejecting The Defendant's Claim**
      **That The Indictment Had Been Secured On The Basis**
      **Of False Testimony, Correctly Denied The**
      **Defendant's Motion To Dismiss The Indictment.**

Before trial, the defendant filed a motion to

dismiss the indictment on the ground that "false

and/or misleading" testimony had been presented to the

grand jury that handed up the indictment. R.A. 30. The

motion judge, David A. McLaughlin, rejected the claim

that Officer Malek, the single witness who testified

before the grand jury, gave false information to the

grand jury in order to secure an indictment:

> This motion does not present a situation where an
> agent of the Commonwealth knowingly gave false
> information to a grand jury in order to obtain an
> indictment. . . . In context, the differences in
> the memories of the two individuals [Officer
> malek and Charles Moniz] was not substantial or
> material.

D. Br. at Addendum C.

The motion judge's decision is obviously correct.

The defendant established at most that Malek and Moniz

had on some points inconsistent recollections of what

took place in the aftermath of the Mutual station
robbery. The defendant ignores the substantial points
of congruence in their accounts. Moreover, the
defendant presented nothing in his motion, and
presents nothing in his brief, that would permit this
Court to conclude even that it is Malek, rather than
Moniz, whose account is in error, let alone that Malek
deliberately lied to the grand jury. Nor does he offer
any thoughts on why Officer Malek would have thought
it necessary to lie to secure an indictment in a case
in which the trail of evidence led from the crime
scene practically to the defendant's feet.  The
defendant has failed to make the necessary showing
that the Commonwealth deliberately presented false
information to the grand jury to secure the
indictment. Commonwealth v. Levesque, 436 Mass. 443,
447 (2002).

D.    **The Remedy Fashioned By The Motion Judge Who**
      **Ruled On the Defendant's Second Lost Evidence**
      **Claim Was As Much As He Was Entitled To.**

On June 27, 2000, and on December 3, 2001, the
defendant filed motions seeking dismissal of the
indictments or other relief for the Commonwealth's
asserted loss of destruction of potentially

41

exculpatory evidence. Judge Gary Nickerson heard and
denied the first motion (R.A. 2, 15), which dealt with
the so-called "turret tape," that is, the police tape
of communications between the officers on the street
and the police dispatcher. Judge Nickerson found as a
fact that the taping system had malfunctioned and thus
that there was never was a turret tape for the day of
the robbery (D. Br. Addendum A at 2-3). Although
noting that he did not believe the failure of the
taping system was equivalent to the loss or
destruction of evidence, the judge nonetheless
analyzed the defendant's claim as if it were (D. Br.
Addendum A at 4). He concluded that the defendant had
failed to clear the preliminary hurdle, Commonwealth
v. Dinkins, 440 Mass. 715, 717 2004), of establishing
a reasonable possibility that the tape had contained
exculpatory evidence, and that, in any event, judge
could discern no culpability on the part of the
Commonwealth and no prejudice to the defendant (D. Br.
Addendum A at 5-6). Nothing in the defendant's brief
casts the slightest doubt on the propriety of these
findings and rulings.

In his memorandum and order of December 21, 2001,
Judge Robert Kane considered the defendant's claim

42

with respect to the property of the victim, Rosemary

Hobbs that had been taken in the robbery and was later

returned to her by the police. See the appendix to the

defendant's pro se brief (hereafter "Pro Se R.A.___")

at 17. Judge Kane concluded that as there might have

been recoverable fingerprints on the items returned,

the defendant had met his initial burden of

demonstrating a reasonable possibility that access to

the returned items might have produced evidence

favorable to the accused (pro Se R.A. 17). The judge

concluded:

> Based upon the government's culpability
> falling within the realm of negligence and the
> lost evidence assuming the form of potential but
> not necessarily an actual loss of exculpatory
> evidence, I fashion the following remedy: The
> government's witnesses may testify to discovering
> the belongings of Ms. Hobbs, but may not testify
> to observing Anthony Cabral in the bedroom where
> Hobbs's pocketbook was recovered. This relief
> preserves defendant's opportunity to argue that
> Kazen possessed the recovered evidence without
> unduly depriving the government of it evidence.

