UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ANTHONY CABRAL,

Petitioner,

V.

CIVIL ACTION
NO. 05-11069-PBS

DAVID NOLAN,

Respondent.


## MEMORANDUM IN SUPPORT OF §2254 PETITION
OF ANTHONY CABRAL


### INTRODUCTION


Now comes the petitioner, Anthony Cabral, pro se, pursuant
to 28, U.S.C., §2254, and files this memorandum in support of
his petition to vacate and set aside his conviction for violation
of M.G.L. c.265, §19, unarmed robbery, and states as follows:

This is a petition for writ of habeas corpus relief under
Title 28, United States Code, §2254; Rule 1(A)(1 and 2).

Petitioner asserts that he is in custody pursuant to a
judgment of conviction on indictment No. 9973CR288 for violation
of M.G.L. c.265, §19.(EX. F), Infra.

This above judgment constitutes collateral review of such
claim, in violation of the Fourth and Fourteenth Amendment to

-1-

the United States Constitution laws. (unaddress claims).

In this memorandum of law the petitioner will argue the expectation of privacy (standing) in the dwelling home, for the sake of argument, petitioner at this time abandons the issue on the automobile was unlawfully searched, and items recovered from within was unlawfully seized.

BACKGROUND

On the morning of June 21, 1999, officers of the Fall River City Police Department burst into the home of John Kazen, while in the company of the petitioner (Anthony Cabral), and searched throughout the house looking for evidence of a crime. They arrested the petitioner in the kitchen area and walk two rooms of the arrestee, to retrieve a pocketbook. Opening the bag to find identification belonging to Rosemary Hobbs. Charges were filed against the petitioner in the states district court. On July 15, 1999. Petitioner was indicted for violation of M.G.L. c.265, §17. Pretrial[1] a motion to suppress evidence was heard on August 21, 2000, before Justice Daniel F. Toomey in the Bristol Superior Court, continued on September 28-29, 2000,

---

[1]     The petitioner relies on the respondent's appendix accompanying his motion to dismiss petition provided to this court on June 30, 2005, hereinafter as "(EX.___, pp.__)." The petitioner will attach the relevant transcripts documents to this memorandum for convenience. Volumes 2-3 of petitioner's suppression hearing referred to hereinafter as "(S.Tr.____)" Another Tr. volume held in Worcester County where John Kazen testified, hereinafter as "(K.S.Tr.___)."

and concluded on November 8, 2000, in the Worcester Superior
Court. Counsel's filed memorandums (EX.H,pp.1-7) on December
14, 2000. The court denied the suppression motion, Justice Daniel
F. Toomey made the findings of facts on the motion. See Endor-
sement (EX.I). On August 27, 2001, the petitioner filed a
reconsideration motion to suppress evidence with memorandum
of law, from the denial of petitioner's first motion to suppress
evidence. On August 30, 2001, the reconsideration motion was
allowed and again denied (EX.B,p.6, at Docket No.44). On May
20, 2005, petitioner filed petition for writ of habeas corpus
pursuant to 28, U.S.C., §2254, and now filed this memorandum
of law in support of his petition.

## ARGUMENT

The evidence in the case at bar is as follows: The petitioner
argues a reasonable expectation of privacy in the dwelling home
of John Kazen, located at 181 Division Street. The petitioner
will show that he was the target of the entry/search and had
a possessory interest in the items sought by the officers. The
governments intrusion infringes upon the petitioner's expectation
of privacy in hope of securing evidence of a crime.

Officer Malek testified at the suppression hearing that:
when he arrived at the Mutual Gas Station he learned there was
a robbery by an individual named Charles Moniz. Moniz informed

-3-

Malek that this individual was in possession of a pocketbook
(S.Tr.2, at 51), Malek also had information by the clerk that
a pocketbook was stolen (S.Tr.2, at 51-52, 67). Which affords
individuals accused of possessory crimes "automatic standing."
See Jones v. United States, 362 U.S. 257 (1960). While
investigating a robbery, Malek made a warrantless entry/search
of an auto and found a Father's Day card with the name Tony
Cabral (petitioner)(S.Tr.2, at 56)(S.Tr.3, at 11-12). Malek was
informed of the suspect's name by Charles Moniz (S.Tr.2, at 59)
(S.Tr.3, at 12-13). Charles Moniz's mother also named the suspect
(S.Tr.3, at 15-16)(S.Tr.2, at 60).

Clearly officers made a warrantless entry/search of John
Kazen's apartment on the basis of arresting the petitioner and
not Mr. Kazen, the sole purpose of the intrusion infringed upon
the petitioner's expectation of privacy. The search and seizure
were undertaken with the hope of securing evidence upon which
to indict and convict him, in violation of the Fourth Amendment.
See Chapman v. United States, 365 U.S. 616 (1961).

Standing to invoke the exclusionary rule has been found
to exist only when the government attempts to use illegally
obtained evidence to incriminate the victim of the illegal search.
See Brown v. United States, 411 U.S. 223 (1973); Alderman v.
United States, 394 U.S. 165 (1969); Wong Sun v. United States,
371 U.S. 471, 491-492 (1963); Jones v. United States, 362 U.S.
257, 261 (1960).

-4-

In United States v. Attson, 900 F.2d 1427 (1990) under proper factual circumstances, government conduct which is motivated by investigatory or administrative purposes will fall within scope of Fourth Amendment as conduct constituting search or seizure. Moreover, the petitioner's interest is in the place the search occured. Kazen testified, at the hearing, that: he lived at 181 Division Street with his girlfriend for the past five years (K.S.Tr.1,at 5), and at approximately 6:00 Or 6:30 a.m. he was standing in his driveway, at which time petitioner came by. Kazen invited him into his apartment (K.S.Tr.1, at 7-8). The petitioner frequently came to Kazen's house in the mornings to do drugs (K.S.Tr.1,at 21, 24-30). In addition, that the petitioner had stayed overnight in the past and did not need permission to take a shower in the apartment. Officer Malek's own testimony established the petitioner standing, as prior knowledge (S.Tr.2, at 66)(K.S.Tr.1,at 11, 45). Kazen's testimony clearly shows that petitioner had mutual use of the property, joint access or control. See United States v. Matlock, 415 U.S. 164 (1974). Finally petitioner claimed that he was legitimately on the property in the apartment of John Kazen's at the time of the search. In Jones v. United States, supra, at 267, the Supreme Court held: ("Anyone legitimately on premises where a search occurs has standing to challenge the legality of the search"). This issue is undisputed. Kazen's testimony clearly shows that petitioner was in the apartment/bedroom at the time

-5-

the police entered the apartment of John Kazen (K.S.Tr.1 at 11,
21, 24-26, 30-45). Lawfully in the place at the time of the
search.

In Holloway v. Wolff, 482 F.2d 110 (1973), a petitioner
has standing to object to the search of the bedroom in a third
person home because lawfully in the house at the time of the search
even though no showing the petitioner had ever been given permission
to use or had ever been in bedroom. The government's conduct
constituted a search and the activity intruded on petitioner's
reasonable expectation of privacy. Rakas v. Illinois, 439 U.S.
128, 143 (1978); Rawlings v. Kentucky, 448 U.S. 98, 104-105
(1980). Thus, the court should have provided the petitioner
with "automatic standing." See United States v. Salvucci, 448 U.S.
83, 93 (1980). Automatic standing flows from the expectation of
pivacy in the place searched at the time the items were seized.

Like in Jones, supra, the petitioner was a person aggrieved
by an unlawful search and seizure, one against whom the search
was directed, which protected by the Fourth Amendment. Kazen
testified that the petitioner was in the bedroom at the time
officers entered into the apartment and ordered petitioner
to come in the kitcken area where the arrest occured (K.S.Tr. 1,
at 11);(S.Tr. 2, at 64-69);(S.Tr. 3, at 25-26).

The record may show a dispute on consent for entry, but
there is no dispute that the record does not show consent to
search the apartment of John Kazen, which in fact is the

-6-

violation of the Fourth Amendment of the United States
Constitution.

After the arrest of the petitioner in the kitchen area,
the officers went beyond the scope of a Chimel v. California,
395 U.S. 752 (1969)  search. The scope of the search is a limited
search. The police may conduct a warrantless search of the area
within the arrestee's immediate control, this is the area from
within which he might gain possession of a weapon or destructable
evidence. Chimel, supra, at 763.

In the case at bar, the petitioner does not dispute that
if the court found the officers were lawfully in the living
room, before the violation of the Fourth Amendment of the United
States Constitution, seizing fruits of a crime would be
instrumentalities in plain view. See Coolidge v. New Hampshire,
403 U.S. at 465 (1968)("It is well established that under certain
circumstances the police may seize evidence in plain view
without a warrant"). The petitioner's challenge is not the
seizure, but the search. It is the search that violated petitioner's
Fourth Amendment rights of the United States Constitution.

Absent one of the well delineated exceptions to the warrant
requirement, "[A] container which can support a reasonable
expectation of privacy may not be search, even on probable
cause, without a warrant." United States v. Jacobsen, 466 U.S.
109, 120 n.17 (1984), citing Ross 456 U.S. at 809-12; See also
Smith v. Ohio, 494 U.S. 541 (1990).

An expectation of privacy gives rise to Fourth Amendment protection where the petitioner had an actual or subjective expectation of privacy and the claimed expectation is one which society recognizes as reasonable. See Bond v. United States, 529 U.S. 334, 338 (2000); Horton v. California, 496 U.S. 128, 141 n.11 (1990); United States v. Place, 462 U.S. 696, 701 (1983). The petitioner claims that he had a substantial possessory interest in both the house searched and the pocket-book seized. See Bumper v. North Carolina, 391 U.S. 543, 548 n.11 (1968); Smith v. Maryland, 442 U.S. 735, 740 (1979); and Kate v. United States, 389 U.S. 347, 361 (1967).

The United States Supreme Court has ruled that when an officer illegally invades the privacy of an individual to obtain evidence, all evidence must be suppressed based on the prior illegal police conduct. See Wong Sun v. United States, 371 U.S. 471, 491-92 (1963).

Officer Malek clearly was looking for evidence of a crime when he retrieved the pocketbook from the bedroom area, and opened the pocketbook, clearly showing a full-blown search from top-to-bottom looking for incriminating evidence of a crime, in violation of a basic rule. See Lewis v. United States, 385 U.S. 206 (1966)(government agent is not authorized to conduct a general search for incriminating materials).

In Vale v. Louisiana, 399 U.S. 30, 34 (1970)("Belief however well founded, that an article sought is concealed in a dwelling

-8-

house furnishes no justification for a search of that place without a warrant"), Agnello v. United States, 269 U.S. at 33. That basic rule has never been questioned in the Supreme Court. Stoner v. California, 376 U.S. 483, 487 n.5 (1964).

The petitioner was arrested in the kitchen area, two rooms from the bedroom area, in which the pocketbook was first searched, violating the Fourth Amendment (S.Tr.2, at 64-69);(S.Tr.3 at 25-26).