Pro Se R.A. 20.

The judge's granting of limited relief implies a

finding that no greater relief was warranted. The

judge was correct that neither dismissal of the

indictment nor suppression of proceeds of the robbery

was appropriate. The potential prejudice to the

defendant from the loss of this evidence was low. The
defendant's argument as to the premature return of
Hobbs's pocketbook, wallet and personal papers is that
he was deprived of the opportunity to test these items
for fingerprints. Pro Se Br. at 71. But the robber, at
least initially, was wearing gloves (Tr. 2:30-31),
and, in any case, an object may be handled without
leaving readable prints on it. See, e.g., United
States v. Hemmer, 729 F.2d 10, 12 (1st Cir. 1984)
("[t]he fact that certain bills traced to the bank did
not bear their fingerprints does not necessarily mean
that defendants did not touch the bills"). Nor would
the presence of Kazen's prints on these items
necessarily have helped the defendant: Kazen might
simply have handled these items after Cabral had
brought them to Kazen's apartment.

Thus, the defendant's loss of the opportunity to
establish the absence of his prints or the presence of
Kazen's prints on the items taken from Hobbs did not
deprive the defendant of evidence that might have
affected the verdict. See Commonwealth v. Than, 59
Mass.App.Ct. 410, 412-413 (2003)(defendant was not
prejudiced by the loss of the opportunity to
fingerprint gun where he was charged with constructive

44

possession of it; thus the absence of his prints or the presence of another's would not aid his defense); Commonwealth v. Burns, 43 Mass.App.Ct. 263, 267-268 (1997); Commonwealth v. Walker, 14 Mass.App.Ct. 544, 547-548 (1982).

Moreover, the evidence of the defendant's guilt was overwhelming: he was seen at the Mutual station shortly before the robbery, and then was tailed from the scene of the robbery to the apartment where the police found him, the loot, and the distinctive clothing he wore for the robbery. In the circumstances, the premature return of Hobbs's belongings could not have prejudiced the defendant. Commonwealth v. Waters, 420 Mass. 276, 279 (1995).[7]

E.    **The Motion Judge Correctly Denied The Defendant's Motions To Suppress Moniz's Identification Of Him As The Mutual Station Robber.**

---

[7] In a separate memorandum of decision Judge Kane dealt with the remaining items the defendant contended the Commonwealth had lost or destroyed. Judge Kane found that the defendant had failed to prove that the Commonwealth had lost the father's day card or the bag that had contained the cash from the Mutual station. Pro Se R.A. at 22-23. He accepted the Commonwealth's representation that because of equipment failure there was no turret tape to produce. Pro Se R.A. at 23. He left to the trial judge the question whether the defendant had had an opportunity to inspect the keys to the Thunderbird before they were returned to the car's owner. Pro Se R.A. 23 & n2. After a hearing, the trial judge ruled that the defendant had failed to establish that he had not had an opportunity to inspect the keys. Tr. 1:42, 52.

In his motions of December 3 and December 12, 2001 (R.A. 7, 62-63, 95-96) the defendant moved to suppress all evidence concerning Moniz's identification of him as the robber. In his motions, the defendant alleged that an impermissibly suggestive one-on-one confrontation between witness and defendant at the hearing on the motion to suppress had tainted that in-court identification and would taint any later identification of the defendant as well. R.A. 95-96. In his memorandum of decision and order of January 3, 2002, the motion judge, Robert Kane, denied the defendant's motion to suppress the identification. D. Br. Addendum G at 6.[8]

Applying the Supreme Judicial Court's six-part test, Commonwealth v. Johnson, 420 Mass. 458, 463-464 (1995), Judge Kane concluded that even if Moniz's encounter with the defendant at the motion hearing had