In Horton, supra, at 136-137, the court ruled that, "First, not only must the item be in plain view; its incriminating character must also be immeditely apparent... Secondly, [n]ot only must the officer be lawfully located in a place from which the object can be plainly seen, but he, or she, must also have a lawful right of access to the object itself." In petitioner's case, the officers were walking from room to room searching for evidence of a crime (K.S.Tr.1 at 12-13, 36-37), at which time one officer (Malek) saw in a bedroom a pocketbook on the bed. Malek entered the bedroom and retrieved the pocketbook, at which time, Malek opened the pocketbook and found some identification within belonging to Rosemary Hobbs (S.Tr.2 at 66-70), indicating a fullblown search, from top to bottom, looking for incriminating evidence of a crime. This search violated petitioner's Fourth and Fourteenth Amendment rights of the United States Constitution.

-9-

This clearly proves that the incriminating character of the evidence was not immediately apparent, nor did officer Malek have consent to retrieve that pocketbook, let alone the opening and search of same. All containers and packages receive full protection of the Fourth Amendment during a police search. See United States v. Bonitz, 826 F.2d 954 (1987)("... it is clear beyond doubt that the record does not support a finding that the sear kits located in plastic envelopes, inside a file box, wherein plain view, thus absent some other exception, discovery and seizure of the sear kits without a search warrant was unlawful and those items must be suppressed").

Officer Malek's testimony at the motion to suppress evidence hearing was that: he went into the front room area, after the arrest of petitioner in the kitcken area, at which time he walked into a bedroom, two rooms from the kitchen area, not to sweep the bedroom but to retrieve the pocketbook. Malek had one suspect in mind and that was the petitioner, and they beleived they had the suspect in custody.

Furthermore, even if officer Malek knew the pocketbook was fruits of a crime, Malek could have seized the bag, but first obtained a search warrant before opening the pocketbook. See M.G.L. c.276, §1, ("... property seized as a result of a search in violation of the provisions of this paragraph shall not be admissible in evidence in criminal proceedings").

In Mincey v. Arizona, 437 U.S. at 385, the Court of

-10-

Appeals held that the police conduct violated the Fourth Amendment, requiring the evidence derived from that conduct to be excluded.

No contention has been raised in this case that Malek's reaching for the pocketbook involved a self-protective action for the officer's safety. Furthermore, a protective sweep is a limited sweep of the apartment. See Maryland v. Buie, 494 U.S. 325 (1990).

In Coolidge v. New Hampshire, supra, at 517, the United States Supreme Court held: ("... [i]f the police stray outside the scope of an authorized Chimel search they are already in violation of the 4th Amendement and evidence so seized will be excluded."). officer Malek was not conducting a valid protective sweep when he discovered the objects inside the pocketbook. In Mincey v. Arizona, supra, at 398, the Supreme Court held: ("... the fact that the search uncovered nothing of great personal value to respondent is irrelevant."). After the search of the pocketbook, officer Malek re-entered the living room, at which time he observed officer Alen Beausoleil walk over to the couch, he had picked up a winter jacket, a small black gun, boots, jeans and a little type of spray bottle. At this time officer Malek collected the items as evidenece (S. Tr. 2 at 68-70). The search of the pocketbook was the Fourth Amendment violation. This is when officer Malek first discovered evidence at 181 Division Street. All

-11-

the mentioned items above, collected after the illegal search of the pocketbook are fruits of the poisonous tree. See Wong Sun v. United States, supra, at 488; see also, Mapp v. Ohio, 367 U.S. 643, 654 (1967); and Week v. United States, 232 U.S. 383, 398 (1914). (S.Tr. 2, at 17-18, 40-41).

As well as the search by way of warrant, was based upon the information and evidence obtained from the illegal searched evidence, seized in violation of the Fourth and Fourteenth Amendment of the United States Constitution, and should have been excluded from evidence at the petitioner's jury trial.

## CONCLUSION

Based on the arguments set out herein, the petitioner's request that this court reverse the conviction and order the Superior Court to vacate and set aside petitioner's conviction and exclude the tainted evidence in a new jury trial, and/or order an evidentiary hearing to resolve this matter.

Dated: September 1, 2005 .

Respectfully Submitted,

_____

Anthony Cabral, pro se
P.O. Box 100
So. Walpole, MA. 02071

-12-

VERIFICATION

I, Anthony Cabral, hereby declare under penalty of perjury that the facts stated in the foregoing memorandum are true and correct.

_____
Anthoney Cabral, pro se

CERTIFICATE OF SERVICE

I, Anthony Cabral, hereby certify that two true copies of the above documents are served upon A.A.G. (Randall E. Ravitz's) office, by first class mail on this 1st day of September____, 2005.

_____
Anthony Cabral, pro se

TRANSCRIPTS OF OFFICER ALAN BEAUSOLEIL

AND MICHAEL MALEK

AT THE MOTION TO SUPPRESS EVIDENCE HEARING

(VOLUMES 2 AND 3).

```
BRISTOL, S     COURT
      FILED

    DEC 3 1 2002

   MARY L
```

Volume:     2
Pages:      93
Exhibits:   Per Index

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                          SUPERIOR COURT
9973CR0228


**COMMONWEALTH OF MASSACHUSETTS**

**vs.**

**ANTHONY CABRAL**

BEFORE:   HONORABLE DANIEL F. TOOMEY


**MOTION TO SUPPRESS**


**APPEARANCES:**

    **David L. Crowley, Assistant District Attorney,**
Bristol District, 888 Purchase Street, New Bedford,
Massachusetts 02740, for the Commonwealth.

    **Stephen C. Nadeau, Esq.,** 190 Rock Street, Fall
River, Massachusetts 02722, for the Defendant.


                    New Bedford Superior Courthouse
                    New Bedford, Massachusetts
                    Thursday, September 28, 2000


---

MARILYN SILVIA
Official Court Reporter

2-2

## I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Alan Beausoleil | | | | |
| by Mr. Crowley: | 3 | | 45 | |
| by Mr. Nadeau: | | 23 | | 46 |
| Michael Malek | | | | |
| by Mr. Crowley: | 49 | | | |
| Rosemarie Hobbs | | | | |
| by Mr. Nadeau: | 76 | | | |
| Gloria A. Reardon | | | | |
| by Mr. Nadeau: | 84 | | | |

## E X H I B I T S

| No. | Description | Iden. | Evid. |
|---|---|---|---|
| None marked | | | |

1  regard to that bedroom?

2  A.  Officer Malek looked and identified a pocketbook,

3  black pocketbook on the bed, it was just sitting

4  on the bed.

5  Q.  Did he say something to you about the pocketbook?

6  A.  I believe he asked Mr. Kazen if he had any

7  females living there, something about females, if

8  anybody was living in the apartment with him.

9  Q.  What did Mr. Kazen say about that?

10  A.  He lived there alone.

11  Q.  Did Mr. Kazen at any time claim ownership of that

12  pocketbook?

13  A.  He said it was not his.

14  Q.  What did you see Officer Malek do with regard to

15  the pocketbook?

16  A.  Officer Malek went into that bedroom, looked in

17  the pocketbook,  found a black glove, retrieved

18  that for identification, found that it belonged

19  to the witness in the robbery.

20  Q.  Did he take the pocketbook?

21  A.  I believe he did at that point.

22  Q.  From the belongings within the pocketbook, did he

23  determine who it belonged to?

24  A.  I believe the victim in the robbery.

25  Q.  How was that done?

| | | |
|---|---|---|
| 1 | A. | I don't know what paperwork he pulled out of |
| 2 | | there.  There was something in there that -- |
| 3 | Q. | Now, when you -- after the pocketbook was |
| 4 | | retrieved, what was done in that apartment? |
| 5 | A. | I just began -- just looking about the room, and |
| 6 | | I noticed the hooded winter jacket, blue jeans, |
| 7 | | work boots, and in between a couch and a chair |
| 8 | | there was a gun, what appeared to be a gun, from |
| 9 | | where I was looking on the floor. |
| 10 | Q. | Did you retrieve these items? |
| 11 | A. | I did, sir. |
| 12 | Q. | Were there other items that were retrieved from |
| 13 | | the living room? |
| 14 | A. | There was a mask there, amongst them clothing, |
| 15 | | there was a black mask, and the gun that was |
| 16 | | retrieved happened to be a fake gun. |
| 17 | Q. | Do you recall finding anything related to the |
| 18 | | robbery such as a spray bottle? |
| 19 | A. | I believe Officer Malek found the spray bottle. |
| 20 | Q. | You say several items were retrieved in the |
| 21 | | apartment? |
| 22 | A. | Yes. |
| 23 | Q. | Officer Beausoleil, I'm going to ask you what |
| 24 | | information did you have about the number of |
| 25 | | people involved in this robbery? |

2-40

```
 1    Q.   And you say Officer Botelho came up as well?
 2    A.   Yes, sir.
 3    Q.   At that point, or sometime after that, you and
 4         Officer Malek -- strike that.  Officer Malek
 5         wanted to question Mr. Kazen in another room away
 6         from Mr. Cabral; is that right?
 7    A.   Yes, sir.
 8    Q.   How long after you had entered the apartment did
 9         that take place?
10    A.   Very short period of time.
11    Q.   Couple of minutes?
12    A.   Minutes maybe.
13    Q.   You spoke to -- as you were speaking to
14         Mr. Kazen, is when you say that Malek saw the
15         pocketbook?
16    A.   Yes, sir.
17    Q.   He investigated that?
18    A.   Yes, sir.
19    Q.   You, as you're looking around, saw the clothing?
20    A.   Yes, sir.
21              THE COURT:  What room was this in, sir,
22         if you know?
23              THE WITNESS:  That would have been the
24         living room area.
25    Q.   And that enters into the kitchen/pantry, whatever
```

1   we want to call it?

2 A. It's like an open archway between the two.

3 Q. What opens off the living room?

4 A. That bedroom.  I don't know what else is off that

5   bedroom or off that room.  I don't even know

6   where the bathroom is located.

7 Q. You don't know whether there were other bedrooms

8   or bathrooms off that living room?

9 A. I don't, no.

10 Q. You used the term "protective sweep"?

11 A. Yes, sir.

12 Q. That was done after you had talked to Kazen and

13   Officer Malek investigated the pocketbook and you

14   found these items of clothing?

15 A. Yes, sir, during that time.

16 Q. Protective sweep, you mean you looked around the

17   house to make sure there were no other

18   accomplices or something of that nature?

19 A. Yes, sir.

20 Q. Is it your testimony you didn't look in the

21   bathroom or other bedrooms?

22 A. I didn't, but there were other officers in the

23   other room.

24 Q. Now, you indicated that you found a hooded

25   jacket, winter coat?

2-51

1   A.  Not at that particular time, it was just

2       Mr. Moniz.

3   Q.  What did Charles Moniz tell you?

4   A.  He informed me a male had just robbed the gas

5       station; the man was wearing a mask, had a gun

6       and left in a blue Thunderbird heading west down

7       Bradford Avenue and turned down one of the side

8       streets.

9   Q.  Had Mr. Moniz told you whether he had seen that

10      man?

11  A.  He stated that he saw the man come out of the

12      store into this vehicle and drive off.

13  Q.  Did he tell you whether he had seen either this

14      gun or pocketbook or any of these items?

15  A.  He stated the male had a gun; and like I said,

16      entered the car and drove down Bradford Avenue.

17  Q.  At some point after that, did you learn that

18      pocketbook was one of the items stolen from the

19      Mutual gas station?

20  A.  During the course of the investigation, it was

21      revealed to me that the clerk's pocketbook from

22      the store had been taken.