---

[8] Judge Kane did not address the question whether Moniz's identification of the defendant at the motion to suppress hearing should be suppressed as unnecessarily suggestive, beyond observing that it was essential that the defendant be present at that hearing, making unavoidable Moniz's exposure to him. Id. at 4. In any event, there was, as it turned out, no need to have resolved that question, as there was no testimony at trial about Moniz's identification of the defendant at the hearing on the motion to suppress.

been unnecessarily suggestive, Moniz's identification
of the defendant did have the necessary independent
source. Judge Kane noted that Moniz twice saw the
robber's face as he followed him, the first time from
a distance of approximately 15 feet, and that Moniz
recognized him as someone he had seen before.[9] In
addition, Moniz had never identified anyone else as
the robber, or failed to identify the defendant as the
robber. D. Br. Addendum G at 5.

The motion judge's decision was correct. The fact
that Moniz was exposed to the defendant at the hearing
on the motion to suppress did not automatically taint
Moniz's subsequent identification of the defendant at
trial. "It is not unusual for a crime witness to
identify a suspect and later be exposed to pretrial
information tending to confirm the correctness of that
identification. The critical issue is whether an
earlier identification has been corrupted by that
information. Absent evidence at the motion hearing of
such corrupting effect . . . no taint attached to the

---

[9] It may be inferred from Moniz's testimony at the
hearing on the motion to suppress that while following
the robber he saw his face at least four times. See M.
Suppress Tr. 1:10, 13, 15, 16, 44, 45, 50. At trial,
Moniz expressly confirmed that in following the
defendant from the Mutual station to Moniz's Division
Street apartment building he saw the defendant's face a
total of four times (Tr. 2:161-162).

47

subsequent in-court identification." Commonwealth v.
Ayles, 31 Mass. App. Ct. 514, 518 (1991). The
defendant points to nothing about Moniz's exposure to
him at the motion hearing, beyond the fact that it
would have been obvious that he was the defendant,
that was likely to have tainted Moniz's trial
identification. Contrast Commonwealth v. Bonnoyer, 25
Mass. App. Ct. 444, 447-451 (1988)(motion judge
properly suppressed the identification of a witness
who had been uncertain of her identification until
police officer told her one robber had named the
defendant as his accomplice).

**F.    The Trial Judge's Instructions To The Jury On
        Identification Were Unexceptionable.**

    The defendant requested in his "Motion For Jury
Instruction" "Intensive instruction on identification
as outlined in United States v. Telfaire."[10] R.A. 124.
The judge agreed to give (Tr. 3:105) and did give (Tr.
3:125-127 an extensive instruction on identification.
On appeal, the defendant complains that the judge
omitted certain language from Telfaire. Sup. Pro Se
Br. at 20-23. He did not object to the charge as
given.

---

[10] 469 F.2d 552 (D.C. Cir. 1972).

The trial judge was not required to charge in the exact language requested by the defendant. Commonwealth v. Frate, 405 Mass. 52, 54 (1989)

The specific language from Telfaire that the defendant claims was omitted was either given in substance or would have been inappropriate in light of the evidence. See Sup. Pro Se Br. at 21. The jury heard no evidence that the Moniz identified the defendant in any kind of one-on-one confrontation, or that he ever misidentified or failed to identify the defendant. Plainly it was not necessary for the judge's charge to cover such circumstances. See Commonwealth v. Andrade, 422 Mass. 236, 245 (1996)("A judge does not err by failing to instruct on a theory which has no basis in evidence").

## CONCLUSION

For the foregoing reasons, this court should affirm the judgment of conviction.

Respectfully submitted,
For the Commonwealth,

David B. Mark
Assistant District Attorney
Bristol District
888 Purchase Street
New Bedford, MA 02740
(508) 997-0711
BBO # 320510

May 2004

ADDENDUM

Mass. General Laws, Chapter 90, § 13

§ 13.        Precautions for Safety of Vehicle,
             Operator, and Passengers.