23  Q.  What type of pocketbook was it?

24  A.  It was described as a dark leather pocketbook.

25  Q.  When did you learn that, before or after any

1       entry into 181 Division Street?

2   A.  It was prior to my entry.

3   Q.  What was the source of that information?

4   A.  It was a dispatch by one of the officers.

5   Q.  Fair to say there were other officers at the

6       Mutual gas station taking information from the

7       victims while you were investigating?

8   A.  Yes, sir.

9   Q.  After you heard from Charles Moniz about what he

10      saw and told you about the gun and mask, the

11      person driving the blue Thunderbird, what did you

12      do?

13  A.  I radioed to the surrounding cars what I had

14      there, initially they were unaware of what the

15      situation was.  I then drove my cruiser westerly

16      along Bradford Avenue checking side streets for

17      this motor vehicle.

18  Q.  Did you get a physical description of this person

19      from Mr. Moniz?

20  A.  I was told it was a white male wearing a stocking

21      mask, wearing a winter hooded jacket, jeans and

22      work boots.

23  Q.  Any physical description with regard to height or

24      size, or anything like that?

25  A.  You know, five, five-ten-ish, somewhere around

1    A.    Looked in the immediate front seat area, in

2          between the front seats, floor, attempted the

3          glove box, visors.

4    Q.    Did you look in the glove box?

5    A.    No.

6    Q.    Glove box was locked?

7    A.    Yes, sir.

8    Q.    To the best of your memory you didn't find a

9          registration?

10   A.    No, I didn't.

11   Q.    Did you find something of significance to you

12         inside the car?

13   A.    Yes, I did.

14   Q.    What did you find?

15   A.    Next to the front seat standing up facing me, it

16         was like a homemade, what happened to be a

17         Father's Day card.  On it said "Happy Father's

18         Day," it depicted a male lifting a barbell and

19         underneath it said "Tony Cabral."

20   Q.    This appeared to be some type of child's drawing?

21   A.    There were like little ribbons or strips of

22         ribbon stapled to it.

23   Q.    At some point Officer Beausoleil was on the

24         scene, correct?

25   A.    Yes, he was the first one to assist me over

1    where the person went?

2              THE COURT:  Well, let's be a little

3    precise and not leading.  Could you tell us

4    exactly what Mr. Moniz said about the gentleman

5    entering the structure.

6              THE WITNESS:  He saw the male cross the

7    street and run into the yard of 181 Division

8    Street; the male ran to the back of the house and

9    entered a rear doorway there.  The male then ran

10   up the stairway to the second floor, second floor

11   east, there's two apartments upstairs.

12   Q.  This is information some of us read in your

13       report, correct?

14   A.  Yes, sir.

15   Q.  Mr. Moniz, in fairness, did he ever indicate to

16       you that he saw this male, where he went, once he

17       got into the yard?

18   A.  He stated he was aware who this male was now, and

19       that this particular male had a friend that lived

20       at his mother's house, he rented an apartment on

21       the second floor east.

22   Q.  He told you at that point he knew who this male

23       was?

24   A.  Yes.

25   Q.  Did he give you a name?

1    A.   He said Tony Cabral.

2              THE COURT:  Did he tell you he saw Tony

3         Cabral enter the second floor east?

4              THE WITNESS:  Yes, sir, that's the male

5         he saw --

6              THE COURT:  No, listen to my question.

7         Did he say:  I saw Tony Cabral run up the stairs

8         and enter the second floor east?

9              THE WITNESS:  His mother informed him

10        that she saw Tony Cabral run upstairs.  The

11        mother was in the yard when Mr. Cabral ran into

12        the yard.  He observed Mr. Cabral run across the

13        street into the yard, at which time he had a

14        conversation with his mother.

15             THE COURT:  Got you.  And then he

16        relayed to you what his mother said?

17             THE WITNESS:  She said he ran upstairs.

18             THE COURT:  Did anybody in this cast of

19        characters see Mr. Cabral enter the second floor

20        east?

21             THE WITNESS:  The mother or Mr. Moniz,

22        no, not from downstairs, she saw him when he went

23        upstairs.

24   Q.   Now, sir, it's fair to say Mr. Moniz was very

25        excited when he was relating this to you?

1  Q.  What did you do at that point?

2  A.  At that time I ran up the back stairway, Officer

3      Botelho and me.

4  Q.  What happened when you went upstairs?

5  A.  I went upstairs to the second floor east

6      apartment, the door was open.  I observed Officer

7      Tosior and Beausoleil had Mr. Cabral leaning

8      forward.  There's like a little breakfast nook

9      type table there, he was leaning over there, they

10     started to pat him down.  I observed another male

11     in the back dining room/kitchen area, he was

12     sitting on a chair.

13 Q.  Do you know either Mr. Cabral or Mr. Kazen?

14 A.  Yes, I know both of them.

15 Q.  You have seen them before?

16 A.  Yes, sir.

17 Q.  What was done with Mr. Cabral at that point?

18 A.  At that point we put -- Officer Tosior, I believe

19     handcuffed him for our safety until we could

20     determine what was going on.

21 Q.  Was there some concern -- what was the concern

22     for your safety at that point?

23 A.  Information received that parties may be in

24     possession of a hand gun; and for our safety, we

25     have to make sure access couldn't be gained in

1      the immediate area for a handgun.

2  Q.  After he was handcuffed, what did you do, where

3      did you go?

4  A.  At that point Mr. Cabral, we sat him down on a

5      chair right next to his breakfast nook.  We

6      informed Mr. Kazen why we were there; we informed

7      both parties of their rights; we were asking if

8      they were willing to speak with us.

9  Q.  You informed both parties of their rights,

10     Miranda rights?

11 A.  They were both in the area.

12 Q.  At some point did you begin to speak to

13     Mr. Kazen?

14 A.  Yes, sir.

15 Q.  Where?

16 A.  First we -- after stating why we were there,

17     Mr. Kazen became a little upset at us, stating he

18     wasn't a thief, he appeared to be getting a

19     little bit agitated.  So we kind of asked if we

20     could talk to him in a different room away from

21     Mr. Cabral, attempted to calm him down, speak to

22     him in a rational manner, and determine exactly

23     what was going on.

24 Q.  Where did you go?

25 A.  We went into a front living room area.

```
 1   Q.  Did you start asking him some questions?

 2   A.  Yes, sir.

 3   Q.  What did you ask him and what was he saying?

 4   A.  We told him we were investigating a robbery that

 5       Mr. Cabral may have been involved in, asking

 6       where Mr. Kazen was -- Mr. Cabral was, questions

 7       along that line.

 8   Q.  What was he saying?

 9   A.  He was talking, answering questions.  He stated

10       he was outside the house earlier; and during

11       questioning both myself and Officer Beausoleil

12       were asking questions, Beausoleil on one side and

13       I was to the rear of Mr. Kazen.

14   Q.  My question, what were some of the answers you

15       were getting to your questions?  What did

16       Mr. Kazen tell you?

17   A.  Mr. Kazen said he was standing out front and

18       Mr. Cabral came by to visit.

19   Q.  That's what he told you, Cabral came by for a

20       visit?

21   A.  Then he went into the apartment.

22   Q.  While you were talking with him in the living

23       room were you looking around?

24   A.  I was observing the apartment, yes, sir.

25   Q.  Did you see something where you were standing in
```

1        the living room?

2    A.  Yes, sir.

3    Q.  What did you see?

4    A.  From my vantage point, I was standing next to the

5        bedroom, I looked right inside, and right on top

6        of the bed there was a black leather pocketbook,

7        lady's pocketbook with a glove on top of it.

8    Q.  How far away were you from that pocketbook?

9    A.  12 feet maybe.

10   Q.  Anything in your way?

11   A.  No, sir.

12   Q.  Did you have to move anything in any way to see

13       that pocketbook?

14   A.  As soon as you entered the bedroom there was a

15       bed.

16   Q.  Did you see this pocketbook from the living room

17       or bedroom?

18   A.  From the living room.

19   Q.  When you saw that pocketbook did it have any

20       meaning to you?

21   A.  Yes, it did.

22   Q.  What information was that?

23   A.  We were informed by the clerk from the Mutual gas

24       station her pocketbook had been stolen in the

25       robbery.

```
 1   Q.   Had you received information prior to coming to

 2        that apartment what type of pocketbook it was, a

 3        description of that pocketbook?

 4   A.   It was described as a dark leather pocketbook.

 5   Q.   From where you were standing ten, 12 feet away

 6        from the pocketbook, could you describe what you

 7        saw.

 8   A.   There was a bed that was made, the pocketbook was

 9        right on top, and the glove was on top of the

10        pocketbook.

11   Q.   What color?

12   A.   Black.

13   Q.   Did it appear to fit the description?

14   A.   Yes, sir.

15   Q.   What did you do?

16   A.   At that point I asked Mr. Kazen if anybody else

17        lived in the apartment with him.

18   Q.   What did he say?

19   A.   He said no.

20   Q.   What did you do then?

21   A.   I asked him if he had a girlfriend.

22   Q.   What did he say?

23   A.   No.

24   Q.   What did he do then?

25   A.   At that point I walked into the bedroom to take a
```

```
 1            closer look at the pocketbook.  I retrieved the
 2            pocketbook, I opened it up, found some
 3            identification belonging to a Rosemarie Hobbs.
 4      Q.    Did that have any significance to you when you
 5            looked at it?
 6      A.    At that particular moment, no.
 7      Q.    Did you determine if Rosemarie Hobbs was one of
 8            the people who's pocketbook --
 9      A.    Through a radio transmission we determined that
10            she was the original complainant.
11      Q.    What did you do armed with that information and
12            now that you had the pocketbook?
13      A.    At that point I was returning into the room, I
14            observed Officer Beausoleil walk over to a couch,
15            he had picked up a winter jacket, he then bent
16            down and he picked up a small black gun, there
17            was also a pair of boots, some jeans, and a
18            little type of spray, almost like a water bottle
19            type thing.
20      Q.    Did you also see whether he had found some type
21            of black mask and shirt?
22      A.    Yes, I did.  There was a mask located also on the
23            floor.
24      Q.    Did you see where he got those items?
25      A.    Some of it was on the couch and some of it was on
```

```
 1            the floor right next to the couch.
 2      Q.    Was there anything in the way of those items or
 3            blocking those items?
 4      A.    No, sir, we could see them from where I was.
 5      Q.    What did you do with all those items?
 6      A.    I collected them as evidence.
 7      Q.    And either you or someone at the station,
 8            evidence officer, has those items?
 9      A.    Yes, it was turned over to her evidence officer.
10      Q.    After you retrieved all those items, what did you
11            do?
12      A.    Mr. Cabral was placed under arrest.  Mr. Kazen
13            was eventually placed under arrest after a
14            warrant check revealed we had outstanding
15            warrants for him.
16      Q.    Did you have any conversation at all with
17            Mr. Cabral?
18      A.    Not at that time, no, sir.
19      Q.    Do you see him in the courtroom?
20      A.    Yes, sir.
21      Q.    Could you point him out and describe an article
22            of clothing he might be wearing.
23      A.    He's got the green shirt with white shirt
24            underneath it, goatee.
25                       MR. CROWLEY:  May the record reflect
```

TRANSCRIPTS OF JOHN KAZEN

AT THE MOTION TO SUPPRESS

EVIDENCE HEARING (VOLUME 1)

(#120)

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                          WORCESTER SUPERIOR COURT
                                            **BRCR1999-00228**