No person, when operating a motor vehicle, shall
permit to be on or in the vehicle or on or about
his person anything which may interfere with or
impede the proper operation of the vehicle or any
equipment by which the vehicle is operated or
controlled, except that a person may operate a
motor vehicle while using a citizens band radio or
mobile telephone as long as one hand remains on
the steering wheel at all times. No person having
control or charge of a motor vehicle, except a
person having control or charge of a police, fire
or other emergency vehicle in the course of
responding to an emergency, or a person having
control or charge of a motor vehicle while engaged
in the delivery or acceptance of goods, wares or
merchandise for which the vehicle's engine power
is necessary for the loading or unloading of such
goods, wares or merchandise shall allow such
vehicle to stand in any way and remain unattended
without stopping the engine of said vehicle,
effectively setting the brakes thereof or making
it fast, and locking and removing the key from the
locking device and from the vehicle. Whenever a
bus having a seating capacity of more than seven
passengers, a truck weighing, unloaded, more than
four thousand pounds, or a tractor, trailer, semi-
trailer or combination thereof, shall be parked on
a way, on a grade sufficient to cause such vehicle
to move of its own momentum, and is left
unattended by the operator, one pair of adequate
wheel safety chock blocks shall be securely placed
against the rear wheels of such vehicle so as to
prevent movement thereof. The provisions of the
preceding sentence shall not apply to a vehicle
equipped with positive spring-loaded air parking
brakes. No person shall drive any motor vehicle
equipped with any television viewer, screen or
other means of visually receiving a television
broadcast which is located in the motor vehicle at
any point forward of the back of the driver's seat
or which is visible to the driver while operating
such motor vehicle. Whoever operates a motorcycle
on the ways of the commonwealth shall ride only

A 1

upon the permanent and regular seat attached
thereto, and he shall not carry any other person,
nor allow any other person to ride, on such
motorcycle unless it is designed to carry more
than one person, in which case a passenger may
ride upon the permanent and regular seat if such
seat is designed for two persons, or upon another
seat which is intended for a passenger and is
firmly attached to the motorcycle to the rear of
the operator if proper foot rests are provided for
the passenger's use, or upon a seat which is
intended for a passenger and is firmly attached to
the motorcycle in a side car. No person shall
operate a motor vehicle, commonly known as a pick-
up truck, nor shall the owner permit it to be
operated, for a distance more than five-miles, in
excess of five miles per hour, with persons under
twelve years of age in the body of such truck,
unless such truck is part of an official parade,
or has affixed to it a legal "Owner Repair" or
"Farm" license plate or a pick-up truck engaged in
farming activities. No person, except firefighters
or garbage collectors, or operators of fire trucks
or garbage trucks, or employees of public utility
companies, acting pursuant to and during the
course of their duties, or such other persons
exempted by regulation from the application of
this section or by limited application by special
permit granted by the selectmen in a town or of
the city council in a city, shall hang onto the
outside of, or the rear-end of any vehicle, and no
person on a pedacycle, motorcycle, roller skates,
sled, or any similar device, shall hold fast or
attach the device to any moving vehicle, and no
operator of a motor vehicle shall knowingly permit
any person to hang onto or ride on the outside or
rear-end of the vehicle or streetcar, or allow any
person on a pedacycle, motorcycle, roller skates,
sled, or any similar device, to hold fast or
attach the device to the motor vehicle operated on
any highway. No person or persons, except
firefighters acting pursuant to their official
duties, shall occupy a trailer or semitrailer
while such trailer or semitrailer is being towed,
pushed or drawn or is otherwise in motion upon any
way. No person shall operate a motor vehicle while
wearing headphones, unless said headphones are
used for communication in connection with
controlling the course or movement of said
vehicle.

A 2

Mass. R. Crim. P. 24(b)

Rule 24.    Opening Statements; Arguments;
            Instructions to Jury

(a) Opening and Closing Statements; Arguments.

(1) Order of Presentation. The Commonwealth shall
present its opening statement first. The defendant
may present an opening statement of his defense
after the opening statement of the Commonwealth or
after the close of the Commonwealth's evidence. The
defendant shall present his closing argument first.