**COMMONWEALTH**

**V.**

**ANTHONY CABRAL**

**MOTION TO SUPPRESS HEARING**

DATE:    **NOVEMBER 8, 2000**
   AT:   **WORCESTER SUPERIOR COURT**
         **WORCESTER, MASSACHUSETTS**
BEFORE:  **HONORABLE DANIEL TOOMEY**

**APPEARANCES**

DAVID CROWLEY, A.D.A.    (FOR THE COMMONWEALTH)

STEPHEN NADEAU, ESQ.     (FOR THE DEFENDANT CABRAL)
190 ROCK STREET
FALL RIVER, MASSACHUSETTS

PATRICIA A. O'BRIEN, COURT REPORTER

## I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Michael Malek | | | | |
| by Mr. Nadeau: | | 3 | | |
| by Mr. Crowley: | | | 28 | |

## E X H I B I T S

| No. | Description | Iden. | Evid. |
|---|---|---|---|

```
 1         driver's door.
 2    Q.   Where was it?
 3    A.   It was standing up on the side of the front seat,
 4         where the back -- I don't know how to describe
 5         it, the back panel to the seat comes down, it was
 6         wedged right against there.  So it was facing
 7         right out at me.
 8    Q.   Do you have that card with you?
 9    A.   I have it in my vehicle outside, yes, sir.
10    Q.   Is it your testimony you could read it from where
11         you were standing outside the car?
12    A.   Yes, sir.
13    Q.   And you could read -- you're saying you could
14         read the words "Tony Cabral" from outside the
15         car?
16    A.   Yes, sir.
17    Q.   Is that the first you had heard about Tony Cabral
18         with regard to this incident?  First connection,
19         you say that Tony Cabral had a possible
20         connection?
21    A.   Possible connection, yes, sir.
22    Q.   At that point had anyone identified to you that
23         that motor vehicle was in fact the vehicle that
24         had left the Mutual gas station?
25    A.   Not when I initially got there.  I was the only
```

```
 1        one there.
 2    Q.  Did you take that card out of the car before or
 3        after Officer Beausoleil got to the blue car?
 4    A.  I don't know.
 5    Q.  Did you take anything else out of the car?
 6    A.  No, sir, not that I recall.
 7    Q.  Now, you say -- your testimony was, I believe
 8        that at some point Officer Botelho arrived as
 9        well?
10    A.  Yes, sir.
11    Q.  That was after Officer Beausoleil?
12    A.  Yes, sir.
13    Q.  Was that before or after Mr. Moniz arrived at
14        that location?
15    A.  Just before he got to that location.
16    Q.  So at some point shortly after Botelho arrives,
17        Mr. Moniz comes running up to you; is that
18        correct?
19    A.  Yes, sir.
20    Q.  And you received some further information from
21        him; is that correct?
22    A.  Yes, sir.
23    Q.  And your testimony is that you receive -- at that
24        point received the name Tony Cabral?
25    A.  From Mr. Moniz, yes.
```

| 1 | Q. | From Mr. Moniz? |
| 2 | A. | Yes. |
| 3 | Q. | He indicated -- your testimony is that he |
| 4 | | indicated to you that he had seen him and he knew |
| 5 | | him; is that correct? |
| 6 | A. | Yes, sir. |
| 7 | Q. | And he knew him by name? |
| 8 | A. | Yes, sir. |
| 9 | Q. | Did he tell you -- let me strike that.  Is it |
| 10 | | your testimony that he told you that at sometime |
| 11 | | after the robber had left the gas station is when |
| 12 | | he saw the individual with the mask off? |
| 13 | A. | He had followed this auto over several streets, |
| 14 | | and when he saw the car parked there, he observed |
| 15 | | the male get out, he was not wearing a mask at |
| 16 | | this time, and at that point he saw the male's |
| 17 | | face. |
| 18 | Q. | Your recollection is then that Mr. Moniz saw the |
| 19 | | face of the individual after the car was parked |
| 20 | | on Almond Street? |
| 21 | A. | He observed the man get out. |
| 22 | Q. | And at that time Mr. Moniz told you that he |
| 23 | | recognized this individual as Tony Cabral? |
| 24 | A. | Yes, sir. |
| 25 | Q. | And you say he further told you that he knew him |

```
 1   A.   -- as I started walking up Division Street, we
 2        observed his mother in the yard.
 3   Q.   You spoke to his mother?
 4   A.   He did, she speaks like broken English, so
 5        it's --
 6   Q.   And at this point --  well -- Moniz was speaking
 7        to his mother?
 8   A.   Yes.
 9   Q.   In your presence?
10   A.   Yes.
11   Q.   Outside of 181 Division Street?
12   A.   Yes, sir.
13   Q.   And she was speaking in broken English?
14   A.   She's not very fluent in English.  He was
15        speaking to her in Portuguese and relaying
16        information to us.
17   Q.   And is it your testimony that you heard
18        Mrs. Moniz also identify Mr. Cabral?
19   A.   Through Mr. Moniz.
20   Q.   So Mr. Moniz was talking to his mother, then he
21        related to you what he had said to her in
22        Portuguese?
23   A.   Yes, sir.
24   Q.   He told you that his mother had seen Tony
25        Cabral?
```

```
 1   A.   Yes.
 2   Q.   Your understanding is his mother knew him by
 3        name?
 4   A.   The information I had was that a male ran into
 5        the yard with a -- carrying a pocketbook and
 6        several items, whether she had actually said
 7        Mr. Cabral or not, I have no knowledge whether
 8        she had said that to him or not.
 9   Q.   Do you know today whether or not Mrs. Moniz
10        recognized the individual?
11   A.   Again, I had no way of of conversing with her.
12   Q.   Were you told that she recognized the individual?
13   A.   As Mr. Cabral?
14   Q.   Yes.
15   A.   I have no knowledge if she knows Mr. Cabral by
16        name.
17             MR. NADEAU:   May I approach the witness
18        please, your Honor?
19             THE COURT:   You may.
20   Q.   You testified at the grand jury?
21   A.   No, I didn't.
22   Q.   I would ask you to look at the grand jury minutes
23        which I have been provided.   It seems to indicate
24        that you were a witness at the grand jury.
25   A.   I never testified in this matter.
```

| | | |
|---|---|---|
| 1 | A. | I heard them knock, "Police," and then several |
| 2 | | seconds later, whatever, we heard him tell |
| 3 | | somebody not to move, let's see your hands, |
| 4 | | something to the effect, and then they |
| 5 | | transmitted they were in the building. |
| 6 | Q. | You didn't hear any conversation from anybody in |
| 7 | | the apartment, yelling or anything of that |
| 8 | | nature? |
| 9 | A. | Not initially, no, sir. |
| 10 | Q. | At that time you learned they were inside the |
| 11 | | apartment, you went upstairs? |
| 12 | A. | Yes, sir. |
| 13 | Q. | And at that point officers already had Mr. Cabral |
| 14 | | under control? |
| 15 | A. | He was leaning against this breakfast nook and |
| 16 | | they were just starting to pat him down. |
| 17 | Q. | They handcuffed him? |
| 18 | A. | After they patted him down. |
| 19 | Q. | And patted him down in the kitchen? |
| 20 | A. | Yes, sir. |
| 21 | Q. | At that point, shortly thereafter, you asked |
| 22 | | Kazen to go into the other room to talk to him? |
| 23 | A. | Yes. |
| 24 | Q. | Is it fair to say that prior to that, that's the |
| 25 | | first time you went into the living room; is that |