(2) Time Limitation. Counsel for each party shall
be allowed fifteen minutes for an opening statement
and thirty minutes for argument; but before the
opening or the argument commences, the judge on
motion or sua sponte, may reasonably reduce or
extend the time.

(b) Instructions to Jury; Objection. At the close
of the evidence or at such earlier time during the
trial as the judge reasonably directs, any party
may file written requests that the judge instruct
the jury on the law as set forth in the requests.
The judge shall inform counsel of his proposed
action upon requests prior to their arguments to
the jury. No party may assign as error the giving
or the failure to give an instruction unless he
objects thereto before the jury retires to consider
its verdict, specifying the matter to which he
objects and the grounds of his objection. Upon
request, reasonable time shall be given to each
party to object to the charge before the jury
retires. Where either party wishes to object to the
charge or to request additional instructions, the
objection or the request shall be made out of the
hearing of the jury, or where appropriate, out of
the presence of the jury.

A 3

## RECORD APPENDIX

### TABLE OF CONTENTS

**Defendant's Pro Se Motion**
     To Dismiss Appointed Counsel ...................... RA 1

**Affidavit in Support Of Defendant's Pro Se Motion**
     To Dismiss Counsel ............................... RA 2

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPART
CRIMINAL COURT
NO. ~~0073~~ 99 CR 0228

APR  6 2001

COMMONWEALTH OF MASSACHUSETTS

S.

ANTHONY CABRAL

Motion to Dismiss Appointed
Council

I, ANTHONY CABRAL, Pro se, the defendant IN
the Above matter, move this HONORABLE COURT
to dimiss my APPOINTED Council.
I RESPECTFULLY REQUEST THAT this motion be ALLOWED AT the COURT'S EARLIEST CONVENIENCE.

Respectfully Submitted
Anthony Cabral
ANTHONY CABRAL Pro se;

RA-1

# Affidavit in Support
## Of defendents Motion to
## Dismiss Council

.Bristol, ss.                                    No. 0073CR0228

I Anthony Cabral do swear to the best of my ability that the facts of this affidavit are true.

1) On 14, Dec 2000, I Recieved a copy of Judge Toomey's denial of my Motion to Surpress, also on the same date I handed Steven Nadeau Council for the defendent a brief predated 8, Nov. 2000 and asked him to proceed with an Interlocutory Appeal.

2) After providing Council with my brief he discouraged me from pursuing an interlocutory appeal. Stating we had stronger issues at futher proceedings.

3) Jan. 2001, I provided Council with scrap material with the posability of pursuing a Motion to dismiss. We also discused incorporating O'Dell and McCarthy to support my Motion to dismiss. (Salman) He said that he would with O'Dell, but I had no Right to argue McCarthy.

RA - 2

4) I Asked Council to Review My material And proceed in the best direction he Thought we should go

5.) I beleave that the material that Council Cited in My Motion to Dismiss was inproperly prepared.

6) I was Relying on the intire testermony of my Motion to Surpress to support my Motion to Dismiss. (Salman)

7) Council severed the testermony of the "Grand Jury" Also the "Motion to Surpress.

8) On 22, March 2001, Council visited me at Bristol County Jail At N Dartmouth, during our conversation I Asked Council why he proceeded in this Manner, His Answer was, "I Filed the best way I thought possible", He Also stated that we had A difference of opinion.

9.) I feel Attorney And Client have come to An impasse. RA - 3

10.) I feel I CAN NO LONGER CONTINUE with MR. NADEAU AS My AtTORNEY.

11.) We HAVE differences OF OPINIONS IN whAT direction My defence Should PROCeed.

12.) I NO LONGER tRuST StEVEN NAdEAU NOR do I tRUST HE WILL PROCEED IN My beST INTEREST.

Signed UNDER the PAINS ANd PeNilties OF PuRjURY

Dated: 27, MARch 2001

Sincerly;

Athony CABRAL

RA-4