1    Q.    SECONDS.

2          AND DID THEY KNOCK LOUDLY?

3    A.    YES.

4    Q.    AND THE POLICE ASK TO COME IN; DON'T THEY?

5    A.    WELL, THEY JUST KNOCKED ON THE DOOR; THEY WERE SCREAMING

6          HIS NAME.

7    Q.    THEY'RE SCREAMING HIS NAME?

8    A.    YES.

9    Q.    AND THEY KNOW YOU; RIGHT?

10   A.    YES.

11   Q.    AND YOU KNOW THEM?

12   A.    YES.

13   Q.    AND DON'T THEY ASK YOU IF THEY CAN COME IN?

14   A.    NO, THEY NEVER ASKED ME.  THEY CAME RIGHT IN.

15   Q.    SO THEN YOU DON'T REMEMBER THEM ASKING YOU THAT; RIGHT?

16   A.    I KNOW THEY DIDN'T ASK ME THAT.  I WAS IN THE OTHER ROOM.

17   Q.    YOU WERE IN THE OTHER ROOM GETTING HIGH?

18   A.    YES.

19   Q.    OKAY.  AND YOU'RE SAYING TODAY WHEN YOU'RE HIGH ON DRUGS,

20         HIGH ON COCAINE, HIGH ON HEROIN, THAT YOU KNOW THEY

21         DIDN'T SAY -- DIDN'T ASK IF THEY COULD COME IN?

22   A.    YES.

23   Q.    IN ANY EVENT, THEY COME INTO THE HOUSE; YOU'RE IN THE

24         KITCHEN; RIGHT?

```
 1    A.   YES, AT THE TIME I WAS IN THE KITCHEN.

 2    Q.   AND YOU'RE TELLING THE COURT THAT THREE OR FOUR OFFICERS

 3         HAVE THEIR GUNS DRAWN, AND THEY PUT THEM TO YOUR HEAD?

 4    A.   YES.

 5    Q.   BUT AT THE TIME THAT THEY KNOCK ON THE DOOR, THEY WERE

 6         ASKING FOR TONY AND NOT FOR YOU; CORRECT?

 7    A.   YES.

 8    Q.   BUT THEY PUT THE GUNS TO YOUR HEAD?

 9    A.   YUP.

10    Q.   BY THE WAY, WAS TONY LOOKING OUT THE WINDOWS, THE FRONT

11         WINDOWS ONTO THE STREET -- OF DIVISION STREET?

12    A.   I CAN'T SEE ON THAT SIDE OF THE HOUSE FROM WHERE I WAS.

13    Q.   WHAT ROOM WERE YOU IN WHEN YOU HEARD THE COPS?

14    A.   THE KITCHEN.

15    Q.   SO WHEN YOU FIRST HEARD THE KNOCKS, YOU KNEW IT WAS THE

16         POLICE; CORRECT?

17    A.   I COULD HEAR PEOPLE YELLING FOR TONY OUTSIDE.  I THOUGHT

18         IT WAS THE POLICE, ALL THE NOISES.  THEN I HEARD THE

19         -- WHICH I THOUGHT WAS THE COPS SAY, IF WE COULD KICK THE

20         DOOR DOWN TO MY AUNT.

21    Q.   YOU BELIEVED IT WAS THE POLICE; RIGHT?

22    A.   YES.

23    Q.   SO WHEN YOU FIRST HEARD THE KNOCKS, YOU WENT AND OPENED

24         THE DOOR RIGHT AWAY; CORRECT?
```

```
1   A.   NO.

2   Q.   NO, YOU DIDN'T DO THAT?

3   A.   NO.  IT WAS TOO FAST; I DIDN'T EVEN HAVE A CHANCE TO OPEN

4        THE DOOR.

5   Q.   AND THEY JUST WALKED IN THE DOOR, AND THAT'S WHEN THEY

6        HAD THEIR GUNS DRAWN; CORRECT?

7   A.   YES.

8   Q.   THEY SAT YOU DOWN, AND THEY HANDCUFFED YOU.  THAT'S WHAT

9        YOUR TESTIMONY IS; RIGHT?

10  A.   YES.

11  Q.   AND TONY CABRAL, HE WAS ALSO HANDCUFFED, AND HE WAS

12       FRISKED; CORRECT?

13  A.   HE WAS IN THE OTHER ROOM; THEY COULDN'T SEE HIM.  LIKE

14       I SAID, YOU CAN'T SEE IN THE OTHER SIDE OF THE HOUSE.

15       THEY CALLED FOR HIS NAME.  AND I TOLD HIM TO COME OUT

16       BECAUSE THE COPS WERE ALL SHAKING.  THEY HAD THEIR GUNS

17       TO MY HEAD, AND I WAS SCARED.

18  Q.   YOU WERE SCARED; RIGHT?

19  A.   YEAH.

20  Q.   DID THEY ASK YOU AFTER THEY PAT-FRISKED HIM AND PUT

21       HANDCUFFS ON HIM, DID THEY KEEP THE HANDCUFFS ON YOU?

22  A.   YES.

23  Q.   AND WHEN THEY MOVED YOU IN THE OTHER ROOM, DID THEY KEEP

24       THE HANDCUFFS ON YOU?
```

```
 1   A.   YES.

 2   Q.   YOU REMEMBER THAT?

 3   A.   YES.

 4   Q.   NOW, YOU ALSO TOLD THE POLICE SOMETHING ABOUT THE

 5        INCIDENT.  YOU SAID YOU HAD NOTHING TO DO WITH IT BECAUSE

 6        -- AND YOU SAID THAT YOU WERE A JUNKIE, AND YOU DON'T

 7        COMMIT ANY ROBBERIES; CORRECT?

 8   A.   WELL, THAT'S WHEN HE WAS THREATENING ME SAYING THAT HE

 9        WAS GOING TO CHARGE ME ACCESSORY-TO-THE-FACT.  I SAID

10        YOU CAN CHECK MY RECORD.  I NEVER DID A ROBBERY.  I NEVER

11        ROBBED NOBODY IN MY LIFE.

12   Q.   I GUESS MY QUESTION IS, SIR, YOU KNEW THAT THE POLICE

13        WERE INVESTIGATING A ROBBERY; RIGHT?

14   A.   YEAH, THEY TOLD ME.

15   Q.   THEY TOLD YOU THAT.  AND THEY TOLD YOU THAT BEFORE THEY

16        EVER FOUND ANY POCKETBOOK; CORRECT?

17   A.   I AIN'T SURE.

18   Q.   YOU DON'T REMEMBER THAT?

19   A.   NO, I AIN'T SURE.

20   Q.   SO, THE POLICE WHEN THEY WERE THREATENING TO ARREST YOU

21        AND CHARGE YOU WITH AN ACCESSORY, WHEN THEY WERE DOING

22        THAT, YOU DON'T KNOW WHETHER YOU KNEW THERE WAS A ROBBERY

23        GOING ON OR NOT?

24   A.   NO.
```

1    Q.   NOW YOU SAID YOUR GIRLFRIEND CAROL -- WHAT'S HER NAME?

2    A.   FASEEL (PHONETIC).

3    Q.   AND ARE YOU STILL WITH HER?

4    A.   YES.

5    Q.   AND WHERE DOES SHE LIVE; WHAT'S HER ADDRESS?

6    A.   SHE LIVE IN WALPOLE.

7    Q.   WALPOLE THE PRISON?

8    A.   NO.

9    Q.   WHERE DOES SHE LIVE?

10   A.   THE TOWN OF WALPOLE.

11   Q.   AND WHAT'S THE ADDRESS, SIR?

12   A.   87 LEWIS AVE.

13   Q.   HOW LONG HAS SHE BEEN THERE?

14   A.   AHH, I DON'T KNOW.

15   Q.   YOU SAY SHE LIVED WITH YOU THAT DAY; RIGHT?

16   A.   SHE LIVED WITH ME FOR FIVE YEARS.

17   Q.   SHE WAS LIVING WITH YOU ON THAT DAY?

18   A.   YES.  AND -- FOR FIVE YEARS TILL THAT DAY.

19   Q.   UNTIL THAT DAY?

20   A.   YEAH, AND AFTER THAT DAY, TOO.  FIVE YEARS BEFORE THAT

21        SHE'S BEEN LIVING WITH ME.

22   Q.   SHE WASN'T HOME THAT MORNING; CORRECT?

23   A.   NO.

24   Q.   WHERE WAS SHE?

```
 1    A.    SHE WAS IN A REHAB.

 2    Q.    AND WHEN DID SHE GET INTO THE REHAB?

 3    A.    I AIN'T SURE IF IT WAS A DAY OR TWO BEFORE THAT.  A

 4          COUPLE OF DAYS BEFORE THAT SHE WENT TO REHAB.

 5    Q.    A COUPLE OF DAYS BEFORE.

 6          AND YOU SAID THAT THE POCKETBOOK THAT'S INVOLVED IN THIS

 7          CASE, THAT WAS ON THE BED; RIGHT?

 8    A.    YES.

 9    Q.    IS THAT YOUR BED?

10    A.    YES.

11    Q.    IS THAT THE BED YOU SLEEP ON?

12    A.    I SLEEP IN THE PARLOR ON THE COUCH A LOT.

13    Q.    WELL, DO YOU SLEEP ON THE BED, AS WELL?

14    A.    YES.

15    Q.    AND THAT POCKETBOOK, IS IT YOUR TESTIMONY THAT THAT

16          POCKETBOOK BELONGED TO YOUR GIRLFRIEND?

17    A.    HE ASKED ME WHOSE POCKETBOOK IT WAS.  I SAID IT MUST BE

18          MY GIRL'S.

19    Q.    AT THE TIME WHEN YOU SAW THE POCKETBOOK AND THE POLICE

20          OFFICER SHOWED IT TO YOU, THEY ASKED YOU IF IT BELONGED

21          TO YOU; RIGHT?

22    A.    NO.  I WAS IN THE ROOM -- THE POCKETBOOK WAS WAY IN THE

23          OTHER ROOM.  HE POINTED TO THE POCKETBOOK ON THE EDGE OF

24          THE BED.  HE SAYS IS THAT YOUR POCKETBOOK.  I SAYS NO,
```

```
 1        IT MUST BE MY GIRL'S.

 2   Q.   SO THE OFFICER WENT AND GOT IT; RIGHT?

 3   A.   THE OFFICER WENT AND GOT THE POCKETBOOK IN THE ROOM;
 4        YEAH.

 5   Q.   AND THE OFFICER WENT AND BROUGHT IT OUT IN THE OTHER
 6        ROOM?

 7   A.   YEAH.

 8   Q.   AND YOU TOLD THE OFFICER THAT THAT POCKETBOOK BELONGED
 9        TO YOUR GIRLFRIEND; RIGHT?

10   A.   NO.  HE NEVER SAID NOTHING TO ME.  HE GRABBED THE
11        POCKETBOOK; HE WENT UP TO THE OTHER COP AND RIPPED IT
12        OPEN.  HE SAID THIS IS THE POCKETBOOK THEY WERE LOOKING
13        FOR OR SOMETHING LIKE THAT.

14   Q.   YOUR GIRLFRIEND HAD BEEN IN REHAB FOR TWO DAYS?

15   A.   I AIN'T SURE.  TWO DAYS, THREE DAYS.

16   Q.   TWO OR THREE DAYS?

17   A.   YES.  I AIN'T SURE HOW LONG SHE WAS IN REHAB.

18   Q.   BUT YOUR TESTIMONY IS WHEN THE OFFICERS ASK YOU ABOUT THE
19        POCKETBOOK, AND YOUR GIRLFRIEND HAS BEEN IN REHAB FOR TWO
20        OR THREE DAYS, YOU TELL THEM THAT IT MUST BE MY
21        GIRLFRIENDS?

22   A.   YES.  BECAUSE I DON'T GO IN THAT ROOM.  I WAS STAYING IN
23        THE PARLOR.

24   Q.   YOU DON'T GO IN THE BEDROOM?
```

1    A.    NOPE.

2    Q.    WHERE IS THE BATHROOM?

3    A.    ON THE OTHER SIDE.  I DON'T HAVE TO GO IN THE BEDROOM.

4    Q.    IS THERE A CONNECTION FROM THE BEDROOM TO THE BATHROOM?

5    A.    NO.  THE PARLOR WHERE I USUALLY LAY AND WATCH TV AND PASS

6          OUT EVERY NIGHT.

7    Q.    NOW YOU SAY, ALSO, THAT THERE WAS SOMETHING YOU DIDN'T

8          WANT THE POLICE TO FIND; RIGHT?

9    A.    YES.

10   Q.    AND THERE WERE NO DRUGS IN THE HOUSE; RIGHT?

11   A.    NO.  IT WAS HYPODERMIC NEEDLES.

12   Q.    SO YOU WERE CONCERNED.  WHY YOU WOULDN'T LET THEM GO INTO

13         THE HOUSE IS BECAUSE OF HYPODERMIC NEEDLES; RIGHT?

14   A.    YUP.

15   Q.    AND IT HAD NOTHING TO DO WITH THE FACT THAT YOU KNEW THAT

16         THE DEFENDANT HAD COMMITTED A CRIME AND HAD SOME THINGS

17         IN YOUR HOUSE?

18   A.    NO, NO.

19   Q.    IT HAD NOTHING TO DO WITH THE FACT THAT WHEN HE CAME UP

20         YOUR BACK STEPS HE HAD AN ARMFUL OF THINGS, INCLUDING A

21         TOY GUN, AND A --

22   A.    I DIDN'T SEE ANY OF THAT, AND HE CAME RIGHT BY ME.

23   Q.    SO HE HAD NOTHING IN HIS HANDS?

24   A.    I DIDN'T SEE NOTHING.

1    Q.   HE HAD NOTHING IN HIS HANDS; RIGHT?

2    A.   I DIDN'T SEE NOTHING; NO.  YEAH, HE HAD NOTHING IN HIS

3         HANDS, I GUESS, IF I DIDN'T SEE IT.

4    Q.   NOW, DID THE POLICE FIND THOSE HYPODERMICS?

5    A.   NO.  WHEN THEY WENT BACK I THINK THEY FOUND THEM BECAUSE

6         THEY WERE IN A DIFFERENT SPOT.

7    Q.   THEY WERE IN A DIFFERENT SPOT.

8         SO, YOU BELIEVE THE POLICE FOUND THEM; RIGHT?

9    A.   YUP.

10   Q.   THEY NEVER CHARGED YOU WITH THAT; DID THEY?

11   A.   NOPE.

12   Q.   AND THEY NEVER CHARGED YOU AS AN ACCESSORY IN THIS CASE;

13        RIGHT?

14   A.   NO.

15   Q.   BY THE WAY, WHEN YOU WERE ARRESTED ON THE WARRANTS, WHERE

16        DID YOU GO?

17   A.   THE FALL RIVER POLICE STATION.

18   Q.   AND AFTER THAT, WHERE DID YOU GO?

19   A.   TAUNTON HOUSE OF CORRECTION.

20   Q.   AND HOW LONG WERE YOU IN THE HOUSE OF CORRECTION?

21   A.   I STOOD THERE ONE NIGHT.

22   Q.   ONE NIGHT, AND THAT WAS IT?

23   A.   YEAH, BECAUSE THEY HAD TO GET IN TOUCH WITH MY LAWYER.

24        THEY DIDN'T THINK I HAD A LAWYER.

1    Q.   DID YOU SEE MR. CABRAL IN THE JAIL?

2    A.   YES.

3    Q.   YOU DID.

4         YOU HAD SOME CONVERSATION WITH MR. CABRAL IN JAIL?

5    A.   NO, I DIDN'T HAVE NO CONVERSATION.

6    Q.   NO?

7    A.   NO.

8    Q.   DID YOU GET ANY COMMUNICATION BETWEEN THE TWO OF YOU

9         WHILE YOU WERE IN JAIL?

10   A.   NOPE.

11   Q.   DID ANYBODY GIVE YOU A MESSAGE FROM MR. CABRAL?

12   A.   NO.

13   Q.   NO COMMUNICATION AT ALL BETWEEN THE TWO OF YOU.

14        BUT YOU SAW HIM IN JAIL?

15   A.   YES.

16   Q.   WHERE DID YOU SEE HIM?

17   A.   THAT MORNING WHEN I WAS LEAVING HE WAS LOCKED UP WITHIN

18        A COUPLE OF CELLS DOWN.

19   Q.   AND YOU DIDN'T TALK AT ALL?

20   A.   I WENT IN THERE; I WAS SICK.

21   Q.   YOU DIDN'T ASK HIM WHAT WAS GOING ON?

22   A.   NO.  I KNEW WHAT WAS GOING ON IN FALL RIVER BEFORE I EVEN

23        WENT TO JAIL.

24                 MR. CROWLEY:  I HAVE NOTHING ELSE, YOUR HONOR.

1-44

```
 1                    THE COURT:  ANY REDIRECT, SIR?

 2                    MR. NADEAU:  JUST A COUPLE MORE, PLEASE, YOUR

 3          HONOR.

 4

 5                         REDIRECT EXAMINATION

 6    Q.    (BY MR. NADEAU)  MR. CABRAL, AT THE TIME THAT YOU WERE

 7          OUTSIDE THE BUILDING, -- EXCUSE ME, MR. KAZEN.  AT THE

 8          TIME THAT YOU WERE OUTSIDE THE BUILDING AND WHEN YOU SAW

 9          MR. CABRAL WALK BY, WAS YOUR AUNT OUTSIDE -- EXCUSE ME,

10          MR. CABRAL DRIVE BY, WAS YOUR AUNT OUTSIDE AT ALL?

11    A.    NO, SHE WAS UPSTAIRS IN THE WINDOW.

12    Q.    DID YOU EVER SEE HER OUTSIDE TALKING TO THE POLICE

13          OUTSIDE THE BUILDING?

14    A.    NO.

15    Q.    NOW, WHEN YOU -- YOU SAID YOUR GIRLFRIEND HAD GONE INTO

16          REHAB A DAY, OR TWO, OR THREE DAYS BEFORE THIS INCIDENT.

17          IS THAT RIGHT?

18    A.    YES, SIR.

19    Q.    DID SHE LEAVE -- WHAT HAPPENED TO HER BELONGINGS WHEN SHE

20          WENT INTO REHAB?

21    A.    SHE LEFT EVERYTHING THERE EXCEPT FOR WHAT SHE TOOK WITH

22          HER.

23    Q.    SO SHE STILL HAD CLOTHING AND OTHER ITEMS OF HER PROPERTY

24          --
```

```
 1   A.   YES.

 2   Q.   -- IN YOUR APARTMENT ON THAT DATE?

 3   A.   YES.

 4   Q.   NOW YOU STATED THAT MR. CABRAL WOULD BE ALLOWED TO TAKE

 5        A SHOWER EVERY MORNING?

 6   A.   (NO VERBAL RESPONSE)

 7   Q.   YOUR TESTIMONY IS HE DIDN'T NEED PERMISSION?

 8   A.   NO.  HE HAS DONE IT BEFORE.

 9   Q.   HAS HE EVER STAYED OVERNIGHT?

10   A.   YES.

11   Q.   THAT'S ALL I HAVE.  THANK YOU.

12             THE COURT:  ANYTHING ELSE, SIR?

13             MR. CROWLEY:  NO, YOUR HONOR.

14             THE COURT:  HANG ON ONE SECOND, SIR.

15        DID YOU HAPPEN TO SEE THE POLICE OFFICERS DISCOVERING

16        THINGS IN THE APARTMENT OTHER THAN THE PURSE, THE

17        POCKETBOOK?

18             THE WITNESS:  YES.

19             THE COURT:  OKAY.  YOU SAW THEM FIND A MASK?

20             THE WITNESS:  YES.

21             THE COURT:  DID YOU SEE THEM FIND A TOY GUN?

22             THE WITNESS:  I DON'T KNOW WHAT IT WAS, YOUR

23        HONOR.  I SEEN THEM TAKING STUFF OUT FROM BEHIND THE

24        CHAIR, AND THEY WRAPPED IT IN A COAT.
```

```
 1   A.   YEAH.

 2   Q.   NOTHING UNUSUAL AT ALL; RIGHT?

 3   A.   (NO VERBAL RESPONSE)

 4   Q.   YOU HAVE TO ANSWER YES OR NO FOR THE RECORD, SIR.

 5   A.   NO.

 6   Q.   NOTHING UNUSUAL?

 7   A.   NO.

 8   Q.   AND THEN YOU INVITED HIM INTO THE HOUSE; CORRECT?

 9   A.   YES.

10   Q.   DID YOU HAVE ANY OTHER CONVERSATION ABOUT THAT AT THAT

11        TIME?

12   A.   NO.  HE JUST PULLED UP.  AND I TOLD HIM TO COME -- WE

13        TALKED FOR A SECOND, AND I TOLD HIM TO COME ON INTO THE

14        HOUSE.

15   Q.   WHAT DID HE SAY TO YOU, AND WHAT DID YOU SAY TO HIM?

16   A.   IT WAS ABOUT DRUGS.

17   Q.   AND WHAT WAS THE CONVERSATION ABOUT DRUGS?

18   A.   HE HAD A BAG HE WAS GOING TO GIVE ME.

19   Q.   HE HAD A BAG OF HEROIN?

20   A.   YES.

21   Q.   AND HAD YOU CALLED HIM PREVIOUSLY TO BRING THAT BAG OF

22        HEROIN TO YOU?

23   A.   NO.

24   Q.   SO HE WAS JUST BRINGING YOU THIS BAG OF HEROIN?
```

```
 1    A.    YES.

 2    Q.    AND HE WAS DOING THAT JUST OUT OF THE BLUE.  YOU HADN'T

 3          ASKED HIM TO DO THAT; RIGHT?

 4    A.    NO.

 5    Q.    SO AT 6:15 IN THE MORNING IN FALL RIVER ON THE DATE IN

 6          QUESTION,  MR.  CABRAL  DRIVES  UP  AND  YOU  HAVE  A

 7          CONVERSATION ABOUT GETTING HEROIN FROM HIM.

 8    A.    (NO VERBAL RESPONSE)

 9    Q.    CORRECT?

10    A.    YES.

11    Q.    ONE BAG OF HEROIN?

12    A.    YES.

13    Q.    AND WHAT WAS YOUR HABIT AT THAT TIME?

14    A.    I DON'T KNOW.  A LOT.  A LOT MORE THAN ONE BAG.

15    Q.    A LOT MORE THAN ONE BAG.

16          HOW MANY BAGS OF HEROIN HAD YOU BEEN DOING A DAY?

17    A.    TWENTY, THIRTY.

18    Q.    TWENTY OR THIRTY.

19          AND HE HAD ONE BAG FOR YOU; RIGHT?

20    A.    YUP.

21    Q.    AND DID YOU HAVE ANY OTHER HEROIN IN YOUR HOUSE THAT DAY

22          AT THAT TIME?

23    A.    NO.

24    Q.    SO HE WAS BRINGING YOU ONE BAG OF HEROIN?
```

```
 1    A.    YUP.  HE WASN'T BRINGING IT TO ME.  HE JUST COME BY AND

 2          SAID HE HAD IT AND WAS GOING TO DO ME A FAVOR AND --

 3    Q.    OKAY.  SO HE'S DOING YOU A FAVOR BRINGING YOU A BAG OF

 4          HEROIN; RIGHT?

 5    A.    GIVING ME ONE, YEAH.  HE CAME BY; HE SAID HE HAD ONE HE

 6          COULD GIVE ME.

 7    Q.    OKAY.  SO HE DIDN'T JUST HAND IT TO YOU IN THE STREET AND

 8          THEN TAKE OFF, BUT RATHER, HE WENT AND PARKED THE CAR

 9          AND BROUGHT IT INSIDE THE HOUSE; RIGHT?

10    A.    YES.

11    Q.    SO YOU WEREN'T WAITING OUTSIDE FOR HIM AT 6:15 IN THE

12          MORNING --

13    A.    NO

14    Q.    -- BECAUSE YOU KNEW HE WAS COMING?

15    A.    NO.

16    Q.    HE PARKS THE CAR, GETS OUT OF THE CAR, AND COMES BACK TO

17          YOUR HOUSE; RIGHT?

18    A.    YES.

19    Q.    AND YOU'RE STILL WAITING IN THAT DRIVEWAY?

20    A.    YES.

21    Q.    ALL RIGHT.  DOES HE GIVE YOU THE BAG OF HEROIN THEN?

22    A.    NO.

23    Q.    OKAY.  YOU WALK INSIDE THE HOUSE; RIGHT?

24    A.    YUP.
```

```
 1   Q.   AND YOU WALK IN THE DRIVEWAY INTO THE BACK ENTRANCE TO
 2        THE HOUSE; CORRECT?
 3   A.   YES.
 4   Q.   AND THAT'S THE MAIN ENTRANCE TO THAT HOUSE; CORRECT?
 5   A.   YUP.  WELL, IT'S THE BACK ENTRANCE, THE MAIN ENTRANCE IS
 6        THE FRONT, BUT IT'S THE ONE WE USE.
 7   Q.   THAT'S THE ONE THAT EVERYBODY USES?
 8   A.   YES.
 9   Q.   YOU WALK UP YOUR STAIRS TO YOUR APARTMENT; CORRECT?
10   A.   YUP.
11   Q.   AND YOU GO INSIDE YOUR APARTMENT?
12   A.   YUP.
13   Q.   WOULD IT BE FAIR TO SAY, MR. KAZEN, AT NO TIME FROM THE
14        POINT THAT YOU FIRST SAW HIM WAS THE DEFENDANT MR. CABRAL
15        ALONE IN THAT HALLWAY UNTIL THE POLICE CAME; RIGHT?
16   A.   NO.
17   Q.   HE WAS WITH YOU AT ALL TIMES FROM THE POINT THAT YOU
18        FIRST SAW HIM AT 6:15 IN THE MORNING; RIGHT?
19   A.   YES.
20   Q.   SO IT'S FAIR TO SAY THAT HE NEVER WENT INTO YOUR AUNT
21        DELORES' APARTMENT?
22   A.   NO.
23   Q.   AND YOUR TESTIMONY WOULD BE THAT HE WASN'T CARRYING
24        ANYTHING IN HIS ARMS; WAS HE?
```

```
 1   A.   NO.

 2   Q.   SO HE DIDN'T HAVE, FOR INSTANCE, A BLACK MASK; CORRECT?

 3   A.   NOT THAT I'D SEEN.

 4   Q.   NOT THAT YOU SEEN.

 5        HE HAD NOTHING IN HIS HANDS; RIGHT?

 6   A.   I THINK HE JUST HAD ONE OF THOSE POUCHES YOU WEAR AROUND

 7        YOUR BELT.

 8   Q.   A FANNY-PACK TYPE THING?

 9   A.   YES.  I DON'T REMEMBER HIM CARRYING NOTHING.

10   Q.   OKAY.  SO HE WASN'T CARRYING A LADY'S POCKETBOOK?

11   A.   NO.

12   Q.   AND HE WASN'T CARRYING ANY BLACK GLOVES?

13   A.   NO, I DIDN'T SEE NO BLACK GLOVES.

14   Q.   AND HE WASN'T CARRYING A HOODED WINTER COAT?

15   A.   NO.

16   Q.   AND HE WASN'T CARRYING A BLACK MASK; WAS HE?

17   A.   NO.

18   Q.   YOU CERTAINLY DIDN'T SEE A GUN OR A TOY GUN; DID YOU?

19   A.   NO.

20   Q.   AND YOU DIDN'T SEE A SPRAY BOTTLE, OR SOME TYPE OF

21        BOTTLE, THAT YOU WOULD HAVE A LIQUID IN AND YOU WOULD

22        SPRAY.  YOU DIDN'T SEE THAT; DID YOU?

23   A.   NO.

24   Q.   AND HE WASN'T CARRYING THAT; WAS HE?
```

```
 1   A.   I DIDN'T SEE HIM CARRYING NOTHING.

 2   Q.   OKAY.  AND HE NEVER LEFT YOUR HOUSE UNTIL THE POLICE GOT

 3        THERE; CORRECT?

 4   A.   YEAH.

 5   Q.   ALL RIGHT.  AND IT WOULD BE FAIR TO SAY THAT NONE OF

 6        THOSE ITEMS THAT I JUST MENTIONED: A BLACK MASK, A BLACK

 7        SET OF GLOVES, A WOMAN'S POCKETBOOK, A SPRAY BOTTLE, A

 8        TOY GUN, NONE OF THOSE THINGS WERE IN YOUR APARTMENT

 9        BEFORE THE DEFENDANT MR. CABRAL GOT THERE; RIGHT?

10   A.   NO.

11   Q.   AND YOU HAD NEVER SEEN ANY OF THOSE ITEMS BEFORE; RIGHT?

12   A.   (NO VERBAL RESPONSE)

13   Q.   YES OR NO, SIR?

14   A.   NO.

15   Q.   SO YOU ARE IN THE APARTMENT FOR HOW LONG BEFORE THE

16        POLICE COME?

17   A.   MAYBE -- I DON'T KNOW.  A MINUTE.

18   Q.   SO IT'S ABOUT ONLY A MINUTE OR SO?

19   A.   WELL, MAYBE TWO MINUTES.

20   Q.   MAYBE TWO MINUTES.

21        WELL, THE DEFENDANT MR. CABRAL DIDN'T TAKE A SHOWER; DID

22        HE?

23   A.   (NO VERBAL RESPONSE)

24   Q.   HE DIDN'T TAKE A SHOWER IN YOUR APARTMENT; DID HE?
```

1   A.   I DON'T KNOW I WAS IN THE OTHER ROOM.

2   Q.   WHAT ROOM WERE YOU IN?

3   A.   I WAS GETTING HIGH IN THE OTHER ROOM.

4   Q.   WHICH ROOM?

5   A.   I WAS GETTING HIGH IN THE KITCHEN.

6   Q.   OKAY.  AND WHERE DID THE DEFENDANT CABRAL GO?

7   A.   HE WAS WHERE THE BATHROOM IS.

8   Q.   WHERE THE BATHROOM IS?

9   A.   IN THE PARLOR, THE BATHROOM IN THE PARLOR.

10  Q.   DID YOU HAVE ANY CONVERSATION WITH MR. CABRAL ABOUT HIM

11       TAKING A SHOWER?

12  A.   NO.

13  Q.   DID HE ASK FOR PERMISSION TO TAKE A SHOWER?

14  A.   NO.  HE DOESN'T HAVE TO ASK FOR PERMISSION TO TAKE A

15       SHOWER THOUGH.

16  Q.   SO YOU WOULD ALLOW HIM TO TAKE A SHOWER WHENEVER HE

17       WANTED TO?

18  A.   YES.  HE'S COME OVER MY HOUSE.  HE'S A GOOD FRIEND OF

19       MINE.

20  Q.   YOU WOULD ALLOW HIM TO TAKE A SHOWER IF HE WANTED TO?

21  A.   YES.

22  Q.   WHEN YOU SAW HIM NEXT AFTER YOU WERE GETTING HIGH, WOULD

23       IT BE FAIR TO SAY HE DIDN'T LOOK LIKE HE TOOK A SHOWER?

24  A.   I DON'T KNOW BECAUSE THE NEXT TIME I SEE HIM AFTER I WAS

```
 1        GETTING HIGH I HAD GUNS TO MY HEAD.  YOU KNOW WHAT I

 2        MEAN.

 3   Q.   WELL, BEFORE YOU SAY YOU HAD GUNS TO YOUR HEAD, THERE

 4        WERE A LOT OF THINGS THAT HAPPENED IN BETWEEN THAT;

 5        RIGHT?

 6   A.   (NO VERBAL RESPONSE)

 7   Q.   LIKE THE POLICE WERE KNOCKING ON YOUR DOOR?

 8   A.   THAT WAS THE ONLY THING THAT HAPPENED.  I WAS IN THE

 9        OTHER ROOM GETTING HIGH, AND I HEARD THE BANGING ON THE

10        DOOR, AND THAT'S WHEN THE COPS COME IN.  THEY CALLED FOR

11        HIM.  I TOLD HIM, TONY, COME ON OUT.

12   Q.   YOU WOULD AGREE WITH ME, SIR, THAT IT WAS ONLY ABOUT A

13        MINUTE OR TWO FROM THE TIME THAT HE CAME INTO YOUR

14        APARTMENT --

15   A.   WELL, TWO MINUTES OR TWO AND A HALF MINUTES.

16   Q.   TWO AND A HALF MINUTES.

17        NOT ENOUGH TIME FOR HIM TO TAKE A SHOWER; RIGHT?

18   A.   I DON'T KNOW.  MAYBE HE COULD HAVE TOOK A SHOWER THAT

19        QUICK.  I DON'T KNOW.  I DON'T TAKE A SHOWER IN TWO AND

20        A HALF MINUTES.

21   Q.   OKAY.  WHEN YOU SAW HIM, WAS HIS HAIR WET?

22   A.   YES.

23   Q.   WHEN WAS THAT?

24   A.   WHEN I FIRST SEEN HIM?
```

```
 1   Q.   WHEN YOU FIRST SAW HIM WAS HIS HAIR WET?

 2   A.   NO, AFTER HE CAME OUT OF THE OTHER ROOM HIS HAIR WAS WET.

 3   Q.   OKAY.  DID HE LOOK LIKE HE WAS SWEATING?

 4   A.   YEAH.  SO WAS I.

 5   Q.   YOU WERE SWEATING?

 6   A.   I WAS -- YEAH, I WAS SWEATING.

 7   Q.   BECAUSE HE WAS SHOOTING UP HEROIN?

 8   A.   COKE AND HEROIN; YES.

 9   Q.   COKE AND HEROIN.

10        SO, YOU HAD -- WHO HAD THE COKE?

11   A.   I DID.

12   Q.   YOU HAD THAT IN THE HOUSE?

13   A.   YES.

14   Q.   AND YOU WERE USING COCAINE, AND YOU WERE USING HEROIN

15        JUST BEFORE THE POLICE GOT THERE; CORRECT?

16   A.   YES.

17   Q.   AND WHEN THE POLICE GOT THERE AND KNOCKED ON YOUR DOOR

18        AND GOT INTO THE HOUSE WHATEVER WAY THEY GOT INTO THE

19        HOUSE, YOU WERE UNDER THE INFLUENCE OF DRUGS; RIGHT?

20   A.   YES.

21   Q.   YOU WERE HIGH?

22   A.   YES.

23   Q.   AND YOU SHOT UP THE ONE BAG; CORRECT?

24   A.   YUP.
```

```
 1   Q.   SO THERE WAS NO MORE HEROIN IN THE HOUSE; CORRECT?

 2   A.   NOPE.

 3   Q.   AND DID HE HAVE ANY MORE DRUGS, COCAINE, IN THE HOUSE?

 4   A.   NOPE.

 5   Q.   SO THERE'S NO MORE COCAINE IN THE HOUSE; RIGHT?

 6   A.   RIGHT.

 7   Q.   SO THERE ARE NO DRUGS AT ALL IN THE HOUSE BY THE -- WHEN

 8        THE POLICE GOT THERE; CORRECT?

 9   A.   YES.

10   Q.   BY THE WAY, YOU DON'T KNOW IF ANYBODY WAS IN THAT HALLWAY

11        LISTENING  IN  TO  THIS  WHOLE  INCIDENT  INSIDE  YOUR

12        APARTMENT; DO YOU?

13   A.   YEAH, MY AUNT WAS OUT THERE.

14   Q.   WAS OUT THERE WHEN THE POLICE CAME IN?

15   A.   YES.

16   Q.   AND  YOU  DON'T  KNOW  WHETHER  YOUR  COUSIN,  MR.  MONEZ

17        (PHONETIC), WHETHER HE WAS IN THERE?

18   A.   (NO VERBAL RESPONSE)

19   Q.   YOU HAVE NO IDEA?

20   A.   I DON'T KNOW.

21   Q.   OKAY.  THE POLICE KNOCK ON THE DOOR; CORRECT?

22   A.   YES.

23   Q.   FOR HOW LONG?

24   A.   IT WAS SECONDS.
```

```
 1        right?
 2    A.  Yes, sir.
 3    Q.  First time any officers went into the living
 4        room?
 5    A.  Yes, sir.
 6    Q.  It's fair to say prior to that time no officers
 7        had done a protective sweep of the apartment?
 8    A.  Not at that time.
 9    Q.  You talked to Kazen for several minutes?
10    A.  Yes, sir.
11    Q.  And you happened to see a pocketbook?
12    A.  Yes, sir.
13    Q.  Is it fair to say that you knew Kazen?
14    A.  Yes, sir.
15    Q.  And you knew he had a girlfriend, didn't you?
16    A.  No, sir.
17    Q.  So you had no knowledge, apart from what
18        Mr. Kazen may have said, as to whether he had a
19        girlfriend that lived with him or stayed with
20        him, or anything of that nature?
21    A.  I asked him if he had one, he said no.
22    Q.  Apart from that, you had no information, no prior
23        knowledge?
24    A.  No, sir.
25    Q.  Fair to say, Officer, that you couldn't see into
```

```
 1          that bed from the kitchen?
 2    A.    No, sir.
 3    Q.    Is it fair to say you couldn't see the location
 4          where Officer Beausoleil found the coat and the
 5          fake gun and other items from the kitchen?
 6    A.    No, sir.
 7    Q.    Your testimony was at that point the name
 8          Rosemarie, or Rosemarie Hobbs meant nothing to
 9          you?
10    A.    As I entered the apartment, no.
11    Q.    And as you looked at the pocketbook?
12    A.    Not at that particular time, no.
13    Q.    Where did the information come from regarding the
14          pocketbook?
15    A.    As far as what the --
16    Q.    What you knew at the time.
17    A.    I received information that a pocketbook was also
18          taken in the robbery from one of the officers who
19          went to the Mutual Gas Station and spoke to
20          Ms. Hobbs and relayed the information.  I don't
21          remember exactly who.
22    Q.    Do you remember Mr. Moniz also told you something
23          about a pocketbook?
24    A.    I don't recall.  I believe he did, yes.
25    Q.    You believe he did?
```

TRANSCRIPTS OF JOHN KAZEN

AT THE MOTION TO SUPPRESS

EVIDENCE HEARING (VOLUME 1)

## INDEX

### JOHN KAZEN, SWORN

DIRECT EXAMINATION      (BY MR. NADEAU)      PAGE  4
CROSS EXAMINATION       (BY MR. CROWLEY)     PAGE 20
REDIRECT EXAMINATION    (BY MR. NADEAU)      PAGE 44

COURT EXAMINES WITNESS                       PAGE 45

**WITNESS EXCUSED**                          PAGE 47

------------------------------------------------------------

## EXHIBIT(S)

**1** - AFFIDAVIT DATED 11/8/00                    PAGE 48

1    A.    YES, SIR; SIX APARTMENTS.

2    Q.    AND IS IT MY UNDERSTANDING THAT THOSE APARTMENTS ARE ALL

3          SEPARATE RESIDENCES?

4    A.    YES, SIR.

5    Q.    AND WHICH APARTMENT BY NUMBER OR LOCATION DID YOU LIVE

6          IN?

7    A.    THE SECOND FLOOR ON THE EAST SIDE.

8    Q.    WHO LIVED WITH YOU THERE AT THAT TIME, IF ANY ONE?

9    A.    JUST MY GIRLFRIEND.

10   Q.    WHAT'S HER NAME?

11   A.    CAROL FASEEL (PHONETIC).

12   Q.    AND HOW LONG HAD SHE RESIDED WITH YOU?

13   A.    THEN I THINK IT WAS FIVE YEARS.

14   Q.    AND DID SHE HAVE CLOTHING, AND BELONGINGS, AND THINGS

15         LIKE THAT IN THE APARTMENT?

16   A.    YES.

17   Q.    WHO ELSE LIVED ON THE SECOND FLOOR OVER -- STRIKE THAT.

18         I TAKE IT THERE ARE OTHER OCCUPANTS ON THE SECOND FLOOR?

19   A.    NEXT DOOR.

20   Q.    WHO LIVED IN THAT APARTMENT?

21   A.    MY AUNT.  AND AT THE TIME I THINK THERE WAS ONE SON.

22   Q.    AND YOUR AUNT'S NAME?

23   A.    DELORES MONEZ (PHONETIC).

24   Q.    AND THE SON'S NAME?

1       JUNE 21ST, CAN YOU TELL ME AT APPROXIMATELY 6 OR

2       6:30 A.M. WHERE YOU WERE?

3   A.  STANDING IN MY DRIVEWAY.

4   Q.  AND WHAT'S -- THAT'S AT THE CORNER OF DIVISION AND ALMAN

5       (PHONETIC) STREET?

6   A.  YES, 181 DIVISION.

7   Q.  YOU WERE ON DIVISION STREET?

8   A.  YES.

9   Q.  AND WHAT HAPPENED AT THAT TIME?

10  A.  I WAS STANDING OUTSIDE.  TONY CAME BY, AND I INVITED HIM

11      IN MY HOUSE.

12  Q.  WHEN YOU SAY "TONY" COULD YOU TELL US HIS FULL NAME?

13  A.  TONY CABRAL.

14  Q.  IS HE IN THE COURTROOM TODAY?

15  A.  YES, RIGHT THERE (INDICATING).

16  Q.  THE GENTLEMAN SITTING HERE IN THE GREEN OUTFIT?

17  A.  YES, SIR.

18  Q.  WHEN YOU SAY HE CAME BY, WAS HE WALKING, DRIVING OR WHAT

19      WAS GOING ON?

20  A.  DRIVING.

21  Q.  AND I TAKE IT HE STOPPED AND HAD SOME CONVER -- A SHORT

22      CONVERSATION WITH YOU?

23  A.  YES, SIR.

24  Q.  DID YOU INVITE HIM INTO YOUR APARTMENT?

Shadur

```
 1   A.   YES, SIR.

 2   Q.   DID YOU SEE HIM PARK HIS CAR?

 3   A.   NO, THAT WAS AROUND THE CORNER.

 4   Q.   OKAY.  SO HE DROVE BY YOU AND WENT AROUND THE CORNER?

 5   A.   YES.  HE STOPPED TO TALK TO ME, AND THEN HE JUST PARKED

 6        HIS CAR.

 7   Q.   WHAT DID YOU DO WHEN HE DROVE AROUND THE CORNER?

 8   A.   I WAS WAITING FOR HIM TO COME IN THE HOUSE WITH ME.

 9   Q.   AND WHAT DID YOU -- DID YOU STAY THERE OUTSIDE WAITING

10        FOR HIM, --

11   A.   YES.

12   Q.   -- OR DID YOU GO BACK IN?

13   A.   NO, I STAYED OUTSIDE.  HE CAME IN WITH ME.

14   Q.   AND I TAKE IT THAT HE HAD YOUR PERMISSION TO GO INTO YOUR

15        APARTMENT WITH YOU?     Shadur

16   A.   YUP.

17   Q.   HAD HE BEEN THERE BEFORE?

18   A.   YES.

19   Q.   WAS YOUR DOOR -- THE DOOR TO YOUR APARTMENT, I TAKE IT

20        THAT ENTERED INTO A HALLWAY?

21   A.   YES.

22   Q.   IS THAT THE SAME HALLWAY THAT YOUR AUNT AND COUSIN'S

23        DOORWAY OPENS INTO?

24   A.   YES.
```

```
 1   A.   YES, AS SOON AS THEY CAME IN THROUGH THE DOOR.  I WAS IN

 2        THE  HALLWAY  BETWEEN  THE  BEDROOMS,  THE  PARLOR  AND  THE

 3        KITCHEN.   THERE IS LIKE A LITTLE HALLWAY THERE.  AND I

 4        WAS WALKING TO GO TOWARD THE DOOR TO OPEN THE DOOR, AND

 5        THEY CAME IN WITH THEIR GUNS.  THEY PUT THEIR GUNS TO MY

 6        HEAD AND THREW ME IN THE CHAIR.

 7   Q.   DID YOU KNOW -- SO SOME OFFICER PUT A GUN TO YOUR HEAD.

 8        DO YOU KNOW WHICH OFFICER THAT WAS?

 9   A.   NO.   THERE WERE THREE OR FOUR WHEN THEY WERE PUTTING THE

10        GUNS TO MY HEAD.

11   Q.   AND YOU WERE IN THE KITCHEN?

12   A.   YES.

13   Q.   WHERE WAS MR. CABRAL AT THIS TIME?

14   A.   HE WAS IN THE BEDROOM.

15   Q.   WHAT DID THE OFFICER SAY TO YOU WHEN THEY DID THAT?

16   A.   THEY SAID NOTHING TO ME.  THEY STARTED YELLING TO TONY.

17   Q.   WHAT WERE THEY YELLING?

18   A.   TONY COME OUT HERE.  WE ARE GOING TO BLOW YOUR HEAD AWAY.

19        STUFF LIKE THAT.

20   Q.   DID YOU DO ANYTHING?

21   A.   NO.   THEY THREW ME IN A CHAIR.  AND I WAS JUST ASKING

22        THEM WHAT'S GOING ON, WHAT'S GOING ON?

23   Q.   DID MR. CABRAL -- DID THEY FIND MR. CABRAL AT SOME POINT?

24   A.   HE CAME OUT.
```

EXPECTATION OF PRIVACY

1        ARE YOU DOING?

2    Q.   WAS THERE A RESPONSE?

3    A.   NO.   I FORGOT WHAT HE SAID.   HE SAID SOMETHING, BUT I

4         FORGOT WHAT HE SAID.

5    Q.   DID THE OFFICER STOP FROM GOING INTO THE OTHER ROOM?

6    A.   NO, HE KEPT GOING.   I KEPT ASKING HIM WHAT ARE YOU DOING,

7         WHAT ARE YOU DOING BECAUSE I HAD SOMETHING IN THE OTHER

8         ROOM I DIDN'T WANT HIM TO SEE.

9    Q.   DID YOU GIVE HIM PERMISSION TO GO IN THE OTHER ROOM?

10   A.   NO.   YOU SEE AT THE TIME I WAS AN ADDICT, AND I HAD

11        SOMETHING IN THE OTHER ROOM I DIDN'T WANT HIM TO SEE.

12   Q.   DID YOU -- WERE YOU EVER ASKED AT ANY TIME WHETHER THEY

13        COULD GO IN THE OTHER ROOM?

14   A.   NO, THEY NEVER ASKED ME.

15   Q.   AT SOME POINT WERE YOU TOLD THEY WERE INVESTIGATING A

16        ROBBERY?

17   A.   NOT UNTIL HE THREATENED ME THAT I WOULD BE AN ACCESSORY

18        TO ARMED ROBBERY IF I DIDN'T -- AHH -- LET HIM GO IN THE

19        OTHER ROOM AND STUFF.

20   Q.   OKAY.   AND WHEN DID THAT TAKE PLACE?

21   A.   (NO VERBAL RESPONSE)

22   Q.   WHEN DID THAT -- WHEN WAS THAT STATEMENT MADE I SHOULD

23        ASK?

24   A.   HE CALLED ME INTO THE OTHER -- WHEN HE WAS IN THE OTHER

```
1    Q.   IN FACT, YOU WEREN'T WORKING THAT DAY AT ALL; WERE YOU?

2    A.   NO.

3    Q.   SO, AT 6:15 TO 6:30 IN THE MORNING YOU'RE STANDING IN

4         YOUR DRIVEWAY HAVING A CUP OF COFFEE MILK?

5    A.   YES.

6    Q.   OKAY.  MR. CABRAL WASN'T SCHEDULED TO COME TO YOUR HOUSE;

7         HE DIDN'T HAVE ANY PLANS FOR HIM TO BE THERE?

8    A.   NO.

9    Q.   RIGHT?

10   A.   RIGHT.

11   Q.   HE JUST SHOWED UP; RIGHT?

12   A.   YES.

13   Q.   6:15 TO 6:30 IN THE MORNING; CORRECT?

14   A.   YUP.

15   Q.   AND YOU TESTIFIED THAT HE DROVE BY; CORRECT?

16   A.   YUP.

17   Q.   WERE YOU SURPRISED TO SEE HIM?

18   A.   NO.

19   Q.   YOU WEREN'T?

20   A.   NO.

21   Q.   DID MR. CABRAL FREQUENTLY COME TO YOUR HOUSE AT 6:15 IN

22        THE MORNING?

23   A.   SOMETIMES; YEAH.

24   Q.   AND WHEN MR. CABRAL CAME TO YOUR HOUSE ON THOSE OTHER
```